ACCEPTED
04-14-00905-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
5/15/2015 11:46:24 AM
KEITH HOTTLE
CLERK

**No. 04-14-00905-CV**

**In the Fourth District Court of Appeals
San Antonio, Texas**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

05/15/2015 11:46:24 AM

KEITH E. HOTTLE
Clerk

**Escondido Resources II, LLC,**
*Appellant,*

**v.**

**Justapor Ranch Company, L.C.,**
*Appellee.*

On Appeal from the 49th Judicial District Court
Webb County, Texas,
Cause No. 2013-CV7-001396-D1

**BRIEF OF APPELLANT**

James P. Keenan
State Bar No. 11167850
keenan@buckkeenan.com
J. Robin Lindley
State Bar No. 12366100
lindley@buckkeenan.com
BUCK KEENAN, LLP
700 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 225-4500
Facsimile: (713) 225-3719

Robert Dubose
State Bar No. 00787396
rdubose@adjtlaw.com
ALEXANDER DUBOSE
JEFFERSON & TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008
Telephone: (713) 523-2358
Facsimile: (713) 523-4553

*Additional counsel listed on next page*

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
ALEXANDER DUBOSE
JEFFERSON &TOWNSEND LLP
515 Congress Avenue
Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

**ATTORNEYS FOR APPELLANT**

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Appellant:** | Escondido Resources II, LLC |
| **Appellate Counsel:** | Wallace B. Jefferson<br>Rachel A. Ekery<br>ALEXANDER DUBOSE JEFFERSON<br> &TOWNSEND LLP<br>515 Congress Avenue, Suite 2350<br>Austin, Texas 78701<br><br>Robert Dubose<br>ALEXANDER DUBOSE JEFFERSON<br> & TOWNSEND LLP<br>1844 Harvard Street<br>Houston, Texas 77008<br><br>Kirsten Castañeda<br>ALEXANDER DUBOSE JEFFERSON<br> &TOWNSEND LLP<br>4925 Greenville Avenue, Suite 510<br>Dallas, Texas 75206<br>Telephone: (214) 369-2358<br>Facsimile: (214) 369-2359 |
| **Trial and Appellate Counsel:** | James P. Keenan<br>J. Robin Lindley<br>BUCK KEENAN, LLP<br>700 Louisiana, Suite 5100<br>Houston, Texas 77002 |
| **Appellee:** | Justapor Ranch Company, L.C. |
| **Appellate Counsel:** | Timothy Patton,<br>TIMOTHY PATTON, P.C.<br>14546 Brook Hollow #279<br>San Antonio, Texas 78232 |
| **Trial and Appellate Counsel:** | Patton G. Lochridge<br>MCGINNIS LOCHRIDGE & KILGORE LLP |

600 Congress Avenue, Suite 2100
Austin, Texas 78701

Jose M. Rubio, Jr.
JOE RUBIO LAW FIRM
1000 Washington Street, Suite 4
Laredo, Texas 78040

## TABLE OF CONTENTS

Identity of Parties and Counsel ............................................................................2

Index of Authorities ..............................................................................................7

Statement of the Case............................................................................................13

Issues Presented ....................................................................................................14

Statement of the Facts ...........................................................................................15

Summary of Argument ..........................................................................................30

Argument................................................................................................................32

I.   The trial court erred by granting summary judgment that the lease terminated because Escondido did not correctly reconcile royalty underpayment. ...............................................................................................33

    A.   Texas law disfavors lease termination and prohibits termination absent clear, unequivocal, and unambiguous lease language. ...........33

    B.   Paragraph XIV does not provide that the lease terminates for a failure to reconcile underpaid royalties.............................................37

        1.   The lease treats underpayment and nonpayment differently, with different words in different provisions. ........38

        2.   Paragraph XIV terminates for nonpayment of royalties, not underpayment.................................................................44

        3.   Paragraph XIV does not address remedies for failure to reconcile underpayment. ..........................................................46

        4.   In any event, Paragraph XIV cannot support termination so long as Escondido's interpretation is reasonable. ...............49

    C.   Independently, termination is improper because Justapor did not establish Escondido was required to reconcile any underpayment. ...............................................................................49

1. Justapor did not establish any underpayment for production months February 2012 – January 2013 based on unambiguous lease terms. ...................................50

    a. The special pricing provision replaced all pricing measures, or alternatively was ambiguous. ...................51

    b. The royalty price measure on which Justapor relies is ambiguous or meaningless. ........................................54

2. Fact issues exist regarding production months November 2011 – January 2012. ...........................................55

D. Independently, lease termination is improper because it is inequitable on these facts. ..................................................57

    1. It would be inequitable to enforce a termination in light of Justapor's conduct. ...........................................58

    2. Forfeiture is inequitable because it would be disproportionate with the alleged breach. ...............................61

    3. Forfeiture would be inequitable because Jones did not raise it for 18 months after the alleged termination. ................62

E. Remedy: the summary judgment should be reversed in its entirety and partial summary judgment rendered that there was no termination..................................................................62

II. Regardless of whether the lease terminated, Justapor did not conclusively establish Escondido was a bad-faith trespasser.......................63

A. Escondido was not a bad-faith trespasser per se because it lawfully entered into possession of the land. .....................................64

B. Justapor also did not conclusively establish that Escondido lacked a good-faith belief in the superiority of its title. ......................67

C. Because Escondido was not a bad-faith trespasser, the judgment should be reversed and the case remanded for further proceedings................................................................69

III. The trial court erred by granting summary judgment declaring the parties' rights and requiring conveyance of Escondido's leasehold interests regarding the "vacancy tract." ........................................................71

    A. Justapor did not conclusively establish its declaratory judgment claim. .................................................................72

        1. Justapor did not conclusively establish that the interests to be conveyed include leasehold interests. ...........................73

        2. Unless "mineral interests" and "additional interests" mean the same thing, the letter agreement is ambiguous. .......75

        3. Justapor did not establish that it had chosen an entity to which any interests should be conveyed. .................................76

        4. Justapor did not identify any leasehold interest that should have been, but was not, conveyed. ...............................77

    B. Justapor was not entitled to specific performance. ...........................77

Conclusion and Prayer .....................................................................80

Certificate of Compliance ..................................................................82

Certificate of Service ......................................................................82

Appendix .....................................................................................83

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Apparel Prods., Inc. v. Brabs, Inc.*,
880 S.W.2d 267 (Tex. App.—Houston [14th Dist.] 1994, no writ)...................78

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*,
124 S.W.3d 154 (Tex. 2003) ..............................................................................46

*Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*,
352 S.W.3d 445 (Tex. 2011) ..............................................................................59

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
297 S.W.3d 768 (Tex. 2009) ..............................................................................34

*Barnes v. Winona Oil Co.*,
200 P. 985 (Okla. 1921)................................................................................65, 66

*Barrand, Inc. v. Whataburger, Inc.*,
214 S.W.3d 122 (Tex. App.—Corpus Christi 2006, pet. denied) .......................73

*Benavides v. Hunt*,
79 Tex. 383, 15 S.W. 396 (1891) .......................................................................36

*Bonham State Bank v. Beadle*,
907 S.W.2d 465 (Tex. 1995) ..............................................................................73

*Brannon v. Gulf States Energy Co.*,
562 S.W.2d 219 (Tex. 1977) ........................................................................69, 71

*City of Houston v. Clear Creek Basin Auth.*,
589 S.W.2d 671 (Tex. 1979) ..............................................................................79

*Covington v. Travelers Indem. Co.*,
122 S.W.3d 330 (Tex. App.—Fort Worth 2003, no pet.)...............................68, 69

*Dallas Power & Light Co. v. Cleghorn*,
623 S.W.2d 310 (Tex. 1981) ..............................................................................46

*DeBord v. Muller*,
446 S.W.2d 299 (Tex. 1969) ........................................................78

*Decker v. Kirlicks*,
110 Tex. 90, 216 S.W. 385 (1919) ........................................36, 37, 49

*DeWitt Cnty. Elec. Co-op., Inc. v. Parks*,
1 S.W.3d 96 (Tex. 1999).............................................................74

*Elliott v. Davis*,
553 S.W.2d 223 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.)................68

*Enter. Leasing Co. v. Barrios*,
156 S.W.3d 547 (Tex. 2004) (per curiam) ........................................53

*In re Ford Motor Co.*,
 211 S.W.3d 295, 299 (Tex. 2006) (per curiam; orig. proceeding)....................47

*Fortis Benefits v. Cantu*,
234 S.W.3d 642 (Tex. 2007) .......................................................47

*Frost Nat'l Bank v. L & F Distribs., Ltd.*,
165 S.W.3d 310 (Tex. 2005) (per curiam) ........................................75

*G.H. Bass & Co. v. Dalsan Properties-Abilene*,
885 S.W.2d 572 (Tex. App.—Dallas 1994, no writ)..............................56

*Guleke v. Humble Oil & Ref. Co.*,
126 S.W.2d 38 (Tex. Civ. App.—Amarillo 1939, no writ)..............................33

*Gulf Prod. Co. v. Cruse*,
271 S.W. 886 (Tex. Comm'n App. 1925) ........................................37

*Gulf Prod. Co. v. Spear*,
125 Tex. 530, 84 S.W.2d 452 (1935) .........................................64, 69

*Henshaw v. Tex. Natural Res. Found.*,
147 Tex. 436, 216 S.W.2d 566 (1949) ...........................................35

*Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*,
111 S.W.3d 75 (Tex. 2003)........................................................74, 75

*Houston Exploration Co. v. Wellington Underwriting Ags., Ltd.*,
352 S.W.3d 462 (Tex. 2011) ......................................................................54

*Houston Prod. Co. v. Mecom Oil Co.*,
62 S.W.2d 75 (Tex. Comm'n App. 1933) ..............................................65, 66, 67

*Humble Oil & Ref. Co. v. Harrison*,
146 Tex. 216, 205 S.W.2d 355 (Tex. 1947) ........................................................57

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
341 S.W.3d 323 (Tex. 2011) ..........................................................38, 40, 41, 53

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*,
962 S.W.2d 507 (Tex. 1998) ......................................................................57

*Key Operating & Equip., Inc. v. Hegar*,
435 S.W.3d 794 (Tex. 2014) ......................................................................66

*King v. Dall. Fire Ins. Co.*,
85 S.W.3d 185 (Tex. 2002)........................................................................45

*Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*,
320 S.W.3d 829 (Tex. 2010) ......................................................................35

*Knight v. Chicago Corp.*,
188 S.W.2d 564 (Tex. 1945) ..............................................................36, 49, 50

*Levetz v. Sutton*,
404 S.W.3d 798 (Tex. App.—Dallas 2013, pet. denied)..............................78, 79

*Lowder v. Schluter*,
78 Tex. 103, 108, 14 S.W. 205, 206, *rev'd on reh'g on other
grounds*, 78 Tex. 109, 14 S.W. 207 (1890) ......................................................67

*Lowder v. Schluter*,
78 Tex. 103, 14 S.W. 205, *rev'd on reh'g on other grounds*, 78
Tex. 109, 14 S.W. 207 (1890) ................................................................67, 69

*Luccia v. Ross*,
274 S.W.3d 140 (Tex. App.—Houston [1st Dist.] 2008, pet.
denied)................................................................................................79

*Maxvill-Glasco Drilling, Co., Inc. v. Royal Oil & Gas Corp.*,
   800 S.W.2d 384 (Tex. App.—Corpus Christi 1990, writ denied)......................70

*Mayfield v. de Benavides*,
   693 S.W.2d 500 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).......64, 65, 67

*McConnell v. Southside Indep. Sch. Dist.*,
   858 S.W.2d 337 (Tex. 1993) ...............................................................78

*Moore v. Jet Stream Investments, Ltd.*,
   261 S.W.3d 412 (Tex. App.—Texarkana 2008, pet. denied)............................70

*Neece v. A.A.A. Realty Co.*,
   159 Tex. 403, 322 S.W.2d 597 (1959) .................................................53

*Outdoor Sys., Inc. v. BBE, L.L.C.*,
   105 S.W.3d 66 (Tex. App.—Eastland 2003, pet. denied).....................34, 35, 46

*Pac. Mut. Life Ins. Co. v. Westglen Park Inc.*,
   160 Tex. 1, 325 S.W.2d 113 (1959) ....................................................58

*Paciwest, Inc. v. Warner Alan Props., LLC*,
   266 S.W.3d 559 (Tex. App.—Fort Worth 2008, pet. denied)............................79

*Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*,
   227 S.W.3d 876 (Tex. App.—Dallas 2007, no pet.) .........................................77

*Reilly v. Rangers Mgmt., Inc.*,
   727 S.W.2d 527 (Tex. 1987) ...............................................47, 50, 76

*REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*,
   932 F.2d 447 (5th Cir.1991) ...............................................................35

*Rogers v. Ricane Enters., Inc.*,
   772 S.W.2d 76 (Tex. 1989)...................................................................42, 46

*Ryan v. Kent*,
   36 S.W.2d 1007 (Tex. Comm'n App. 1931, judgm't adopted)..........................35

*Stafford v. S. Vanity Magazine, Inc.*,
   231 S.W.3d 530 (Tex. App.—Dallas 2007, pet. denied)..................................78

*T-Anchor Corp. v. Travarillo Assocs.*,
    529 S.W.2d 622 (Tex. Civ. App.—Amarillo 1975, no writ)...................37, 57, 62

*Truly v. Austin*,
    744 S.W.2d 934 (Tex. 1988) .................................................................................58

*Universe Life Ins. Co. v. Giles*,
    950 S.W.2d 48 (Tex. 1997)...................................................................................68

*Vela v. Pennzoil Prod. Co.*,
    723 S.W.2d 199 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.)...................68

*Vinson Minerals, Ltd. v. XTO Energy, Inc.*,
    335 S.W.3d 344 (Tex. App.—Fort Worth 2010, pet. denied)......................34, 35

*W.T. Waggoner Estate v. Sigler Oil Co.*,
    118 Tex. 509, 19 S.W.2d 27 (1929) ...............................................................36, 47

*Wagner & Brown, Ltd. v. Sheppard*,
    282 S.W.3d 419 (Tex. 2008) ...............................................................................70

*Walker v. Fed. Kemper Life Assurance Co.*,
    828 S.W.2d 442 (Tex. App.—San Antonio 1992, writ denied) .........................33

*Williams Consol. I, Ltd./BSI Holdings, Inc. v. TIG Ins. Co.*,
    230 S.W.3d 895 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ...................32

*Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center E., Inc.*,
    290 S.W.3d 554 (Tex. App.—Dallas 2009, no pet.) ..........................................74

*XTO Energy, Inc. v. Pennebaker*,
    07-10-00396-CV, 2011 WL 6846196 (Tex. App.—Amarillo Dec.
    29, 2011, no pet.) (mem. op.) .............................................................................34

**Statutes**

Tex. Prop. Code §§ 22.021-0.24 ...............................................................................71

Tex. Prop. Code § 22.021(a) .....................................................................................71

**Other Authorities**

41 Tex. Jur. 3d Forfeitures and Penalties § 6 (1998)................................................35

Patrick H. Martin & Bruce M. Kramer, 3 Williams & Meyers, Oil and Gas Law § 656.2 (2008) ................................................................34

| | |
|---|---|
| *Nature of the Case* | Oil-and-gas lease dispute |
| *Trial Court* | 49th District Court, Webb County, Hon. Joe Lopez |
| *Trial Court Disposition* | Summary judgment in favor of plaintiff, Justapor, Ranch Company, L.C. In its judgment the trial court: |

- Declared that the mineral lease terminated on March 2, 2012 and that ownership of minerals reverted to Justapor;
- Awarded more than $12 million from Escondido to Justapor in trespass damages consisting of all production proceeds for all oil-and-gas sales from March 2, 2012 to August 2014. The judgment did not credit Escondido for either the costs of production or for improvements;
- Awarded Justapor all production proceeds after August 2014 until the date Escondido relinquishes possession, again with no deductions for costs or improvements;
- Declared Escondido a bad-faith trespasser at all times; and
- Ruled that Escondido takes nothing on its counter claims, which means it receives nothing for its $33 million in improvements.

CR3:1859-62. The court severed Justapor's claims for exemplary or punitive damages (based on the claim of bad-faith trespass) and its claims for attorney's fees, expert witness fees, and accounting costs. CR3:1897-98. Those claims are now stayed.

## ISSUES PRESENTED

1. **Lease termination**. Did the trial court err in granting Justapor's motion for summary judgment and in denying Escondido's cross motion for partial summary judgment? Specifically, did it err in ruling that the Justapor lease terminated based on an underpayment of royalties, and in granting the relief that flowed from that ruling, when:

- paragraph XIV of the lease did not provide that an underpayment of royalties or failure to reconcile an underpayment terminated the lease;

- Justapor's claim of termination turns on words in the lease that do not support termination or, alternatively, are ambiguous; and

- equity does not favor termination and forfeiture here?

2. **Bad-faith trespass**. Did the trial court err in declaring Escondido a bad-faith trespasser as a *matter of law* when (1) Escondido lawfully exercised its right to possession when it entered the property, and (2) Escondido presented evidence that it did not believe the lease terminated, which negates bad faith?

3. **Vacancy tract.** Did the trial court err in rendering summary judgment on Justapor's declaratory judgment claim? Further, did the trial court err in awarding specific performance regarding conveyance of interests in the "vacancy tract?"

14

## Overview

This appeal concerns an oil-and-gas lease between Justapor Ranch Company, L.C. (the lessor) and Escondido Resources II, L.L.C. (the lessee). Escondido spent more than $33 million to drill seven gas wells and to make other capital improvements to the property. CR3:1149 (¶5). Escondido paid Justapor more than $5.7 million in royalties for the first five years of production. CR3:1148.

But Justapor stands to profit much more on its legal claims that the lease terminated in 2012 and that Escondido has been a bad-faith trespasser. The reason? As Justapor reads the lease, royalties were underpaid by about $81,000. CR3:1148; CR1:331-332. And as Justapor reads the lease, *any* amount of underpayment not reconciled by March 1 of any year terminates the lease. The trial court agreed, granting summary judgment that:

- the lease terminated on March 2, 2012;
- Escondido owes more than $12 million in gross production proceeds from March 2, 2012 through August 2014 with no deduction for Escondido's costs of production;
- Escondido owes all gross production proceeds from August 2014 through the date Escondido relinquishes possession, again with no deductions;
- Escondido recovers none of its $33 million in improvements; and
- Escondido faces punitive damages in a severed proceeding because the trial court ruled it was a bad-faith trespasser as a matter of law.

CR3:1859-61; 1796-99.

**The parties**

Justapor owns an 803-acre ranch in Webb County. CR3:1325 (¶1). The sole owner of Justapor is Jimmy Jones. CR3:1022. Jones is a trial lawyer whose practice includes "land, oil and gas." CR3:1023.

In May 2008 Jones contacted Escondido, an oil-and-gas production and development company, to ask whether it was interested in leasing mineral interests on the ranch. CR3:1325 (¶2).

**Lease negotiation and terms**

In early June 2008, when Jones was discussing with Escondido a possible lease of minerals from Justapor, Jones also offered to represent Escondido as its attorney in negotiating other oil and gas leases. CR3:1328 (¶¶12-13); CR3:1325-26 (¶¶3-5). Beginning in mid-June, Jones represented Escondido in negotiating two other leases. CR3:1328 (¶13). As compensation, Escondido agreed to Jones' request to give him an overriding royalty interest on one lease. CR3:1328 (¶14).

During this same time, Jones also negotiated his own lease, for Justapor, with Escondido's Vice President, David Wrather. CR3:1325 (¶1-2). Escondido was not represented by separate counsel in negotiating the Justapor lease, and Jones never suggested that his client retain separate counsel. *Id*. (¶2). Jones drafted both the lease and an amendment that the parties signed on the same day, June 24, 2008. CR3:1325-26. This dispute turns on three sections of the lease and the amendment.

16

## 1 – Gas-royalty provision and its amendment—Paragraph III(b)

Jones drafted a gas-royalty provision that appeared verbatim in the ultimate lease. CR3:982 (¶III(b)); CR3:1231-32 (¶III(b); CR3:1325 (¶3). This paragraph, III(b), provided that Escondido shall calculate and pay a 25% royalty on gas from the lease based on the highest of four price measures:

> ... Lessee shall calculate and pay royalties to Lessor on One-Fourth (1/4th) of all gas produced from this lease and its constituents and products sold or used therefrom, which royalties shall be calculated and paid to Lessor based upon the highest of (i) the CURRENT MARKET VALUE of such gas production from this lease which is sold by, through or under Lessee or used by, through or under Lessee, (ii) the CURRENT HOUSTON SHIP CHANNEL PRICE for such gas production, as hereinafter defined, or (iii) the CURRENT PROCEEDS REALIZED BY LESSEE for such gas production, without deduction of any costs or expense except as hereinafter stipulated or, (iv) the highest sales price of any gas were gas produced from the property could be present when sold to a third party.

CR3:982 (¶III(b)). The first three pricing measures—CURRENT MARKET VALUE, CURRENT HOUSTON SHIP CHANNEL PRICE, and CURRENT PROCEEDS REALIZED BY LESSEE—are further defined in part III(b). *Id.* But the fourth pricing measure—part III(b)(iv)—is not defined in the lease and is not a customary royalty provision. *Id.*; CR3:1137 (¶2).

Wrather told Jones that Escondido did not want to base royalty payments on the highest of these four price measures, but instead wanted to base the royalty on the sale price Escondido had negotiated with a purchaser, Enterprise. CR1325 (¶4). When the parties signed the lease in June 2008, the Enterprise pipeline was the

17

only market readily available to purchase and transport gas from the Justapor Ranch. CR3:1326 (¶5). Wrather sent Jones Enterprise's purchase terms. *Id.*; CR3:1274.

Jones responded that Justapor would agree to a royalty based on the Enterprise price, but only for as long as Escondido held the lease and did not assign it to another party. CR3:1325 (¶4). To accomplish this, Jones proposed a non-assignable amendment that (1) would incorporate the pricing terms of Escondido's agreement with Enterprise, but (2) would apply only to Escondido, not any assignee. *Id.* The parties ultimately agreed to an amendment "to provide a special royalty pricing provision, based on the Enterprise price." CR3:1326 (¶4). Jones drafted this amendment. *Id.* CR3:1325 (¶4).

This special pricing provision was reflected in the following sentence of the lease amendment:

> Provided however, Lessee shall have the right to enter into gas sales' contracts that will determine the price upon which gas royalty is calculated if such contracts provide no less than a price redetermination every six months and provide the following minimum terms....

CR3:1015 (minimum terms omitted); CR3:1326 (¶5). But the amendment, as drafted by Jones, placed this provision in a paragraph labeled as an amendment to Paragraph III "(b) ii." CR3:1014-15. It appeared at the end of a long paragraph that

18

defined "HOUSTON SHIP CHANNEL PRICE" using the same language as the original lease. CR3:1015.

Escondido understood that the amendment's special pricing provision was a substitute for all four pricing provisions in Paragraph III(b) of the lease. CR1326 (¶5). But Justapor later took the position that the purpose of the amendment was "to amend specifically the Houston Ship Channel price to reflect what they were getting from Enterprise." CR3:1036.

### 2 – Accounting and adjustment provision—Paragraph III(g)

Oil-and-gas producers frequently receive adjusted information from purchasers that changes the volume and price on which a royalty payment was based, often months after the royalty was paid. CR3:1149 (¶6). And producers often make mistakes in royalty calculations or disagree lessors about prices, volumes, or methodology used to calculate royalty. CR3:1138 (¶7). Accordingly, paragraph III(g) of the lease is a lengthy clause that addresses a number of subjects relating to discrepancies in royalty payments, such as accounting for royalties, notice and disputes over royalty deductions, adjustments for overpayment of royalty, and adjustments for underpayment. CR3:987-98 (III(g)). Several aspects of this clause are relevant.

**Accounting**—Escondido was required to provide Justapor with a detailed accounting of specific aspects of the royalty calculation on a monthly basis. CR3:987 (III(g)).

**Overpayment**—Paragraph III(g) also addressed how the parties would reconcile overpayment of royalty:

> If it is agreed by Lessor or the royalty owner in question that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee. Any overpaid royalty owner shall not be charged interest on overpaid sums.

CR3:987-88 (III(g)).

**Underpayment**—Paragraph III(g) also addressed how the parties would reconcile underpayment of royalty:

> In the event the prices and/or volumes used by Lessee in calculating and payment of production royalties paid to Lessor was less than those required to be paid, Lessee shall issue its check to make up the difference on or before March 1st of each year.

*Id.* Justapor has conceded that no language in paragraph III(g) says the failure to reconcile underpayment by March 1 terminates the lease. CR3:1043:18-22.

Escondido reviewed prices and volumes on a monthly basis. CR3:1117:24-1118:14. Over the life of the lease, Escondido made 15 reconciliation payments to Justapor, which totaled more than $441,000. CR3:1149 (¶8).

20

### 3 – Nonpayment provision—Paragraph XIV

Paragraph XIV of the lease addressed the nonpayment of royalties. CR3:996-97. The following is the relevant part of this paragraph, with the key disputed language in bold:

> **Royalties payable to Lessor in the manner hereinabove provided for are due and payable to Lessor within a period of sixty (60) days following each month's production of oil or gas produced and sold from the premises.** Thereafter, such payments shall be delinquent and will bear interest at the rate of Ten (10%) percent per annum, compounded monthly, until paid. **In the event that such royalties are not paid and become delinquent, and there is no title dispute or title defect, this lease shall terminate <u>ipso facto</u> on the date that such royalties were due and not paid.** In the event such royalties are not paid and become delinquent, Lessor without other notice than this paragraph, shall be authorized to file suit in the District Court of Webb County, Texas, for recovery of such delinquent royalties....

CR3:996-97 (¶XIV) (bold added, underlining in original).

Justapor has conceded that Escondido never failed to pay monthly royalties within 60 days following monthly production, as Article XIV requires. CR3:1041:17-1042:3. Instead, it claims that some royalties were paid in the wrong amount. *Id.*

While Jones and Wrather were negotiating the Justapor lease, Jones told Wrather that he had drafted a "tough agreement" in case Escondido ever assigned its rights under the Lease Agreement to another party. CR3:1329 (¶17). But Jones told Wrather that he would work out with Escondido any issues that might arise

between them. *Id.* Based on that conversation and the fact that Jones was Escondido's attorney in other matters, Wrather believed the parties would amicably resolve any differences. CR3:1329. Jones never mentioned that he believed the termination provision meant that the lease could terminate for underpayment of royalties, no matter how small. CR3:1329 (¶17).

**Escondido drilled wells, made site improvements, and paid royalties**

After the lease was signed, Escondido made more than $33.1 million in improvements to the Justapor Ranch. CR3:1149 (¶5); CR3:1112:24-1113:11. These included roads and ponds as well as seven wells. CR3:1113:10-16. Of this amount, about $10 million was spent on drilling costs and other improvements after March 2, 2012, the date on which Justapor claims the lease terminated. CR3:1220-21.

To transport gas from Justapor Ranch to Enterprise, Escondido built a meter site and a pipeline across the ranch to connect with the Enterprise pipeline system. CR3:1326 (¶6). To facilitate this, Escondido and Justapor signed a Surface Site Agreement, which Escondido then assigned to Enterprise. *Id.*; CR3:1282-88.

Escondido first paid royalties in June 2009. CR3:1148 (¶3). In 2011 Enterprise reduced the amount of gas it purchased from Escondido because of capacity constraints on its pipeline system. CR3:1326 (¶7). To make up for the

22

reduction in sales to Enterprise, Escondido sold gas from the Justapor Ranch to Kinder Morgan. *Id.*

From its first production in June 2009 until April 2014, Escondido paid Justapor more than $5.7 million in royalties. CR3:1148 (¶3). Justapor has not disputed the amount of royalties that were paid for production occurring before October 2011. *See* CR3:330-31.

**Jones first claims that the lease terminated**

Before the current dispute arose, Justapor claimed that the lease terminated on another ground.

In June 2011, Jones told Escondido that the lease had terminated "ipso facto" when Escondido purportedly underpaid a compensatory royalty under article V of the lease. CR3:1070:5-1071:11; CR3:1072:11-1074:17. But Jones later admitted that the lease did not terminate as the result of an underpayment. CR3:1073:3-1074:13. The parties ultimately resolved their disagreement over the compensatory royalty by letter agreement dated August 9, 2011. CR1:445-48; CR3:1308-11.

As part of this letter agreement, Escondido agreed to convey, to an entity of Justapor's choice, certain interests in a 42-acre tract known as the "vacancy tract." CR3:977. Two different versions, both initialed and signed on the same date, use different words to memorialize the parties' agreement. One version requires

Escondido to convey mineral interests it already has acquired in the Justapor Ranch "as well as *all other mineral mineral [sic] interests* [Escondido] acquire[s] in this land after [Justapor's] approval & consent." CR3:1310 (emphasis added). The other version requires Escondido to convey mineral interests it already has acquired in the Justapor Ranch "as well as *all other additional interests* we acquire in this land after your approval and consent." CR1:447 (emphasis added). Escondido gave Jones executed deeds conveying all mineral interests owned or subsequently acquired by Escondido in the Vacancy Tract. CR3:1327-28 (¶11). Justapor later asserted that Escondido must convey not only mineral interests acquired in Justapor Ranch, but also all leasehold interests. CR1:255.

**Jones' actions prevent Escondido's sales to Enterprise**

In October 2011 Enterprise announced it would resume purchasing gas from the Justapor Ranch because its capacity constraints had lifted. CR3:1326 (¶8). But in the same month, Jones sent Enterprise a letter announcing that the Enterprise sales meter Surface Site Agreement between Justapor and Enterprise terminated because Enterprise missed one $4,500 yearly lease payment in May. CR3:1299, 1326 (¶8), 1092:5-11, CR3:1282. Jones also told Enterprise that it could not use the meter and that he was going to seize its equipment. CR3:1092:7-19. The Surface Site Agreement did not provide for automatic termination upon default, but instead provided that Justapor must give notice and an opportunity to correct

24

the late payment before the lease terminated. RR3:1284 (¶15). Justapor gave no notice and no opportunity to cure, and refused to accept Enterprise's late rental check. RR3:1054:17-1059:13. As a result of Jones' claim of termination, Enterprise could not purchase gas from the Justapor Ranch. CR3:1326-27 (¶8).

Unable to sell to Enterprise, Escondido could only sell to Kinder Morgan at a lower daily spot price or shut in the wells until it found a purchaser for a higher price. CR1:341:5-13; CR3:1327 (¶9). It began negotiating sales to other higher-priced markets in order to sell several months later. *Id.* In the meantime, rather than sell to Kinder Morgan at the lower daily spot price, Escondido proposed to shut-in the wells until it could finalize these higher-price deals or secure a new surface-site agreement between Jones and Enterprise. CR3:1326-27 (¶¶8-9). Escondido also told Jones that the price to be realized from the sale of gas at the daily spot price would be lower. *Id.* (¶9). But Jones insisted that Escondido sell gas at the lower daily spot price and not shut-in the wells for any time. *Id.*

Escondido made sales at the lower daily spot price for three months beginning in October 2011, which resulted in royalties to Justapor that were $3,851 less than the Enterprise special pricing provision set out in the amendment. CR1:340:13-23; CR3:1148 (¶4). It has not made up this $3,851 underpayment because Justapor caused it to receive a lower price and because Jones verbally

25

agreed to the royalty he was going to get based on the lower daily spot price. CR1:340:20-341:20; CR3:1089:13-20.

**Dispute over royalties for production months after January 2012**

In May 2013, Justapor hired Charlie Graham to audit Escondido's records regarding the calculation of royalties. CR3:1025:24-1026:18. Graham determined that Escondido's calculations of royalties on a price-received basis were correct. CR3:1337:8-19; 1338:8-24. Graham did not audit the royalty calculations on other bases, such as market value or the Houston Ship Channel price. CR3:1336:6-17. Graham believed that Escondido was trying to properly calculate the quantity and price of gas sales. CR3:1339:18-20.

Justapor sued Escondido in August 2013, claiming the lease had terminated due to an underpayment of royalties. CR1:22, and 25. Before suing, Justapor gave Escondido no notice that it believed Escondido had underpaid gas royalties. CR3:1044:20-1045:9. And it gave Escondido no opportunity to cure. *Id*.

Justapor initially claimed that the lease terminated "as early as April 2012" because royalty payments for production beginning in February, 2012, were based on a weighted average price in breach of pricing provision III(b)(iv). RR3:1304, 1305. Justapor claimed that the lease terminated because of the underpayment alone. RR3:1304. Justapor later amended its claim to assert, for the first time, that an underpayment triggered termination if it was not corrected by March 1 of the

26

following year. CR1:150. Later, Justapor's expert identified two periods in which he claims Escondido underpaid the royalty:

- **October 2011 – January 2012** production: alleged underpayment of $3,851;

- **February 2012 – January 2013** production: alleged underpayment of $77,107.

CR1:320, 331-32; CR3:1148 (¶4).

The parties' experts disagree over whether royalties were underpaid at all between February 2012 and January 2013. If the special pricing provision in the amendment replaced the lease's royalty price entirely, as Escondido contends, then Escondido correctly calculated the royalty based on current proceeds. CR1150 (¶11). Justapor presented no summary-judgment evidence of any underpayment based on that measure. But if the special pricing provision in the lease amendment replaced only the Houston Ship Channel Price, as Justapor contends, then the amount of these underpayments was disputed by two experts. According to Justapor's expert, the amount of underpayment would be $77,107. CR1:331; CR3:1148 (¶4). But according to Escondido's expert, even assuming Justapor's interpretation of the contract, the correct amount of underpayment would be $22,107. *Id.* (¶¶11, 13).

**Summary judgment proceedings and final judgment**

Justapor and Escondido filed cross motions for summary judgment on the issue of whether the lease had terminated. The trial court denied Escondido's motion, granted Justapor's motion, and signed a final judgment in Justapor's favor. CR3:1796-99; 1857-62. The court ruled that the lease terminated on March 2, 2012 and that all of Escondido's interests under the lease reverted to Justapor at that time. CR3:1859.

The court declared Escondido a bad-faith trespasser and that it has never been a good-faith trespasser. CR3:1859. As a result of that ruling, the court awarded not only an accounting of all underpaid royalties, but also awarded Justapor all of Escondido's post-March 2, 2012 production proceeds, with no deduction for expenses. CR3:1861. The amount awarded through August 31, 2014 was more than $12 million, with an unspecified award of all additional production proceeds from that date through the date Escondido relinquishes possession. *Id.* The court dismissed Escondido's counterclaims, including its claims for reimbursement based on Escondido's improvements to the property. CR3:1860; CR1:142-43. The court severed Justapor's claims to recover punitive damages and attorney's fees based on this judgment. CR3:1897-1900.

Justapor also moved for summary judgment on its claim for declaratory judgment, asking the court to interpret the letter agreement as requiring Escondido

28

to convey both "mineral and leasehold" interests acquired by Escondido in Justapor Ranch. CR1:155 (¶34), 254-55. The trial court granted summary judgment declaring that the letter agreement requires conveyance of both mineral and leasehold interests acquired by Escondido in the Justapor Ranch. CR3:1797. In addition, the trial court awarded specific performance requiring Escondido to convey these interests to Justapor on or before the date the judgment becomes final and non-appealable. CR3:1858-59.

**Termination and forfeiture**. Texas law requires a heightened level of clarity in lease language before an automatic-termination clause can legally kill a lease. The point is to disfavor forfeiture of a lessee's rights unless the lessor makes explicit that draconian intent. Under Texas law, an *enforceable* termination clause must be clear, unequivocal, and unambiguous.

The termination clause in this lease fails that test. Paragraph XIV does not provide that a payment pennies less than owed divests the lessee of its rights, converts its capital investments, and threatens punitive damages. Rather, it terminates only for *nonpayment* of monthly royalties. It specifically addresses instances in which the lessor goes to the mail, only to find no monthly check. It says that the lease will terminate if "such royalties are not paid.…"

Paragraph III(g) is the remedy for payments made that are less than owed— payments that are "less than those required to be paid." Nothing in that paragraph even hints at the capital punishment Justapor seeks. The nonpayment paragraph provides for termination; the underpayment paragraph does not.

The trial court's ruling that the lease terminated based on underpayment of royalties violates basic rules governing lease termination and forfeiture provisions. It blurs the line in the oil-and-gas industry that distinguishes royalty nonpayment from underpayment. Because the trial court's core legal ruling is wrong, Justapor's

judgment must be reversed. And Escondido is entitled to summary judgment that the lease survives.

**Bad faith**. Even if the lease had terminated as a matter of law, the trial court wrongly concluded that Escondido was a bad-faith trespasser as a matter of law. Escondido entered into possession of the land under the Justapor lease before any adverse claim and long before Jones embarked on his windfall-litigation strategy. Escondido did not believe the lease terminated—for good reason that should survive even an affirmance of the trial court's core holding. Bad faith is inherently a fact question for a jury. The evidence here could not conclusively establish that Escondido was a bad-faith trespasser.

**Vacancy tract conveyance.** The trial court also erred by granting summary judgment on Justapor's declaratory judgment claim regarding the vacancy tract, because the parties' letter agreement unambiguously requires Escondido to convey only mineral interests, not leasehold interests.

Appellate courts exist for cases like this.

## ARGUMENT

## Standard of Review

"When both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its burden." *Williams Consol. I, Ltd./BSI Holdings, Inc. v. TIG Ins. Co.*, 230 S.W.3d 895, 900 (Tex. App.—Houston [14th Dist.] 2007, no pet.). "Because each party was a movant, the burden for each was the same: to establish entitlement to a summary judgment by conclusively proving all elements of the claim or defense as a matter of law." *Id*. Thus, the questions presented by the standard of review are:

- **Issue 1: Termination**: Did the lease terminate as a matter of law? Or did the evidence conclusively establish that it did not terminate?

- **Issue 2: Bad faith**: Did the summary-judgment evidence conclusively establish Escondido was a bad-faith trespasser?

- **Issue 3: Vacancy tract:** Did Justapor conclusively establish its interpretation of the letter agreement or its (unpleaded) right to specific performance?

**I.    The trial court erred by granting summary judgment that the lease terminated because Escondido did not correctly reconcile royalty underpayment.**

This is not an ordinary contract construction case. Under Texas law, lease language must meet a heightened level of clarity and plain language in order to provide for automatic termination. If the conditions for termination are not clear, unequivocal, and unambiguous, the lease will not terminate. Nor will termination be enforced if forfeiture would be inequitable.

The trial court erred in granting summary judgment that the lease terminated, and it erred in denying Escondido's cross-motion for partial summary judgment that it did not terminate, for three independent reasons:

(1) the lease did not clearly, unequivocally, and unambiguously provide for termination based on failure to reconcile underpayment of royalty;

(2) Justapor did not conclusively establish that Escondido failed to correctly reconcile any underpayment of royalty; and

(3) termination and forfeiture are impermissible under Texas law because they would be inequitable on these facts.

**A.    Texas law disfavors lease termination and prohibits termination absent clear, unequivocal, and unambiguous lease language.**

The automatic termination of a lease or other contract is a forfeiture. *Walker v. Fed. Kemper Life Assurance Co.*, 828 S.W.2d 442, 446 (Tex. App.—San Antonio 1992, writ denied); *Guleke v. Humble Oil & Ref. Co.*, 126 S.W.2d 38, 40

(Tex. Civ. App.—Amarillo 1939, no writ). The forfeiture sought by Justapor is disproportionately large. Under Justapor's reading of the contract, Escondido's failure to correct any underpayments, no matter how small, causes Escondido to forfeit its rights and lose its investment of more than $33 million in this lease, subjects it to trespass damages in excess of $12 million, and exposes it to punitive damages.

Texas law disfavors lease forfeiture. *XTO Energy, Inc. v. Pennebaker*, 07-10-00396-CV, 2011 WL 6846196, at *3 (Tex. App.—Amarillo Dec. 29, 2011, no pet.) (mem. op.). "Forfeitures are not favored in Texas, and contracts are construed to avoid them." *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009). In general, "[f]orfeiture is a harsh and punitive remedy, and it is not favored in law or equity." *Outdoor Sys., Inc. v. BBE, L.L.C.*, 105 S.W.3d 66, 70 (Tex. App.—Eastland 2003, pet. denied). And specifically with regard to the claim here, Texas law applies a rule of strict construction to "forfeiture provisions based on failure to make proper and timely payment of royalty." *Vinson Minerals, Ltd. v. XTO Energy, Inc*., 335 S.W.3d 344, 354 (Tex. App.—Fort Worth 2010, pet. denied) (quoting Patrick H. Martin & Bruce M. Kramer, 3 Williams & Meyers, Oil and Gas Law § 656.2 (2008)).

So unlike an ordinary contract dispute, special rules of construction—applying a heightened standard—apply to lease forfeitures. These principles include the following:

**1. All doubts resolved against forfeiture**. "Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 841-42 (Tex. 2010) (quoting *REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.,* 932 F.2d 447, 454 (5th Cir.1991). Thus, "If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed." *Henshaw v. Tex. Natural Res. Found.*, 147 Tex. 436, 444, 216 S.W.2d 566, 570 (1949). This rule has been applied specifically to oil-and-gas leases. If a "lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture." *Vinson Minerals*, 335 S.W.3d at 354 (citing *Ryan v. Kent, 36 S.W.2d 1007, 1011 (Tex. Comm'n App. 1931, judgm't adopted)).

**2. Clear and unequivocal language required**. The right to forfeiture may be found only in language that is plain, clear, and unequivocal. *Outdoor Sys.*, 105 S.W.3d at 71. The cause of forfeiture must be "plainly and clearly stated," and "the time definitely fixed." *Id.* (quoting 41 Tex. Jur. 3d Forfeitures and Penalties § 6 (1998)). As the Supreme Court of Texas has recognized:

> The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be

found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful.

*W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 522, 19 S.W.2d 27, 31 (1929) (quoting *Decker v. Kirlicks*, 110 Tex. 90, 94, 216 S.W. 385, 386 (1919)).

When the contractual termination provision is not clear, forfeiture is forbidden. *See, e.g., Benavides v. Hunt*, 79 Tex. 383, 392, 15 S.W. 396, 399 (1891) (holding that termination could not be based on a condition requiring lessee "to use all economy in the conduct and management of said mining enterprise" because that language is "too uncertain to recognize as a condition on which a forfeiture might rest.").

**3. Forfeiture cannot result from an ambiguous provision**. It follows from the two previous rules that, "[i]f the provision is ambiguous, that alone condemns it as a forfeiture provision." *Decker v. Kirlicks*, 110 Tex. 90, 94, 216 S.W. 385, 386 (Tex. 1919). Forfeiture cannot be based on the breach of an ambiguous provision. "[I]f there is *any* uncertainty in the language [of a mineral lease] so as to make it ambiguous or of doubtful meaning," a request for forfeiture should be denied. *Knight v. Chicago Corp.*, 188 S.W.2d 564, 566 (Tex. 1945) (emphasis added).

Given the gravity of terminating a contract, this rule makes sense:

A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought

not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure.

*Decker*, 110 Tex. at 94, 216 S.W. at 386.

**4. Consider general customs and practices**. In construing forfeiture provisions in lease contracts, courts will take into consideration general customs and practices, as well as the law affecting the matters contracted about, and will presume that the parties contracted with such customs, practices, and laws in mind, unless the contrary clearly appears from the terms of the contract. *Gulf Prod. Co. v. Cruse*, 271 S.W. 886, 886-87 (Tex. Comm'n App. 1925).

**5. No forfeiture if inequitable**. Ordinarily, Texas courts resolve issues of construction without reference to equity. But forfeiture lies at the intersection of law and equity, and courts consider the equities of an asserted forfeiture. "Although parties may contract to provide for forfeiture upon default, where equities are shown which justify a continuation of the contract rather than forfeiture of it, the forfeiture will be prevented." *T-Anchor Corp. v. Travarillo Assocs.*, 529 S.W.2d 622, 627 (Tex. Civ. App.—Amarillo 1975, no writ) (citing authorities and holding that equities prevented forfeiture).

### B. Paragraph XIV does not provide that the lease terminates for a failure to reconcile underpaid royalties.

Paragraph XIV of the lease does not clearly, unequivocally, and unambiguously provide for termination based on either an underpayment of

royalties or a failure to reconcile underpayment. Instead, it addresses only nonpayment of monthly royalties. In this particular lease, nonpayment and underpayment are treated separately and differently—(1) addressed in separate provisions, (2) referred to with different terminology, (3) and dealt with under different procedures, timelines, and consequences. The plain language of paragraph XIV addresses only nonpayment of royalties. No part of paragraph XIV refers in any way to underpayment, the underpayment provision, or a failure to reconcile underpayment.

>    **1.    The lease treats underpayment and nonpayment differently, with different words in different provisions.**

To construe a contract, Texas courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). The beginning of this analysis is "the contract's express language." *Id*.

This lease contains two separate provisions with different procedures for (1) adjustments of past royalty payments including overpayment and underpayment, and (2) nonpayment. The key language of these provisions is as follows:

38

| III(g)—royalty adjustments, overpayment, and underpayment<br>CR3:987-88 (¶III(g)) (emphasis added) | XIV—nonpayment<br>CR3:996-97 (¶XIV) (bold emphasis added). |
|---|---|
| "In accounting to Lessor for royalties payable hereunder, Lessee shall be required, on a monthly basis, if requested by Lessor, to account to Lessor for each well on leased premises based upon the volume of production…the BTU…content of such production, the royalty interest in such production and the amount owed and paid to such royalty interest owner.…"<br><br>"If it is agreed by Lessor or the royalty owner in question that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee."<br><br>"**In the event the prices and/or volumes used by Lessee in calculating and payment of production royalties paid to Lessor was less than those required to be paid, Lessee shall issue its check to make up the difference on or before March 1st of each year.**" | "**Royalties payable to Lessor in the manner hereinabove provided for are due and payable to Lessor within a period of sixty (60) days following each month's production** of oil or gas produced and sold from the premises. Thereafter, such payments shall be delinquent and will bear interest at the rate of Ten (10%) percent per annum, compounded monthly, until paid. **In the event that such royalties are not paid and become delinquent**, and there is no title dispute or title defect, **this lease shall terminate <u>ipso facto</u> on the date that such royalties were due and not paid**. In the event such royalties are not paid and become delinquent, Lessor without other notice than this paragraph, shall be authorized to file suit in the District Court of Webb County, Texas, for recovery of such delinquent royalties.…" |

Several differences between paragraphs III(g) and XIV demonstrate that these paragraphs address distinct subjects and have different effects.

**a. The provisions use different words**. The discussion of underpayment in III(g) refers to an *amount* of payment: "payment of production royalties paid to Lessor" that are "less than those required to be paid." And other parts of paragraph

39

III(g) refer to adjustments to past royalty amounts for deductions, overpayment, and underpayment. In contrast paragraph XIV expressly refers to a *failure to pay monthly royalties on time*: "such royalties are not paid and become delinquent." CR3:996 (¶XIV).

The use of different phrasing is consistent with industry custom and usage. The oil-and-gas industry does not equate an underpayment of royalty with a nonpayment. CR3:1137 (¶3). Nor does the industry consider neglecting to reconcile a prior underpayment as failing to make a payment at all. *Id*.

**b. The provisions address different concepts**. Just as the oil-and-gas industry differentiates royalty nonpayment from royalty underpayment, CR1:1137 (¶3), so does this lease.

Paragraph III(g)—including parts not quoted above—addresses topics all relating to adjustments to royalties. These topics include accounting, deductions, withholding of taxes, reconciliation of overpayment, and reconciliation of underpayment ("on or before March 1st of each year"). These detailed adjustment provisions exist because gas purchasers frequently send the producer adjusted data about volume or price many months after the royalty is paid, thus requiring a royalty adjustment. CR3:1149 (¶6).

In contrast, paragraph XIV applies only to the deadline for monthly royalty payments ("sixty (60) days following each month's production"), and the

40

consequences of nonpayment. The first sentence provides *when* monthly royalties are due—providing a different due date than reconciliation payments (60 days vs. March 1st). CR3:996-97 (¶XIV). The second sentence addresses late-payment interest for monthly royalties that are not paid—not reconciliation payments for underpaid royalties. The third sentence addresses termination when "such royalties" are not paid within 60 days. *Id.* And the final sentence authorizes a particular venue for suit to recover "such royalties [that] are not paid." *Id*.

Each sentence in paragraph XIV addresses only monthly royalty nonpayment—the failure to meet the 60-day deadline. But here, monthly royalty nonpayment is not at issue. Justapor admitted that Escondido always paid monthly royalties within 60 days. CR3:1041:17-1042:3. Rather, because Justapor seeks to recover for alleged underpayment of royalties, paragraph III(g) applies. It addresses royalty adjustments and reconciliation of underpayment.

**c.** **The provisions have different, inconsistent procedures for underpayment and nonpayment**. These two provisions provide separate paths for (1) underpayment and adjustments, versus (2) nonpayment.

If Escondido underpays by using the incorrect price or volume, the consequence is not termination but instead the covenant that Escondido will make a reconciliation payment by March 1 of the following year. CR3:987-88 (¶III(g)). Paragraph III(g) does not specify a remedy, termination or otherwise, for a breach

41

of that covenant, leaving available an ordinary action for breach of contract and damages. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

Unlike paragraph III(g), paragraph XIV does not provide a grace period until the following March 1. Instead, it provides that the failure to meet the 60-day deadline for monthly payment of royalties allows a series of *immediate* remedies: (1) termination "on the date that such royalties were due and not paid," (2) immediate accrual of 10% interest, and (3) the immediate right to sue "without other notice than this paragraph." CR3:996-97 (¶XIV).

It would be inconsistent with the lease's plain language to treat a breach of paragraph III(g) as a trigger for termination under paragraph XIV. Paragraph III(g) provides a grace period to make up underpayment and provides no express remedies for a failure to make up underpayment above and beyond contract law. In contrast, Paragraph XIV provides immediate and severe consequences, which makes sense for nonpayment but not for a royalty payment that often later requires adjustment. The two provisions in completely different parts of this contract do not address the same subject.

**d.      Unlike the long process for adjusting underpayment, the remedy of "ipso facto" termination is immediate and based on an instance that shows an obvious breach**. Under paragraph XIV "ipso facto" termination occurs immediately. CR3:996-97 (¶XIV). Unless the event triggering termination would

42

be immediate and obvious, parties would have no marker to know that their legal relationship has automatically changed.

Nonpayment of royalties within 60 days is exactly the sort of event that would be instantaneously obvious to the parties so that they know termination has occurred.

In contrast, an underpayment or failure to reconcile an underpayment is not an immediately apparent breach and therefore cannot result in an instant lease termination. If paragraph XIV applied to underpayment or the failure to make a reconciliation payment by March 1, the lease could easily terminate without either party knowing. But oil-and-gas producers frequently receive information from purchasers many months later that affect the volume or price on which the payment was made. CR3:1149 (¶6). Under Justapor's interpretation, if such information were received about a December royalty payment in the following April, for instance, the lease would have terminated on March 2 without either party's knowledge. That interpretation is not what the contract says and is not reasonable.

An ipso facto termination provision provides a bright line that allows both parties to know the lease has immediately terminated and to adjust their conduct accordingly. Here, Justapor first claimed termination 20 months after the initial underpayment and 18 months after the March 1 deadline for reconciliation payments. CR1:22; CR3:1044:20-1045:9. Such a strained interpretation would

permit no-fault terminations that a producer who has invested more than $33 million in the lease has no ability to correct. It makes no sense to apply the ipso facto termination language to underpayment or the failure to timely reconcile underpayment.

### 2. Paragraph XIV terminates for nonpayment of royalties, not underpayment.

Justapor initially asserted that the lease terminated ipso facto under paragraph XIV when Escondido first made an underpayment. CR3:1304, 1307. But Justapor later adjusted its interpretation, conceding that the lease does not terminate immediately upon any underpayment. CR3:1027:18-1028:12; CR3:1073:3-1074:13. Instead, Justapor now says that Escondido's failure to reconcile underpaid royalties by March 1 of the following year results in termination. CR1:248-49; CR3:1027:18-1028:12; CR3:1073:3-1074:13.

The plain language of paragraph XIV has nothing to do with underpayment at all—whether an underpayment by itself or a failure to reconcile an underpayment. Instead, Paragraph XIV provides for termination when "such royalties"—the monthly royalties due in 60 days discussed throughout the paragraph—"are *not paid* and become delinquent." CR3:996-97 (¶XIV) (emphasis added).

Nothing in this paragraph refers back to the underpayment of royalties, which is addressed separately in paragraph III(g). Under the express terms of

44

III(g), underpayment must be rectified by the March 1 deadline rather than a 60-day deadline. CR3:988 (¶III(g)). The lease does not even use the same language in paragraph XIV ("delinquent payments") that it uses to describe underpayment in paragraph III(g) ("royalties paid ... less than those required to be paid"). *Compare* CR3:988 (¶III(g)) *with* CR3:996-97 (¶XIV). Instead, the only thing that triggers termination is nonpayment—which occurs immediately when the monthly royalties due in 60 days "are not paid and become delinquent." CR3:996-97 (¶XIV).

If the lease were to terminate upon the date of any underpayment, the March 1 reconciliation deadline would be meaningless. A violation of paragraph XIV results in immediate termination, immediate accrual of interest, and immediate authorization to sue. CR3:996-97 (¶XIV). If those consequences also apply at the moment Escondido makes any underpayment, then it would be meaningless to provide a reconciliation procedure and a March 1 deadline for reconciliation payments. A court should "give effect to all contract provisions, and render none meaningless." *King v. Dall. Fire Ins. Co.*, 85 S.W.3d 185, 193 (Tex. 2002).

The parties did not draft the lease to terminate immediately upon underpayment. Paragraph XIV does not provide for termination based on royalties "not paid in whole or in part." It does not provide for termination based on royalties "paid less than those required to be paid." And it does not provide for

45

termination based on nonpayment "of any amounts due to the Lessor hereunder." *Cf. Outdoor Sys.*, 105 S.W.3d at 69. The parties did not use the sort of language necessary to specify clearly and plainly that the lease terminates in the event of an underpayment.

### 3. Paragraph XIV does not address remedies for failure to reconcile underpayment.

Justapor's new interpretation, advanced in its summary-judgment motion, was that paragraph XIV is triggered by Escondido's failure to make March 1 reconciliation payments. That interpretation is unreasonable for a number of reasons.

First, it has no support in the plain language. No part of paragraph XIV refers to reconciliation payments of underpaid royalties or their March 1 deadline. Instead, the sentence about ipso facto termination uses the phrase "such royalties" to refer to the monthly royalties due within 60 days under the prior sentences of the paragraph. CR3:996-97 (¶XIV).

Second, Justapor's interpretation also requires adding or implying language to the lease. Courts "may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). Specifically, when construing a lease, a court should not imply "terms in opposition to the express language that the parties themselves have written into the contracts." *Rogers*, 772 S.W.2d at 79 (quoting *Dallas Power & Light Co. v.*

46

*Cleghorn*, 623 S.W.2d 310, 311 (Tex. 1981)). And because termination requires plain and unequivocal language, courts cannot imply grounds for termination that are not expressly stated in the termination provision. *W.T. Waggoner Estate*, 118 Tex. at 522, 19 S.W.2d at 31.

Yet Justapor's interpretation would require that words be added. It would require changing:

> In the event that such royalties are not paid and become delinquent, ... this lease shall terminate ipso facto on the date that such royalties were due and not paid.

to add or imply the following highlighted language to the lease:

> In the event that such royalties are not paid and become delinquent, or in the event that underpayment of royalties are not reconciled by March 1 of the following year under paragraph III(g) of this lease, ... this lease shall terminate ipso facto on the date that such royalties were due and not paid.

The parties could have written the highlighted language. But it does not appear in this lease. Nor should the Court add it or imply it, especially when lease termination under Texas law requires clear and unequivocal language.

Third, Justapor's interpretation is unreasonable and oppressive. A court should avoid an interpretation of a contract that renders it "unreasonable, inequitable, or oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (cited in *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 650 n.54 (Tex. 2007) and *In re Ford Motor Co.*, 211 S.W.3d 295, 299 (Tex. 2006)) (per curiam;

orig. proceeding). The parties to oil-and-gas leases frequently disagree about the prices and volumes used in royalty calculations. CR3:1138 (¶7). New information may be received months later that requires an adjustment of the royalty. CR3:1138 (¶6). If the failure to reconcile underpayment by March 1 results in immediate termination, the lessee would risk losing its lease based on a disagreement about the methodology, pricing, or volumes to be used in royalty calculations, or if it made a mistake. CR3:1138 (¶7). Such an interpretation would allow lessors effectively to blackmail a lessee by disputing every reconciliation. *Id*. And it would allow, as in this case, a lessor to conduct audits months or years after the claimed termination event, looking for any type of uncorrected underpayment in order to hijack a valuable mineral lease and improvements to property and recover over a year of past proceeds. *Id*.

Paragraph XIV does not clearly and unequivocally provide for termination based on a failure to make reconciliation payments by March 1. By its plain language, paragraph XIV does not provide for termination of the lease based on underpayment at all. Instead, paragraph XIV provides for termination only for a nonpayment of monthly royalties within 60 days after the production month. Accordingly, this Court should reverse the summary judgment in its entirety and render partial summary judgment that the lease did not terminate.

### 4. In any event, Paragraph XIV cannot support termination so long as Escondido's interpretation is reasonable.

Even if Justapor's competing interpretation were somehow defensible, the fact that Escondido's interpretation is reasonable would, at a minimum, mean that Jimmy Jones drafted a lease agreement that is fundamentally ambiguous. Because an ambiguous termination or forfeiture provision cannot support that draconian remedy, the trial court erred in concluding that Escondido's lease expired. *See Knight*, 188 S.W.2d at 566. "If the provision is ambiguous, that alone condemns it as a forfeiture provision." *Decker*, 110 Tex. at 94, 216 S.W. at 386. Upon concluding two reasonable interpretations exist, the result is not a fact issue on the provision's proper meaning, but instead a ruling as a matter of law against termination. *See Knight*, 188 S.W.2d at 566; *Decker*, 110 Tex. at 94, 216 S.W. at 386. This court should therefore render judgment that the lease did not terminate.

### C. Independently, termination is improper because Justapor did not establish Escondido was required to reconcile any underpayment.

An independent reason to reverse the trial court's holding of termination is that Justapor failed to establish conclusively that Escondido breached the contract by failing to reconcile alleged underpayments. Although the Court could decide the issue of termination without deciding whether Escondido breached the contract, it is necessary for the Court to address this part I.C in order to rule on the summary judgment determination of breach of contract as a matter of law, the award of

$3,619 in contract damages, and the severed claim for attorney's fees and other fees. *See* CR3:1861, 1897-98.

Justapor's claim of breach is based on two different periods and amounts of alleged underpayment: (1) $77,107 for production months February 2012 through January 2013; and (2) $3,851 for production months October 2011 through January 2012. Because the theory and defenses for these two periods are different, we address them separately.

**1.** **Justapor did not establish any underpayment for production months February 2012 – January 2013 based on unambiguous lease terms.**

There are two respects in which Justapor's argument for termination is not unambiguously supported by the royalty-price provisions: (1) the effect of the special royalty pricing provision in the first lease amendment, and (2) the effect of the royalty pricing prong on which Justapor relies. Summary judgment on the issue of breach was improper because the lease unambiguously supports Escondido's reading of the amendment. Alternately, the lease is ambiguous, precluding summary judgment. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987). Further, if there is any ambiguity, uncertainty, or doubt in the lease language triggering termination, forfeiture is prohibited as a matter of law. *Knight*, 188 S.W.2d at 566. Thus, Justapor's motion should have been denied and partial

summary judgment of no termination should have been granted in Escondido's favor.

### a. The special pricing provision replaced all pricing measures, or alternatively was ambiguous.

The parties' dispute over the royalty price concerns the effect of the lease amendment on the pricing provision in paragraph III(b), which provided that the 25% royalty "shall be calculated and paid to [Justapor] based upon the highest of" four different gas prices: (i) "CURRENT MARKET VALUE," (ii) the "CURRENT HOUSTON SHIP CHANNEL PRICE," (iii) "CURRENT PROCEEDS REALIZED BY LESSEE" [Escondido], and (iv) "the highest sales price of any gas were gas produced from the property could be present when sold to a third party." CR3:982 (¶III(b)). The first three of these prices were defined in detail; the last was not defined at all. CR3:982-83 (¶III(b)(i)–(iii)).

In the lease amendment, the special pricing provision stated:

> Provided however, Lessee shall have the right to enter into gas sales' contracts that will determine the price upon which gas royalty is calculated if such contracts provide no less than a price redetermination every six months and provide the following minimum terms....

CR3:1015 (minimum terms omitted); CR3:1326 (¶5). The amendment, as drafted, placed this provision in a paragraph labeled as an amendment to Paragraph III "(b) ii." It appeared at the end of a long paragraph in which the first parts of the paragraph define "HOUSTON SHIP CHANNEL PRICE." CR3:1015.

51

The parties offer two competing interpretations:

1 – **Escondido's interpretation**: The special pricing provision, on its face, modifies "the price upon which gas royalty is calculated." It replaces all four alternate price measures as the single price on which gas royalty is calculated.

2 – **Justapor's interpretation**: The special pricing provision only modifies the Houston Ship Channel Price—which means that any of the other three alternate prices govern if it is higher. *See* CR3:1669.

There are several reasons why Escondido's interpretation is the only reasonable one, or alternatively, the amendment is at least ambiguous.

First, the special pricing provision does not modify only the Houston Ship Channel Price as Justapor claims. CR3:1015. The sentence does not mention the Houston Ship Channel Price. Instead, the sentence states in global terms that its measure "will determine the price upon which gas royalty is calculated." *Id*. Justapor's reading of this sentence contradicts its plain language. Justapor attempts to transform "price upon which gas royalty is calculated" into the Houston Ship Channel Price. But the gas royalty is not calculated on the Houston Ship Channel Price under the original lease when the Houston Ship Channel Price is not the highest of the four measures. The plain language of the special price provision modifies the whole royalty price, not just the Houston Ship Channel Price.

Second, Justapor's best argument is based, not on the language of this sentence, but on its label and location—at the end of a long paragraph that begins with the title "(b) ii" and that, apart from this sentence, consists of a definition of the Houston Ship Channel Price. But the location and label of the paragraph do not determine its meaning when the plain language requires a different construction. Although "in certain cases courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight is given to the operative contractual clauses of the agreement.'" *Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (per curiam) (quoting *Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 600 (1959)).

Third, it would make no sense for the special pricing provision to modify just the Houston Ship Channel Price. If the special pricing provision were to modify only the Ship Channel price, then it would be redundant with part (iii) of the 4-prong royalty in the original lease, which also is based on a "current proceeds" measure. Under Justapor's reading, the amendment would make parts (ii) and (iii) redundant, therefore rendering one of them meaningless surplusage. A court should avoid an interpretation that renders a term meaningless. *Italian Cowboy*, 341 S.W.3d at 333. Instead, the special pricing provision is a measure of royalty price based on the current proceeds that Escondido receives from contracts that meet minimum pricing requirements. That has nothing to do with the Ship

53

Channel Price, but is a replacement for all of the royalty measures and therefore "will determine the price upon which gas royalty is calculated." CR3:1015.

Fourth, the surrounding circumstances, including the parties' prior negotiations, demonstrate that Justapor's interpretation is unreasonable. *See Houston Exploration Co. v. Wellington Underwriting Ags., Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (noting that courts may consider "surrounding circumstances that inform, rather than vary from or contradict, the contract text"). Wrather told Jones that Escondido did not want to use the royalty calculation in the original lease, but instead wanted to base pricing on Escondido's agreement with Enterprise. CR3:1325 (¶4); CR3:1274. And Jones agreed to such a non-assignable amendment. CR3:1325-26 (¶4). These negotiations, consistent with Escondido's interpretation, render Justapor's interpretation unreasonable.

### b. The royalty price measure on which Justapor relies is ambiguous or meaningless.

Justapor's motion for summary judgment argued that Escondido underpaid royalties by around $77,100 for one year of production starting in February 2012 because it did not use the fourth pricing measure in the original lease:

> (iv) the highest sales price of any gas were gas produced from the property could be present when sold to a third party.

CR3:982 (¶III(b)); *see also* CR1:233-235 (motion for summary judgment); CR1:330-332 (expert calculations of underpayment). Justapor argued that this

54

measure resulted in the highest gas price and should have been applied after February 2012. CR1:233-35; CR1:330-332.

This provision is ambiguous at best, and meaningless at worst. Even if it is assumed that "were" is a typo and should mean "where," this provision still makes no sense. For instance, would "where gas is sold" refer to the highest sales from a particular well, from anywhere on the property, or to market price in the area? Does "when sold" refer to the highest sales price at the exact time of the sale, the day of the sale, the month of the sale? And does "when sold to a third party" refer to the highest sales price for that particular purchaser or to any purchaser?

There was ample summary-judgment testimony that this language is meaningless in the industry. According to Energy Law Professor Lowe, "[a] typical lessee in the oil-and-gas industry would not know how to apply this provision to the calculation of royalty payments" and it "could be interpreted in alternative ways...." CR3:1137 (¶2). It is not a "customary or usual royalty provision" and is "unclear and ambiguous." *Id*. According to CPA Abington, this provision is "unclear" and is not defined. CR3:1150 (¶10). This provision was inherently ambiguous.

### 2. Fact issues exist regarding production months November 2011 – January 2012.

The issue for the alleged $3,851 underpayment for production months November 2011 through January 2012 is different. There is no dispute that

Escondido paid Justapor royalties that were $3,851 less than the Enterprise special pricing provision set out in the amendment. CR1:340:13-23; CR3:1148 (¶4). But it did not make up that amount because (1) Justapor caused it to receive a lower price during this period by terminating the Enterprise ground lease and insisting that Escondido continue to sell at the daily spot price, and (2) Jones verbally agreed to the royalty he was going to get based on the lower daily spot price. CR1:340:20-341:20; CR3:1089:13-20; *see also supra* p. 24-25. Further, Jones did not complain about this alleged nonpayment for over 18 months as he continued to accept royalties from Escondido. CR3:1044:20-1045:9. During this time Escondido continued to invest an additional $10 million into its $33 million investment, including drilling costs and other improvements CR3:1220-21.

This evidence at least created a fact issue on Escondido's defenses of waiver and estoppel. CR2:928. Jones' verbal agreement to the reduced royalty, plus his continued acceptance of royalties for 18 months without complaint, raises a fact issue on waiver. *See G.H. Bass & Co. v. Dalsan Properties-Abilene*, 885 S.W.2d 572, 578 (Tex. App.—Dallas 1994, no writ) (holding evidence that landlord accepted less than full payment raised a fact issue of waiver precluding summary judgment).

Similarly, the evidence supports an inference that Jones concealed his complaint and his belief that the lease terminated as Escondido poured an

additional $10 million into drilling costs and improvements. This meets the elements of equitable estoppel: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998).

Accordingly, the summary judgment and the awards based on termination *and* breach of contract should be reversed, summary judgment rendered that there was no termination, and the breach-of-contract issue remanded for further proceedings.

### D. Independently, lease termination is improper because it is inequitable on these facts.

Because this case involves forfeiture, equity is an independent ground to reverse the termination finding. Equitable defenses are available to a claim of lease termination. *See Humble Oil & Ref. Co. v. Harrison*, 146 Tex. 216, 226, 205 S.W.2d 355, 361 (Tex. 1947). Even if the lease clearly, plainly, and unambiguously provided for termination in these circumstances, the equities "justify a continuation of the contract rather than forfeiture of it...." *T-Anchor*, 529 S.W.2d at 627. "[E]quity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject

57

matter of the suit and to [the party asserting clean hands]." *Pac. Mut. Life Ins. Co. v. Westglen Park Inc.*, 160 Tex. 1, 6, 325 S.W.2d 113, 117 (1959).

## 1. It would be inequitable to enforce a termination in light of Justapor's conduct.

Justapor's claim of forfeiture disregards its apparent scheme to lay a trap. Jones, while representing Escondido in other matters, drafted a lease that, under his interpretation, enhanced the likelihood both of Escondido's forfeiture and Justapor's windfall. The evidence supports an inference that Justapor told Escondido that the "tough" aspects of the lease would not apply to it and that any problems would be resolved by negotiation. Then, after reaping the benefit of Escondido's $33 million in improvements, Justapor made every effort to find a technical reason to terminate the lease and caused Escondido to lose its highest-paying gas purchaser. This evidence of Justapor's unclean hands should have precluded summary judgment for Justapor. *See Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988) (preventing a party who caused the failure of a project to impose liability on others for its failure).

**The negotiation and drafting of the lease**. Before entering this lease, Jones gained Escondido's trust by making reassurances about any future problems with this lease and even becoming Escondido's fiduciary in negotiating other leases.

Jones drafted the Justapor lease and the amendment. CR3:1325-26. He was also acting as Escondido's attorney. Although Jones did not represent Escondido in

negotiating this lease, he was Escondido's attorney in other matters during some of the negotiations and at the time this lease was signed. CR3:1328 (¶¶12-13); CR3:1325-26 (¶¶3-5); CR3:1328 (¶13). The situation is similar to a lawyer who already represents a client when he negotiates an attorney-client agreement with that client. Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011). And although Escondido was a sophisticated party, it was not represented by independent counsel, nor did Jones suggest that it retain counsel. CR3:1325 (¶2).

Jones assured Escondido that it would not be subject to the original lease's pricing terms and that any disagreements would be negotiated. He told Escondido Justapor would agree to payment of royalty based on the Enterprise pricing terms, but only so long as the lease was held by Escondido. CR1325 (¶4). And he agreed to draft the "special royalty pricing provision, based upon the Enterprise price." CR1325-26(¶4). He told Escondido that he had drafted a "tough agreement" in case Escondido ever assigned its rights under the Lease Agreement to another party, but that he would work out with Escondido any issues that might arise. CR3:1329 (¶17). He never told Escondido that he interpreted the termination provision to mean that the lease could terminate based on an underpayment of

royalties, a circumstance the lease covered under a separate provision. CR3:1329 (¶17).

Despite these representations and Jones' fiduciary relationship with Escondido, he now seeks to do the opposite—argue that the royalties were not governed by the Enterprise price agreement and assert that the lease terminated ipso facto, without notice, and without any attempt to work out any issues that might arise.

**Justapor's creation of the circumstances resulting in underpayment**. Jones, acting on behalf of Justapor, created the situation that gave rise to the first underpayment. No gas royalty payments were disputed until Jones terminated the Enterprise Surface Site Agreement unilaterally. Justapor improperly terminated that agreement because Enterprise was late on one $4,500 lease payment. CR3:1326 (¶8); CR 3:1092:5-11; CR3:1282. Justapor refused to give Enterprise the notice of default and opportunity to cure required by the lease, and it even refused to accept Enterprise's subsequent rental check. CR3:1054:17-1059:13. It told Enterprise that Enterprise could not use the meter and that Justapor was going to take their equipment. CR3:1092:7-19. And Justapor insisted Escondido sell gas at a lower daily spot price to Kinder Morgan rather than shutting in the wells until Escondido could negotiate a better price. CR3:1326-27 (¶8). This prevented

Enterprise from purchasing gas produced on the Justapor Ranch and forced Escondido to sell gas for a lower price. CR3:1326-27 (¶8); CR1:341:5-13.

**Justapor's agreement to the underpayment**. There was evidence that Jones verbally agreed to the royalty price based on the lower daily spot price. CR1:340:20-341:20; CR3:1089:13-20. Although this verbal modification of the lease may not be enforceable, it is evidence that Justapor led Escondido to believe the lower royalty payment was not a problem. This is especially true in light of Jones earlier promise to Wrather that, notwithstanding the lease's "tough" terms designed for assignees, Justapor would work out any problems that arose with Escondido. It would be inequitable to terminate the lease based on an underpayment to which Justapor consented.

The evidence supports an inference that Justapor terminated the Enterprise Surface Site Agreement to cause Escondido to lose that purchaser, provoking an act of default resulting in forfeiture. Equity should not reward that scheme.

### 2. Forfeiture is inequitable because it would be disproportionate with the alleged breach.

The trial court terminated Escondido's lease in which it had invested more than $33 million, and awarded well more than $12 million in damages, as legal remedies to Escondido's royalty underpayment of somewhere between $3,800 and $81,000, or somewhere between .00067 and .014 of the $5.7 million in royalties previously paid to Justapor.

61

Even if the lease clearly and unambiguously provided for termination, the inequity of such disproportionate result does not justify a forfeiture. *See T-Anchor Corp.*, 529 S.W.2d at 627.

### 3. Forfeiture would be inequitable because Jones did not raise it for 18 months after the alleged termination.

Justapor first notified Escondido that it believed there had been any underpayment of gas royalties when it sued Escondido in August 2013. CR1:22; CR3:1044:20-1045:9. This was 20 months after the underpayment of October 2011 royalties and 17 months after the March 2, 2012 date Justapor alleges, and the trial court held, that the lease terminated. CR3:1859. During this time Escondido continued to invest an additional $10 million into its $33 million investment, including drilling costs and other improvements CR3:1220-21. Yet under the trial court's judgment, Escondido loses all of its investment, must return all revenues from that 18-month period, and cannot deduct its expenses during that period. *See* CR3:1859-61. That result is neither fair nor equitable.

### E. Remedy: the summary judgment should be reversed in its entirety and partial summary judgment rendered that there was no termination.

Both Justapor's grounds for summary judgment and all affirmative relief granted to it in the judgment were premised on the termination of the lease. *See* CR1:260-61; CR3:1858-1861. Accordingly, the summary judgment granting Justapor's affirmative claims should be reversed in its entirety.

62

Additionally, because the lease did not terminate as a matter of law, judgment should be rendered in Escondido's favor denying the following causes of action asserted by Justapor, all of which are premised on lease termination: trespass (including claims of bad-faith trespass and punitive damages), trespass to try title, and its request for an accounting and declaratory relief. CR1:153-155; CR2:812. Justapor's claim of breach of contract should be remanded for further proceedings consistent with this Court's judgment.

## II. Regardless of whether the lease terminated, Justapor did not conclusively establish Escondido was a bad-faith trespasser.

In its final judgment and summary-judgment orders, the trial court found "that from March 2, 2012 through the date hereof [Escondido] has remained, and remains, in unlawful possession of minerals covered by the Justapor Lease as a bad-faith trespasser, and is not, and never has been, a good faith trespasser.…" CR3:1760, 1797, 1859. Based on this ruling, the trial court declared that Justapor is entitled to damages in the amount of all proceeds from the sale of oil and gas produced from the Justapor Lease from March 2, 2012 until the date of final, non-appealable judgment in this matter, less royalties already paid by Escondido, but without any deduction for production costs or other expenses incurred by Escondido with regard to the Lease. CR3:1860; *see also* CR1:254.

Justapor's claim that Escondido is a trespasser rests on the finding that the Lease terminated. CR1:250-54. As shown in part I above, the trial court erred in

that ruling. Accordingly, as a matter of law, Escondido remained the lessee and was not a trespasser at all, much less a trespasser in bad faith. If the Court reverses the trial court's ruling that the lease terminated, it should reverse the summary judgment on the bad-faith trespass claim without the need to examine this separate issue.

But even if the lease had terminated as a matter of law, Justapor did not conclusively establish bad-faith trespass, and the trial court's summary judgment should be reversed.

### A. Escondido was not a bad-faith trespasser *per se* because it lawfully entered into possession of the land.

The question of whether Escondido was a bad-faith trespasser turns on whether, as a matter of law, Escondido transformed from a lessee in lawful possession of land under a lease into a bad-faith trespasser at the moment Justapor contends the Lease terminated (*i.e.*, on March 2, 2012). In general, the question of a defendant's good faith in entering upon land and developing oil-and-gas production is one of fact. *Gulf Prod. Co. v. Spear*, 125 Tex. 530, 539, 84 S.W.2d 452, 457 (1935). To be in good faith, a party must have both an honest and reasonable belief in the superiority of one's title. *Id.*; *Mayfield*, 693 S.W.2d at 504.

The law will conclusively presume that a person is a bad-faith trespasser only when he enters into possession of land and makes improvements thereon with full knowledge of the pendency of an action to enforce an adverse claim to the

premises. *Houston Prod. Co. v. Mecom Oil Co.*, 62 S.W.2d 75, 76 (Tex. Comm'n App. 1933); *Mayfield v. de Benavides*, 693 S.W.2d 500, 504 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.). The conclusive-presumption standard does not focus on when the person enters *on to the land*, but rather when he enters *into possession of the land*. Thus, Texas law distinguishes between: (1) a person who enters into peaceable possession of land under a valid lease before any adverse claim is filed; and (2) a person whose first entry on the land does not occur until after a lawsuit has been filed to enforce an adverse claim. *Mecom*, 62 S.W.2d at 76.

When a lessee in good faith enters into peaceable possession of land under a valid oil-and-gas lease, and under a claim of right produces oil and gas from it, and the lease later is declared invalid or otherwise terminated in a suit to enforce an adverse claim, the lessee is not a bad-faith trespasser *per se*. *Id.*; *Barnes v. Winona Oil Co.*, 200 P. 985, 986 (Okla. 1921) (quoted and discussed in *Mecom*). The conclusive presumption will not arise if the lessee has taken possession of land under a lease in good faith, but later learns that the lease does not afford him the right to develop the minerals. *Mecom*, 62 S.W.2d at 76; *Barnes*, 200 P. at 986. Only when a person first enters into possession of land with full knowledge of the pendency of a lawsuit to enforce an adverse claim—*i.e.*, there is no prior possession by the lessee—does Texas law classify the person as a bad-faith

65

trespasser *per se*, such that he cannot recover the cost of his improvements. *Mecom*, 62 S.W.2d at 76-77.

This rule reflects Texas policy to encourage the recovery of minerals and to discourage waste in the production of oil and gas. *Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014). When a lessee acquires peaceable possession of the land prior to a lawsuit on an adverse claim, allowing continued production pending resolution of a later claim furthers the recovery of minerals and lowers the risk of waste. Subjecting oil and gas lessees to the risk that, upon the filing of an adverse claim (no matter how arguable or spurious), the lessee must cease operations until the claim is resolved would discourage lessees from agreeing to develop oil and gas production. Moreover, punishing a lessee who has obtained possession in an orderly manner without creating a breach of the peace, and who is operating under a lease that has not yet been declared invalid or void, would give the landowner an unjust windfall. *See Barnes*, 200 P. at 986.

A lessee who enters into possession of land under a lease *before* the filing of a lawsuit, *i.e.*, without any knowledge of a pending action to enforce an adverse claim, does not fall under the conclusive presumption standard and cannot be a bad-faith trespasser *per se*. *See Mecom*, 62 S.W.2d at 76-77. Continuing to possess the land after receiving notice of an adverse claim does not prohibit a finding of good faith, although it is a circumstance a jury may consider in answering the fact

question. *Mayfield*, 693 S.W.2d at 505. This rule recognizes that, even though a defendant may know there is title in another superior to the defendant's title, he might believe, and have good grounds to believe, in his own claim to the property. *Lowder v. Schluter*, 78 Tex. 103, 108, 14 S.W. 205, 206, *rev'd on reh'g on other grounds*,[1] 78 Tex. 109, 14 S.W. 207 (1890). Belief in one's own superior right is determined from all the facts in evidence, the titles, and other circumstances, as viewed by persons of ordinary intelligence and prudence. *Lowder*, 78 Tex. at 108, 14 S.W. at 206.

It is undisputed that Escondido entered lawful possession of the land before March 2, 2012. CR3:981, 1326 (¶5).[2] Justapor has neither alleged nor proven that the lease terminated before that date. Accordingly, Escondido cannot be a bad-faith trespasser *per se*. *See Mecom*, 62 S.W.2d at 76-77.

### B. Justapor also did not conclusively establish that Escondido lacked a good-faith belief in the superiority of its title.

Aside from the *per se* bad faith established when a lawsuit is filed before a party first gains possession of land, good faith may become a question of law if

---

[1] On rehearing, the Court determined there was no evidence defendants had adverse possession that would entitle them to recover the value of any improvements, rendering harmless the jury charge error on which the Court initially reversed and remanded. 78 Tex. at 109, 14 S.W. at 207.

[2] Justapor's lawsuit was not filed until August 20, 2013. CR1:22. Escondido was not served with the lawsuit until September 23. CR1:9. Even if the conclusive presumption could apply, Escondido could not have acted "with full knowledge of the pendency of an action to enforce an adverse claim to the premises" until September 23, 2013, a date over 18 months *after* the date on which the trial court concluded Escondido became a bad-faith trespasser. *See* CR3:1760, 1797, 1859.

67

there is no conflict in the evidence. *Covington v. Travelers Indem. Co.*, 122 S.W.3d 330, 334-35 (Tex. App.—Fort Worth 2003, no pet.). On the other hand, if there is evidence on both sides, bad faith presents a fact question precluding summary judgment. *See Covington*, 122 S.W.3d at 335; *Vela v. Pennzoil Prod. Co.*, 723 S.W.2d 199, 205 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.); *Elliott v. Davis*, 553 S.W.2d 223, 226-27 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.). Rendering summary judgment where such a fact question exists not only contravenes Texas law, but also deprives the defendant of its "exceptionally broad jury trial right" under the Texas Constitution. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997).

In this case, the weight of the summary-judgment evidence indicates that Escondido had a good-faith belief in the superiority of its title. Justapor contends the Lease terminated because of alleged royalty underpayment. CR1:246-49. Escondido, on the other hand, contends the termination provision is triggered only by nonpayment of monthly royalties; for this and other reasons, any alleged underpayment did not terminate the Lease. CR3:959-66. Escondido's interpretation, supported by expert testimony about industry and custom, provided good grounds to believe the Lease continued in effect, even if Escondido's belief ultimately turns out to be mistaken. CR3:1137-138 (¶¶2-9); CR3:1149-51 (¶¶6-11). Additionally, there was evidence that Escondido believed its interpretation of the

pricing and termination provisions was correct. CR3:1325-26 (¶¶4-5), 1329-30 (¶17); *see Brannon v. Gulf States Energy Co.*, 562 S.W.2d 219, 224 (Tex. 1977) (holding one may be completely mistaken about superior title and still trespass in good faith); *Lowder*, 78 Tex. at 108, 14 S.W. at 206 (allowing that good grounds to believe in one's own claim even when one knows there is superior title in another). There was no evidence that Escondido ever believed that the lease terminated and that it was a trespasser.

At most Escondido may have established its good faith as a matter of law; at least, the issue presents a question of fact that a jury must decide. *See Spear*, 125 Tex. at 539, 84 S.W.2d at 457; *Covington*, 122 S.W.3d at 335. As a result, the trial court's summary-judgment ruling that Justapor was a bad-faith trespasser (including both liability findings and all damages awards) should be reversed and the claim remanded for further proceedings consistent with this Court's opinion.

**C.  Because Escondido was not a bad-faith trespasser, the judgment should be reversed and the case remanded for further proceedings.**

Several aspects of the judgment were premised on the ruling that Escondido is a bad-faith trespasser. If this Court holds the lease terminated, but reverses the ruling that Escondido is a bad-faith trespasser, then other aspects of the judgment also must be reversed.

**Trespass damages**. Escondido's measure and evidence of damages to support the judgment award of $12,038,042 in trespass damages require that Escondido be a bad-faith trespasser. *Se*e CR3:1676, 1860, 1861. But if the bad-faith ruling is reversed, Escondido's measure is incorrect because it fails to deduct drilling and operating costs. *See Moore v. Jet Stream Investments, Ltd*., 261 S.W.3d 412, 428 (Tex. App.—Texarkana 2008, pet. denied). In cases involving good-faith oil-and-gas trespass, courts measure damages by "net profits." *Maxvill-Glasco Drilling, Co., Inc. v. Royal Oil & Gas Corp*., 800 S.W.2d 384, 386 (Tex. App.—Corpus Christi 1990, writ denied). A party "who drills a well in good faith is entitled to reimbursement." *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 426 (Tex. 2008). The award of trespass damages must be reversed and the issue remanded.

**Accounting**. The judgment orders an accounting and payment of all proceeds of production from March 2, 2012 through August 31, 2014 and from September 1, 2014 until Escondido relinquishes possession. CR3:1859. This relief should be reversed to allow deductions for drilling and operating costs. *See Moore*, 261 S.W.3d at 428.

**Prejudgment interest**. The judgment's award of prejudgment interest is based on the improper damage awards and thus should be reversed. *See* CR3:1861.

**Relief under Texas Property Code**. The judgment denied Escondido's counterclaim under Texas Property Code Sections 22.021-0.24, including its claim to recover the value of improvements. CR2:930; CR3:1860. Section 22.021 provides that a trespasser who possessed property in good faith and made valuable improvements to it is either:

> (1) entitled to recover the amount by which the estimated value of the defendant's improvements exceeds the estimated value of the defendant's use and occupation of and waste or other injury to the property; or

> (2) liable for the amount by which the value of the use and occupation of and waste and other injury to the property exceeds the value of the improvements and for costs.

Tex. Prop. Code Ann. § 22.021(a); *see also Brannon*, 562 S.W.2d at 224 (holding driller under invalid lease entitled to reimbursement of reasonable drilling expenditures if it drilled "in good faith belief in the superiority of its lease").

If the bad-faith ruling is reversed, the case should be remanded for trial of this claim because there was evidence that Escondido made $33.1 million in improvements to the land, including approximately $10 million after March 2, 2012. CR3:1149 (¶5); CR3:1220-21.

## III. The trial court erred by granting summary judgment declaring the parties' rights and requiring conveyance of Escondido's leasehold interests regarding the "vacancy tract."

Justapor also sought summary judgment on declaratory judgment concerning 42 acres known as the "vacancy tract." The dispute concerns the meaning and

71

effect of the August 9, 2011 letter agreement regarding the "vacancy tract" and whether Justapor is entitled to a conveyance of the vacancy tract. CR1:255. The trial court's summary judgment ruling did not specifically address the vacancy tract. But its Final Judgment provided broadly that Justapor is entitled to a conveyance from Escondido "of mineral interests acquired under the Justapor Ranch,..." and "all other additional interests and improvements acquired in or under the Justapor Ranch, such as mineral interests, *leasehold interests*, or any other interests acquired by lease, deed or otherwise." CR3:1858 (emphasis added). The trial court also ordered specific performance: that Escondido "shall effectuate such conveyance on or before the date this judgment becomes a final, non-appealable judgment…." CR3:1858-59.

Escondido seeks to reverse this broad relief in the judgment, in part, because of the improper ruling on lease termination. But because the vacancy tract was a separate summary-judgment ground, and appears to fall within the broad relief granted, this separate issue addresses why Justapor is not entitled to a conveyance of interests specifically in the vacancy tract.

### A. Justapor did not conclusively establish its declaratory judgment claim.

Justapor did not conclusively establish (1) that its interpretation of the letter agreement was correct, or (2) the existence of a justiciable controversy. Declarations interpreting a contract are appropriately rendered by summary

72

judgment only if the contract provision at issue is unambiguous. *See Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 129 (Tex. App.—Corpus Christi 2006, pet. denied). Declaratory judgment is proper only if a real and substantial controversy involving a genuine conflict of tangible interests exists, not merely a theoretical dispute. *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).

### 1. Justapor did not conclusively establish that the interests to be conveyed include leasehold interests.

Based on the letter agreement as a whole, the only reasonable interpretation is that Escondido agreed to convey only "mineral interests"—not leasehold interests. The summary judgment record contains two versions of the letter agreement. CR1:445-48; CR3:1308-11. Both are initialed. Both are signed. Both have the same date.

The letter agreement attached to Escondido's summary judgment response provides:

> Additionally, we have agreed to convey to an entity of your choice, mineral interests we have acquired under the referenced 803 acres, as well as *all other mineral mineral [sic.] interests* we acquire in this land after your approval & consent.

CR3:1310 (emphasis added). A different version of the letter agreement attached to Justapor's summary judgment motion provides:

> Additionally, we have agreed to convey to an entity of your choice, mineral interests we have acquired under the referenced 803 acres as well as *all other additional interests* we acquire in this land after your approval and consent.

73

CR1:447 (emphasis added).

Based on these two versions and the letter agreement as a whole, "mineral interests" and "additional interests" should mean the same thing. Interpreting the two versions to have the same meaning is consistent with the fact that both agreements are initialed and dated the same day. These writings must be considered together. *See DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999).

The letter agreement attached to Justapor's summary judgment motion provides that Escondido will convey "mineral interests *we have acquired* under the referenced 803 acres, as well as all other additional interests *we acquire in this land after your approval and consent*." CR1:447 (emphasis added). The general term "additional interests we acquire" refers back to the specific term "mineral interests." *See Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003). In other words, Escondido agreed as to not only mineral interests acquired *at the time* the agreement was signed, but also any mineral interests acquired with Justapor's approval and consent *after* signing. *See* CR1:447. In contract interpretation, specific and exact terms are given greater weight than general language. *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center E., Inc.*, 290 S.W.3d 554, 560-61 (Tex. App.—Dallas 2009, no pet.). When words of a general nature are used in connection with the designation of particular

74

objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation. *Hilco Elec.*, 111 S.W.3d at 81.

In order to hold that "additional" means something other than "mineral" interests, the Court would have to strike out the term "mineral" from that version of the letter agreement and add the term "additional." In contrast, interpreting "additional" to mean "mineral" interests harmonizes the two versions and prevents a conflict that would render the term "mineral interests" in that version of the letter agreement meaningless. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

Justapor acknowledged mineral interests do not include leasehold interests. CR3:1679 (¶38). Justapor's position that "additional" means a different type of interest, as opposed to additional interests of the same type acquired at a later date, would require the Court to violate fundamental rules of contract interpretation and common sense. The letter agreement unambiguously requires conveyance only of "mineral interests," which do not include leasehold interests. Accordingly, the trial court erred in granting summary judgment that the letter agreement requires conveyance of interests other than mineral interests.

### 2. Unless "mineral interests" and "additional interests" mean the same thing, the letter agreement is ambiguous.

If the Court disagrees, however, the face of the summary judgment record at least shows the letter agreement is ambiguous. If "mineral interests" and

75

"additional interests" are given different meanings, it is unclear whether the parties intended to require Escondido to convey "mineral interests" or "additional interests" and what "additional interests" might include. *Compare* CR1:447 *with* CR3:1310. This ambiguity would create fact questions about the letter agreement's meaning and effect, precluding summary judgment on Justapor's vacancy tract claim. *See Reilly*, 727 S.W.2d at 529.

### 3. Justapor did not establish that it had chosen an entity to which any interests should be conveyed.

The letter agreement provided that Escondido was obligated to convey either "mineral interests" or "additional interests" "to an entity of [Justapor's] choice…." CR1:447; CR3:1310. Justapor provided no summary judgment evidence that it identified its chosen entity to Escondido, and neither the summary judgment motion nor the judgment identifies the entity to whom Escondido is required to convey unidentified "leasehold interests, or any other interests acquired by lease, deed, or otherwise …." CR1:254-55; CR3:1760.

Unless and until Justapor chose an entity to whom any later interests could be conveyed, there is no basis to conclude that Escondido "failed" to convey any such interest or that it must convey any interest now.

### 4. Justapor did not identify any leasehold interest that should have been, but was not, conveyed.

Justapor also did not identify any leasehold or other interest that Escondido acquired in the vacancy tract after Justapor's approval and consent. The most the summary judgment record shows is that Escondido has leased some interests from owners of the vacancy tract, but there is no evidence as to when these interests were acquired or whether they were acquired "after [Justapor's] approval and consent." CR1:355 (Deupree deposition). Affidavit testimony by Justapor's Jones that "Escondido has failed to convey all of its leasehold interest in the Vacancy Tract" is conclusory and constitutes no evidence. *Compare* CR1:315-16 (¶8) *with Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 883-84 (Tex. App.—Dallas 2007, no pet.). This testimony does not identify any lease, establish it concerns the vacancy tract, or establish it was acquired after Justapor's approval and consent.

Justapor's claim for declaratory relief sought an advisory ruling regarding a phantom interest to be conveyed to a never-chosen entity. It is no support for any portion of the trial court's judgment.

### B. Justapor was not entitled to specific performance.

Neither Justapor's pleading nor its summary judgment motion requested specific performance, but instead only a declaration that Justapor "is entitled to a conveyance of all of Escondido's interest in the Vacancy Tract...." CR1:153 (¶¶22-

77

24); CR1:255. A summary judgment cannot be sustained on a ground not set forth in the motion. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339, 341 (Tex. 1993). Nor is summary judgment proper on an unpleaded claim. *See DeBord v. Muller*, 446 S.W.2d 299, 301 (Tex. 1969) (holding summary judgment unavailable to defendant on unpleaded affirmative defense).

The trial court granted specific performance when it added to the judgment: "and [Escondido] shall effectuate such conveyance on or before the date this judgment becomes a final, non-appealable judgment …." CR3:1858-59. This grant of relief is beyond the summary judgment motion. *Compare* CR1:255 *with* CR3:1858-59.

Even if Justapor had pleaded or sought summary judgment for specific performance, Justapor did not show it was entitled to such relief. Claims for declaratory relief and specific performance are not interchangeable. A determination that an agreement is enforceable—*i.e.*, a declaration of the parties' rights under an agreement—does not equate to a determination that a party is entitled to specific performance. *Levetz v. Sutton*, 404 S.W.3d 798, 805 (Tex. App.—Dallas 2013, pet. denied). A party seeking specific performance must establish that it has performed, or tendered performance of, its obligations under the contract. *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied); *Am. Apparel Prods., Inc. v. Brabs, Inc.*, 880

S.W.2d 267, 269 (Tex. App.—Houston [14th Dist.] 1994, no writ). By failing to provide any evidence (much less, conclusively establish) that it had chosen an entity to whom any interests should be conveyed, Justapor was not entitled to summary judgment affording specific performance.

In addition, a party seeking specific performance must establish that the other party has breached the contract. *Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). If the letter agreement does not provide unambiguously that Escondido is required to convey only mineral interests, not leasehold interests, specific performance is improper. A contract is subject to specific performance if its essential terms are expressed with such certainty and clarity that it may be understood without recourse to parol evidence. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied). The heightened degree of certainty required for specific performance is a product not only of its equitable nature, but also of its ultimate goal: to require exact performance of a contract in the specific form in which it was made. *Levetz*, 404 S.W.3d at 805.

Justapor did not conclusively establish its right to specific performance, requiring reversal of this portion of the trial court's judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

## CONCLUSION AND PRAYER

Escondido prays that the Court:

- reverse the trial court's summary judgment in Justapor's favor in its entirety;

- either:

  - render partial summary judgment in Escondido's favor that the lease did not terminate and therefore dismiss Justapor's causes of action for trespass, trespass to try title, its request for an accounting and declaratory relief; *or*

  - alternatively, reverse the trial court's summary judgment that Escondido was a bad-faith trespasser and all relief based on that finding, including the accounting ordered by the trial court, all awards of past and future proceeds from the sale of oil and gas, prejudgment interest, costs, and post-judgment interest; *and*

- and remand this case for further proceedings on the remaining claims consistent with this Court's opinion.

Respectfully submitted,

/s/Robert Dubose

| | |
|---|---|
| James P. Keenan | Robert Dubose |
| State Bar No. 11167850 | State Bar No. 00787396 |
| keenan@buckkeenan.com | rdubose@adjtlaw.com |
| J. Robin Lindley | ALEXANDER DUBOSE JEFFERSON |
| State Bar No. 12366100 | & TOWNSEND LLP |
| lindley@buckkeenan.com | 1844 Harvard Street |
| BUCK KEENAN, LLP | Houston, Texas 77008 |
| 700 Louisiana, Suite 5100 | Telephone: (713) 523-2358 |
| Houston, Texas 77002 | Facsimile: (713) 523-4553 |
| Telephone: (713) 225-4500 | |
| Facsimile: (713) 225-3719 | Wallace B. Jefferson |

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel Ekery
State Bar No. 00787424
rekery@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
&TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

Kirsten Castañeda
ALEXANDER DUBOSE JEFFERSON
&TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, Texas 75206
Telephone: (214) 369-2358
Facsimile: (214) 369-2359

**ATTORNEYS FOR APPELLANT**

**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word 2013, this brief contains 14,763 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/Robert Dubose
Robert Dubose

**CERTIFICATE OF SERVICE**

On May 15, 2015, I electronically filed this Brief of Appellant with the Clerk of Court using the eFile.TXCourts.gov electronic filing system which will send notification of such filing to the following:

Timothy Patton,
TIMOTHY PATTON, P.C.
14546 Brook Hollow #279
San Antonio, Texas 78232
tpatton@tp-pc.com

Jose M. Rubio, Jr.
JOE RUBIO LAW FIRM
1000 Washington Street, Suite 4
Laredo, Texas 78040
joerubio@joerubiolawfirm.com

Patton G. Lochridge
MCGINNIS LOCHRIDGE & KILGORE LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701
plochridge@mcginnis1aw.com

/s/Robert Dubose
Robert Dubose

**APPENDIX**

**Tab**          **Item**

1.               Final Judgment (CR3:1857-1891)

2.               Order Granting Plaintiff's Motion for Summary Judgment (CR3:1796-99)

3.               Oil and Gas Lease (CR3:981-1013)

4.               Amendment to Oil and Gas Lease (CR3:1014-1020)

5.               Affidavit of David Wrather (CR3:1325-1330)

6.               Affidavit of John Lowe (CR3:1136-1147)

7.               Affidavit of William Abington without exhibits (CR3:1148-1151)

8.               August 9, 2011 Letter Agreement (version 1) (CR3:1308-1311)

9.               August 9, 2011 Letter Agreement (version 2) (CR1:445-448)

10.              *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768 (Tex. 2009)

11.              *Decker v. Kirlicks*, 110 Tex. 90, 216 S.W. 385 (1919)

12.              *Outdoor Sys., Inc. v. BBE, L.L.C.*,105 S.W.3d 66 (Tex. App.—Eastland 2003, pet. denied)

13.              *T-Anchor Corp. v. Travarillo Assocs.*, 529 S.W.2d 622 (Tex. Civ. App.—Amarillo 1975, no writ)

14.              *Vinson Minerals, Ltd. v. XTO Energy, Inc.*, 335 S.W.3d 344 (Tex. App.—Fort Worth 2010, pet. denied)

15.              Tex. Prop. Code § 22.021(a)

Filed
11/20/2014 4:30:30 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

CAUSE NO. 2013-CV7-001396-D1

| | | |
|---|---|---|
| JUSTAPOR RANCH COMPANY, L.C. | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| ESCONDIDO RESOURCES II, LLC, | § | WEBB COUNTY, TEXAS |
| | § | |
| Defendants | § | |
| | § | |
| | § | |
| | § | 49th JUDICIAL DISTRICT |

## FINAL JUDGMENT

On this the 21st day of November 2014, came on to be heard Plaintiff Justapor Ranch Company, L.C.'s ("Justapor" or "Plaintiff") Motion for Entry of Final Judgment and, upon considering the orders entered by this Court on the Parties' Motions for Summary Judgment, and Motion for Partial Summary Judgment, objections to summary judgment evidence, and Motion for Severance and as well as the Motion for Entry of Final Judgment and the materials submitted therewith, and, upon hearing the arguments of counsel, the Court finds that Plaintiff's Motion for Entry of Final Judgment should be granted in all respects.

The Court finds that on September 11, 2014, this Court heard Justapor Ranch Company, L.C.'s and Escondido Resources, II, LLC's ("Defendant" or "Escondido"), cross motions for summary judgment. After hearing and considering such motions and the evidence and arguments submitted therewith, on October 8, 2014, this Court granted Justapor's Motion for Summary Judgment on Defenses Attacking Lawyer James K. Jones, Jr., and denied Escondido's Motion for Partial Summary Judgment. On October 14, 2014, this Court granted Justapor's Motion for Summary Judgment. This Court also entered its Order Sustaining Objections to Escondido's

1

1857

Resources, II, LLC's Motion for Partial Summary Judgment Evidence and its Order on Justapor's Response to Escondido Resources, II, LLC's Objections to Summary Judgment Evidence. The Court's orders on those Summary Judgment Motions are attached hereto as Exhibits A, B, and C respectively and are incorporated herein by reference for all purposes. The Court's Orders sustaining/denying objections to summary judgment evidence are attached hereto as Exhibits D and E respectively and are incorporated herein by reference for all purposes. This Court's orders on these summary judgment motions disposed of all claims and counterclaims made the subject of this lawsuit except for Justapor's causes of action for exemplary or punitive damages, attorneys fees, and expert witness and accounting fees and Escondido's defenses thereto not decided by this Court's orders on the motions for summary judgment attached hereto as Exhibits A-C.

On November 20, 2014, the Parties filed an Agreed Motion for Severance of Claims to sever these remaining claims and remaining defenses so that the summary judgment orders entered by this Court may become final. This Court on November 21, 2014, granted the Joint Motion for Severance of Claims.

It is therefore,

ORDERED, ADJUDGED, DECLARED, AND DECREED that the Motion for Entry of Final Judgment be and hereby is GRANTED in all respects; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that the oil and gas lease between Plaintiff Justapor Ranch Company, L.C. and Defendant Escondido Resources II, LLC (the "Justapor Lease") is terminated, and was terminated as of March 2, 2012; and it is further

2

ORDERED, ADJUDGED, DECLARED, AND DECREED that the ownership of the minerals covered by the Justapor Lease has reverted to Plaintiff as of March 2, 2012; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Plaintiff is the sole and rightful owner of all interests conveyed by the Justapor Lease and is the owner in fee of the mineral estate; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Defendant is not entitled to remain in possession of the minerals or other property covered by the Justapor Lease and shall surrender possession thereof to Plaintiff; and it is further

ORDERED, ADJUDGED, DECLARED AND DECREED that from March 2, 2012, through the date hereof Defendant has remained, and remains, in unlawful possession of minerals covered by the Justapor Lease as a bad faith trespasser, and is not, and has never been, a good faith trespasser; and it is further

ORDERED, ADJUDGED, DECLARED AND DECREED that Plaintiff is entitled to an accounting for and payment of up to March 1, 2012, all underpaid royalties, and to an accounting for and payment of all the proceeds of all production from the Justapor Lease (1) from March 2, 2012, through August 31, 2014, and, (2) from September 1, 2014, through the date Defendant relinquishes possession less royalties already paid to Justapor and Mary Hansen under the Justapor Lease; and Defendant is hereby ordered to provide the accountings and payments to Plaintiff as stated in (1) above on or before the 31st day after this Judgment is signed and as stated in (2) above on or before March 1, 2015 and continuing on the first day of each successive

3

month for proceeds of production through the date Defendant relinquishes possession; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Plaintiff is entitled to a conveyance from Defendant of mineral interests acquired under the Justapor Ranch, including without limitation the 803 acre tract described in the Justapor Lease, as well as all other additional interests and improvements acquired in or under the Justapor Ranch, such as mineral interests, leasehold interests, or any other interests acquired by lease, deed, or otherwise; and Defendant shall fully effectuate such conveyance on or before the date this judgment becomes a final, non-appealable judgment; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Defendant take nothing on each of Defendant's counterclaims in this matter; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Plaintiff is entitled to damages in the amount of all proceeds from the sale of oil and gas produced from the Justapor Lease from the date of termination until the date of final non-appealable judgment in this matter less royalties already paid to Justapor and Hansen under the Justapor Lease and thereafter until Defendant relinquishes possession to Plaintiff; and it is further

ORDERED, ADJUDGED, DECLARED, AND DECREED that Plaintiff is entitled to and shall recover from Defendant the following damages:

    a. Actual damages for Defendant's trespass, for the proceeds from sale of oil and gas produced by Defendant from Plaintiff's land described in the Justapor Lease (less royalty already paid to Justapor and Hansen under the Justapor Lease) from the

4

1860

date of termination (March 2, 2012) through August 31, 2014, in the amount of $12,038,042;

b. Actual damages for Defendant's trespass, for the proceeds from sale of oil and gas produced by Defendant from Plaintiff's land described in the Justapor Lease (less royalty already paid to Justapor and Mary Hansen under the Justapor Lease) from September 1, 2014, through the date Defendant relinquishes possession to Plaintiff;

c. Actual damages for Defendant's breach of contract in the amount of $3,619.00;

d. Prejudgment interest through November 20, 2014 on the amounts set forth in (a) and (c) above in the amount of $603,233.00;

e. Prejudgment interest on the actual damages incurred after September 1, 2014 until November 20, 2014 at the rate of 5% per annum non-compounded;

f. Court costs through trial and appeal; and

g. Postjudgment interest on all of the above, from the date of this Final Judgment until all amounts are paid in full at the rate of 5% per annum compounded annually.

This Final Judgment disposes of all parties and all claims and is appealable.

5

1861

IT IS SO ORDERED.

SIGNED this 25th day of November, 2014.

_____
The Honorable Judge Joe López

6

CAUSE NO. 2013-CV7-001396-D1

JUSTAPOR RANCH COMPANY, L.C. § IN THE DISTRICT COURT OF
§
Plaintiff, §
§
vs. §
§
ESCONDIDO RESOURCES II, LLC, § WEBB COUNTY, TEXAS
§
Defendants §
§
§
§ 49th JUDICIAL DISTRICT

*[handwritten: Notations/portions needs to be re-typed]*

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On this the ___ day of September, this Court considered Plaintiff Justapor Ranch Company, L.C.'s ("Plaintiff") Motion for Summary Judgment and Plaintiff Justapor Ranch Company, L.C.'s Supplement to its Motion for Summary Judgment Evidence (collectively, the "Motion"). The parties appeared before the Court for the hearing on the Motion. After considering the pleadings, the Motion, Defendant Escondido Resources II, LLC ("Defendant") Response, Plaintiff's Reply, evidence on file in connection with all motions for summary judgment, and arguments of counsel, the Court GRANTS the Motion in full. It is, therefore,

ORDERED, ADJUDGED AND DECREED that the Motion be and hereby is GRANTED in all respects, it is further

ORDERED, ADJUDGED AND DECREED that the oil and gas lease between the parties (the "Justapor Lease") is terminated, and was terminated as of March 2, 2012; and it is further

ORDERED, ADJUDGED AND DECREED that the ownership of the minerals covered by the Justapor Lease has reverted to Plaintiff as of March 2, 2012; and it is further

1

ORDERED, ADJUDGED AND DECREED that Plaintiff is the sole and rightful owner of all interests conveyed by the Justapor Lease and is the owner in fee of the mineral estate; and it is further

ORDERED, ADJUDGED AND DECREED that Defendant is not entitled to remain in possession of the minerals or other property covered by the Justapor Lease and shall surrender possession thereof to Plaintiff; and it is further

ORDERED, ADJUDGED AND DECREED that from March 2, 2012 through the date hereof Defendant Escondido Resources II, LLC ("Defendant") has remained, and remains, in unlawful possession of minerals covered by the Justapor Lease as a bad faith trespasser, and is not, and has never been, a good faith trespasser; and it is further

ORDERED, ADJUDGED AND DECREED that Plaintiff is entitled to an accounting for and payment of up to March 1, 2012, all underpaid royalties, and to an accounting for and payment of all the proceeds of all production from the Justapor Lease from March 2, 2012 through the date of final non-appealable judgment in this matter less royalties already paid under the Justapor Lease; and Defendant is hereby ordered to provide such accounting and payment to Plaintiff; and it is further

ORDERED, ADJUDGED AND DECREED that Plaintiff is entitled to a conveyance from Defendant of mineral interests acquired under the Justapor Ranch, including without limitation the 803 acre tract described in the Justapor Lease, as well as all other additional interests and improvements acquired in or under the Justapor Ranch, such as mineral interests, leasehold interests, or any other interests acquired by lease, deed, or otherwise; and Defendant

2

shall effectuate such conveyance on or before the date this judgment becomes a final, non-appealable judgment; and it is further

ORDERED, ADJUDGED AND DECREED that Defendant take nothing on each of Defendant's counterclaims in this matter; and it is further

ORDERED, ADJUDGED AND DECREED that Plaintiff is entitled to damages in the amount of all proceeds from the sale of oil and gas produced from the Justapor Lease from the date of termination until the date of final non-appealable judgment in this matter less royalties already paid under the Justapor Lease and thereafter until Defendant relinquishes possession to Plaintiff; and it is further

ORDERED, ADJUDGED AND DECREED that Plaintiff is entitled to and shall recover from Defendant the following damages:

a. Actual damages for Defendant's trespass, for the proceeds from sale of oil and gas produced by Defendant from Plaintiff's land described in the Justapor Lease (less royalty already paid under the Justapor Lease) from the date of termination (March 2, 2012) through February 28, 2014 in the amount of $10,413,114.00;

b. Actual damages for Defendant's trespass, for the proceeds from sale of oil and gas produced by Defendant from Plaintiff's land described in the Justapor Lease (less royalty already paid under the Justapor Lease) from March 1, 2014, through the date of final non-appealable judgment in this matter;

c. Actual damages for Defendant's breach of contract in the amount of $3,619.00;

3

d. Prejudgment interest through October 1, 2014 on the amounts set forth in (a) and (c) above in the amount of $508,533.00, plus prejudgment interest on such amounts from October 2, 2014 until the date of the final non-appealable judgment, in an amount to be determined by the Court; and

e. Prejudgment interest on the actual damages incurred after March 1, 2014 until the date of the final non-appealable judgment, in an amount to be determined by the Court;

f. Court costs through trial and appeal; and

g. Postjudgment interest on all of the above, from the date the final judgment is rendered until all amounts are paid in full.

IT IS SO ORDERED.

SIGNED this ___ day of September, 2014.

_____
The Honorable Judge Joe Lopez

4

1799

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

## OIL AND GAS LEASE

STATE OF TEXAS    §

COUNTY OF WEBB  §

THIS AGREEMENT made this $\underline{24^{th}}$ day of $\underline{June}$ 2008, by and between the Justapor Ranch Company, L.C., whose address is 5601 San Dario Av., Suite #5, Laredo, TX 78041 hereinafter called "LESSOR", and Escondido Resources II, LLC whose address is 600 N. Marienfeld, Ste. 400, Midland, TX 79701, hereinafter called "LESSEE",

### WITNESSETH:

I.

Subject to all terms and provisions of this lease, Lessor, in consideration of TEN AND NO/100THS ($10.00) DOLLARS in hand paid, of the royalties herein provided for, and of the agreements of Lessee herein stated, hereby LEASES, and LETS exclusively unto Lessee an oil and gas leasehold estate, covering only the oil and gas formations to a depth of 9,000 feet beneath the surface of the land herein demised, for the purpose of investigating, exploring, drilling for and producing OIL, (including all liquid hydrocarbons and casinghead gas or other products produced from any well classified as an oil well or oil wells by any Governmental authority) and GAS (the term "gas" as used herein is defined as to include natural gas, condensate, distillate or other by-products recovered from wells specified as gas wells by any governmental authority), and subject to the specific surface use provisions hereinafter specified provisions of this lease, to construct and emplace such pipelines, tanks and well equipment on the surface of the lands covered hereby which are necessary to produce, save, treat, process, store and sell said OIL and/or GAS production (as defined herein).

The aforementioned tract of land consisting of 803 acres, more or less, is situated in Webb County, Texas and is more accurately described by metes and bounds on the attached exhibit "A".

For the purposes of calculating the payments hereinafter provided for, said land shall be considered to comprise 803 acres.

II.

Subject to the other provisions herein contained, this lease shall be for a primary term of three (3) years from date hereof, and as long thereafter as oil or gas is

# Ex. A

produced from said land in paying quantities, or as long as this lease is otherwise maintained in whole or part by any other provision of this lease.

## III.

The royalties to be paid by Lessee to Lessor are as follows, to-wit:

(a) On all oil or other liquid hydrocarbons produced from this lease, Lessee shall be required to pay to Lessor the higher of one-fourth (1/4th) of the posted price for similar type of oil produced in Texas Railroad District 4 (as said region now exists) or for similar type of oil produced from this lease or the current market value of that produced and saved from said land, free of all cost and expense to the point of purchase thereof by Lessee, as herein required. All oil or other liquid hydrocarbons produced from this lease shall be treated and stored on this lease until purchased by Lessee.

(b) On all gas production from this lease, including casinghead gas or other gaseous substances, and all other products derived therefrom or in the manufacture of gasoline or other product therefrom, Lessee shall calculate and pay royalties to Lessor on One-Fourth (1/4th) of all gas produced from this lease and its constituents and products sold or used therefrom, which royalties shall be calculated and paid to Lessor based upon the highest of (i) the CURRENT MARKET VALUE of such gas production from this lease which is sold by, through or under Lessee or used by, through or under Lessee, (ii) the CURRENT HOUSTON SHIP CHANNEL PRICE for such gas production, as hereinafter defined, or (iii) the CURRENT PROCEEDS REALIZED BY LESSEE for such gas production, without deduction of any costs or expense except as hereinafter stipulated or, (iv) the highest sales price of any gas were gas produced from the property could be present when sold to a third party. All gas production from this lease shall be measured at each wellhead at Standard Measurement, as prescribed by the Natural Resources Code, Section 91.052, Texas Revised Civil Statutes. Lessor's royalties shall be paid on all gas production produced under this lease. The term "current" or "currently", as used herein, shall mean the time at which production of oil or gas is actually produced from this Lease.

(i) The term "CURRENT MARKET VALUE" shall mean the current market value of gas sold or used off of this lease during each applicable month of production based upon the comparable sales of gas from the Texas Gulf Coast Region, encompassing Texas Railroad Commission Districts Nos. 2, 3 and 4. "Comparable sales of gas" shall be those sales of gas that are comparable in quantity, quality, time and availability to marketing outlets, as those terms are defined in the Texas Supreme Court case of Exxon Corp. v. Middleton, 613 SW2d, 240-252. If comparable sales are unavailable, then appropriate adjustments shall be made to other sales of gas production to make them comparable to the sale of gas production from this Lease. If any of the contracts utilized in determining comparable sales of gas shall expressly or impliedly provide for

and include any deduction for the expense of producing, dehydrating, compressing, treating or marketing of the gas or for transporting or gathering the gas to the point of sale, then such deductions shall be added to the market value of such gas, so that Lessor's royalty shall not be chargeable, directly or indirectly, with any of such post production expenses notwithstanding anything to the contrary contained in Heritage Resources, Inc. v. Nations Bank 939 S.W.2d 118 (TEX 1996) or in similar judicial decisions respecting post production expenses.

(II) The term "HOUSTON SHIP CHANNEL PRICE" shall be construed to mean the price or value which is equal to the highest reported on-shore spot purchase price being paid during the month of production by purchasers of gas produced in the Texas Gulf Area, to be determined on a monthly basis by reference to the index spot gas price (large packages only) for gas delivered to pipelines at Houston Ship Channel/Beaumont, Texas, as recorded in Inside F.E.R.C. vs. Gas Market Report published by McGraw-Hill, minus five (.05) cents per MMBtu, (an agreed upon reasonable transportation charge for this lease production) adjusted for MMBtu content, and without any other deduction by Lessee save unreimbursed severance taxes actually paid by the Lessee in behalf of Lessor to the taxing authority. In the event the above-designated gas price index publication ceases to exist, (or ceases to report such "Houston Ship Channel Price" hereinabove referred to), the Lessor and Lessee shall agree on another publication generally acceptable as providing comparable accurate current data as to current on-shore spot prices for gas delivered into pipelines by purchasers in said area, which substituted publication shall be used in lieu of the above-described publication as part of the foregoing standard, upon which Lessor's royalty shall be calculated and paid. In the event no price index publication can be agreed upon as reliable, then a reliable governmental or other non-partisan publication evaluating the same information shall be used, with current payments to be made on the most current information available and then adjusted, as necessary, within thirty (30) days following the availability of the governmental data or other non-partisan publication, or if no such publication is available for purposes, hereof, this standard, as an element for calculation of Lessor's royalties, shall cease to exist.

(III) The term "CURRENT PROCEEDS REALIZED BY LESSEE" shall be construed to mean the price or value which is equal to all proceeds actually received by Lessee from its purchaser (whether affiliated or unaffiliated) for the sale of the gas produced from this lease.

(c) Lessee specifically agrees to install, maintain and operate a properly calibrated gas metering device at each gas wellhead for the purpose of accurate measurement of all gas production produced from each gas well on this lease, which gas measurement shall be made pursuant to the measurement law referred to under Article III, paragraph (b) of this lease. Such gas meter shall be available for inspection as to its calibration, orifice size and measurements at any time or times by Lessor (or Lessor's representative) and no "by-pass" valves or connections shall be authorized to

be made which do not provide for proper and accurate metering of gas production from any such gas well. Each such gas metering device and orifice plates shall be installed and maintained in accordance with the provisions of the current American Gas Association Report No. 3 (A.G.A. Report #3), as now existing. Further, to assure compliance with American Gas Association Report No. 3 (A.G.A. Report #3), as now published, such meters shall be inspected and re-calibrated monthly by Lessee after notice to Lessor with sufficient time for Lessor to arrange to be present, either personally or through Lessor's representative. Lessee shall also install, operate and maintain a separate gas meter on this lease at each point of exit of a pipeline transporting gas production off of this lease and shall report such gas production volumes taken from this lease, on a monthly basis, to Lessor. All gas volume measurements at the point of exit (whether one or more) shall be compared to the aggregate of all the individual wellhead gas volume measurements, and for the purpose of royalty payment calculations, Lessee shall use whichever volume is greater. Lessee shall report such gas production volumes taken from this lease, and the discrepancies if any on a monthly basis, to Lessor. Lessee shall be required to perform an accurate gas analysis on all gas production, on a well-by-well basis, periodically, but at least monthly from date of first production of each gas well drilled and completed hereunder, which analysis shall extend to the BTU content of such gas production and other commercial constituents thereof. A copy of such gas analysis shall be furnished to Lessor as obtained by Lessee if requested by Lessor. In the event that any distillate or other liquid hydrocarbons are contained in the gas stream of any gas well on this lease, in commercial quantities, then Lessee is required to extract such liquid hydrocarbons on this lease and to store and to sell and market the same separately from the gas production, paying Lessor's royalties thereon. In the event that the gas production contains distillate, condensate, or other liquid hydrocarbons, or water, such gas production shall first be separated at the wellhead prior to measurement of such gas production as provided above. All liquid hydrocarbons removed from the gas stream through such separator shall be stored in steel distillate or condensate tanks at each well site and such liquid hydrocarbons shall be purchased by Lessee at the current pricing provisions specified under subparagraph a) of this Article III, Lessee being required to pay and account to Lessor for Lessor's royalties on all of such separated and stored liquid hydrocarbons on a monthly basis. In the event that the gas production from this lease needs to be compressed, the compression thereof shall occur through facilities located on this lease in a manner designed to maximize production. In the event that Lessee drills and completes several wells on this lease, Lessee may provide for one or more central facilities for heating, dehydration, separation and compression of such gas production with storage tanks for distillate or condensate being also located at such central facility, which central facility or central facilities, must in be located upon this lease in a location to be designated by Lessor. Lessee shall be prohibited from commingling of third party gas production through such processing or central facilities. Further, any gas production which has a fractional oil and gas royalty interest payable to Lessor different from other oil and gas production royalties payable to Lessor hereunder, shall require Lessee to separately process and meter such oil and gas

production upon this lease in which Lessor has a different net royalty interest therein and account to Lessor, accordingly.

In addition, Lessor shall be authorized to install and maintain its own check meter on any oil or gas well upon such leased premises, or on the sales meter of production from this lease, in order to verify the amount of production from any well or wells on this lease; provided that if Lessor elects to install their own check meter or meters, such shall be installed under the supervision of an engineer and after thirty (30) days' written notice to Lessee. In this connection, Lessee shall have the right to make such installation itself of Lessor's check meter or meters, in order that such installation does not interfere with Lessee's operations, provided such installation is performed by Lessee pursuant to Lessor's specifications within a reasonable time, not exceeding thirty (30) days following written request of Lessor. Calibration of such meter (whether one or more), its maintenance, its charts, and computation of production, shall be performed by Lessor at Lessor's sole cost and expense. In this connection, if requested by Lessee, Lessor shall calibrate any such meter in the presence of Lessee. All gas production from this lease must be measured on this lease in the manner stated above prior to point of exit of such gas production from this lease. Calculation of volume of gas production, adjusted for btu content at stated herein, for royalty payment purposes hereunder shall be computed from such exit meter, (whether one or more) or the aggregate of all individual wellhead gas measurement meters at each gas wellhead on this lease, whichever volume amount is the greater.

(d) Lessee agrees that all other gas and its constituents and products which do not extend to condensate covered by the preceding subparagraph c) of this Article III, may be further processed by Lessee at a gas processing plant located off of this lease and in such event, Lessee shall calculate and pay to Lessor, its herein reserved royalties, based upon the higher of the market value thereof or the price paid by such plant operator to Lessee herein for constituents and products extracted from the gas stream and the residue gas remaining after such extraction. Lessee is prohibited from marketing gas production and its products through a processing plant, as referred to herein, unless the combined royalties paid to Lessor for such plant products and residue gas, exceed the value of the royalties payable by Lessee to Lessor on the unprocessed gas stream from this lease as provided for under subparagraph (b) of Article III of this lease.

(e) Lessor and Lessee herein agree that Lessor reserves and shall have the continuing option to take all or any part of Twenty-five (25%) percent of all of the gas produced from this lease in kind (such 25% of all gas production from this lease, sometimes referred to herein as "Royalty Gas"), and Lessor shall be entitled, upon not less than sixty (60) days prior written notice mailed to the Operator of the lease, to require that Lessee commence, as of the effective date and hour of Lessor's election, delivering to the connecting gas gathering and transmission systems for the account of the owners of the Royalty Gas or their designated marketer or purchaser or otherwise,

all of such designated volume of the subsequently accruing Royalty Gas, on a daily basis, for such duration or period as Lessor designates in its written notice to Lessee (hereinafter called "in kind gas"), which delivery into such gas gathering and transmission systems shall be made ratably and transported and delivered by the Lessee and its transporters in accordance with the instructions of Lessor, or Lessor's designated marketer or purchaser. Because all deliveries of Lessor's Royalty Gas are to be made ratably, on a daily basis, with the volumes of gas actually being marketed and delivered by Lessee to Lessor's purchaser, no gas imbalances shall be permitted to accrue as a result of Lessor's election to take its Royalty Gas in kind. Any Royalty Gas not actually taken in kind by Lessor shall be marketed and sold by Lessee, and Lessee shall account to Lessor for all Royalty Gas not actually taken in kind in accordance with Article III (b) of this lease. Lessee further commits and obligates itself to reasonably cooperate with Lessor and Lessor's designated representative in arranging for any such deliveries in kind, including Lessee's obligation to exercise its good faith best efforts to assist Lessor in the obtaining of the consent and commitment of the initial and each subsequent transmission company with whom Lessee is doing business, or hereafter does business, to transport Lessor's in kind gas to the point where all Royalty Gas designated by Lessor as in kind gas can be interconnected and delivered over to other gas transmission systems selected by Lessor (or Lessor's designated marketer or purchaser) from time to time, at a cost of transportation not greater than that then being charged by each such transporter to their respective most favored shippers (whether such shipper is a buyer or seller of gas and regardless of whether such shipper is affiliated with the transporter) for comparable transportation consistent with applicable statutory and regulatory standards governing such transportation.

The right of Lessor to elect, from time to time, to take all or some designated portion of the Royalty Gas as in kind gas shall in no manner relieve the Lessee of its duty to market all gas (with the exception of any gas which Lessor expressly designates as in kind gas) under the Reasonably Prudent Operator Standard, which Lessee agrees to require it, among other things, to market all gas production from this lease as would a Reasonably Prudent Operator under the same or similar circumstances with interests of itself and its royalty owners in mind (except designated in kind gas) and to account to the royalty owners herein, for their royalties on the basis as provided for under Article III(b) of this lease.

(f) Lessor's reserved royalty shall never be reduced by partial production from any well on this lease or by production by one Working Interest Owner but not another (whether one or more), nor shall such royalty obligation be divided among one or more Working Interest Owners, as it is agreed that the royalties reserved by Lessor shall be applied wholly to any production produced from the well bore of any well or wells on this lease and shall remain the responsibility of all Working Interest Owners (whether one or more, jointly and severally).

986

(g) In accounting to Lessor for royalties payable hereunder, Lessee shall be required, on a monthly basis, if requested by Lessor, to account to Lessor for each well on leased premises based upon the volume of production, (measured as provided for under subparagraph (b), hereof), with a statement reflecting the gross production of each well, the gross price per unit of production (gas being expressed in thousand cubic feet and oil being expressed in barrels of 42 gals.), the BTU (British Thermal Unit) content of such production, the royalty interest in such production and the amount owed and paid to such royalty interest owner. Except as provided for herein, Lessee shall not be authorized to make deductions from Lessor's royalties without first notifying Lessor with a full explanation therefore, giving Lessor at least fifteen (15) days to respond thereto. Lessor, at all reasonable times, shall have the right of inspection of Lessees' records relating to computation and payment of the royalties reserved hereunder. In the event Lessor or royalty owner, upon written notice to Lessee, disputes the legitimacy of any deduction or adjustment to Lessor's royalty payments, Lessee shall not be entitled to make such deductions or adjustments against Lessor's royalty (and Lessor's full-royalty payments shall not be interrupted) until such dispute is resolved. If it is agreed by Lessor or the royalty owner in question that a royalty owner was overpaid, then the overpaid royalty owner has the option of repaying such overpayment or allowing Lessee to recoup such overpayment out of future royalty payments on a schedule and in monthly amounts agreed to by such overpaid royalty owner and Lessee. Any overpaid royalty owner shall not be charged interest on the overpaid sums. Further, Lessor shall be entitled, upon request in writing, to be furnished with copies of all gas purchase or gas sales agreements made for the sale of oil or gas or any of its constituents from this leased premises, together with any and all subsequent amendments thereto; provided, however, that Lessor shall keep such agreements confidential except to the extent of their use by Lessor in connection with Lessee's obligations hereunder. In the event Lessee withholds any windfall profits tax (or any other similar tax type of tax by any governmental authority) from any royalty payment payable hereunder, from and after a period of six (6) months following initial production and upon request in writing, Lessor shall be entitled to be furnished with full facts and information respecting the calculation and deduction of such windfall profit tax or other tax upon production, together with evidence of payment of such tax by Lessee. Lessee shall be authorized to withhold from such royalty payment only that windfall profit tax proportionately related to such royalty interest, which is legally owed to governmental authority and actually paid by Lessee in behalf of such royalty interest owner. Severance taxes directly and indirectly paid by Lessee to the State of Texas, which are not reimbursed to Lessee by the Purchaser of oil or gas production from this lease, shall be deducted by Lessee in proportion to Lessor's royalty interest, on a month-by-month basis, from Lessee's payment of such royalties to Lessor. It is agreed that any severance tax on production from this lease, which is paid by the Purchaser of oil or gas production and/or reimbursed by the Purchaser to Lessee, shall not be charged or deducted from Lessor's royalties. Lessee shall annually, on or before January 31st of each year, review the prices and production volumes used by Lessee in calculation of Lessor' s royalties against the price and production volume required to be

paid to Lessor under the terms of this lease. In the event the prices and/or volumes used by Lessee in calculating and payment of production royalties paid to Lessor was less than those required to be paid, Lessee shall issue its check to make up the difference on or before March 1st of each year. If requested by Lessor, Lessee shall submit a report to Lessor on January 31st of each year stating that it has complied with all terms of this lease, including but not limited to, Lessee's obligations concerning operations; measurement and determination of quality of all product, sale or disposition of all product; calculation and payment of royalties and any deductions therefrom. On Lessor's written request, Lessee shall furnish Lessor with all information that was used or should have been used under this lease in calculating the royalties to be paid Lessor under this lease.

(h) Subject to the limitation hereinafter provided, where gas from a well or wells located on said land, capable of producing gas in paying quantities, with or without condensate, is not sold, but is shut-in, and this lease is not being otherwise maintained, then Lessee may pay Shut-In Gas Royalty payments to Lessor, commencing on or before the dates hereinafter specified and annually thereafter on or before the anniversary date of such payment, an amount equal to the sum of ONE HUNDRED AND NO/100THS ($100.00) DOLLARS per acre covered hereby, and while such payment is made, it will be considered that gas is being produced in paying quantities within the meaning of Article II hereof for such entire annual period (whether or not there occurs periodic production during such annual period); provided, however, that no gas well may be held under the provisions hereof providing for payment of Shut-In Gas Royalty payments in lieu of actual production, for more than two (2) consecutive years after the expiration of the primary term. Such Shut-In Gas Royalty will operate to extend such lease for six (6) month period or periods, only. Such Shut-In Gas Royalty payments to be timely, shall be made as follows: on or before thirty (30) days after the date the well is shut-in or, if the well is shut-in during the primary term, on or before thirty (30) days after the date on which said well is shut-in or thirty (30) days after the date this lease ceases to be otherwise maintained, whichever is later. The term "shut-in" as used herein shall mean the later of the date that a well is completed or the date that a commercial well ceases actual production. The term "completed or completion" as used herein shall mean the date thirty (30) days after the date that the well is drilled to its permitted depth as reflected on forms filed with the Texas Railroad Commission. Nothing herein shall relieve Lessee of its duty to market such gas production pursuant to the Reasonably Prudent Operator Standard, as that Standard is defined by Texas case law, now or hereafter.

In the event that Lessee exercises its rights under the foregoing provisions of this subparagraph (h), Lessee shall, conduct appropriate and adequate tests of each shut-in gas well designated by Lessor to determine whether such designated gas well is actually capable of producing gas in paying quantities. Such tests shall be conducted at times selected by Lessee, but not more than thirty (30) days after which Lessee has shut in the well or wells. Lessee shall give Lessor reasonable notice prior to conducting such well tests and Lessor or Lessor's representative shall have the right to be present

at all testing and shall be entitled to receive full information, including all data and interpretation, in connection with such testing. In the event any such test reveals that the well or wells tested (on a well by well basis) are non-commercial as provided in Article XIII hereof, it shall be considered that such well or wells have ceased to produce gas in paying quantities on the date of the test of each such well.

Lessor shall have the same privileges as above outlined to test any oil well on said lands and obtain and deliver operating expense and revenue data on each such well and if such test and examination reveals that such oil well or wells are not producing in paying quantities, then such well or wells shall be considered as having ceased to produce oil in paying quantities on the date of such test, and such well shall not qualify as a productive well, the acreage allocated thereto shall not be held thereby.

No shut-in royalty shall be due during the primary term of this lease.

(i) Subject to the other provisions contained herein, after the primary terms of this lease, Lessee shall pay to Lessor an Annual Minimum Income which shall never be less than the amount of SIXTY AND NO/100THS ($60.00) DOLLARS per acre, for the acreage held by this lease. The Annual Minimum Income to Lessor herein shall be paid within thirty (30) days following the third anniversary of the execution of this lease and each following annual period thereafter. Lessee shall calculate the royalties paid to Lessor during such annual period and if less than such minimum payment amount, then Lessee shall pay or tender such difference to Lessor within such thirty (30) day period.

(j) In the event that Lessee is entitled to receive from a pipeline purchaser of gas production from this lease under a "take or pay" or similar provision in Lessee's Gas Purchase Contract, a sum of money for gas production not taken hereunder, Lessee shall be required to pay to Lessor, herein, one-fourth (1/4th) of all of such sums of money paid to Lessee under the "pay" provisions thereof, without reduction, whatsoever, which monies shall be paid by Lessee to Lessor herein within sixty (60) days from receipt thereof by Lessee. Lessee shall not be entitled to any credit upon its royalty obligations hereunder to Lessor or for any other reason.

IV.

This is a paid up lease and no delay rental payments are due hereunder to maintain this lease in effect. Except as otherwise provided herein, Lessee, during the primary term of this lease, may, at anytime, execute and deliver to Lessor a release covering this entire lease, only, and thereby be relieved of all future obligations regarding this lease, save those obligations which survive the termination of this lease as stated herein. Lessee, after expiration of the primary term, may, at any time, execute and deliver to Lessor or releases covering any portion of the above-described premises and thereby surrender this lease as to such portion and be relieved of all

future obligations as to the acreage surrendered except as to the drainage provisions of Article V.

## V.

If, prior to discovery of oil or gas on said land, Lessee should drill and abandon a dry hole or holes thereon, or if, after discovery of oil or gas, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences drilling, additional drilling or reworking operations within ninety (90) days thereafter. Such drilling or reworking operations shall be prosecuted with no cessation of more than sixty (60) consecutive days between the completion of a well as a producer or dry hole and the commencement of drilling or reworking operations on an additional well. Such drilling or reworking operations shall be prosecuted with no cessation of more than thirty (30) consecutive days. Subject to the provisions of Article XIV, if at the expiration of the primary term, oil or gas is not being produced on said land, but Lessee is then engaged in bona fide drilling or reworking operations thereon, this lease shall remain in force and effect so long as such bona fide operation or operations on said well or any additional well or wells are prosecuted, with no cessation of more than ninety (90) consecutive days, between the completion of a well as a producer or a dry hole and the commencement of drilling or reworking operations on a subsequent well, and if they result in the production of oil or gas in paying quantities, so long thereafter as oil or gas in paying quantities is produced from said land. The term "drilling operations" as referred to in this agreement, shall mean actual drilling operations with a drilling rig on location on Leased Premises, together with all attendant equipment needed to drill a well to the permitted depth, with the drill bit actually making hole. The term "reworking operations", as referred to in this agreement, shall be construed to mean the actual reworking or deepening of a well that on Leased Premises, with the equipment necessary on location to conduct such reworking of such well and actually in the operation of reworking of such well or wells and the prosecution of such operations without cessation for longer than thirty (30) days. Only a well that has been previously completed as a producer may be reworked. The provisions of this paragraph shall control over the doctrine of temporary cessation of production, which doctrine shall never be construed to be applicable to this lease.

Lessee agrees that in the event an off-premises well is draining the leased premises, Lessee will drill, complete and produce such offset well or wells on this leased premises as a Reasonably Prudent Operator would under the same or similar circumstances Lessee shall commence operations to drill such offset well not later than ninety (90) days from the date of the first production of the draining well. Any off lease well drilled within or whose well bore, where producing, passes within 1,000 ft of the leased property, shall be presumed to be draining the leased premises.

In lieu of drilling an offset well on the leased premises, Lessee may elect to pay a compensatory royalty equal to 25% of the gross production and quality of gas

990

produced from the draining well so long as the draining well is in production. If the BTU content of the gas produced from the draining well is not known, the highest BTU content from production on any well on this lease shall be used in the calculation of compensatory royalty due Lessor. Lessee shall either drill or pay a compensatory royalty within 60 days of first production of any draining well. Lessee is prohibited from releasing any acreage subject to the offset well obligation, in lieu of drilling or paying compensatory royalty. Lessee must protect the premises from drainage on a well-by-well basis. Lessee shall not defend a claim for damages resulting from drainage by contending that production between the leased premises and the draining land will "balance out" in light of future production or development of the lease.

If, this lease is kept in effect by the payment of Shut-In Gas Royalty, and gas is sold and delivered from an off-premise well located within one thousand (1,000') feet, of the leased premises, the right to continue to maintain the lease by paying the Shut-In Gas Royalty shall cease. The lease shall only remain in effect upon the drilling and completing of an offset well or payment of a compensatory royalty as stated above. Termination of this lease does not relieve the Lessee of paying a compensatory royalty during the life of the production of the draining well or wells. The compensatory royalty is to be paid monthly.

## VI.

· Lessee shall perform all terms of this lease, and any amendments thereto, in utmost good faith, and the failure to comply with this provision shall operate as a limitation on this lease to the same extent as though no such term was performed or complied with.

## VII.

Lessee shall have a continuing duty and obligation to plug any well drilled or used on this lease within 90 days of (a) the abandonment of such well as a dry hole by Lessee of any such well or wells, or (b) the cessation of production as defined hereunder in Article XIV, all pursuant to plugging requirements of the Texas Railroad Commission or similar jurisdictional authority. Following such plugging on a well by well basis, Lessee shall be obligated to remove from each well site, all well equipment and pipes and to restore the area thereof, as provided for under Article XVII, subparagraph (g) of this lease.

## VIII.

(a.) Lessee is prohibited from assigning or transferring any interest herein leased to Lessee hereunder, in whole or in part without the prior written consent of Lessor, which shall not be unreasonably withheld. In the event of an assignment or partial assignment of this lease with consent of Lessor first obtained in writing, it is agreed that

the foregoing prohibition of assignment without Lessor's consent shall extend to all permitted Assignees, of any part or parcel of this lease and any such Assignment will cause the Assignee thereof to become jointly and severally obligated with Lessee to perform all express and implied obligations owed by Lessee herein to Lessor·(and the other royalty owners claiming under Lessor) as to all covenants, terms and provisions of this lease, express or implied, which shall be considered as covenants running with the title of this lease and binding upon any permitted assignee or sub-lessee of Lessee and shall extend to their respective permitted and consented to heirs, successors and assigns. Any attempted assignment or partial assignment of this lease without the written consent of Lessor shall be null and void. In no event may any assignment of this lease ever operate to reduce or extinguish the obligation of Lessee, which accrued prior to such assignment or partial assignment. Lessee agrees that it's permitted assignments of this lease, or any part thereof, shall not be binding or effective until it furnishes Lessor with copies of such assignments. It is agreed that the term "Assignment" shall extend to any transfer of lease rights, conditional or unconditional, whether labeled as a farm-out, assignment, transfer, or some other label involving a transfer or permit of any or all of Lessee's rights hereunder to a third person.

(b) Lessor may fully assign or transfer any of its rights hereunder, but in such event, it is agreed that any such change, transfer or division of Lessor's rights hereunder shall not operate to enlarge the obligations or diminish the rights of Lessee. No sale or assignment by Lessor shall be binding unless Lessee has been advised in writing of such conveyance. In the event of the death of any person entitled to rentals, royalties or other payments hereunder, Lessee may make such payments to the credit of the deceased or the estate of the deceased, until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence as to the heirs or devisees of the deceased and that all debts of the estate have been paid, at which time all such payments shall be made to the appropriate legal representative, heir or devisee of such deceased owner.

## IX.

Lessee agrees to use only so much of the surface of said lands as is necessary to exercise its rights hereunder. Lessor does not warrant title to the Oil and Gas Leasehold Estate covered hereby. Lessee represents that it reviewed and approved title of Lessor and represents to Lessor that the lands covered hereby were free of third party claims. Lessee, in connection with its operations upon the lands covered hereby, shall have all those rights herein expressly provided for, with all other rights, which could be applied to operations upon lands covered hereby, being expressly reserved by Lessor. Rights to surface use and penetration of formations beneath the surface of lands herein described, by Lessee are subject to all terms and provisions of this lease and are non-exclusive, with exception of those areas or locations upon which are situated Lessee's operating drilling, production, treatment, storage, separators or other related

equipment to such operations which shall be exclusively used by Lessee during the term of such operations, subject to reasonable access rights thereto by Lessor for the exercise of Lessor's rights hereunder.

## X.

In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach thereof, and Lessee, if in default, shall have thirty (30) days after receipt of such notice in which to comply with the obligations imposed by virtue of this instrument. Failure to correct such breach within the time shall cause the lease to forfeit and revert to Lessor.

## XI.

As further consideration for this lease, Lessee shall:

a) On or before 90 days from the date of execution of this lease, Lessee shall drill or cause to be drilled an oil or gas well to the depth of 9,000' or to the base of the Olmos formation if shallower, below the surface sufficient to test and produce commercial quantities of hydrocarbons from the Olmos formation;

b) On or before 90 days from the date of execution of this lease, Lessee shall drill or cause to be drilled a water well to a minimum depth of 1800' not to exceed a depth of 2,200' sufficient to secure production of water from the Trinity (or Carrizo) sands. Lessee shall install all equipment, tanks, pumps, and delivery lines as necessary to secure and deliver water as stated herein. Lessee shall have the non-exclusive license to use such water as it deems necessary for the drilling, completion, and reworking operation of any well on or off the leasehold that it drills, completes, or reworks as operator. Lessee shall bear all expense of upkeep, maintenance, repair, equipment replacement, and cost for such well. Lessor shall at all times have full use and enjoyment of water from the well, and may at its own expense install pipe, tanks, or other delivery on the land. Title and ownership of all equipment and property shall pass to Lessor upon the expiration of the lease. For all water to be used drilling operations off-lease, Lessor shall install pipe and delivery apparatus sufficient to deliver water to tank trucks, at a location selected by Lessor, immediately outside the boundary fence of the of the surface of the property covered by this lease. Lessee's license to use water from the well is exclusive to Lessee and is non-assignable. Lessee shall not use any water from the well for any purpose other than its own drilling, completion, and reworking operations; and

c) On or before one year from the date of execution of this lease, Lessee shall drill or cause to be drilled a second oil or gas well to the depth of 9,000' or to the base of the Olmos formation if shallower, below the surface sufficient to test and produce commercial quantities of hydrocarbons from the Olmos formations

If Lessee can demonstrate that is unable to secure a drilling rig during the time periods required herein, such time periods may be extended for no more than sixty days. If Lessee fails to comply with any of the forgoing provisions, it shall pay Lessor liquidated damages in the amount of $150,000 per provision not complied with no later 30 days from the date of such failure to comply with the terms of this article.

## XII.

By the acceptance of this lease, Lessee agrees to all of its terms, provisions and conditions, which shall also inure to the benefit of and be binding upon Lessee's successors and permitted assigns. All payments of monies hereunder by Lessee to Lessor are payable to Lessor in Webb County, Texas, at the address herein stipulated or such other address as Lessor notifies Lessee, in writing.

## XIII.

In the event this lease is continued in force and effect by production of oil or gas in paying quantities or by drilling operations (as defined under Article V of this lease), which result in production of oil or gas in paying quantities which perpetuate this lease within the meaning of Article II hereof, on or after the expiration of the primary term of this lease, then, in such event, it is agreed that such production shall only perpetuate this lease as to that well unit acreage which is equal to that amount of acreage per well which such well will reasonably drain, subject to the provisions dealing with reduced production and marginal wells, hereafter defined. In no event may any well ever perpetuate lease acreage in excess of forty (40) acres, and as to all other acreage covered hereby, Lessee covenants and agrees, subject to the provisions for Continuous Drilling Operations as hereinafter provided, to execute and deliver to Lessor a recordable written release as to any and all of such other acreage not so allocated to a producing or shut-in well or wells. The acreage allocation per well shall be made within sixty (60) days following completion of the last well completed on this lease or the cessation of drilling operations under the continuous development provisions of this lease, whichever time period occurs later. In the event Lessee fails to make such unit allocations following (60) days' written notice from Lessor, Lessor reserves the right to make such unit allocations based upon the acreage area which any such completed well will reasonably drain (not to exceed however the above unit sizes), by the filing of unit designations of record in the Office of the County Clerk of Webb County, Texas, and the

acreage covered hereby which is not allocated to any such well or wells shall no longer be held by this lease.

In the event that this lease has been perpetuated by production of oil or gas in paying quantities as above provided for on or after expiration of the primary term, hereof, then the release of such unallocated acreage to well unit or units may be postponed only in the event that within a period of ninety (90) days after the expiration of the primary term hereof or the completion of the last well drilled on this lease following expiration of the primary term (whichever occurs last) Lessee commences drilling operations (with adequate drilling rig and equipment to drill and complete the contemplated well) of an additional well or wells on such unallocated acreage and, in such event the entire lease shall remain in force so long as such drilling operations on said additional well or wells are prosecuted with reasonable diligence, and if after the completion or abandonment of any such well, Lessee commences the drilling of an additional well or wells within ninety (90) days from the completion or abandonment of the preceding well, and if Lessee continuously conducts drilling operations in good faith and with reasonable diligence on said lease, without any cessation for longer than thirty (30) days, this lease shall remain in full force and effect during such drilling operations and until the end of ninety (90) days after the completion or the abandonment of the final well; at which time, this lease as to all rights granted hereunder shall automatically terminate as to all acreage covered hereby, LESS AND EXCEPT all acreage allocated to a producing oil or gas well or wells on a well unit by well unit basis as hereinabove provided for. Lessee shall be obligated to release all acreage and depths not so allocated to a producing oil or gas well or wells as herein provided. The term "completion" as used herein, regarding any well drilled on this lease, shall have the following meanings: (a) as to a dry hole, shall mean the date of cessation of drilling by the drilling rig on location; (b) as to a producer of oil, shall mean fifteen (15) days following date of cessation of drilling by the drilling rig; (c) as to a producer of gas which does not involve the fracing of said well, shall mean thirty (30) days following the date of cessation of drilling by the drilling rig; and (d) as to a producer of gas which extends to fracing of the well, shall mean sixty (60) days following cessation of drilling by the drilling rig.

It is further agreed that at the expiration of the primary term, or at the end of such extended period of drilling operations, as hereinabove provided for under this paragraph, whichever occurs later (conditioned upon this lease or any part thereof being perpetuated by production at such time), production from any of said well or wells shall only perpetuate this lease as to depths above the base of the deepest oil or gas strata from which production actually occurs in each such well bore hole, and this lease as to all rights granted hereunder on a well unit by well unit basis below the base of each such oil or gas strata shall terminate. The provisions of the foregoing shall be applicable on a well unit-by-well unit basis, and the acreage and strata herein allocated to each well on a well unit basis shall be held hereunder only for and so long as such well to which such acreage relates produces oil or gas therefrom in paying quantities, or

this lease as to any such unit or units, is otherwise maintained in force and effect under other provisions hereof. Horizontal wells shall hold wells in the form of a unit agreed upon by Lessor or its representative.

Lessee agrees to execute proper releases at the appropriate times to acknowledge termination of this lease as to such undeveloped acreage or strata or cessation of production of any well unit or units, from time to time, during the term of this lease, pursuant to provisions of the foregoing paragraphs.

The acreage retained under this lease as to each producing well, (except the well bore gas and/or oil well) as hereinabove provided, shall be selected by Lessee in a contiguous blocked form surrounding each such well, except in the case of horizontal wells, which shall be selected as provided for above.

At such time as a partial termination or terminations of this lease occurs under the provisions of the foregoing paragraphs (requiring releases by Lessee), each such retained tract and/or retained well bore as to which this lease has not terminated shall be considered as a separately leased tract and/or well bore in the same manner as though Lessor had executed separate and distinct leases covering each such tract and/or well bore as to the oil and gas strata held thereby. Notwithstanding a partial termination of this lease under the above provisions, it is agreed that Lessee shall have and retain such easements of ingress and egress over those lands covered hereby as shall be necessary to enable Lessee to develop and operate the portion or portions of this lease that continue in force and effect by the production of oil or gas therefrom, and it is further agreed that it shall not be necessary for Lessee to remove or relocate any pipelines, tank batteries or other surface equipment or installation from any portion of this lease which have terminated, for so long as same continue to be used for development and operation of such portion of this lease as is continued in force and effect.

It is agreed that the foregoing provisions shall not be construed to reduce Lessee's duty to reasonably develop all of this lease in the same or similar manner as would a Reasonably Prudent Operator under the same or similar facts and circumstances, with interests of itself and its Lessor in mind.

## XIV.

Royalties payable to Lessor in the manner hereinabove provided for are due and payable to Lessor within a period of sixty (60) days following each month's production of oil or gas produced and sold from the premises. Thereafter, such payments shall be delinquent and will bear interest at the rate of Ten (10%) percent per annum, compounded monthly, until paid. In the event that such royalties are not paid and become delinquent, and there is no title dispute or title defect, this lease shall terminate ipso facto on the date that such royalties were due and not paid. In the event

such royalties are not paid and become delinquent, Lessor without other notice than this paragraph, shall be authorized to file suit in the District Court of Webb County, Texas, for recovery of such delinquent royalties, together with such interest thereon and expenses of collection thereof, including court costs, expert and accounting costs, and reasonable attorneys fees. Notwithstanding the foregoing provisions, it is understood that a greater length of time might be required following first production to obtain title examination and proper division orders, and it is therefore agreed that such time period of sixty (60) days shall be extended for an additional reasonable period of time for such purposes, not to exceed, however, an additional sixty (60) days, or until such time as division orders by Lessor, guaranteeing their respective interest in such production, are furnished to Lessee, whichever occurs first. If required by Lessor, Lessee agrees that the form of division order selected by Lessor, which only certifies royalty ownership of Lessor, shall constitute the agreed upon form of division order between the parties notwithstanding any statutory provision to the contrary. With respect to all third party royalties payable hereunder, Lessee assumes all obligations for the proper payment of all third party royalties.

## XV.

It is agreed that Lessor may hereafter execute leases for the exploration, development and production of any minerals not covered by this lease including but not limited to oil and gas formations (not then covered by this lease), uranium and other fissionable materials, to third persons and to grant rights to such third persons to use the surface for such purposes and to penetrate the strata and horizons covered hereby, provided that any such subsequent lease expressly provides that same is subject to this oil and gas lease, but any such mineral lessee shall be authorized to penetrate the oil and gas formations covered hereby provided that such penetration does not unduly interfere with existing operations of Lessee hereunder.

## XVI.

Lessor shall be entitled, upon request in writing to Lessee, to be furnished with copies of any and all tests, together with all of the interpretations of the tests, made of any gas production from the premises, setting forth the quality of such gas, its BTU content and any constituents of gas, such as, but not limited to, distillate, ethane, propane, butane, etc. Further, Lessee agrees to furnish to Lessor upon their written request, true copies of any sonic, electrical, porosity or other type of log or survey of any such well together with the analysis and interpretation of information and data from any core tests or wireline tests conducted on said well or wells. Further, Lessor (or Lessor's representatives) shall have access (at their own risk) to the drilling floor of any well on this lease and to be furnished with all drilling and testing information, which Lessor agrees to keep confidential during drilling, testing and completion of said well. Lessor shall be entitled to full facts and information with respect to any geophysical operations conducted by Lessee upon this lease, or in conjunction with this lease. In

this connection, Lessor shall be entitled to be furnished by Lessee, at any time during the term of this lease or within four (4) years following the expiration of this lease, whichever is longer, with the following:

1. The final base map showing locations of all 3-D senderos (all geophone stations and vibrator points) along which data was recorded.

2. Paper seismic sections of data recorded along all 3-D senderos on lands hereinabove described and to include one-half (1/2) mile outside the boundaries thereof, of such additional distance as to joint operations involving adjoining leases so as to extend the length and width of such adjoining leases.

3. Both final stack and migrated seismic sections will be in Lessee's standard format which will be a scale of five (5") inches per second and a trace spacing of twelve (12) traces per inch. The title block will provide conventional field and processing parameters. All such data and information shall be kept confidential by the undersigned Lessor and used by them only for their own knowledge and development of their own lands located in Webb County, Texas. The undersigned Lessors agree to instruct any representative employed by them to view and take notes on such seismic data to keep such information confidential outside of the use of said Lessors.

4. Lessee agrees to notify the undersigned Lessor, with notice of completion of any geophysical work performed on this lease or any adjoining leases in conjunction with this lease and shall provide all of such data, maps and information referred to above, as well as all interpretation and analysis of such data or information, if any, at any time during such period above stipulated as requested by Lessor. In addition, Lessor reserves the right to have its own geophysicist or other representative view such 3-D seismic or other geophysical data obtained from geophysical operations conducted upon this lease or in conjunction with this lease by Lessee (any other entity authorized by Lessee). Lessee agrees to maintain control and authority over all of such geophysical data secured from exploratory operations on this lease or in conjunction with this lease for viewing by an authorized representative of Lessor. Lessor or Lessor's geophysicist or other representative may view the data, maps, or information mentioned in this lease, together with all interpretation and analysis of such data or information, during normal business hours and upon 10 business days written notice from Lessor to Lessee. Lessee shall make all of such data and information available for viewing and copying by Lessor or Lessor's representatives under the aforementioned confidential agreements. Such presentation and showing of data shall extend to Lessor's programs and workstations in order to facilitate the interpretation of such data for the benefit of Lessor.

## XVII.

Lessee agrees to notify Lessor and Lessor's representative prior to entry upon Leased Premises by Lessee to go upon Leased Premises, to conduct drilling, re-working

or exploratory operations upon lands covered by this lease and the approximate location of such operations. Lessee agrees to coordinate with Lessor's representative prior to beginning operations, in order to agree in writing on size, location and payment for surface damages, on drill sites, roads, pipelines, flow lines or any other construction that may be needed.

It is further agreed:

(a) Lessee is authorized the non-exclusive use of existing roads upon leased premises and be required to use perimeter roads where practical, provided that Lessee first reconstructs such roads as all weather roads capable of bearing heavy "oilfield" type of equipment and keeps such road or roads so used, maintained and in good repair. Lessee agrees to apply and maintain according to the manufacturer's specifications, "Dustchchek" or any similar product approved by the Surface owner to all roads, drill sites, or other sites used in Lessee's operations. In the event such existing roads do not extend to areas on the lease upon which Lessee desires to conduct its operations, then lessee shall be authorized to construct new lease roads (whether one or more than one) which are required for providing access to Lessee to the area of this lease upon which Lessee has elected to conduct drilling operations hereunder. In such event; such new lease roads must not exceed forty (40') feet in width, shall be constructed as an all weather road (whether one or more and by the route designated by Surface Owner) capable of bearing heavy "oilfield" type of equipment and shall be kept in good repair and maintenance throughout the term of this lease.

After a road is no longer needed in its operations, Lessee shall, at the option of the surface owner, remove the caliche and/or other road material from the surface and shall restore the lands utilized for such roads to their original condition. For the propose of this lease, to restore the surface to its' "original condition" shall mean to remove any foreign materials, do any remediation required and to replace any topsoil which was removed from such site during or preceding its construction. Lessee shall then disc such restored site with a heavy brush type disc and then seed with grasses selected by Surface Owner at a rate of not less than eight (8) pounds per acre. At the option of the Lessor, Lessee shall perform such discing and seeding work at a time designated by Lessor or pay the Lessor so that the Lessor may perform such work at their convenience.

Lessee will install new drainage culverts inroads used or constructed by it of sufficient size to keep water from washing out the road and/or backing up normal water flow. Lessee will water lease roads at times of heavy traffic to prevent dust, and dust accumulation on vegetation, caused by such traffic. Lessee will keep the sides of the roads cleared to their original width of construction by mechanical mowing. Lessee agrees to post proper and adequate speed limit signage limiting traffic to twenty (20) mph.

999

(b) With respect to division or interior fences, (as distinguished from boundary fences, which may not be cut by Lessee), between the pastures comprising leased premises, Lessor believes that adequate fence crossings are already available for existing roads or senderos and that no new opening need to be made. However, if after agreement with Lessor, it becomes necessary to cut an existing division or interior fence in connection with a new lease road to be constructed by Lessee along a route required by Lessee to conduct its operations hereunder (as authorized under the preceding subparagraph (a) of this paragraph), or to widen an existing fence crossing, then in either of such events, only, may Lessee cut such existing or interior fences crossed by such proposed lease road as required for access way of Lessee, provided that prior to any such cutting, Lessee must first place two (2) "corner type" posts with "H" braces on either side of such proposed cut with the fence wires securely fastened thereto so as to prevent any sagging of fence wires when the cut is made between such "H" braced posts. Lessee shall use four (4") inch oilfield type eight (8') foot long steel pipes set firmly at least three (3') feet into the soil, embedded in concrete with three (3") inch steel pipe braces between such double steel pipes on either side of such proposed cut. Lessee shall then install a double eight (8') feet one (1") inch steel pipe gate .into such opening, which shall be hung from the opposite corner posts in such a manner that the bottom of such gate shall be no higher than six (6") inches above the soil and shall be at least five (5') feet in height, and approximately eight (8') feet in width so as to form a closure of such constructed opening. Such gate shall be kept locked by Lessee, with chain and lock with separate slots for a separate locks for Lessor and for surface owner so as to allow passage through such gate opening. All gates to be constructed by Lessee on the leased premises shall be single as opposed to double gates.

(c) Lessee shall at all times except when passing through, keep the entry gate locked. Lessee, prior to initiation of drilling operations shall, at its own expense, provide a bonded gate guard, designated by surface owner, at the entry gate, who shall maintain such entry gate locked at all times except when being traversed by authorized personnel of Lessee.

Lessee shall exercise its best efforts to keep the Lessor reasonably informed of the names of the representatives and contractors which Lessee is utilizing in the conduct of its operations on the lands covered hereby, and the business purpose for being on the premises. Lessee agrees to designate in writing the name of the person or persons to be present from time to time on said premises as current operations are being conducted, with whom surface owner may discuss such matters and with whom the Lessor may resolve any claim for use, abuse, injury and/or damage to livestock, wild life, surface area or improvements on said premises, occasioned by or arising from Lessee's operations or other activity on the leased premises. Lessee is responsible for the actions of all individuals who enter upon the leased premises to perform any activity under this lease.

(d) Under no circumstances shall any officer, agent, representative or employee of Lessee or any contractor or subcontractor or sublessee carry firearms on lands covered by this lease, nor shall any such person collect artifacts, including but not limited to arrow heads, collect shed horns, collect fire wood, nor do any hunting, fishing or bring any dogs on any land covered hereby. The presence of drugs and alcohol on the leased premises are strictly prohibited. Any person violating the forgoing prohibitions, or, using illegal drugs, alcohol, or on the premises without authority or business, shall be ejected and barred from the premises permanently.

(e) In the event exploratory operations are conducted under this lease, Lessee agrees that all shot holes will be located a sufficient distance so as not to cause any damage to such improvements. Lessee agrees to promptly fill in all shot holes and restore the surface of the land to substantially the same condition as it was in before the commencement of Lessee's operations. In conducting seismic operations on leased premises, Lessee agrees to use a high degree of care in keeping bulldozer operations from making any unnecessary cuts into the turf of the grass or otherwise unnecessarily disturbing the surface of the land covered by this lease. Lessee shall terrace all senderos on slopes of hills to minimize erosion to lands of surface owner.

.· (f) Prior to commencing drilling or re-working operations, Lessee shall promptly fence all pits to be used therefore, including all salt water reservoirs with bull panel fencing hung on such posts as to provide a strong enough enclosure so as to prevent entry into such area by wildlife and livestock. Regarding any drilling fluids which are harmful to livestock, wildlife or the propagation and growth of grass for livestock on said lands, or to the environment such as oil-based mud or harmful chemicals, Lessee agrees to store the same in protected non-seeping reservoirs and following. drilling operations, to remove the same from such reservoirs on such drilling location and to dispose of the same off of this leased premises, at such time as such drilling fluids and pits are no longer needed to conduct drilling or reworking operations on any well location.

(g) Upon completion of drilling operations upon each well, which may be drilled upon this lease, Lessee shall, with respect to the drilling location, perform the following work:

1) If such drilling operations result in the completion of an Oil and Gas well, then following such completion and installation of all production equipment upon the drill site location, Lessee, with respect to the remainder of the drill site location and the "earthen pits" constructed thereon, Lessee agrees to restore each drill site area occupied by such pits, by the removal therefrom and from this lease, of all drilling fluids, which may contain hazardous or harmful chemicals, all oil base mud and all other harmful chemicals as contained in such pits (which, as above

provided for, were required to have been stored in protected non-seeping reservoirs) and to then allow such pit to be dried and following the drying of such pit, to then fill the same from the surrounding earthen "berms" in such a manner so that when filled, the upper fill shall consist of the original top soil excavated in construction of such pit. All pits which contain harmless drilling fluids shall be allowed to dry prior to restoration of such pit as above provided for, which shall then be filled in the same manner as above provided for so that the top soil originally excavated will be replaced over such pit or pits and restored to its' "original condition".

2)   If such drilling operations result in a dry hole, Lessee shall remove all well equipment, pipes and other materials related to drilling and completion of such well as a dry hole and then proceed to remove hazardous materials, fill pits and to restore the entire drill site location as hereinabove required under subparagraph (g)(1) of this Article, which restoration shall extend to the entire drill site location.

(3)   Upon completion of any well on this lease as a producer of oil or gas, Lessee agrees to fence the area upon which any production or storage or treating equipment is situated with a good and substantial fence capable of turning wild livestock, except as to the well itself which may be left unfenced at Lessee's election. Such fenced area shall be kept in good condition throughout the term of this lease in which such well is not abandoned and plugged. Lessee shall be required to maintain and paint when necessary all drill site equipment, fences, gates and roadways on a continuous basis.

(4)   Upon cessation of production and abandonment of the producing well on each drill site, Lessee shall be required to plug the well as required by Article VII of this lease and to clean up and remove all well production equipment, pipe, underground pipes and other equipment installed by Lessee on such drill site location related to the drilling, completion and production from such well, with removal of the caliche or other location materials underlying such well equipment and perimeter as stated above and restore to its "original condition".

All remedial, clean-up and restoration work shall be performed no later than four (4) months after completion or abandonment of any well drilled on said lands or at an earlier date if weather conditions permit.

(h) Lessee will not inject any salt water or other deleterious substance into the subsurface of Leased Premises. Nor shall Lessee ever have the right to store or dispose of salt water on Leased Premises or adjoining lands or adjoining water tables to this lease. All saltwater must be removed from Leased Premises.

(i) Lessee agrees that in the conduct of any of its operations, or those of its agents, employees or independent contractors, it will not allow any cans, papers, trash, old equipment, parts or any debris to be left on Leased Premises, but will continuously keep such premises clean and in an orderly state.

(j) Lessee shall require all pipe brought upon leased premises for any pipeline purpose be comprised of entirely new pipe, fittings and appurtenances, all of more than sufficient grade and quality to be utilized for such pipeline purposes Lessee is prohibited from bringing upon any of the leased premises, any used pipe or any new pipe with scales such as defined in the Texas Regulations for Control of Radiation (TRCR) Part 46 (Licensing of Naturally occurring Radioactive Material (NORM), (adopted and published June 1, 1993 in 18 Tex. Reg. 3516) effective July 1, 1993. Lessee must inspect all of drilling pipe brought upon the leased premises and assure Lessor, in writing, that such pipe does not violate the foregoing Texas Regulations for Control of Radiation. All oilfield pipe following completion of any well of this lease, shall be removed from lands covered by this lease, unless such pipe is to be used at another location in which event shall be moved to such new location and stored on racks. . During the time that such drilling pipe is on location, such pipes shall be stored on racks in such a manner that they will not make contact with the surface of such location.

(k)     Prior to the commencement of any operations on the leased premises, and at all times thereafter during the existence of this lease, Lessee shall furnish valid insurance certificates evidencing coverage, including the following:

I.      WORKER'S COMPENSATION INSURANCE: covering all employees engaged in operations on the lands subject to this agreement in compliance with the laws of the state of Texas and EMPLOYER'S LIABILITY INSURANCE of not less than $1,000,000 for injuries or death of any one employee and $10,000,000 for injuries to or death of more than one employee resulting from any one accident;

II.     GENERAL PUBLIC LIABILITY AND PROPERTY DAMAGE: In connection with all operations conducted hereunder, with bodily injury and death limit of not less than $1,500,000 for injuries to or death of more than one person resulting from any one accident, and not less than $10,000,000 for injuries to or death of more than one person resulting from any one accident; and property damage limited of not less than $1,000,000 per accident, and $5,000,000 aggregate. Such property damage insurance shall not exclude liability for loss of or damage to property on or above the surface of the earth arising from a blow out or cratering of a gas or oil well,

1003

and shall not exclude damage to the earth arising from spills of oil, chemicals or other deleterious substances or materials;

iii. AUTOMOBILE PUBLIC LIABILITY AND PROPERTY DAMAGE: In connection with all operations conducted hereunder including coverage on owned and non-owned automotive equipment with bodily injury or death limit of not less than $1,000,000 for injuries to or death of any one person resulting from, any one accident, and not less than $10,000,000 for injuries to or death of more than one person resulting from any one accident, and property damage limit of not less than $10,000,000; and

iv. Excess umbrellas coverage in the amount of at least $5,000,000 . Prior to beginning any operations on the premises covered hereby, Lessee shall furnish Lessor current certificates of insurance issued by its insurers in form satisfactory to Lessor under all such policies as evidence that all of such insurance is carried and providing that not less then ten (10 ) days prior written notice of material change in, cancellation of, or refusal to renew, such insurance, or any part thereof, will be given to Lessor. All such certificates and written notices shall be addressed to Lessor at its address appearing on page One of this Lease. Such insurance certificates shall be original issued by Lessee's insurance carrier or agent and shall not be a previously issued certificate. In the event the insurance policies maintained by Lessee under Subparagraph ii. and iii. above provide for combined single limit coverage, the minimum coverage shall be $1,000,000.

v. Maintenance by Lessee of said insurance is in no manner to be considered a limitation on the indemnity obligations imposed on Lessee herein.

vi. Lessee shall assure that all sub-contractors, Lessee's invitees and licenses shall either have insurance coverage comparable to the requirements set out above or be covered by Lessee's policies.

vii. No requirement imposed by Lessor on Lessee in this lease shall be considered maintenance or reservation of a control or participation by Lessor in Lessee's operations.

viii. Lessee agrees to comply with all rules and regulations of the Environmental Protection Laws of the United States of America and of the State of Texas, whether or not such laws, rules or regulations apply to Lessee or Lessee's operations, hereunder.

x. LESSEE SHALL AND BY EXECUTION HEREOF, DOES HEREBY, INDEMNIFY AND HOLD LESSOR HARMLESS FROM ANY CLAIM OR LIABILITY, DAMAMGE, DAMAGES, OR CLAIM FOR DAMAGES OR INJURY, BY REASON OF ANY OCCURRENCE OR HAPPENING INCIDENT TO THE CONDUCT OF ANY OPERATION BY LESSEE, ITS AGENTS, SERVANTS, OR CONTRACTORS, INVITEES AND LICENSEES ON THE LANDS COVERED BY THIS OIL AND GAS LEASE, INCLUDING BUT NOT LIMITED TO ANY DAMAMGE OR INJURY WHICH RESULT IN THE VIOLATION OF ANY ENVIRONMENTAL PROTECTION LAWS OR OTHER SIMILAR LAWS RELATED TO CLAIMS, LIABILITIES OR PENALTIES OF THE FEDERAL OR STATE GOVERNMENTS DUE TO INJURY, DAMAGE OR CONTAMINATION TO THE VIRONMENT OF THE SURFACE OR SUB-SURFACE OF LANDS COVERED BY THIS LEASE OR ADJOINING THIS LEASE AND LESSEE AGREES TO PERFORM ALL REMEDIAL WORK REQUIRED BY ANY SUCH GOVERNMENTAL ENTITY RELATED THERETO, OR AS OTHERWISE PROVIDED IN THIS LEASE, WHICH EVER OBLIGATION IS GREATER, AND INCLUDING BUT NOT LIMITED TO ANY AND ALL INJURY OR DAMAGE TO PERSON OR PROPERTY FROM ANY CAUSE.

(l) Lessee shall pay the Lessor for all damage to the land, brush, grasses and crops on said land, cattle and livestock resulting from any operation or exercise of rights hereunder, as well as for all damages to fences, water wells and reservoirs and all other improvements of the Lessor, now or hereafter situated on the surface of this leasehold, which are damaged, injured or destroyed by operations of Lessee or any employee, representative, agent or guest of Lessee.

(m) Lessee shall bury all pipelines below ordinary plow depth; provided that temporary lines used for drilling or re-working operations shall not be required to be buried if same are removed upon completion of such operations.

(n) Lessee shall use no water from the surface of or below Lessor's lands except as stated herein. Lessee shall bury any pipelines that cross ranch roads in such a way to not impede traffic thereon and not leave such pipeline exposed to damage by heavy vehicles.

(o) Lessee shall erect, at a distance not to exceed twenty-five (25) feet from each well on the premises covered by this lease, a legible sign on which shall be stated the name of the operator, the lease designation, the name of the well, and the Railroad Commission lease number. Where two or more wells on the same lease whether by individual flow line connections direct to the tank or tanks or by use of a multiple header system, each line between each well and such tank or header shall be legibly identified at all times, either by a firmly attached tag or plat or an identification properly painted on such line at a distance not to exceed three (3) feet from such tank or header

connection. Said signs, tags, plates or other identification markers shall be maintained in a legible condition throughout the term of this lease.

(p) Lessor shall not be required to sell Lessee caliche. Lessee shall use the type and quality of caliche required by Lessor. No caliche shall be mined from the surface unless agreement is reached on source and payment therefore. All caliche used for operations shall be returned to the original source after a site or a road is no longer in use.

(q) At the option of the Lessor, all permanent well and facility locations will be fenced with King Ranch Wire, or heavy bull wire panels. When fencing a well and related facilities, an area 150' x 150' will be enclosed to accommodate the entry of reworking and other equipment to such drill site. Temporary enclosures must be erected in a manner acceptable to the surface owner in order to assure their ability to turn livestock, wildlife and withstand weather and other forms of stress.

## XVIII.

Notwithstanding any provision contained herein or implied by law, to the contrary, Lessee agrees that prior to initiating or commencing any seismic, drilling or reworking operations, to perform the following:

A. Seismic Operations:

(1)     Secure from Lessor written permission to conduct seismic operations on the land subject to this lease after payment of surface damages.

(2)     Provide Lessor with all copies of seismic permits.

B. Drilling Operations:

(1) Furnish Lessor a copy of all permits from any regulatory authority for such drilling operations, accompanied by a plat reflecting the actual location of such drill site and the name of the Permittee. Lessee agrees that such Permittee shall not be changed or altered without prior notification to Lessor in writing with full facts and information of any such alteration.

(2) Furnish Lessor with the name and address of the drilling company who shall perform such operations and the name, address and telephone number of the person in charge of such drilling operation.

1006

(3) Inform Lessor, in writing, of the date of entry on Leased Premises to commence any operation on Leased Premises after staking a location thereon.

B. Reworking Operations:

(1) Furnish Lessor with copies of any re-working permits from any regulatory authority, together with facts and information regarding the type and extent of such reworking operation contemplated, the type of equipment to be used and the name and address of the operator of such equipment.

(2) Notify Lessor of the entry date for such operations.

## XIX.

Lessor and Lessee agree to the following miscellaneous provisions:

(a) Lessee shall take the highest degree of care and all proper safeguards to protect said premises and to prevent theft of oil, gas and other hydrocarbons produced from said lease. This includes, but is not limited to, the installation of all necessary equipment, seals, locks or other appropriate protective devises on or at all access points at the lease's production, gathering and storage systems where theft of hydrocarbons can occur. Lessee shall be liable for the loss of any hydrocarbons resulting from theft and shall pay the Lessor royalties thereon as provided in Article V above, on all oil, gas or other hydrocarbons lost by reason of theft.

· (b) No well may be drilled or any equipment be placed within Five HUNDRED feet (500') of any structure, water well, stock pens, or stock tank now existing or hereafter located on the property without Lessor's written permission.

(c) It is expressly agreed that no express statement of a covenant contained herein shall constitute a waiver or abandonment of any covenant implied in equity or at law, and Lessor shall have the benefit of all such implied covenants. In the event of a conflict between an express covenant set out herein and a covenant implied at law or in equity, the express covenant set out herein shall govern the rights of the parties to the extent of the express covenant, insofar as there is a conflict between it and the implied covenant, but without such a conflict, both express covenants and implied covenants shall govern the rights and relationship of the parties.

(d) This Oil and Gas Lease shall be executed and acknowledged by Lessor and Lessee, in duplicate originals and when Lessor is in receipt and possession of a fully executed and acknowledged duplicate original of this Oil and Gas Lease, Lessor shall execute a memorandum for recordation purposes of this Oil and Gas Lease on a form approved by Lessor, delivering same to Lessee for recordation in the Office of the

1007

County Clerk of Webb County, Texas. It is agreed that neither party herein shall record their duplicate original of this Oil and Gas Lease unless such recordation becomes necessary to enforce their rights hereunder. Each duplicate original shall be fully effective and binding upon the parties, whether or not both duplicate originals are presented for any such enforcement. The provisions of this Oil and Gas Lease are binding upon the parties hereto and their respective successors and assigns. The pronouns of gender shall include the other genders, and either the singular or the plural shall include the other. Lessee, by its acceptance of this lease, agrees and obligates itself to all terms and provisions of this lease. Lessee agrees that upon its receipt of the notice of this Oil and Gas Lease for recordation purposes from Lessor, that it shall file same of record and will deliver to Lessor, a copy of such recorded notice showing the filing and recording information thereof.

(e) The terms and conditions contained herein shall constitute covenants running with the land and shall be binding upon, and for the benefit of, Lessor and Lessee and their respective heirs, legal representatives, successors and assigns.

(f) No change or modification of this Oil and Gas Lease shall be valid or binding unless the same is made or specified in writing and signed by the parties, and no course of dealing between the parties shall be construed to alter the terms hereof.

. (g) If any clause or provision of this lease is illegal, invalid or unenforceable under present or future laws, then it is the intention of the parties hereto that the remainder of the lease shall not be affected thereby, and it is also the intention of both parties that, in lieu of each clause or provision that is illegal, invalid or unenforceable, there shall be added as a part of this lease a clause or provision as similar in terms to the illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Failure of either party to declare any default immediately upon occurrence thereof, or delay in taking any action in connection therewith, shall not waive such default, but said party shall have the right to declare any such default at any time and take such action as might be lawful or authorized hereunder, either in law or in equity.

(i) In the event there is any ambiguity in this lease, Lessor and Lessee agree that the ambiguity shall not be construed in favor of the Lessor and against the Lessee; nor shall the ambiguity be construed in favor of the Lessee and against the Lessor, but that the parties interpreting the contract will be required to use other rules of construction in order to resolve the ambiguity.

(j) No land demised in this lease may be pooled or unitized with any other land. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended, or allowed, or shall be implied or result merely from the inclusion of such separate tracts within this lease. As

1008

used in this lease, the words "separate tract" mean any tract with differing percentage royalty ownerships, now or hereafter.

(k) Due to the relative positions of Lessor and Lessee in regard to availability of data relating to operations on and around the Lease, and in order to preclude unnecessary and costly claims in court, the parties hereto, agree to a tolling of all applicable statutes of limitations as same relate to any express or implied duties, obligations, covenants or conditions imposed upon Lessee by virtue of this Lease. As additional consideration for the execution of this Lease by Lessor, the parties hereto and our heirs, representatives, successors and assigns agree that the tolling of all statutes of limitations which might be applicable to any express or implied duties, obligations, covenants or conditions arising out of this Lease shall commence on the effective date of this lease and such tolling of all applicable statutes shall continue until and be lifted as hereinafter provided. As to a specific matter raised by Lessor or royalty owner, this tolling of limitation shall be lifted as to such specified incidence(s) in question thirty (30) days after Lessee specifically provides Lessor or other royalty owners hereunder with sufficient data to enable the requesting parties to adequately be apprised of the facts or circumstances relating to such issue and/or incidences regardless of whether such circumstance would constitute a reversion of any rights or breach of any expressed or implied duty, covenant or condition of this Lease, or would give rise to any other cause of action arising out of the relationship between the parties to this Lease (including royalty owners) and our heirs, successors and assigns. In all events the tolling of all statutes of limitation shall be lifted thirty (30) days after the full and complete termination of this Lease.

    **(l)**      In the event Lessee should file for voluntary Bankruptcy or Insolvency or for reorganization, or should some third party force Lessee into Involuntary Bankruptcy or Insolvency for the benefit of creditors in any court pursuant to any statute either of the United States or and State, or should Lessee enter into an agreement with creditors for the appointment of a receiver or trustee, covering all or a portion of Lessee's interest in and to the leased premises, then upon the occurrence of any of the above events and at the election of Lessor, Lessee, shall not be relieved of any of its obligations under the Lease, including but not limited to any unpaid royalty due Lessor, surface restoration, and the plugging of abandoned, or non-commercial well or wells. For purposes of enforcing Lessee's obligations in Bankruptcy Court, Lessor shall be considered for all purposes a preferred secured creditor with the highest class permitted by law. **LESSEE FURTHER AGREES TO INDEMNIFY LESSOR FOR ALL LOSS AND DAMAGE SUFFERED BY LESSOR BY REASON OF SUCH BANKRUPTCY INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS FEES AND COURT COSTS, IF ANY.**

## XX.

As further consideration for this lease, Lessor shall have the right, but not the obligation, to participate in any oil or gas well drilled on this property. Lessee shall provide Lessor or his designee with all information, including well logs and Authority For Expenditures (AFEs) regarding the well drilled within the later of 5 business days of completion of all tests and operations conducted by Lessee after its decision to complete a well as a producer. Lessor shall notify Lessee in writing of its election to participate in the well within 5 business days of receipt of the forgoing information, and Lessor shall tender its corresponding share of working interest costs within 15 business days after tender of the election. Information shall be provided to Lessor or his designee on a well by well basis. As to each well, Lessor has the right to participate in an amount up to Ten percent (10%) of the working interest in that well. The relationship between the parties in regard to this working interest shall be governed by the Joint Operating Agreement attached hereto as exhibit "b". All working interests shall be dealt with in an identical manner regarding rights, obligations and penalties arising from any working interest in the wells located on these lands that Lessor elected to participate in; provided, however, that the working interest described in this paragraph shall never be charged with any cost or expense attributable to monies paid to or for the benefit of Lessor.

EXECUTED in duplicate originals on this the 2ᵗʰ day of ____ 2008 it being agreed that this Lease will not be effective until executed by both parties.

Justapor Ranch Company, L.C.

By: _____
James K. Jones, Jr, Manager

LESSOR

Escondido Resources II, LLC

By: _____
J. David Wrather, Vice-President

LESSEE

STATE OF TEXAS           §

COUNTY OF WEBB          §


This Instrument was acknowledged before me on the 24th day of June 2008 by James K. Jones, Jr., Manager of Justapor Ranch Company, L.C. as the act and deed of such Limited Liability Company.



ROSIE PERALES
Notary Public, State of Texas
My Commission Expires
April 22, 2009

NOTARY PUBLIC, STATE OF TEXAS


STATE OF TEXAS           §

COUNTY OF HARRIS         §

This Instrument was acknowledged before me on the 23rd day of June 2008 by J. David Wrather, Vice-President of Escondido Resources II, LLC, as the act and deed of such Limited Liability Company.



ANDREW CARTER DAVIS
Notary Public, State of Texas
My Commission Expires
June 19, 2011

NOTARY PUBLIC, STATE OF TEXAS

EXHIBIT "A"

Field Notes
of a
800.325 Acre Tract
Part of Survey 1931 ~ Abstract 554 ~ H.E. & W.T. Original Grantee ~ 44.000 Acres Call
Part of Survey 1932 ~ Abstract 3213 ~ O. Pratt Original Grantee ~ 245.555 Acres Calc.
Survey 1719 ~ Abstract 519 ~ Jane Guyman Original Grantee ~ 190.770 Acres Call
Survey 163 ~ Abstract 76 ~ H. & G.N.R.R. Co. Original Grantee ~ 320.000 Acres Call
Webb County, Texas

Being a tract of land that is calculated to contain 800.325 acres, more or less, by a recent on the ground survey, being comprised of Part of Survey 1931, Abstract 554, H.E. & W.T. Original Grantee (44.000 Acres Call), Part of Survey 1932, Abstract 3213, O. Pratt Original Grantee (245.555 Acres Calc.), Survey 1719, Abstract 519, Jane Guyman Original Grantee (190.770 Acres Call) and Survey 163, Abstract 76, H. & G.N.R.R. Co. Original Grantee (320.000 Acres Call) in Webb County, Texas, with this 800.325 acre tract being the calculated remaining part of that certain tract of land that was conveyed to Maurice Arden Ray et ux by R.I. Driver by that certain Warranty Deed with Vendor's Lien dated October 10, 1932 and recorded in Volume 126, Pages 387-389 of the Deed Records of Webb County, Texas, with this 800.325 acre tract being comprised of a tract of land that is calculated to contain 8.140 acres within the right-of-way of U.S. Highway No. 83, and of 1.019 acres outside of fences in the northeast part of the called 44.000 acre tract out of Survey 1931, leaving a net acreage of 791.166 acres, with this 800.325 acre tract being more particularly described by metes and bounds as follows, to-wit: ···

BEGINNING at the intersection of the calculated position of the south line of the aforementioned Survey 1932 and north line of Survey 1712, Abstract 506, Mrs. Mary Aebworth Original Grantee with the center of U.S. Highway No. 83, with this being the northwest corner of a tract of land that is called to contain 1613.545 acres, more or less, as described in that certain Instrument dated July 22, 1983, and recorded in Volume 1023, Page 512 of the Real Property Records of Webb County, Texas, with this point being a point on tangent in the most southerly line of this tract;

THENCE South 89°56'01" West 60.24 Feet across the right-of-way of U.S. Highway No. 83 to a point for the calculated position of the southwest corner of this tract;

THENCE with the calculated position of the presently occupied westerly right-of-way line of U.S. Highway No. 83 and southwesterly line hereof along the following three courses:
THENCE North 05°08'35" West 494.73 Feet to a point for an exterior corner of this tract;
THENCE North 84°50'32" East 10.00 Feet to a point for an interior corner of this tract;
THENCE North 05°08'35" West . 2690.08 Feet to the calculated intersection point of this line with the southeasterly line of Survey 1394, Abstract 1999, Eusebio Garcia Original Grantee and the northwesterly line of the aforementioned Survey 1932, for the northwest corner of this tract;

THENCE North 69°21'24" East Feet across the right-of-way of U.S. Highway No. 83 with the southeast line of Survey 1394 and northwest line of Survey 1932, the northwest line hereof, passing at 51.89 Feet the center of U.S. Highway No. 83, and 114.15 Feet in all to a fence corner post on the east right-of-way line of U.S. Highway No. 83 for the ostensible southwest corner of Tract 65 of La Moca Ranch Subdivision as shown on the Plat of La Moca Ranch East of Highway 83 that is recorded in Volume 11, Page 5 of the Plat Records of Webb County, Texas, with this fence corner being a point on tangent in the northwesterly line of this tract;

THENCE North 69°21'24" East 1987.26 Feet continuing generally along an existing fence on the occupied southeasterly line of said Tract 65 of La Moca Ranch Subdivision, the southeasterly line of Survey 1394, a northwesterly line of Survey 1932, and a northwesterly line hereof, to a fence corner at the called position of the southeast corner of said Survey 1394 on the southwesterly line of Survey 1391, Abstract 434, H.B. & W.T.R.R. Co. Original Grantee, an exterior corner of Tract 77 as shown on the aforementioned Plat of La Moca Ranch Subdivision, an exterior corner of Survey 1932, and an exterior corner of this tract;

THENCE South 20°07'21" East 300.17 Feet generally along an existing fence on an occupied southwesterly line of said Tract 77 and southwesterly line of Survey 1391, a northeasterly line of Survey 1932, and a northeasterly line hereof, to a fence corner for the occupied southwest corner of said Tract 77, the occupied southwest corner of said Survey 1391, an occupied interior corner of Survey 1932, and an occupied interior corner of this tract;

1012

THENCE   generally along an existing fence on the occupied southeasterly line of said Tract 77 and southeasterly line of said Survey 1391, an occupied northwesterly line of Survey 1932 and a northwesterly line hereof along the following three courses:

THENCE   North 69°47'39" East      1357.64 Feet to a point of deflection in said fence;

THENCE   North 69°42'37" East      1853.43 Feet to a point of deflection at an existing fence corner;

THENCE   North 69°28'35" East      1796.22 Feet to a fence corner marking the occupied southeast corner of said Tract 77, the southeast corner of Survey 1391, a point on tangent in the northwesterly line of Survey 1932, the called position of an upper southwesterly exterior corner of Survey 1931, Abstract 554, H.E. & W.T. Original Grantee, and an interior corner of this tract;

THENCE   North 19°59'13" West      967.07 Feet generally along an existing fence on the occupied northeasterly line of Tract 77 and occupied northeasterly line of Survey 1391, the called position of the most westerly southwest line of Survey 1931 and a southwesterly line hereof, to a fence corner marking the ostensible position of the most westerly corner of Survey 1931 and southwest corner of Survey 1390, Abstract 2244, Felipe de la Garza Original Grantee, with this fence corner being a northwesterly exterior corner of this tract;

THENCE   North 89°50'28" East      generally along an existing fence on the occupied south line of Survey 1390 and north line of Survey 1931, the most northerly line of this tract, passing at 1195.52 Feet an existing fence corner, and continuing with the projection of this line a total distance of 1396.83 Feet to a point for the calculated position of the northeast corner of a tract of land that is called to contain 44 acres, more or less, as described by metes and bounds in the aforementioned Warranty Deed with Vendor's Lien that is recorded in Volume 126, Pages 387-389 of the Deed Records of Webb County, with this calculated point being the northeast corner of this tract;

THENCE   South 00°03'02" East initially with the projection of an existing fence that is generally along the occupied easterly line of said 44 acre tract, passing at 359.29 Feet a fence corner, and continuing generally with said existing fence a total distance of 2542.30 Feet to an existing fence corner at the ostensible position of the south line of Survey 1931, the ostensible position of the northwest corner of Survey 164, Abstract 2184, D.N. Cobb Original Grantee, the ostensible position of the northeast corner of Survey 163, Abstract 76, H. & G.N.R.R. Co. Original Grantee, and a point of deflection in the easterly line of this tract;

THENCE   generally along an existing fence on the occupied west line of Survey 164 and east line of Survey 163, the east line hereof, along the following two courses:

THENCE   South 00°02'31" East      2699.68 Feet to an existing fence corner, and a point of deflection in this line;

THENCE   South 00°03'08" West      1039.15 Feet to a fence corner at a fence on the occupied north line of Survey 1711, Abstract 524, John Marshall Original Grantee, being on the north line of the aforementioned tract of land that is called to contain 1613.545 acres, more or less, as described in that certain Instrument dated July 22, 1983, and recorded in Volume 1023, Page 512 of the Real Property Records of Webb County, Texas, for the ostensible position of the southwest corner of Survey 163, the ostensible position of the southeast corner of Survey 163, and the southeast corner of this tract;

THENCE   generally along an existing fence partly on the occupied north line of Survey 1711, the north line of Survey 1712, and the north line of said 1613.545 acre tract, being partly with the occupied south line of Survey 163, Survey 1719, and Survey 1932, the south line hereof, along the following three courses:

THENCE   South 89°54'11" West      3891.98 Feet to an existing fence corner, and a point of deflection in this line;

THENCE   South 89°56'01" West      3556.01 Feet to an existing fence corner on the northeasterly right-of-way line of U.S. Highway No. 83 and a point on tangent in the south line of this tract;

THENCE   South 89°56'01" West      50.28 Feet across the right-of-way of U.S. Highway No. 83 to the PLACE OF BEGINNING and containing 800.325 acres of land, more or less.

State   of Texas §
County of Webb §

I, A.J. Medina, Jr., Registered Professional Land Surveyor, do hereby certify that the foregoing field notes, and the attached map, are based on a survey that was conducted on the ground under my supervision and that they reflect facts that were found at the time that said survey was made. Bearings shown are based on GPS Observations, SPCS, Texas South Zone, NAD83. This the 29th day of January 2007.

Antonio J. Medina, Jr.
Registered Professional Land Surveyor No. 5104

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

## AMENDMENT TO OIL AND GAS LEASE

STATE OF TEXAS §

COUNTY OF WEBB §

THIS AGREEMENT made this 24 day of _____ 2008, by and between the Justapor Ranch Company, L.C. hereinafter called "LESSOR", and Escondido Resources II, LLC whose address is 600 N. Marienfeld, Ste. 400, Midland, TX 79701, hereinafter called "LESSEE",

### WITNESSETH:

**1.**

The parties to this agreement have entered into an Oil and Gas Lease dated June 24, 2008 covering 803 acres of land located in Webb County, Texas described by metes and bounds on the document attached hereto as exhibit "A". The parties agree that the provisions contained herein shall amend the provisions of the lease between them; provided however, that these provisions shall only remain in effect so long as Escondido is Lessee. If Escondido assigns its rights to a third party pursuant to the provisions of the Lease, the terms of this amendment shall become null and void.

**2.**

Paragraph III is amended to provide:

(a)     On all oil or other liquid hydrocarbons produced from this lease, Lessee shall be required to pay to Lessor the higher of one-fourth (1/4th) of the posted price for similar type of oil produced in Texas Railroad District 4 (as said region now exists) or for similar type of oil produced from this lease or the current market value of that produced and saved from said land, subject only to deductions imposed by purchaser, if any, for transportation of product to the purchasers facility. All oil or other liquid hydrocarbons produced from this lease shall be treated and stored on this lease until purchased by Lessee.

(b) ii     The term "HOUSTON SHIP CHANNEL PRICE" shall be construed to mean the price or value which is equal to the highest reported on-shore spot purchase price being paid during the month of production by purchasers of gas produced in the Texas Gulf Area, to be determined on a monthly basis by reference to the index spot gas price (large packages only) for gas delivered to pipelines at

## Ex. B

1014

Houston Ship Channel/Beaumont, Texas, as recorded in Inside F.E.R.C. vs. Gas Market Report published by McGraw-Hill, minus five (.05) cents per MMBtu, (an agreed upon reasonable transportation charge for this lease production) adjusted for MMBtu content, and without any other deduction by Lessee save unreimbursed severance taxes actually paid by the Lessee in behalf of Lessor to the taxing authority. In the event the above-designated gas price index publication ceases to exist, (or ceases to report such "Houston Ship Channel Price" hereinabove referred to), the Lessor and Lessee shall agree on another publication generally acceptable as providing comparable accurate current data as to current on-shore spot prices for gas delivered into pipelines by purchasers in said area, which substituted publication shall be used in lieu of the above-described publication as part of the foregoing standard, upon which Lessor's royalty shall be calculated and paid. In the event no price index publication can be agreed upon as reliable, then a reliable governmental or other non-partisan publication evaluating the same information shall be used, with current payments to be made on the most current information available and then adjusted, as necessary, within thirty (30) days following the availability of the governmental data or other non-partisan publication, or if no such publication is available for purposes, hereof, this standard, as an element for calculation of Lessor's royalties, shall cease to exist. Provided however, Lessee shall have the right to enter into gas sales' contracts that will determine the price upon which gas royalty is calculated if such contracts provide no less than a price redetermination every six months and provide the following minimum terms:

## Price:

The price to be paid by Buyer to Seller for each MMBtu of Gas purchased hereunder shall be: (i) ninety-five percent (95%) of the "Houston Ship Channel Index Price" for monthly volumes averaging 5,000 Mcf per day or less; (ii) ninety-six percent (96%) of the "Houston Ship Channel Index Price" for monthly volumes averaging 5001- 10,000 Mcf per day; (iii) ninety-seven percent (97%) of the "Houston Ship Channel Index Price" for monthly volumes averaging 10,001- 15,000 Mcf per day; and (iv) ninety-eight percent (98%) of the "Houston Ship Channel Index Price" for monthly volumes averaging over 15,000 Mcf per day.

## Deducts:

The "MMBtus of Gas purchased hereunder" shall mean the quantity (in MMBtus) of Gas delivered at the Delivery Point(s), minus: (i).

for all Gas delivered under this Contract, a pro rata share of all fuel, shrinkage, lost and unaccounted for Gas incurred by the Buyer in compressing and gathering the Gas delivered hereunder; provided, however, that such pro rata share of all fuel, shrinkage and lost and unaccounted for Gas shall not exceed four percent (4%) of the total quantity of Gas delivered at Point(s) of Delivery where delivery pressures are above 350 psig. Such pro rata share of fuel, shrinkage and lost and unaccounted for Gas shall be based on the volume, in Mcf, of Seller's Gas received at the Redelivery Point each month to the total volume, in Mcf, of all Gas received by Buyer or its designee at the Delivery Point(s) to be gathered or transported each month, and (ii) for all Gas delivered under this Contract which Buyer elects to process, one hundred percent (100%) of all fuel, shrinkage, lost and unaccounted for Gas incurred by the Buyer and which is attributable to the processing of Gas delivered hereunder.

Plant Products:
Eighty-six percent (86%) of the proceeds for the sale of Plant Products attributable to Seller's Gas less a processing fee of six cents ($0.06) per MMBtu.

Provided further, Lessor shall provide copies of such contracts, and any amendments thereto, to Lessee upon execution along with a written statement that such contract indicates the all compensation received by Lessee for sale of the gas, and Lessor has at all times the right to take his gas in kind as provided herein.

(i)     Subject to the other provisions contained     herein,     after the primary terms of this lease, Lessee shall pay to Lessor an Annual Minimum Income   which shall never be less than the amount of FORTY AND NO/100THS ($40.00) DOLLARS per acre, for the acreage held by this lease. The Annual Minimum Income to Lessor herein shall be paid within thirty (30) days following the third anniversary of the execution of this lease and each following annual period thereafter.

3.
Paragraph XIII is amended to provide:

In the event this lease is continued in force and effect by production of oil or gas in paying quantities or by drilling operations (as defined under Article V of this lease), which result in production of oil or gas in paying quantities which perpetuate this lease within the meaning of Article II hereof, on or after the

expiration of the primary term of this lease, then, in such event, it is agreed that such production shall only perpetuate this lease as to that well unit acreage which is equal to that amount of acreage per well which such well will reasonably drain, subject to the provisions dealing with reduced production and marginal wells, hereafter defined. In no event may any well ever perpetuate lease acreage in excess of forty (40) acres, unless Lessee proves that more acreage is required to protect a well from drainage, and as to all other acreage covered hereby, Lessee covenants and agrees, subject to the provisions for Continuous Drilling Operations as hereinafter provided, to execute and deliver to Lessor a recordable written release as to any and all of such other acreage not so allocated to a producing or shut-in well or wells. The acreage allocation per well shall be made within sixty (60) days following completion of the last well completed on this lease or the cessation of drilling operations under the continuous development provisions of this lease, whichever time period occurs later. In the event Lessee fails to make such unit allocations following (60) days' written notice from Lessor, Lessor reserves the right to make such unit allocations based upon the acreage area which any such completed well will reasonably drain (not to exceed however the above unit sizes), by the filing of unit designations of record in the Office of the County Clerk of Webb County, Texas, and the acreage covered hereby which is not allocated to any such well or wells shall no longer be held by this lease.

In the event that this lease has been perpetuated by production of oil or gas in paying quantities as above provided for on or after expiration of the primary term, hereof, then the release of such unallocated acreage to well unit or units may be postponed only in the event that within a period of ninety (90) days after the expiration of the primary term hereof or the completion of the last well drilled on this lease following expiration of the primary term (whichever occurs last) Lessee commences drilling operations (with adequate drilling rig and equipment to drill and complete the contemplated well) of an additional well or wells on such unallocated acreage and, in such event the entire lease shall remain in force so long as such drilling operations on said additional well or wells are prosecuted with reasonable diligence, and if after the completion or abandonment of any such well, Lessee commences the drilling of an additional well or wells within ninety (90) days from the completion or abandonment of the preceding well, and if Lessee continuously conducts drilling operations in good faith and with reasonable diligence on said lease, without any cessation for longer than ninety (90) days, this lease shall remain in full force and effect during such drilling operations and until the end of ninety (90) days after the completion or the abandonment of the final well; at which time, this lease as to all rights granted hereunder shall automatically terminate as to all acreage covered hereby, LESS AND EXCEPT all acreage allocated to a producing oil or gas well or wells on a well unit by well unit basis as hereinabove provided for. Lessee shall be obligated to release all acreage and depths not so allocated to a

1017

producing oil or gas well or well as herein provided. The term "completion" as used herein, regarding any well drilled on this lease, shall have the following meanings: (a) as to a dry hole, shall mean the date of cessation of drilling by the drilling rig on location; (b) as to a producer of oil, shall mean fifteen (15) days following date of cessation of drilling by the drilling rig; (c) as to a producer of gas which does not involve the fracing of said well, shall mean thirty (30) days following the date of cessation of drilling by the drilling rig; and (d) as to a producer of gas which extends to fracing of the well, shall mean sixty (60) days following cessation of drilling by the drilling rig.

It is further agreed that at the expiration of the primary term, or at the end of such extended period of drilling operations, as hereinabove provided for under this paragraph, whichever occurs later (conditioned upon this lease or any part thereof being perpetuated by production at such time), production from any of said well or wells shall only perpetuate this lease as to depths one hundred feet (100') below the base of the deepest oil or gas strata from which production actually occurs in each such well bore hole, and this lease as to all rights granted hereunder on a well unit by well unit basis one hundred feet (100') below the base of each such oil or gas strata shall terminate. As to each unit held by production where there are horizons capable of producing in paying quantities but not producing, this Lease shall further terminate at the expiration of two (2) years after the primary term or two (2) years after the extended period, whichever is later, for depths from the surface to one hundred feet (100') above the stratigraphic equivalent of the then shallowest producing zone. The provisions of the foregoing shall be applicable on a well-by-well basis, and the acreage and strata herein-allocated to each well on a well unit basis shall be held hereunder only for and so long as such well to which such acreage relates produces oil or gas therefrom in paying quantities, or this lease as to any such unit or units, is otherwise maintained in force and effect under other provisions hereof. Horizontal wells shall hold wells in the form of a unit agreed upon by Lessor or its representative.

Lessee agrees to execute proper releases at the appropriate times to acknowledge termination of this lease as to such undeveloped acreage or strata or cessation of production of any well unit or units, from time to time, during the term of this lease, pursuant to provisions of the foregoing paragraphs.

The acreage retained under this lease as to each producing well, (except the well bore gas and/or oil well) as hereinabove provided, shall be selected by Lessee in a contiguous blocked form surrounding each such well, except in the case of horizontal wells, which shall be selected as provided for above.

At such time as a partial termination or terminations of this lease occurs under the provisions of the foregoing paragraphs (requiring releases by Lessee), each

such retained tract and/or retained well bore as to which this lease has not terminated shall be considered as a separately leased tract and/or well bore in the same manner as though Lessor had executed separate and distinct leases covering each such tract and/or well bore as to the oil and gas strata held thereby. Notwithstanding a partial termination of this lease under the above provisions, it is agreed that Lessee shall have and retain such easements of ingress and egress over those lands covered hereby as shall be necessary to enable Lessee to develop and operate the portion or portions of this lease that continue in force and effect by the production of oil or gas therefrom, and it is further agreed that it shall not be necessary for Lessee to remove or relocate any pipelines, tank batteries or other surface equipment or installation from any portion of this lease which have terminated, for so long as same continue to be used for development and operation of such portion of this lease as is continued in force and effect.

It is agreed that the foregoing provisions shall not be construed to reduce Lessee's duty to reasonably develop all of this lease in the same or similar manner as would a Reasonably Prudent Operator under the same or similar facts and circumstances, with interests of itself and its Lessor in mind.

4.

Paragraph XIX (k) is deleted.

5.

The following Paragraph XXI is amended to the lease:

The parties may mediate any dispute between them pursuant to the rules set forth in the Texas Civil Practices and Remedies code upon request by either party to this amendment.

6.

This Amendment may only be changed by written documents signed by both parties. This Amendment shall not be filed of record.

EXECUTED in duplicate originals on this the 2⁴ᵗʰ day of ____ 2008, it being agreed that this Amendment will not be effective until executed by both parties.

Justapor Ranch Company, L.C.

By:_____
James K. Jones, Jr., Manager

LESSOR

1019

Escondido Resources II, LLC

By: _____
J. David Wrather, Vice-President

LESSEE

STATE OF TEXAS      §

COUNTY OF WEBB    §

This Instrument was acknowledged before me on the 24th day of June 2008 by James K. Jones, Jr., Manager of Justapor Ranch Company, L.C. as the act and deed of such Limited Liability Company.



ROSIE PERALES
Notary Public, State of Texas
My Commission Expires
April 22, 2009

_____
NOTARY PUBLIC, STATE OF TEXAS

STATE OF TEXAS      §

COUNTY OF HARRIS §

This Instrument was acknowledged before me on the 23rd day of June 2008 by J. David Wrather, Vice-President of Escondido Resources II, LLC, as the act and deed of such Limited Liability Company.



ANDREW CARTER DAVIS
Notary Public, State of Texas
My Commission Expires
June 19, 2011

_____
NOTARY PUBLIC, STATE OF TEXAS

1020

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

CAUSE NO. 2013-CV7-001396-D1

| | | |
|---|---|---|
| JUSTAPOR RANCH COMPANY, L.C., | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| V. | § | WEBB COUNTY, TEXAS |
| | § | |
| | § | |
| ESCONDIDO RESOURCES II, LLC, | § | |
| *Defendant.* | § | 49th JUDICIAL DISTRICT |

## AFFIDAVIT OF DAVID WRATHER

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

1.     My name is David Wrather. I am employed with Escondido Resources II, LLC ("Escondido") in the position of Senior Vice President. My position includes responsibility for land operations, including involvement in the negotiation of oil and gas leases on behalf of Escondido. I participated in the lease negotiations between Escondido and Justapor Ranch Company, L.C. ("Justapor") for the lease of oil and gas interests on an 803-acre ranch owned by Justapor in Webb County, Texas (the "Justapor Ranch"). I negotiated the lease with James K. Jones ("Jones") who I understood to be the owner of Justapor. As a result, I have personal knowledge of the facts set forth in this affidavit and they are true and correct.

2.     Jones contacted me in May, 2008, to inquire about Escondido's interest in leasing the oil and gas minerals on the Justapor Ranch. Jones informed me that he was a lawyer in Webb County, Texas. Escondido did not have separate counsel representing it in the negotiation or execution of the lease between it and Justapor.

3.     On June 4, 2008, Jones e-mailed me a lease agreement form for the Justapor Ranch. On June 6, 2008, I e-mailed Jones comments to the lease form and an example of a proposed royalty provision which Escondido had recently used in another lease. A true and correct copy of the e-mail chain and form are attached to Escondido's response to Jones' Motion for Summary Judgment (the "Response") at Exhibit I.

4.     During our negotiations, I told Jones that Escondido wanted to base its royalty payment obligations upon the pricing terms Escondido had negotiated with Enterprise for a gas sales agreement (the "Enterprise Gas Sales Agreement") as a minimum price that Escondido would pay for purposes of royalty payments. On June 13, 2008, I e-mailed Jones the pricing terms we had negotiated with Enterprise for the payment of gas. A true and correct copy of this e-mail is attached to the Response as Exhibit J. Jones informed me that Justapor would agree to the payment of royalty based upon the Enterprise pricing terms with Escondido, but not with any subsequent assignee of Escondido. Jones informed me that Justapor wanted an amendment to the proposed lease that would incorporate special pricing terms related to Escondido's price arrangement with Enterprise. Jones provided me with a draft of the proposed amendment. On

1

Ex. S

June 13, 2008, I e-mailed Jones comments to the proposed amendment wherein I referenced in connection with the pricing provision,"as per Enterprise offer". A true and correct copy of this e-mail and the attached draft are attached to the Response as Exhibit K. Based upon my discussions and negotiations with Jones, the parties agreed that an amendment was to be drafted to provide a special royalty pricing provision, based upon the Enterprise price, that would be available only to Escondido, and not any subsequent assignee.

5. Escondido and Justapor entered into the oil and gas lease dated June 24, 2008, covering the lease of minerals on the Justapor Ranch (the "Lease Agreement"). On the same date, Escondido and Justapor also entered into an amendment to the Lease Agreement titled "Amendment to Oil and Gas Lease" ("Amendment No. 1"). Based upon the negotiations and agreement reached with Jones, Escondido understood and believed Amendment No. 1, and its special pricing provision, to be a replacement provision for the pricing provisions contained in Article III(b) of the Lease Agreement. The parties entered into Amendment No. 1 so that Escondido's royalty obligations under the Lease Agreement would correlate to the pricing terms of the Enterprise Gas Sales Agreement. At the time the Lease Agreement and Amendment No. 1 were executed, Enterprise was the only market readily available to transport and purchase gas produced from the Justapor Ranch.

6. In order to sell gas produced from the Justapor Ranch to Enterprise, Escondido needed to construct a meter site on the Justapor Ranch and build a pipeline from the Justapor Ranch across other adjacent properties to a connection point on the Enterprise System. Escondido acquired the right of way necessary to construct the pipeline. As part of this project, Escondido and Justapor executed a Surface Site Agreement which included a pipeline right of way and meter station surface site on the Justapor Ranch, a copy of which is attached to the Response as Exhibit L. It was discussed with Jones that the Surface Site Agreement and pipeline would be conveyed to Enterprise when the facilities were constructed. Escondido did construct the pipeline and ultimately assigned the Surface Site Agreement and pipeline to Enterprise with the consent of Justapor, a copy of which is attached to the Response as Exhibit M.

7. By 2011, capacity constraints on the Enterprise pipeline system caused Enterprise to limit the volume of gas which was purchased from Escondido, including gas produced from the Justapor Ranch. During this period of time, Escondido made sales of gas produced from the Justapor Ranch to an alternative market, Kinder Morgan Texas Pipeline, LLC ("Kinder Morgan"). Gas was delivered to Kinder Morgan via a gathering system installed by a new midstream company that had entered the area, Meritage Midstream Services, LLC. Meritage acquired a meter site for their pipeline from Justapor and acquired right of way to take Escondido's gas, including Justapor's gas, to Kinder Morgan.

8. In October 2011, Enterprise informed Escondido that it had capacity available on its system, and intended to re-initiate gas purchases from the Justapor Ranch. The price which would be realized from the sale of gas to Enterprise was greater than the price available from Kinder Morgan. Escondido made plans and was prepared to sell gas from the Justapor Ranch to Enterprise. However, by letter dated October 19, 2011, Jones communicated to Enterprise that the Surface Site Agreement was terminated. Enterprise informed me that it could not purchase gas from the Justapor Ranch as a result of the termination notice sent to it by Jones and Jones

2

1326

informed me that he now owned the Enterprise meter and equipment located on the meter site. Jones informed me that Escondido could not sell gas from the Justapor Ranch to Enterprise as a result of the termination of the Surface Site Agreement. Because of the termination of the Enterprise Surface Site Agreement, the right of way and meter station on the Justapor Ranch were not available to Enterprise to accept gas from the Justapor Ranch. Jones informed me that Justapor would negotiate with Enterprise for a new surface site agreement containing additional terms.

9. During the same period of time, Escondido was attempting to access additional markets for gas produced from the Justapor Ranch. Escondido negotiated processing contracts with ConocoPhillips Company (dated September 1, 2011) and Copano Processing, L.P. (dated October 25, 2011), and expected these additional markets to be available by the end of 2011 or early 2012. Escondido also believed, based upon Jones' statements regarding negotiations with Enterprise, that a new surface site agreement would soon be executed again providing Escondido with access to the Enterprise market. Each of these alternative markets was expected to provide a higher price for the Justapor Ranch gas than that available from Kinder Morgan, due in part to processing capability. As a result of the timing of the termination of the Surface Site Agreement, and the expected availability of markets from Copano and ConocoPhillips in the near future, Escondido decided to shut-in the wells on the Justapor Ranch until those higher-priced markets became available. I informed Jones that Escondido wanted to shut-in the wells on the Justapor Ranch until higher-price markets became available. The only short-term market available to Escondido at that point in time, due to the termination of the Surface Site Agreement with Enterprise, was sales to Kinder Morgan based upon a daily spot price. At that point in time, the daily spot price was lower than the price which would have been paid by Enterprise if the Surface Site Agreement had not been terminated, and lower than the price Escondido expected to receive in the future for sales to Copano and ConocoPhillips. Jones directed me to continue sales and not shut-in the wells. I explained to him that Escondido wanted to sell gas to Enterprise and believed that Jones and Enterprise were working on resolving their issues and that Escondido would rather shut-in the wells rather than sell the gas at the lower gas daily spot price, without processing. Jones stated that he wanted Escondido to proceed with sales, even though processing was not available.

10. Also in 2011, a disagreement arose between Escondido and Justapor over the calculation of a compensatory royalty payment relating to a well drilled on property adjacent to the Justapor Ranch. There were also issues outstanding between the parties related to drilling commitments under the Lease Agreement; a working interest owned by another Jones entity, JAK Passive Minerals, L.C.; and mineral interests owned by third parties on a portion of acreage within the Justapor Ranch referred to by the parties as the "Vacancy Tract". Each of these issues was addressed in a letter agreement entered into between Escondido and Justapor dated August 9, 2011 (the "Letter Agreement").

11. Since execution of the Letter Agreement, Escondido has supplied Jones with executed deeds conveying all mineral interests owned by Escondido at that time, or subsequently acquired, for the Vacancy Tract. Escondido is not currently the owner of any mineral interests in the Vacancy Tract or the Justapor Ranch which has not been previously conveyed to Justapor or another entity owned or controlled by Jones as a result of deeds signed and delivered by

3

1327

Escondido to Jones. It was never discussed, contemplated, or agreed that Escondido would convey any leasehold interest which it currently holds on the Justapor Ranch in connection with the Letter Agreement.

12. Also in May, 2008, Escondido was attempting to secure leases of minerals on other properties in the Webb County area. In particular, Escondido was negotiating to obtain a mineral lease from William S. Harte (the "Harte Lease") and one other property. These other leasing negotiations were underway in the same period of time during which Escondido was also engaged in negotiations with Jones for a mineral lease on the Justapor Ranch.

13. In late May, 2008, Escondido sent leasing proposals for two negotiations it was engaged in, one of which was the Harte Lease. In early June, 2008, and prior to the execution of the Justapor Lease, Jones informed me that he could represent Escondido in connection with its leasing efforts in Webb County. I informed Jones of Escondido's interest in acquiring the Harte Lease and, at least, one other. Jones informed me that he knew the parties involved with both lease negotiations and that he could represent Escondido in negotiating and securing the Harte lease. On June 10, 2008, I e-mailed Jones with the terms of the lease offer Escondido had made in connection with one of the negotiations. A true and correct copy of the e-mail transmitting the Benavides Lease offer and the offer itself are attached to Escondido's Response to the Lawyer Jones Motion for Summary Judgment (the "Lawyer Jones Response") as Exhibit Y (filed under seal). Negotiations on that Lease did not progress beyond the preliminary stage. However, Escondido continued negotiations in connection with the Harte Lease.

14. Between June 10, 2008, and June 16, 2008, Jones and I discussed the terms under which Jones would undertake the representation of Escondido in connection with the Harte Lease. Jones informed me that he would represent Escondido in connection with its efforts to negotiate and acquire the Harte Lease in exchange for the payment to Jones of a fee in the form of an overriding royalty interest on the Harte Lease if the negotiations lead to the execution of a lease. Jones informed me that in exchange for Escondido's agreement to pay an overriding royalty interest, he would represent Escondido in connection with the Harte Lease. On June 16, 2008, I spoke with others at Escondido regarding the payment of an overriding royalty interest to Jones as requested for his legal services. After these discussions, I e-mailed Jones on June 16, 2008, confirming Escondido's agreement to engage Jones in connection with obtaining and negotiating the Harte Lease and Escondido's agreement to pay Jones an overriding royalty interest. Exhibit Z to the Lawyer Jones Response is a true and correct copy of an e-mail exchange between me and Jones dated June 16, 2008 through June 17, 2008. The first e-mail in this exchange on June 16, 2008, is the e-mail setting out the terms of Escondido's engagement of Jones. On June 17, 2008, Jones e-mailed me a request to send him a copy of Escondido's proposal for the Harte Lease as referenced in Exhibit Z, which I did. Jones' e-mail also requested that I call him. I telephoned Jones on the 17th at which time we discussed his representation of Escondido in connection with the Harte Lease and the terms of the overriding royalty interest which Escondido had agreed to pay Jones in connection with that representation. Jones stated he would represent Escondido in connection with the Harte Lease. At no time did Jones inform me that he had not agreed to undertake any representation of Escondido as of that time. As a result of my conversations with Jones, I understood and believed him to be engaged at that time as Escondido's counsel in connection with the Harte Lease and other potential leasing efforts. Jones

4

confirmed this understanding during our conversation of June 17, 2008, when the Harte Lease proposal was discussed. Jones never advised me during this time period that he had not agreed to represent Escondido. There was no subsequent telephone conversation during the months of July or August, 2008, during which Jones told me he had decided to represent Escondido. I am aware of no other writing between myself or others at Escondido, on the one hand, and Jones, on the other hand, constituting an engagement agreement for Jones other than the e-mail of June 16, 2008, marked as Exhibit Z to the Lawyer Jones Response.

15. Jones did proceed to represent Escondido as its attorney in connection with the Harte Lease. Exhibit AA to the Lawyer Jones Response is a copy of a July 23, 2008 e-mail I sent Jones containing information related to Harte's legal representative. On June 24, 2008, I sent Mr. Harte an email (Exhibit FF to the Lawyer Jones Response) informing him that Jones was representing Escondido and to expect a call from him. Exhibit BB to the Lawyer Jones Response is an e-mail sent to me by Jones relaying to me information regarding his conversations with Harte's attorney and the status of negotiations. Exhibit CC to the Lawyer Jones Response is an e-mail from Jones to me dated January 7, 2009, setting forth his opinions regarding the terms of the proposed Harte Lease. Exhibits DD and EE to the Lawyer Jones Response are e-mails from Jones to me dated January 7, 2009, with redlined comments to the proposed Harte Lease.

16. At no time did Jones advise me that Escondido should engage separate counsel in connection with the negotiation and execution of the Lease Agreement. At no time did Jones request or obtain Escondido's written consent to his representation of Escondido at the same time he was negotiating with Escondido the Lease Agreement for the Justapor Ranch.

17. While we were negotiating the Lease Agreement for the Justapor Ranch, Jones told me that he had drafted a tough agreement in case Escondido ever assigned its rights under the Lease Agreement to another party, but that he would work out with Escondido any issues which might arise. Based upon this conversation, and the fact that Jones was acting as Escondido's attorney, I assumed that any disagreements which might arise between Escondido and Justapor would be resolved through a negotiation process. During lease negotiations, Jones and I never discussed his interpretation of pricing provision III(b)(iv) of the Lease Agreement. We also did not discuss the termination provision contained in Article XIV. I did request one change to the annual certification requirement contained in Article III(g); however, Jones and I never discussed his understanding or interpretation of Article III(g) insofar as it relates to the obligation to make annual reconciliation payments. Prior to this lawsuit, Jones never informed me that it was his position or Justapor's position that the Lease Agreement would terminate if there were ever an underpayment of royalties which was not correctly and fully reconciled and paid by March 1 of the succeeding year. Jones never informed me that it was his position or Justapor's position that the Lease Agreement would terminate if there was an underpayment of royalties. Jones never informed me of his or Justapor's interpretations of the pricing provisions in Article III of the Lease Agreement as asserted in this lawsuit. If, prior to the execution of the Lease Agreement, Jones had informed me of the interpretation and construction being advanced by him and Justapor in this case, I would not have agreed to the Lease Agreement without further clarification or modification. In particular, Escondido would not have agreed to the pricing provision contained in Article III(b) of the Lease Agreement if it were not modified by

5

1329

Amendment No. 1 as Escondido understood based on its conversations with Jones. Escondido would not have agreed to a lease which provided a remedy for underpayment of royalty as argued by Justapor in this case. Escondido would not have agreed to a lease which provided for termination for a failure to reconcile an alleged royalty underpayment as argued by Justapor in this case. None of these arguments or interpretations was explained to me by Jones prior to execution of the Justapor Lease.

FURTHER AFFIANT SAYETH NOT.

_____
David Wrather

SUBSCRIBED and SWORN to before me this the 4th day of September, 2014.

_____
Notary Public, State of Texas

C TRAVIS WALNE
My Commission Expires
January 25, 2016

6

1330

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

NO. 2013-CV7-001396-D1

| JUSTAPOR RANCH COMPANY, L.C., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| V. | § | WEBB COUNTY, TEXAS |
| | § | |
| | § | |
| ESCONDIDO RESOURCES II, LLC, | § | |
| Defendant. | § | 49th JUDICIAL DISTRICT |

## AFFIDAVIT OF JOHN S. LOWE

| THE STATE OF MAINE | § |
| | § |
| COUNTY OF HANCOCK | § |

BEFORE ME THE UNDERSIGNED NOTARY PUBLIC, on this day personally appeared John S. Lowe, who after being by me duly sworn, stated under oath:

1. My name is John S. Lowe. I am the George W. Hutchison Professor of Energy Law at Southern Methodist University's Dedman School of Law. I have more than 35 years' experience teaching courses on issues related to property law, oil and gas law, and oil and gas contracts. I am also an attorney and member of the bars of Texas, Oklahoma, and Ohio. I am Past President of the Rocky Mountain Mineral Law Foundation, and Past Chair of the Section of Environmental, Energy, and Resources Law of the American Bar Association. I have published numerous articles dealing with oil and gas contracts. I have also written, or co-written with others, books on oil and gas leases and contracts. I often present lectures and papers on issues related to oil and gas leases and contracts. Additional information regarding my experience and qualifications is set out in my résumé, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference. I am familiar with and have an understanding of the customary terms used in oil and gas lease agreements, and industry custom, practice, and usage in applying those terms. I have specialized knowledge, skill, education, and experience regarding oil and gas lease provisions and issues related to the custom, usage, and practice in the oil and gas industry related to provisions in oil and gas leases, including but not limited to royalty-calculation provisions, royalty-payment provisions, and audit provisions. I have reviewed the oil and gas lease dated June 24, 2008 (the "Lease") that is the subject of this lawsuit along with amendments thereto including the Amendment to Oil and Gas Lease dated June 24, 2008 ("Amendment No. 1"). I have also reviewed Plaintiff's First Amended Petition and exhibits thereto; deposition testimony of Jimmy K. Jones, David Wrather, William Deupree, Kurt von Plonski, and Charlie E. Graham; Plaintiff's Designation of Expert Witnesses; Escondido's Designations of Expert Witnesses; Plaintiff's Motion for Summary Judgment; and, deposition exhibits 2A, 2B, 3, 11, 42, 48, 57, 59, 61, 62, 64, 69, and 74. I have personal knowledge of the facts set forth herein, and am competent to testify thereto. The facts stated in this affidavit are true and correct.

1

## Ex. F

2. Article III(b)(iv) of the Lease is not a customary or usual royalty provision. This provision is unclear and ambiguous. A typical lessee in the oil and gas industry would not know how to apply this provision to the calculation of royalty payments. Unlike the other royalty provisions contained in the Lease, there is no defined term or definition for the meaning of royalty provision (iv). Justapor, in the deposition of James K. Jones, contends that royalty-provision (iv) contains an error in that the word "were" should be "where." Even if the word "were" was changed to "where," royalty-provision (iv) would remain unclear and ambiguous. As drafted, pricing-provision (iv) could be interpreted in alternative ways by a typical industry lessee. The uncertainty and lack of clarity with regard to the meaning of royalty provision (iv) is increased by Amendment No. 1. In this instance, it appears Amendment No. 1 was executed simultaneous to the Lease in order to afford the lessee, Escondido Resources II, L.L.C. ("Escondido"), with a special pricing provision available only to it, and not to subsequent assignees. Escondido appears to have operated with the understanding that the provisions of paragraph 2 of Amendment No. 1 amending Article III of the Lease provided an alternative royalty methodology that supplanted each of the four royalty provisions contained in Article III(b) of the Lease. It is reasonable and consistent with industry custom and practice for Escondido to pay royalties in a manner consistent with this interpretation and understanding of the effect of Amendment No. 1 on the Lease royalty-payment provisions.

3. Industry custom and practice would apply the termination clause contained in Article XIV of the Lease only to non-payment of royalty. The termination clause would not apply to underpayment or miscalculation of royalty. The industry differentiates royalty non-payment from royalty underpayment. It is unusual, but not unheard of, to have lease provisions calling for termination if a royalty is not paid. But it is unheard of to have a termination provision in the event of an underpayment. The industry does not consider non-payment of royalty to be the same as an underpayment of royalty. An underpayment is an underpayment, not a non-payment; in other words, if there is an underpayment, a subsequent failure to correct the underpayment does not change the nature of the underpayment to a non-payment of royalty. Because the termination provision contained in Article XIV does not expressly apply to the underpayment of royalties, it also does not apply to a failure to correct an underpayment of royalty through a review or reconciliation process. Article XIV does not condition the continuation of the Lease on the correction of any or all royalty underpayments by March 1 of the succeeding calendar year. Industry custom and practice does not consider royalty underpayments to be the same as a failure to pay royalty. Likewise, industry custom and practice would not consider a failure to reconcile a royalty underpayment by March 1 of the succeeding year to be a non-payment of royalty. It is not usual or customary to have a lease-termination clause for underpayment of royalties or for the failure to correct or reconcile an underpayment.

4. Article XIV of the Lease states it does not apply in the event of a title dispute or title defect. That "carve out" is included because it is industry custom and practice to hold payment of royalties "in suspense" when there is a title dispute or title defect. The carve out for a title dispute or title defect protects the lessee from termination for non-payment of royalty if there is a suspension due to a title issue. The inclusion of the carve-out language for title disputes and defects further evidences that the intent of the parties was that the termination provision contained in Article XIV would apply to instances of non-payment, rather than instances of underpayment. This is consistent with industry custom and practice.

2

1137

5. Article III(g) of the Lease calls for the lessee to review prices and production volumes used in its calculation of royalty payments against the price and production volumes required to be paid under the terms of the lease by January 31 of each year, and to issue make up payments for the difference on or before March 1 of each year. From an industry custom and practice point of view, Escondido appears to have complied with this provision through its periodic monitoring of prices and volumes throughout the course of the year, and through its periodic reconciliation payments made to the lessor.

6. The reconciliation provision contained in paragraph III(g) deals with underpayments of royalties. Article III(g) does not contain any term or condition which would terminate the Lease in the event lessee fails to correct any underpayment of royalties by the date set forth therein. This is consistent with industry custom and usage. It is not be customary nor usual to apply a remedy of termination to a failure to correct royalty underpayments. Industry custom and usage would not consider the provisions of Article XIV dealing with non-payment of royalties to be triggered by any non-compliance with the provisions of Article III(g) dealing with reconciliation payments.

7. Industry custom and usage would not interpret a provision relating to the "true up" or reconciliation of royalty underpayments such as is contained in paragraph III(g) to constitute a lease-termination event. In the lessor/lessee context, there are frequently misunderstandings, issues, disagreements, and disputes relating to the prices and volumes used to make royalty payments, and applying a termination provision to underpayment of royalties in these sorts of circumstances is not customary or usual. A lessee would be placed in an untenable position if it was at risk of losing its lease in the event of disagreement about the methodology, pricing, or volumes to be used in royalty calculations, or, if it made a mistake. The lessor would effectively be able to blackmail a lessee, or conduct audits looking for any type of uncorrected underpayment in order to declare a lease terminated. The industry does not conduct business in this manner.

8. Applying industry custom and practice, it appears Escondido acted reasonably in its calculation and payment of royalties. The alleged underpayments at issue in this case appear to have been made using accepted industry practices for the making of royalty payments and appear to have been done in compliance with at least one of the pricing prongs made the subject of the royalty-payment provisions and Amendment No. 1. Escondido's conduct in making the royalty payments in this fashion would not be considered to have been done in "bad faith" from an industry point of view and standard, but instead appear to have been made in good faith.

9. The parties included specific termination provisions in the Lease at Articles X and XIV. Article X allows for termination in the event lessee is not conducting "operations" in compliance with the terms of the Lease and fails to correct such non-compliance following notice by lessor. Likewise, as set forth above, the provisions of Article XIV relate to termination for the non-payment of royalties, not the underpayment of royalties. The inclusion of these two termination provisions in the Lease coupled with the fact that the Lease does not contain a provision that calls for termination in the event of an underpayment of royalties or a failure to correct an underpayment of royalties suggests that the intent of the parties was not to include an underpayment of royalties or a failure to correct a royalty underpayment as a terminable event. This is consistent with industry practice.

3

1138

10. According to the deposition testimony and reports of other experts, Escondido has invested over $30 million making improvement associated with the Lease. Applying a termination clause to the underpayment of royalties as presented by the circumstances of this case would, under industry standards, impose a harsh, unusual, disadvantageous, costly, unfair, and unreasonable consequence upon Escondido.

11. Forfeiture is a harsh remedy. It is the usual and customary practice in the industry to specify, with clarity, the terms under which a lease may terminate. In the absence of an express and specific provision, industry practice would not consider an act or omission of the lessee to be a termination event. In this case, the plain language of Article XIV addresses termination for the nonpayment of a royalty. Article XIV does not expressly or specifically provide for termination due to underpayment of a royalty or a failure to reconcile an underpayment. Similarly, Article XIV does not provide for termination of the lease agreement when there is a dispute between the lessee and the lessor regarding the calculation of royalty payments.

12. The oil and gas industry recognizes the "doctrine of obstruction," which includes an implied covenant on the part of the lessor not to interfere with the lessee's performance of the lease agreement. In this case, testimony indicates that the lessor's termination of the Enterprise surface-site lease prevented Escondido from selling to the high-priced Enterprise market. If the lessor's termination was not done in accordance with the surface-site lease, then the termination was not proper and may have prevented Escondido from achieving a higher price for production. Such conduct would be inconsistent with and contrary to the implied covenant on the part of the lessor arising under the "doctrine of obstruction."

FURTHER AFFIANT SAYETH NOT.

John S. Lowe

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 29th day of August, 2014, to certify which witness my hand and seal of office.

Notary Public, State of Maine

MARIANNE HUNT
Notary Public, Maine
My Commission Expires August 16, 2020

4

John S. Lowe
George W. Hutchison Professor of Energy Law
Senior Associate Dean for Academic Affairs
Southern Methodist University
Dedman School of Law
3315 Daniel Ave.
Dallas, TX 75275-0116
214-768-2595
jlowe@smu.edu

## PROFESSIONAL EXPERIENCE

•George W. Hutchison Professor of Energy Law at Southern Methodist University, since 1989. Senior Associate Dean for Academic Affairs, Dedman Law School, since 2009.

•Honorary Lecturer and Principal Research Fellow, Centre for Energy, Petroleum and Mineral Law, the University of Dundee, Scotland, 2000-2014.

•Senior Fellow, Faculty of Law, University of Melbourne, Victoria, Australia, since 2007.

•Visiting Professor, Faculty of Law, University of Sydney, NSW, Australia, since 2008.

•Visiting Professor, School of Energy and Resources, University College London in Adelaide, SA, Australia, 2010-2012.

•Visiting Professor, Universidad de ESAN, Lima, Peru, 2008.

•Fulbright Senior Specialist and Visiting Borden Ladner Gervais LLP Chair of Energy Law and Policy, University of Alberta, Edmonton, Ala., Canada, 2008.

• Visiting Professor, Universidade Agostinho Neto, Luanda, Angola, 2009.

• Visiting Professor, Chulalongkorn University Faculty of Law, Bangkok, Thailand, 2010, 2012.

•International Legal Advisor and Chair, International Legal Standards Advisory Group, Commercial Law Development Program, U.S. Department of Commerce, 2006-2009.

•From 1978-1989 Professor of Law and Associate Director of the National Energy Law & Policy Institute, the University of Tulsa.

•From 1975-1978 Assistant and Associate Professor, the University of Toledo.

•Visiting Professor at Texas (1983), Denver [Distinguished Professor of Natural Resources Law] (1986), and New Mexico [Visiting Judge Leon Karelitz Chair] (1996).

•Private practice 1970-1975.

•Government practice (Government of Malawi) 1966-1969.

1

1140

## EDUCATIONAL BACKGROUND

•B.A. Denison 1963. (Highest Honors, Phi Beta Kappa, Omicron Delta Kappa, General Motors Scholar);

•LL.B. Harvard 1966. (Harvard Entering Scholar, Maxwell Scholar).

## PROFESSIONAL LICENSURE AND CERTIFICATIONS

•Member of the bars of Texas, Oklahoma, and Ohio.

•Admitted to practice before the U.S. Supreme Court, the U.S. Tax Court, the U.S. Fifth Circuit, and the U.S. District Courts for the Southern and Northern Districts of Ohio

•Member of the commercial arbitration panels of the American Arbitration Association, the CPR Institute for Dispute Resolution and the International Chamber of Commerce.

## COURSES TAUGHT

•Property Law, at SMU, Tulsa, and Toledo, as needed from 1975 to the present;

•Oil and Gas Law, at SMU [since 1987], Tulsa [1978-87], Texas [1983], Denver [1986], and New Mexico [1996];

•Oil and Gas Contracts, at SMU [since 1987], Dundee [since 2000], Melbourne [since 2007], Sydney [since 2008], University College London in Adelaide [2010-2012].

## PUBLICATIONS: BOOKS AND BOOK SUPPLEMENTS

•OIL AND GAS LAW IN A NUTSHELL, West Publishing Company, 6th edition 2014) (1st through 5th editions published in 1983, 1988, 1995, 2003, 2008);

•CASES AND MATERIALS ON OIL AND GAS LAW (West Publishing Company, 6th edition 2012) (with Professors Owen Anderson, Ernest Smith, David Pierce, and Christopher Kulander). (1st through 5th editions published in 1986, 1993, 1998, 2003, 2008);

•OIL AND GAS FORMS MANUAL 5th edition (West Publishing Company 2009) (with Professors Owen Anderson, Ernest Smith, and David Pierce). (1st through 5th editions published in 1987, 1993, 1998, 2004);

•INTERNATIONAL PETROLEUM TRANSACTIONS (Rocky Mtn. Min. Law Fnd. 3rd edition 2010) (with Professors Ernest Smith, John Dzienkowski, Owen Anderson, Bruce Kramer and Jacqueline Weaver). (1st edition published in 1993);

•HEMINGWAY OIL AND GAS LAW AND TAXATION (West Publishing Company 4th edition 2004) (with Professors Owen Anderson, John Dzienkowski, David Pierce, Robert Peroni and Ernest Smith);

•1996-2013 Cumulative Pocket Parts, KUNTZ LAW OF OIL AND GAS (Maintained and updated annually for Lexis/Nexis since 1996 with Professors Anderson, Smith and Pierce.);

2

1141

•1989-2007 Cumulative Pocket Parts, SUMMERS OIL AND GAS LAW (Maintained and updated annually for West from 1989 to 2007);

•Vol. 28, WEST'S LEGAL FORMS (3rd Ed. 1997) (with Professor Bradford Stone) (Maintained and updated annually from 1997 to 2007);

•Volumes 6, 7 & 7A, WEST'S TEXAS FORMS (3rd ed. 1997) (Maintained and updated annually from 1997 to 2008).


## SELECTED PUBLICATIONS: MAJOR LAW JOURNAL ARTICLES

•Recent Significant Developments Affecting Farmout Agreements, 50th Oil & Gas Inst 3-1 (Matthew Bender 1999). (Peer reviewed);

•Royalty Calculation in Texas, Ch. 3 in Oil and Gas Law for a New Century: Precedent as Prologue (Appendix to the Proceedings of the 50th Anniversary Celebration of the Southwestern Legal Foundation, Matthew Bender, 1999) (Peer reviewed);

•The Lessee's Right to Free Use of Produced Substances: New Wine in Old Bottles, 37 Nat. Res. J. 729 (1997) (not peer reviewed);

•Defining the Royalty Obligation, 49 SMU L.J. 223 (1996). (Not peer reviewed) [Selected as the Outstanding Law Review Article of 1996 by the Texas Bar Foundation. Reprinted at 33 Pub. Land & Res. Dig. 257 (1996)];

•The Easement of the Mineral Estate for Surface Use, THE NATURAL RESOURCES LAW MANUAL 239-251 (ABA 1995) (Peer reviewed);

•The Easement of the Mineral Estate for Surface Use: An Analysis of Its Rationale, Status and Prospects, 39th Rocky Mtn. Min. L. Inst. Ch. 4 (1993) (Peer reviewed);

•Principles of Energy Policy, 32 Washburn L. J. 1 (1992) (Not Peer reviewed);

•Developments in Nonregulatory Oil and Gas Law: Are We Moving Toward a Kinder and Gentler Law of Contracts?, 42nd Oil & Gas Inst. 1-1 (Matthew Bender, 1991) (Peer reviewed);

•The Meaning of "Payout" in Oil and Gas Farmout Agreements, 10th Eastern Min. L. Inst., 13-1 (Matthew Bender, 1989) (Peer reviewed);

•A New Generation of Gas Contracts, VIII Corp. Counsel Rev. 1 (1989) (Peer reviewed);

•Developments in Non-Regulatory Oil and Gas Law, 39th Oil & Gas Inst. Ch. 1 (Matthew Bender, 1988) (Peer reviewed);

•Current Lease and Royalty Problems in the Gas Industry, 23 Tulsa L.J. 547 (1988) (Not peer reviewed);

•Analyzing Oil and Gas Farmout Agreements, 41 Southwestern L. J. 759 (1987); reprinted at 25 Pub. Land & Res. Dig. 5 (1988). (Not peer reviewed). [Selected as the Outstanding Law Review Article of 1988 by the Texas Bar Foundation];

3

•What Substances are "Minerals"? 30th Rocky Mtn. Min. L. Inst. 2-1 (1985) (Peer reviewed);

•Severance Taxes as an Issue of Energy Sectionalism, 5 Energy L.J. 357 (1984) (Peer reviewed);

•Developments in Non-Regulatory Oil and Gas Law: The Issues of the Eighties, 35th Oil & Gas Inst. 1 (Matthew Bender 1984) (Peer reviewed);

•Shut-In Royalty Payments, 5th Eastern Min. L. Inst. Ch. 18 (1984) (Peer reviewed);

•Eastern Oil and Gas Operations: Do Recent Developments Suggest New Answers to Old Problems?, 4th East. Min. L. Inst. Ch. 20 (1983) (Peer reviewed);

•Developments in Non-Regulatory Oil and Gas Law, 32nd Oil and Gas Inst. 117 (Matthew Bender 1981) (Peer reviewed);

•Beyond Section 858A - A Proposed System of Ground Water Liability and Management for Eastern States, 8 Ecology L.Q. 131 (1979) (with Lon C. Reudisili and Bruce Graham) (Not peer reviewed);

•Representing the Landowner in Oil and Gas Leasing Transactions, 31 Okla. L. Rev. 257 (1978). Abstracted in 16 Pub. Land & Res. L. Dig. 188 (1979) (Not peer reviewed);

•Ohio Oil and Gas Conservation Law - The First Ten Years (1965-1975), 37 Ohio State L.J. 31 (1976) (with J. R. Emens) (Not peer reviewed).


## SELECTED PRESENTATIONS, LECTURES, AND PAPERS

•March 2004, "History of the Energy Law Journal," Energy Bar Association, Washington, D.C.;

•May 2004, "International Gas Trade," Oman Rule of Law Forum, Washington, D.C.;

•September 2004, "Royalty and Implied Covenants," National Association of Royalty Owners' national convention, Denver, CO;

•September 2004 and 2005, "International Environmental Issues in Petroleum Development," Association of International Petroleum Negotiators, Houston, TX;

•February 2006, "International Minerals Development and Trade," Kyrgyzstan Rule of Law Forum, Dallas, TX;

•April 2006, "U.S. Energy Policy," Oklahoma City Mineral Bar Assoc., Oklahoma City, OK, and SMU Law Reunion Weekend, Dallas, TX;

•May 2006, US Oil Policy in the Middle East. Institute of Foreign Relations, Ministry of Foreign Affairs, Riyadh, Saudi Arabia;

•October 2007, "Damages in International Arbitration," American University, Washington;

•December 2007, "The International Arbitration Process," Qatar University, Doha, Qatar [two presentations];

4

1143

•December 2007, "Teaching in American Law Schools," faculty presentation, Qatar University, Doha, Qatar;

•March 2008, "Operator Liability, Removal and Succession," Rocky Mountain Mineral Law Fnd. Special Inst. on Operating Agreements, Denver, CO;

•November 2008, "US Energy Policy," to the Institute of United States Policy Studies, Edmunton, Alberta;

•March 2009, "Iraq's Draft Technical Services Contract," to officers of the Iraq Ministry of Oil, Dead Sea, Jordan;

•May 2009, "International Farmout Agreements" to students in the LLM program at Universidade Agostinho Neto, Luanda, Angola;

•May 2009, "International Operating Agreements" to students in the LLM program at Universidade Agostinho Neto, Luanda, Angola;

•May 2009, "Legal Drafting of International Contracts" to Association of International Petroleum Negotiators Regional Meeting, Luanda, Angola;

•October 2009, "The Future of Oil and Gas Law," Symposium at Washburn University Law School, Topeka, KS;

•October 2009, "Principles of U.S. Energy Policy," Cornell Institute of Public Affairs, Ithaca, NY;

•February 2010, "International Unitization Issues," seminar for Iraqi Ministry of Oil officials, Dallas, TX;

•March 2010, "Operating Agreement Problems," University of Texas CLE, Houston, TX;

•May 2010, Selected Issues in International Operating Agreements, University College London in Adelaide, South Australia.

•June 2010, Short Course in International Petroleum Contracts, University of Dundee, UK.

•September 2010, International Petroleum Contracts and Issues, Chulalongkorn University Faculty of Law, Bangkok, Thailand.

•September 2010, Implications of the Macando Oil Spill, Petroleum Institute of Thailand Executive Session, Bangkok, Thailand.

•October 2010, Short Course in Oil and Gas Law, Rocky Mountain Mineral Law Fnd., Westminster, CO.

•March 2011, Operator/Non-Operator Issues, University of Texas Fundamentals of Oil and Gas Law, Houston, TX.

•May 2011, Selected Issues in International Operating Agreements, University College London in Adelaide, South Australia.

5

1144

•May 2011, Intensive Masters' Course in Global Oil and Gas Contracts, University of Sydney

•May 2011, Legal Issues in the Development of Petroleum Resources, Australia National Tax Office, Perth, WA, Australia.

•June 2011, Intensive Masters Course in Global Oil and Gas Contracts, University of Sydney LLM program, British Institute for International and Comparative Law, London, UK.

•June 2011, Short Course in International Petroleum Contracts, University of Dundee, UK.

•November 2011, Contracts Used in International Petroleum Transactions, Agencia Nacional do Petroleo, Rio de Janeiro, Brazil.

•March 2012, Operator/Non-Operator Issues, at the University of Texas' program on Fundamentals of Oil and Gas Law, Houston, TX.

•March 2012, Energy's Future, 2012 Energy Symposium, Thurgood Marshall Law School, Houston, TX.

•April and May 2012, Intensive Masters' Course in Global Oil and Gas Contracts, University of Sydney LLM program, NSW, Australia.

•May 2012, Selected Issues in International Operating Agreements, at University College London's Natural Resources LLM program in Adelaide, South Australia.

•May 2012, Intensive Masters/JD Course in International Petroleum Contracts, University of Melbourne, Vic., Australia.

•May 2012, Legal Issues in the Development of Petroleum Resources, Australia National Tax Office, Melbourne, Vic., Australia.

•May 2012, International Petroleum Contracts, University of Dundee, Scotland, UK.

•June 2012, Cross-Border Unitization, for senior Iraqi government officials and officials of the US Departments of State, Interior, and Commerce, in Washington, D.C.

•September 2012, International Farmout and Operating Agreements, Chulalongkorn University Faculty of Law, Bangkok, Thailand.

• November 2012, Panelist, "Emerging Issues in US Energy Law," Appellate Judges Education Institute, in New Orleans.

•February 2013, Moderator and Panelist, Energy and the Arab Spring, ABA International

6

Law Section meeting, Dallas, TX.

•March 2013, "Issues in Operating Agreements," at the University of Texas' program on Fundamentals of Oil and Gas Law, Houston, TX.

•May 2013, International Petroleum Contracts, University of Dundee, Scotland, UK.

•June 2013, "International Petroleum Contracts Overview," for lawyers from the Afghan Ministry of Mines and Petroleum and members of the Afghanistan parliament, Doha, Qatar.

## SELECTED APPOINTMENTS AND ELECTED POSITIONS

•President, the Rocky Mountain Mineral Law Foundation, 2003-2004 (previously held other offices);

•Chair of the Section of Environment, Energy, and Resources Law of the American Bar Association, 1992-1993 (previously held other offices);

•Member, ABA Coordinating Group on Energy Law, 1989-1992, 1993-2001;

•Vice Chair and member of the Executive Committee of the Energy Law Institute of the Center for American and International Law, 1999-2004;

•Member of the Council of the Oil, Gas, and Mineral Law Section of the Texas State Bar, 1994-1997;

•Member of the Council of the Energy Law Section (1994-1997) and Member of the Council of the International Law Section (1994-1999), the Dallas Bar Association;

•Member of the Advisory Board, SMU-in-Legacy Dispute Resolution Program, 2001-2004;

•Editor, the Oil and Gas Reporter (Lexis/Nexis) 1987-present.

## AWARDS/SPECIAL RECOGNITION/HONORS

•Recipient of the 2013 Clyde Martz Award for teaching excellence from the Rocky Mountain Mineral Law Foundation;

•Co-recipient of the John Rogers Award for distinguished service to the oil and gas industry (Sponsored by the Center for American and International Law);

•Recipient, Dr. Don C. Smart Prize for Teaching Excellence (sponsored by SMU Law School);

•Recipient, Dr. Don C. Smart Prize for Directed Research (sponsored by SMU Law School);

•Twice awarded the Texas Bar Foundation Outstanding Law Journal Article Award.

## PROFESSIONAL/COMMUNITY SERVICE

•Oil and Gas International Legal Advisor and Chair, International Legal Standards Advisory

7

Group, Commercial Law Development Program, United States Department of Commerce, 2006-2009 (working with the Iraqi Government, the U.S. Embassy in Baghdad, and the State Department on the Iraq Oil Law and related statutes and contracts);

•Chair, SMU Law School Appointments Committee, 1997-2006 (Member 2007 – present);
•Consultant, Commercial Law Development Program, United States Department of Commerce, 2009 to present (working with lawyers from Iraq, Afghanistan, Yemen, India, and Poland).

8

1147

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1

NO. 2013-CV7-001396-D1

| | | |
|---|---|---|
| JUSTAPOR RANCH COMPANY, L.C., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| V. | § | WEBB COUNTY, TEXAS |
| | § | |
| | § | |
| | § | |
| ESCONDIDO RESOURCES II, LLC, | § | |
| Defendant. | § | 49th JUDICIAL DISTRICT |

## AFFIDAVIT OF WILLIAM B. ABINGTON

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME THE UNDERSIGNED NOTARY PUBLIC, on this day personally appeared William B. Abington, who after being by me duly sworn, stated under oath:

1. My name is William B. Abington. I am a Certified Public Accountant, Certified in Financial Forensics, a Certified Fraud Examiner, and an honors graduate of Texas State University. I am a member of the American Institute of Certified Public Accountants, Association of Certified Fraud Examiners, and American Bar Association Section of Natural Resources, Energy and Environmental Law. I am the Managing Director for Alvarez & Marsal's Global Forensic and Dispute Services Group. I have over 25 years experience providing accounting and complex financial analysis, forensic investigations and advisory services. I lead Alvarez & Marsal's dispute and forensic services in the energy sector. Additional information regarding my qualifications is set out in my résumé, a true and correct copy of which is included in Exhibit 1 attached hereto. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2. Attached as Exhibit 1 to my affidavit is a true and correct copy of my report prepared in this case.

3. I have calculated the royalties Escondido paid Justapor in connection with the Lease Agreement. Escondido paid Justapor $5,749,323 in royalty payments for production under the parties' Lease Agreement from June, 2009, through April, 2014.

4. According to the expert report prepared by Charles E. Graham, III, Escondido allegedly "underpaid" Justapor royalties totaling $80,958. This alleged "underpayment" represents 1.4% of total royalties paid to Justapor during the period of time set forth in the preceding paragraph. Mr. Graham alleges royalties in the amount of $3,851 were underpaid for the months of October, 2011, November, 2011, and January, 2012. This amount represents 0.00067 of the total royalty paid.

Ex. G

5. I reviewed the amount of money expended by Escondido on capital improvements made under the parties' Lease Agreement. Escondido incurred $33,100,287 of costs on capital improvements to the property which is the subject of the parties' Lease Agreement.

6. Article III and Article XIV of the Lease Agreement both address royalties; however, they address two different accounting aspects of royalty payment. Article III of the parties' Lease Agreement addresses the accounting of how to calculate royalty and when to make adjustments to the royalty calculation. Article XIV of the Lease Agreement addresses the accounting of when royalty payments are to be paid to the lessor. Article III(g) describes when to make adjustments, or "true-ups" to the royalty calculation. Article III does not call for the Lease Agreement to terminate if adjustments are not identified by lessee and processed by March 1 of the succeeding year. It is common in the oil and gas industry for companies to periodically review royalty calculations and to make true-up payments. It is also common for producers to receive adjustments from purchasers that impact the volume or the price upon which the royalty payment was based. These adjustments may be received numerous months following the initial royalty payment and require the company to make a true up payment to the royalty owner.

7. Article XIV describes the timing of when the royalty payment is due, for both existing and first production, and describes the consequences for not making the royalty payment. Specifically, Article XIV states "Royalties payable to Lessor in the manner hereinabove provided for are due and payable to Lessor within a period of sixty (60) days following each month's production of oil or gas produced and sold from the premises". Unlike Article III(g), which describes the manner and timing to account for potential adjustments to royalty, Article XIV describes when the initial payment on monthly production should be accounted for to the royalty owner and the penalty for a delinquent payment. In other words, it addresses non-payment of the royalty in a timely manner. The reference to a title dispute or defect demonstrates this point. If a title dispute or a title defect exists, royalty payments are typically not paid and are instead accounted for as "suspense" and held accordingly until the title matter can be resolved. In such circumstances, Article XIV provides an exception for non-payment of royalty on a timely basis. The lease termination clause contained in Article XIV is tied to the monthly production and requirement to pay royalty within 60 days following each month's production. Underpayments and adjustments to underpayments are not addressed in Article XIV.

8. I have reviewed the royalty payment information related to the parties' Lease Agreement. Production under the Lease Agreement began during June, 2009. Escondido has routinely made royalty payments to Justapor for production since that time. Additionally, Escondido has made true-up or reconciliation payments to Justapor over the life of the Lease Agreement. Escondido made 15 true-up or reconciliation payments to Justapor from September, 2009, through June, 2014, totaling $441,596.

9. Escondido's interpretation of the methodology for royalty payment calculation is reasonable. David Wrather of Escondido testified that he believed Amendment No. 1 to the Lease Agreement replaced the entire pricing provision contained in Article III of the Lease Agreement so that the pricing provision would mirror the Enterprise contract and limit Escondido's royalty exposure to what it was receiving from Enterprise. Lease agreements often contain language providing that royalties will be paid based on the lessee's proceeds. Oil and gas companies generally strive to align their cash outflows (in this case royalty payments), to their

2

cash inflow (in this case gas sales). Gas accounting involves many complexities, and companies generally desire to pay royalties based on the same price which the company sold the gas to a third party.

10. The royalty pricing provisions in the Lease Agreement are not entirely clear. Article III(b) of the Lease Agreement, as it reads without Amendment No. 1, sets forth a royalty pricing methodology calling for gas royalties to paid at the highest of:

    (i)     Current Market Value

    (ii)    Current Houston Ship Channel Price

    (iii)   Current Proceeds Realized by Lessee, or

    (iv)   The highest sales price of any gas were gas produced from the property could be present when sold to a third party.

Oil and gas leases commonly include pricing provisions based on current market value, the Houston Ship Channel Price and/or current proceeds. Even so, the Lease Agreement goes on to provide definitions of each of three terms. An accountant can determine the value associated with each of these provisions. However, the fourth provision appears unclear, but the Lease Agreement does not define this provision.

11. Amendment No. 1 to the Lease Agreement sets forth pricing amendments to Article III of the Lease Agreement. Amendment No. 1 includes a paragraph that addresses the Houston Ship Channel Price. At the end of this paragraph, a provision states, in part:

> "provided, however, Lessee shall have the right to enter into gas sales contracts that will determine the price upon which gas royalty is calculated if such contracts provide no less than a price redetermination every six months and provide the following minimum terms;"

(hereinafter referred to as the "Pricing Provision").

Although the Pricing Provision is included in the same section that describes the Houston Ship Channel Price, Mr. Wrather testified that he believed the Pricing Provision replaced the royalty pricing terms from the Lease Agreement. Interpreting the Pricing Provision to only relate to the Houston Ship Channel Price, as Justapor contends, appears to blur the meaning of the pricing points contained in Article III(b) of the Lease Agreement. Accountants are routinely required to read and apply oil and gas royalty pricing terms in leases. The language in Amendment No. 1 that describes the circumstances of the Pricing Provision is describing a current proceeds circumstance. Therefore, if the Pricing Provision in Amendment No. 1 amends the entire royalty pricing terms set forth in the Lease Agreement, as testified to by Mr. Wrather, royalties would be calculated based upon the current proceeds so long as the sales price is greater than the minimum price set forth in the Pricing Provision. This interpretation allows each pricing point to concurrently exist in the Lease Agreement, as amended. However, if the Pricing Provision applies only to the Houston Ship Channel Price, then the Pricing Provision is stating that the current proceeds can be paid instead of the Houston Ship Channel Price. Further, if such current

3

proceeds are received from a third party at an arms-length basis, then those proceeds represent a market value transaction. Thus, if the Pricing Provision only applies to the Houston Ship Channel Price, then the Houston Ship Channel Price would be the same as current proceeds and would be the same as market value price. This interpretation appears to blur the distinction of the pricing points and appears to create two different definitions of current proceeds.

12. The affidavit of Charles E. Graham, III and the copy of his report attached thereto, both included as Exhibit F to Plaintiff's Motion for Summary Judgment, sets out alleged trespass damages in the amount of $10,413,114 from March 2, 2012, to February 28, 2014, or alternatively, $4,825,866 from March 2, 2013, to February 28, 2014. According to the Graham report, these numbers are calculated based on "net proceeds" but subtract only royalties and taxes paid from gross proceeds. The amounts set forth by Mr. Graham in his affidavit and report do not account for other operating costs incurred by Escondido. An accurate calculation of the value of the net proceeds to Escondido would include a reduction for the costs associated with production. Taking into account the operating costs incurred, the actual value of the net proceeds realized by Escondido was $6,671,268 from March, 2012, to February, 2014, and $2,820,095 from March, 2013, through February, 2014. A monthly breakdown of these amounts is set forth in my report attached hereto as Exhibit 1.

13. The Graham report alleges royalties were underpaid in the amount of $77,107 for the time period of February, 2012, through January, 2013. It appears the Graham report does not consider two factors relating to the calculation of this amount. First, the Graham report does not account for the time period from February 1, 2012, through February 21, 2012, when Escondido was selling gas only to Kinder Morgan. Instead, the Graham report calculates an alleged underpayment related to Escondido's use of a weighted average price for the entire month, thereby applying the higher Conoco sales price to the time period during which Escondido was not selling to Conoco. Second, it appears that the Graham report does not consider the difference between the entrained NGL mix that exists in the Justapor gas stream and the NGL composition of the co-mingled gas stream delivered to Conoco for processing. I have calculated adjustments to the alleged underpayment for the two above factors, which result in a decrease of more than $55,000 to the alleged underpayment amount of $77,107. A similar adjustment may be in order for the entrained NGL mix of sales to Copano.

14. The facts stated in this affidavit are true and correct.

FURTHER AFFIANT SAYETH NOT.

_William B Abington_ (signature)

William B Abington

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the _9_ day of September, 2014, to certify which witness my hand and seal of office.

ANNA GIANNAKOPOULOS
MY COMMISSION EXPIRE:
December 20, 2016

_____
Notary Public, State of Texas

4

1151

Filed
9/5/2014 3:46:44 PM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1



Escondido Resources II, LLC
526 Kingwood Drive, #353
Kingwood, Texas 77339
(281) 359-6780 office
(281) 361-6780 fax
bill@escondido-resources.com



August 9, 2011

Mr. James K. Jones, Jr.
Justapor Ranch Company, L.C.
JAK Passive Minerals, L.C.
5601 San Dario Ave., Ste #5
Laredo, Texas 78041

Re: Oil and Gas Lease dated June 24, 2008, executed by Justapor Ranch Company, L.C., as Lessor, to Escondido Resources II, L.C., as Lessee covering a tract of 803 acres of land located in Webb County, Texas, as to depths from 9,000 feet below the surface to all deeper depths (the "Deep Rights Lease"), a Memorandum of which dated January 5, 2009, is recorded in Volume 2701, page 269, Official Public Records of Webb County, Texas, and which lease has been amended by instruments dated effective June 24, 2008 by instrument dated October 21, 2008; and

Oil and Gas Lease dated June 24, 2008, executed by Justapor Ranch Company, L.C., as Lessor, to Escondido Resources II, L.C., as Lessee covering the same tract of 803 acres of land located in Webb County, Texas, as the Deep Rights Lease, but limited the depths from the surface to 9,000 feet below the surface (the "Shallow Lease"), a Memorandum of which is recorded in Volume 2609, page 16, Official Public Records of Webb County, Texas, and which lease has been amended by instruments dated effective June 24, 2008, and October 21, 2008.

Dear Mr. Jones:

Reference is here made to each of the Deep Rights Lease and the Shallow Lease referenced in the caption above (collectively, the "Leases"). By instruments of even date herewith, each denominated the Third Amendment of Oil and Gas Lease (the "Third Amendment"), each of Justapor Ranch Company, L.C. (the "Ranch Company"), and Escondido Resources II, L.C. ("Escondido"), has agreed to certain amendments to each of the two Leases.

The purpose of this letter is to confirm the agreement between each of the Ranch Company and Escondido with respect to certain matters covered by the Third

CONFIDENTIAL

Ex. Q

Amendments to the Leases, anything set forth in each of the amendments to the contrary.

Paragraph XIII of each of the two Leases has been amended to provide as follows:

> After the expiration of the primary term of this lease, Lessor and Lessee agree that the commencement of drilling operations on three (3) horizontal wells to any formation on the lands covered by this lease or covered by the [Deep Rights or Shallow Rights] Lease, in any twelve month period beginning July 1 shall satisfy this continuous drilling provision and this lease the [Deep Rights or Shallow Rights] Lease shall remain in full force and effect until the end of a twelve month period beginning July 1 in which Lessee does not commence drilling operations on three (3) horizontal wells. At the end of the twelve month period during which Lessee has not commenced drilling operations on three (3) horizontal wells, this lease and all rights granted hereunder shall automatically terminate as to all acreage covered by this lease, SAVE AND EXCEPT all acreage allocated to each producing oil or gas well, on a well by well basis (whether vertical or horizontal), and designated as provided above. Lessee shall be obligated to release all acreage and depths not so allocated to a producing oil or gas well as herein provided for.

As between the Ranch Company and Escondido, only, and personal only to Escondido (and not its successors and assigns), each reference in the foregoing paragraph, as set forth in each of the Third Amendments, shall be deemed to read "two (2) wells" in place of three. To the extent that Escondido drills and completes more than two (2) wells per year, it shall receive credit for those additional wells against future years drilling commitments.

The drilling of the following wells, in addition to wells already drilled on the 803 acre tract covered by the Leases as of the date of this agreement, will develop fully the lands covered by the Shallow Lease and the Deep Rights Lease as to the formations indicated:

| Formation | No. of Wells |
|---|---|
| Eagle Ford shale | 5 |
| Olmos | 5 |
| Escondido | 3 |
| Total: | 13 |

CONFIDENTIAL

Escondido commits to drill two (2) wells in the Escondido, (1) well in the Olmos, and one (1) Eagle Ford Shale well. If Escondido fails to drill these commitment wells prior to breakup or release of either lease, it shall pay three hundred fifty thousand dollars ($350,000) per well not drilled and completed to Ranch Company. *additionally we have agreed to convey to an entity of your choosing mineral interest we have acquired under the referenced 803 acres as well as all other mineral interest we acquire in this land after your approval & consent.*

In addition to the foregoing, this letter sets forth the terms of an agreement between JAK Passive Minerals, L.C. ("JAK"), and the Ranch Company (collectively, "Jones Entity") and Escondido pertaining to the Shallow Lease.

Under the terms and provisions of Paragraph XX of each of the Leases, Lessor has the right to participate for up to a ten percent (10%) working interest in any well drilled on the leased premises. Jones Entity has agreed, and contemporaneously with the execution and delivery of this letter and the Third Amendments referred to herein, is assigning, or causing to be assigned, to Escondido all of its working interest right, title and interest, in and to any rights it owns in the Leases, effective as of ~~December 31,~~ *November 1* 2010. The form of this assignment is attached hereto as Annex A, and the consideration for this assignment is the inclusion in the Third Amendment of each of the Leases of an increase in the royalty provided for in the Leases from 25% to 30%, i.e. an increase of 5% of 100% in and to production of oil, gas and related hydrocarbons from the Leases.

If the foregoing reflects your understanding of our meetings and discussions, and you are in agreement, please execute and return: (i) a copy of this letter agreement, (ii) each of the two Third Amendments to Oil and Gas Lease and (iii) an assignment in the form attached as Annex A. In exchange for your execution and delivery of these documents, Escondido will simultaneously execute and deliver to you (i) a counterpart of this agreement and (ii) counterparts of each of the two Third Amendments to Oil and Gas Lease. An appropriate accounting shall follow the execution of documents *which that we have agreed to be $600,000.*

This agreement may be executed in multiple counterpart copies, each of which shall be deemed an original of but one and the same instrument.

Very truly yours,

ESCONDIDO RESOURCES II, LLC

By: _____
      J. David Wrather, Vice President                    [signatures continue on following page]

CONFIDENTIAL

ESC004108
1310

Mr. James K. Jones, Jr.
Justapor Ranch Company, L.C.
JAK Passive Minerals, L.C.
August 9, 2011
Page 4

AGREED TO and ACCEPTED this _____ day of August 2011.

JUSTAPOR RANCH COMPANY, L.C.

By:_____
    James K. Jones, Jr., Manager

JAK PASSIVE MINERALS, L.C.

By:_____
    James K. Jones, Jr., Manager

CONFIDENTIAL

Filed
7/23/2014 9:37:20 AM
Esther Degollado
District Clerk
Webb District
2013-cv7-001396-D1



Escondido Resources II, LLC
526 Kingwood Drive, #353
Kingwood, Texas 77339
(281) 359-6780 office
(281) 361-6780 fax
bill@escondido-resources.com

August 9, 2011

Mr. James K. Jones, Jr.
Justapor Ranch Company, L.C.
JAK Passive Minerals, L.C.
5601 San Dario Ave., Ste #5
Laredo, Texas 78041

Re: Oil and Gas Lease dated June 24, 2008, executed by Justapor Ranch Company, L.C., as Lessor, to Escondido Resources II, L.C., as Lessee covering a tract of 803 acres of land located in Webb County, Texas, as to depths from 9,000 feet below the surface to all deeper depths (the "Deep Rights Lease"), a Memorandum of which dated January 5, 2009, is recorded in Volume 2701, page 269, Official Public Records of Webb County, Texas, and which lease has been amended by instruments dated effective June 24, 2008 by instrument dated October 21, 2008; and

Oil and Gas Lease dated June 24, 2008, executed by Justapor Ranch Company, L.C., as Lessor, to Escondido Resources II, L.C., as Lessee covering the same tract of 803 acres of land located in Webb County, Texas, as the Deep Rights Lease, but limited the depths from the surface to 9,000 feet below the surface (the "Shallow Lease"), a Memorandum of which is recorded in Volume 2609, page 16, Official Public Records of Webb County, Texas, and which lease has been amended by instruments dated effective June 24, 2008, and October 21, 2008.

Dear Mr. Jones:

Reference is here made to each of the Deep Rights Lease and the Shallow Lease referenced in the caption above (collectively, the "Leases"). By instruments of even date herewith, each denominated the Third Amendment of Oil and Gas Lease (the "Third Amendment"), each of Justapor Ranch Company, L.C. (the "Ranch Company"), and Escondido Resources II, L.C. ("Escondido"), has agreed to certain amendments to each of the two Leases.

The purpose of this letter is to confirm the agreement between each of the Ranch Company and Escondido with respect to certain matters covered by the Third



EXHIBIT
5

12-10-13 KD
10
K. Von Plonski

JJ 2174

445

Amendments to the Leases, anything set forth in each of the amendments to the contrary.

Paragraph XIII of each of the two Leases has been amended to provide as follows:

> After the expiration of the primary term of this lease, Lessor and Lessee agree that the commencement of drilling operations on three (3) horizontal wells to any formation on the lands covered by this lease or covered by the [Deep Rights *or* Shallow Rights] Lease, in any twelve month period beginning July 1 shall satisfy this continuous drilling provision and this lease the [Deep Rights *or* Shallow Rights] Lease shall remain in full force and effect until the end of a twelve month period beginning July 1 in which Lessee does not commence drilling operations on three (3) horizontal wells. At the end of the twelve month period during which Lessee has not commenced drilling operations on three (3) horizontal wells, this lease and all rights granted hereunder shall automatically terminate as to all acreage covered by this lease, <u>SAVE AND EXCEPT</u> all acreage allocated to each producing oil or gas well, on a well by well basis (whether vertical or horizontal), and designated as provided above. Lessee shall be obligated to release all acreage and depths not so allocated to a producing oil or gas well as herein provided for.

As between the Ranch Company and Escondido, only, and personal only to Escondido (and not its successors and assigns), each reference in the foregoing paragraph, as set forth in each of the Third Amendments, shall be deemed to read "two (2) wells" in place of three. To the extent that Escondido drills and completes more than two (2) wells per year, it shall receive credit for those additional wells against future years drilling commitments.

The drilling of the following wells, in addition to wells already drilled on the 803 acre tract covered by the Leases as of the date of this agreement, will develop fully the lands covered by the Shallow Lease and the Deep Rights Lease as to the formations indicated:

| Formation | No. of Wells |
|---|---|
| Eagle Ford shale | 5 |
| Olmos | 5 |
| Escondido | 3 |
| Total: | 13 |



**JJ 2175**

Escondido commits to drill two (2) wells in the Escondido, (1) well in the Olmos, and one (1) Eagle Ford Shale well. If Escondido fails to drill these commitment wells prior to breakup or release of either lease, it shall pay three hundred fifty thousand dollars ($350,000) per well not drilled and completed to Ranch Company. *Additionally, we have agreed to convey to an entity of your choice, mineral interest we have acquired under the referenced 803 acres as well as all other additional interests we acquire in this land after your approval and consent.*

In addition to the foregoing, this letter sets forth the terms of an agreement between JAK Passive Minerals, L.C. ("JAK"), and the Ranch Company (collectively, "Jones Entity") and Escondido pertaining to the Shallow Lease.

Under the terms and provisions of Paragraph XX of each of the Leases, Lessor has the right to participate for up to a ten percent (10%) working interest in any well drilled on the leased premises. Jones Entity has agreed, and contemporaneously with the execution and delivery of this letter and the Third Amendments referred to herein, is assigning, or causing to be assigned, to Escondido all of its working interest right, title and interest, in and to any rights it owns in the Leases, effective as of ~~December 31,~~ *November* 2010. The form of this assignment is attached hereto as Annex A, and the consideration for this assignment is the inclusion in the Third Amendment of each of the Leases of an increase in the royalty provided for in the Leases from 25% to 30%, *i.e.* an increase of 5% of 100% in and to production of oil, gas and related hydrocarbons from the Leases.

If the foregoing reflects your understanding of our meetings and discussions, and you are in agreement, please execute and return: (i) a copy of this letter agreement, (ii) each of the two Third Amendments to Oil and Gas Lease and (iii) an assignment in the form attached as Annex A. In exchange for your execution and delivery of these documents, Escondido will simultaneously execute and deliver to you (i) a counterpart of this agreement and (ii) counterparts of each of the two Third Amendments to Oil and Gas Lease. An appropriate accounting shall follow the execution of documents *which we have agreed to be $500,000.*

This agreement may be executed in multiple counterpart copies, each of which shall be deemed an original of but one and the same instrument.

Very truly yours,

ESCONDIDO RESOURCES II, LLC

By: _____
    J. David Wrather, Vice President

[signatures continue on following page]

Mr. James K. Jones, Jr.
Justapor Ranch Company, L.C.
JAK Passive Minerals, L.C.
August 9, 2011
Page 4

AGREED TO and ACCEPTED this _10th_ day of August 2011.

JUSTAPOR RANCH COMPANY, L.C.

By:_____
James K. Jones, Jr., Manager

JAK PASSIVE MINERALS, L.C.

By:_____
James K. Jones, Jr., Manager

JJ 2177

448

297 S.W.3d 768
Supreme Court of Texas.

AQUAPLEX, INC. and James Edward Jones, Jr., Petitioners,

v.

RANCHO LA VALENCIA, INC. and Charles R. "Randy" Turner, Respondents.

No. 08–0280.  |  Oct. 30, 2009.

**Synopsis**

**Background:** Real estate developer brought claims against managing joint venturer to recover for fraud, breach of joint venture agreement (JVA), and destruction of property. Joint venturer filed counterclaims and sought declaratory and injunctive relief. Parties entered into a memorandum of settlement agreement (MSA). Joint venturer then added claim of fraudulent inducement to enter the MSA. Following directed verdict against developer on all claims, and jury trial on joint venturer's claims, the 201st District Court, Travis County, Suzanne Covington, J., entered judgment for venturer on fraudulent inducement claim and awarded declaratory and injunctive relief and attorney fees for breach of JVA. Developer appealed. The Amarillo Court of Appeals, Mackey K. Hancock, J., 253 S.W.3d 728, reversed and rendered. Review was granted.

**Holdings:** The Supreme Court held that:

[1] developer's assignment of right, title, and interest in joint venture was a security interest and, therefore, did not divest developer of its interest;

[2] evidence supported finding of developer's intent not to perform the MSA; and

[3] evidence supported an award of damages, but not amount awarded.

Affirmed in part, reversed in part, and remanded.

West Headnotes (20)

**[1]     Damages** ☞ Nature and theory of compensation

An application of the single injury rule does not arise unless there is more than one recovery for a single injury.

1 Cases that cite this headnote

**[2]** **Joint Adventures** Mutual Rights, Duties, and Liabilities of Parties

**Secured Transactions** Requisites and validity in general

**Secured Transactions** Rights and liabilities of parties

Joint venturer's assignment of right, title, and interest in joint venture in consideration of and as security for the payment of all indebtedness owed to lender was a security interest and, therefore, did not divest joint venturer of its interest, where assignee was not obligated to perform any duties and was not obligated for any liabilities, the assignment would have been void upon payment in full, and assignee never elected to exercise any rights upon default.

Cases that cite this headnote

**[3]** **Secured Transactions** Requisites and validity in general

An assignment where the creditor does not assume any obligations and the effectiveness of the instrument is terminated on final payment is a security interest.

Cases that cite this headnote

**[4]** **Joint Adventures** Mutual Rights, Duties, and Liabilities of Parties

Any breach of joint venture agreement entitling managing venturer to sell the property as long as the amount of the sale equaled $60,000 or more per condominium and entitling co-venturer to buy out managing venturer would not support a forfeiture of co-venturer's interest.

Cases that cite this headnote

**[5]** **Contracts** Discharge of contract by breach

Forfeitures are not favored, and contracts are construed to avoid them.

2 Cases that cite this headnote

**[6]** **Contracts** Nature and Form of Remedy

Generally, the proper remedy for breach of contract is damages.

Cases that cite this headnote

**[7]** **Injunction** Interference with contractual or business relations

Managing joint venturer was not entitled to injunction to prevent co-venturer from interfering in sale of property, since co-venturer had not been divested of interest in joint venture and, thus, there was no threat of imminent harm.

1 Cases that cite this headnote

**[8]** **Fraud** Elements of Actual Fraud

The elements of fraud are as follows: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

85 Cases that cite this headnote

**[9]** **Appeal and Error** Considering questions not raised or passed upon in intermediate court

Issue whether legally sufficient evidence supported intent element of fraud claim by managing joint venturer was not waived by co-venturer's failure to raise this alternative ground for affirmance as a cross-point in its response to managing venturer's petition for review; the Court of Appeals did not consider the intent element, but co-venturer raised that issue before the Court of Appeals and in its brief on the merits before Supreme Court. Rules App.Proc., Rules 53.3(c)(2), 53.4.

Cases that cite this headnote

**[10]** **Appeal and Error** Verdict

In reviewing a verdict for legal sufficiency, Supreme Court must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.

2 Cases that cite this headnote

**[11] Fraud** Existing facts or expectations or promises

A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made.

15 Cases that cite this headnote

**[12] Fraud** Intent

While breach of the contract alone is not evidence that a party did not intend to perform, breach combined with slight circumstantial evidence of fraud is some evidence of fraudulent intent, enough to support a verdict.

6 Cases that cite this headnote

**[13] Fraud** Intent

**Fraud** Presumptions and burden of proof

A party's intent is determined at the time the party made the representation, but it may be inferred from the party's subsequent acts after the representation is made.

65 Cases that cite this headnote

**[14] Fraud** Intent

Withdrawal of joint venturer's attorney on belief of his client was perpetrating a fraud and timing of venturer's bankruptcy just after execution of the master settlement agreement with managing venturer provided circumstantial evidence of joint venturer's lack of intent to perform the agreement and satisfied the slight circumstantial evidence standard to establish fraudulent intent not to perform.

2 Cases that cite this headnote

**[15] Fraud** Difference between actual and represented value

**Fraud** Amount awarded

Evidence supported an award of damages under benefit-of-the-bargain measure for joint venturer's fraud in inducing managing venturer to enter master settlement agreement, including award of $35,000 for joint venturer's bad faith bankruptcy filing, damages for joint venturer's failure to provide funding and permit sale of property to third party, and damages for loss of lender's forbearance agreement.

2 Cases that cite this headnote

**[16]** **Fraud** Difference between actual and represented value

**Fraud** Difference between value and price paid

The "out-of-pocket measure" of damages for fraud computes the difference between the value paid and the value received, but the "benefit-of-the-bargain measure" computes the difference between the value as represented and the value received.

6 Cases that cite this headnote

**[17]** **Fraud** Weight and Sufficiency

**Fraud** Difference between actual and represented value

Under the benefit-of-the-bargain measure of damages for fraud, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty; but the damages cannot be based upon an entirely hypothetical, speculative bargain that was never struck and would not have been consummated.

8 Cases that cite this headnote

**[18]** **Fraud** Difference between actual and represented value

Award to managing joint venturer for co-venturer's fraud in inducing joint venturer to enter master settlement agreement for sale to third party needed to reflect offset for managing venturer's interest that survived the failed sale that co-venturer refused to permit.

1 Cases that cite this headnote

**[19]** **Fraud** Amount awarded

Managing joint venturer's loss of benefit of bargain as result of co-venturer's fraudulent inducement to enter master settlement agreement requiring co-venturer to deposit $100,000 into bank account to pay interest, taxes, and expenses on property would not necessarily be $100,000 and needed to be recalculated, as managing venturer had ownership interest and could recover only to the extent of injury.

Cases that cite this headnote

**[20]** **Appeal and Error** Remission of Part of Recovery

Supreme Court may not order a remittitur, but the courts of appeals may. Rules App.Proc., Rule 46.3.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*770** D. Douglas Brothers, Ben Jay Cunningham, Gary L. Lewis, Amy L. Saberian, George & Brothers, L.L.P., Austin, TX, for Petitioners.

Brian Alan Turner, Law Office of Brian Turner, Craig T. Enoch, James G. Ruiz, Elliot Clark, Winstead PC, Austin, TX, for Respondents.

**Opinion**

PER CURIAM.

In this case, we decide whether the evidence presented at trial was legally sufficient to support the award of damages. The trial court believed so and entered judgment on the jury verdict, but the court of appeals reversed, holding that no evidence supported the amount of damages awarded. "[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages," *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 51 (Tex.1998), we reverse the damages portion of the court of appeals' judgment and remand the case to the court of appeals.

Randy Turner established Rancho La Valencia, Inc. to acquire a piece of land called the Tumbleweed Property located in Austin. Rancho took out a $2.4 million loan from OmniBank to develop the property, with Turner as the guarantor. Problems arose during the development, so OmniBank required Rancho to bring in a new partner before it would continue financing. A Rancho employee put Turner in touch with Eddie Jones who agreed to a joint venture. For purposes of the joint venture, Jones established Aquaplex, Inc. Rancho and Aquaplex (through their representatives Turner and Jones) then signed the Tumbleweed Investment Joint Venture Agreement (JVA), which included the following provisions:

- *Contributions:* Rancho would contribute the property and existing project; Aquaplex would contribute $400,000.

- **\*771** • *Loans:* Only Rancho and the property remained responsible for the existing $2.4 million OmniBank loan—Aquaplex had no liability. Aquaplex also made a $644,000 loan to the joint venture, with repayment priority second only to the OmniBank loan.

- *Ownership Interest:* Aquaplex—60%; Rancho—40%.

- *Management:* Aquaplex would be managing partner and would be paid up to a $6,000 monthly management fee. Aquaplex could make all but "major decisions" without Rancho's approval. One "major decision" was selling any of the development's properties for less than $60,000 per unit. Even in a major decision, however, a partner could not unreasonably withhold its approval.

- *Cash Calls:* Aquaplex, as managing partner, could issue a cash call when needed and both partners would be responsible for their pro-rata share. If a partner failed to comply with the cash call, then the other partner could either contribute the amount, loan the joint venture the amount, or could seek to dissolve the joint venture.

- *Third-party Offers:* On an offer of purchase by a third-party of the property, either party that dissented to the sale could make a matching offer to buy the property. If no offer was made, the sale would go through.

Disputes between Aquaplex and Rancho arose soon after the JVA was signed. Aquaplex terminated the project manager and took over the day-to-day management. Aquaplex also demolished the clubhouse, which Rancho had already completed. Aquaplex then issued a cash call under the terms of the JVA, but Rancho refused to contribute. Rancho sued Aquaplex, alleging fraud, breach of duties under the JVA, and conversion and destruction of partnership assets. Rancho claimed that Aquaplex overstated the budgetary needs that led to the cash call and was needlessly destroying property. Aquaplex counter-claimed, alleging frivolous suit, negligent misrepresentation, fraud, breach of the JVA, and breach of warranty. Aquaplex claimed that, prior to the JVA, Rancho misrepresented the status of the project and Rancho's own financial ability to meet continuing financial obligations. In the meantime, Rancho's loan with OmniBank went into default, causing concerns about a potential foreclosure.

The parties proceeded to mediation. They entered into a Rule 11 memorandum of settlement agreement (MSA), which envisioned selling the property or ending the joint venture within six months. The terms of the MSA provided that:

- OmniBank would roll all existing interest into the note and extend it for six months.

- Rancho would deposit $100,000 into an OmniBank account to pay all interest, taxes, and expenses on the property for those six months.

- The property would be listed for six months at $5 million, but that the property could be sold at any price exceeding $4 million. Rancho retained a right of first refusal on any offer.

- Rancho could acquire Aquaplex's interest in the joint venture for $1,645,425 (the approximate amount of Aquaplex's capital contribution, loan, interest, and management fees) at any time in the next six months.

- If the property was not sold or acquired in six months, Rancho's interest passed to Aquaplex.

OmniBank also agreed under a forbearance agreement not to post the property for foreclosure and if the property was not sold, to extend the maturity of the note **\*772** with interest at the then-existing federal funds rate. The MSA contemplated the later execution of a formal settlement agreement. However, Rancho never established the $100,000 account and a formal settlement agreement was never executed, causing OmniBank's forbearance agreement to lapse.

After the collapse of the settlement, the case proceeded to trial. A few days before trial, Rancho's trial counsel filed a motion to withdraw, claiming that his services were being used to perpetuate a fraud. Rancho then filed for bankruptcy, which temporarily stayed the trial court proceedings. During the bankruptcy, an individual named Jeff Greenberg offered to purchase the Tumbleweed Property (the "Greenberg Offer") for $4.05 million. Rancho refused to consent to the sale and filed a *lis pendens* on the property to prevent a sale of the property until the dispute was adjudicated. The bankruptcy court later dismissed Rancho's bankruptcy suit as a bad-faith filing. The trial then resumed. Aquaplex amended its petition to include allegations of breach and fraud related to the MSA. At the close of Rancho's case in chief, the court directed a verdict against Rancho on all of its claims, ruling that Rancho breached the MSA as a matter of law for failing to fund the $100,000 account. This left Aquaplex's claims as the subject of the remainder of the trial. In a video deposition shown at trial, Rancho's former attorney testified under the crime-fraud exception about his dealings with Turner. *See* TEX.R. EVID. 503(d)(1) ("There is no [attorney-client privilege] ... [i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."). The former attorney testified that he discovered that Rancho did not intend to put up the $100,000 deposit required under the MSA and that Rancho was negotiating with bankruptcy attorneys on the side during the settlement process. The jury found that Rancho had breached both the JVA and the MSA and also committed fraud in connection with both. The jury also found that Rancho had assigned its interest in the joint venture to OmniBank in an earlier document.

Aquaplex elected to recover damages for fraud under the MSA and pursued declaratory and injunctive relief for the breach of the JVA. The trial court entered judgment on the jury verdict, which awarded Aquaplex:

- actual damages for fraudulent inducement under the MSA, itemized as:

  # $597,183.70 for the loss of the Greenberg Offer;

# $100,000 for the OmniBank deposit that Rancho failed to set up;

# $279,000 for the loss of the forbearance agreement with OmniBank; [1]

# $35,000 for the amount Aquaplex spent on legal representation during the bankruptcy proceedings.

- punitive damages of $1.5 million under the MSA

- declaratory relief that Rancho had no rights under the JVA because they were divested by either: (1) the MSA; (2) an assignment of the JVA to OmniBank; (3) paragraph 5.2(j) of the JVA;(4) paragraph 5.9 of the JVA

- injunctive relief that Rancho has no rights in the property and cannot interfere with the sale of the property

 **\*773** • $283,624 in attorney's fees

- an avoidance of the *lis pendens* on the property.

 **[1]** Rancho appealed. In its initial opinion, the court of appeals reversed the trial court's judgment, holding that: (1) the single injury doctrine precluded recovery under both the JVA and the MSA; [2] (2) there was no evidence that fraud relating to the MSA caused damages to Aquaplex; and (3) Aquaplex was barred from punitive damages because it did not prove actual damages. 253 S.W.3d 728, 732–36 (Tex.App.-Amarillo 2007). On rehearing, the court of appeals acknowledged that its initial opinion failed to address the declaratory and injunctive relief awarded for Rancho's breach of the JVA. 297 S.W.3d 781, 783. The court held that there was no evidence supporting this relief and rendered judgment that Aquaplex take nothing. *Id.* at 783.

 **[2]   [3]   [4]   [5]   [6]**   The trial court's judgment declared that Rancho no longer had any interest in the joint venture because the interest was divested by one or more of: (1) the MSA; (2) an assignment of Rancho's interest in the joint venture to OmniBank; (3) paragraph 5.2(j) of the JVA; [3] or (4) paragraph 5.9 of the JVA. [4] We agree with the court of appeals that none of these is a proper basis for this relief. First, Aquaplex's counter-claim for declaratory and injunctive relief was premised on breach of the JVA, not the MSA. Second, the unambiguous language of the "assignment" makes clear it was a security interest. It states that Rancho "assigns, transfers and conveys unto OMNIBANK ... all of Assignor's right, title and interest in and to Assignor's 40% ownership in [the joint venture] ... including, but not limited to all rights to cash and other distributions from the Venture." It states that "[t]his assignment is given in consideration of and as security for the payment of all the indebtedness ... owing by Assignor ... to Lender." It further

provides that "[s]o long as there shall exist no default ... Assignor shall have the right to collect ... property and other distribution rights ... pursuant to the terms of the [JVA]." In addition, OmniBank would not be obligated to perform any duties or be obligated for any liabilities under the JVA and, upon default, OmniBank could notify the joint venture that all further distributions under the JVA shall be made to OmniBank. Lastly, it provided that, upon payment in full, the assignment was void. An "assignment" such as this, where the creditor does not assume any obligations and the effectiveness of the instrument is terminated on final payment, is a security interest. *See Amco Trust, Inc. v. Naylor,* 159 Tex. 146, 317 S.W.2d 47, 51 (1958). Nevertheless, we agree with the court of appeals that nothing in the record indicates OmniBank ever elected to exercise any rights it had under the "assignment" upon Rancho's default. Finally, relief cannot **\*774** be premised on Paragraphs 5.2(j) and 5.9 of the JVA. Under 5.2(j), Aquaplex, as managing venturer, had a right to sell the property as long as the amount of the sale equaled $60,000 or more per condo. The Greenberg sale would have fit that description. Under 5.9, Rancho could have offered to buy out Aquaplex, but did not. There is some evidence that Rancho's actions prevented the Greenberg sale. But none of the contractual provisions cited by Aquaplex in the JVA or MSA explicitly supports a forfeiture of interest in the event of a breach. Forfeitures are not favored in Texas, and contracts are construed to avoid them. *See Sirtex Oil Indus., Inc. v. Erigan,* 403 S.W.2d 784, 787 (Tex.1966). Generally, the proper remedy for breach is damages. *See Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991).

 **[7]**   As held by the court of appeals, the injunctive relief can no longer stand because there was no evidence to support the trial court's declaratory relief under the JVA. Thus, the denial of injunctive relief is proper as there was no threat of imminent harm. *See Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 285 (Tex.2004).

 **[8]**   **[9]**   **[10]**   While we agree with the court of appeals with regard to relief under the JVA, we do not agree with regard to the fraud claim under the MSA. The elements of fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex.2001) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998)). The court of appeals focused on the injury (or damages) element, holding that no evidence supported the damages awarded by the trial court. But first we consider whether, as Rancho argues, the intent element is not supported by legally sufficient evidence.[5]   In reviewing a verdict for legal sufficiency, we "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors

could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

**[11] [12] [13]** "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics,* 960 S.W.2d at 48. "Proving that a party had no intention **\*775** of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 305 (Tex.2006) (citing *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986)). While breach of the contract alone is not evidence that a party did not intend to perform, "breach combined with 'slight circumstantial evidence' of fraud" is some evidence of fraudulent intent, enough to support a verdict. *Id.* "[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric,* 708 S.W.2d at 434 (citing *Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 19 S.W. 472, 474 (1892)).

**[14]** Here, Rancho's attorney withdrew and then testified that he believed his client was perpetrating a fraud. The timing of the bankruptcy, filed just after the execution of the MSA, constitutes further circumstantial evidence of Rancho's lack of intent to perform. These examples satisfy the "slight circumstantial evidence" standard enunciated in *Tony Gullo Motors I* and *Spoljaric,* and when combined with Rancho's breach, establish the fraudulent intent requirement. *See, e.g., Tony Gullo Motors I,* 212 S.W.3d at 305–06 (breach plus spoliation of evidence and forged signatures met standard); *Spoljaric,* 708 S.W.2d at 435–36 (breach plus evidence that employer refused to commit bonus plan to writing and remained silent when asked if plan would be approved after it had already been approved met standard). Contrary to the court of appeals' conclusion, there is legally sufficient evidence to support a finding of fraudulent intent.

**[15] [16]** The court of appeals held that no evidence supported the award of damages. 253 S.W.3d at 736. We disagree. "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Formosa Plastics,* 960 S.W.2d at 49 (citations omitted); *see also Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007) (per curiam) (observing that out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory").

The trial court entered judgment on the jury verdict, which awarded the following monetary damages: (1) $35,000 in attorney's fees and expenses incurred by Aquaplex as a result of Rancho's bankruptcy proceedings; (2) $597,183.70 as the amount Aquaplex lost due to Rancho's failure to permit a sale of the property after the execution of the MSA; (3) $100,000 as the amount Rancho

was obligated to provide under the MSA; and (4) $279,000 as the amount that Aquaplex lost due to the loss of the OmniBank forbearance agreement. Under the benefit-of-the-bargain measure, Aquaplex suffered some damages under each of these categories.

Rancho argues that there is no evidence supporting a causal relationship between the alleged fraud and the $35,000 attorney's fees awarded in relation to the bankruptcy filing. But the bankruptcy delay was in direct contradiction to the purpose of the MSA—to end the litigation. The attorney's testimony that Rancho was consulting with bankruptcy counsel and that it did not intend to fund the $100,000 as it agreed in the MSA, along with the evidence of the bad faith bankruptcy filing is **\*776** legally sufficient evidence to support these damages.

 **[17]** Some evidence also supports Aquaplex's claim that it lost the benefit of the sale of the property due to Rancho's fraud. "Under the benefit-of-the bargain measure, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty." *Formosa Plastics,* 960 S.W.2d at 50. But the damages cannot be based upon an "entirely hypothetical, speculative bargain that was never struck and would not have been consummated." *Id.* "[D]etermining whether lost profits have been proved with reasonable certainty is a fact-intensive determination dependent upon the circumstances of a particular case," but "[w]hen a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Id.* at 50 n. 3. Here, there is some evidence that Aquaplex lost profits due to the fraud—specifically the loss of a sale to Greenberg. Greenberg offered $4.05 million for the property, which under the terms of the MSA, satisfied the minimum offer amount of $4 million. Rancho refused to consent to the sale and filed a *lis pendens,* effectively blocking the sale. The court of appeals held, and Rancho argues, that there is no evidence as to why the Greenberg Offer failed, and it is thus speculative to claim the alleged fraud caused its failure. But both parties testified that they knew of the Greenberg Offer, and Rancho testified that it filed the *lis pendens* to prevent the sale. This is sufficient evidence that the sale fell through due to Rancho's actions. Therefore, damages were proper.

 **[18]** The damages were calculated incorrectly, however. The jury and trial court awarded $597,183.70 for the loss of the sale. It appears from the record that this figure was reached by subtracting Aquaplex's original investment of $1,044,000 ($400,000 in contribution and $644,000 loan) from $1,641,183.70, which is the amount Aquaplex argued it was due (including interest) under the JVA had the property been sold to Greenberg. But this figure does not take into account that Aquaplex still received an interest in the property by way of its interest in the joint venture, which survived the failed sale under the Greenberg Offer. The damages figure must reflect this offset. *See Formosa Plastics,* 960 S.W.2d at 49–50. Therefore, the trial court's award was not proper and must be recalculated.

**[19]** The trial court also awarded $100,000 for the OmniBank account Rancho failed to fund. The court of appeals held that there was no evidence that the money was to be paid to Aquaplex or that Aquaplex had to make the payments in lieu of Rancho. 253 S.W.3d at 736. Aquaplex argues that the $100,000 was a benefit-of-the-bargain, and that it was damaged by Rancho's failure to fund the $100,000 because the property remained encumbered with this amount. The court of appeals is partially correct: Rancho's failure to fund the $100,000 damaged the joint venture because its asset is encumbered by additional interest. Because of its ownership interest in the joint venture, Aquaplex was injured and may recover to the extent of that injury. This amount, though, would not necessarily be $100,000, and must be recalculated.

The court of appeals also held that the evidence did not support $279,000 in damages for the loss of the forbearance agreement because Aquaplex put on evidence of damages over a two-year period when the agreement at issue was only a one-year period. 253 S.W.3d at 735. The court of appeals is correct here. Aquaplex outlined the value of a two-year forbearance agreement in a chart at trial, but the agreement **\*777** introduced into evidence was only for one year. Thus, while there may have been damages, it was only for one year and Aquaplex failed to put on any evidence of the appropriate amount of damages for a one-year period.

**[20]** We hold that some evidence supported an award of damages for fraud under the MSA, just not at the level awarded by the trial court. This Court may not order a remittitur, but the courts of appeals may. TEX.R.APP. P. 46.3; *Tony Gullo Motors I,* 212 S.W.3d at 310. Therefore, we affirm the portion of the court of appeals' judgment rejecting Aquaplex's declaratory and injunctive relief, and reverse the portion of the court of appeals' judgment related to the monetary damages. We remand the case to the court of appeals so that it may determine whether to remand for a new trial on damages, *see Formosa Plastics,* 960 S.W.2d at 51, or whether to suggest a remittitur, *see* TEX.R.APP. P. 46.3; *Tony Gullo Motors I,* 212 S.W.3d at 310. Furthermore, because we hold that actual damages were proper, the court of appeals must reconsider whether punitive damages are appropriate. *See Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995) ("[A]ctual damages sustained from a tort must be proven before punitive damages are available."). The court of appeals must also consider the factual sufficiency issues raised by Rancho, but not yet addressed by the court of appeals. *See* TEX.R.APP. P. 53.4.

**Parallel Citations**

53 Tex. Sup. Ct. J. 89

Footnotes

1      The jury actually awarded $279,010 for the loss of the forbearance agreement, but based on the judgment's actual damages award of $1,011,183.70, it appears the trial court rounded this number down to $279,000.

2     We do not reach the single injury issue or consider whether Aquaplex suffered more than one injury. An application of the single injury rule does not arise unless there is more than one recovery for a single injury. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 303 (Tex.2006). Under our holding, Aquaplex has only one recovery.

3     This provision in the JVA listed Aquaplex's authority as "managing venturer." It provided that Aquaplex is authorized to "[sell] all or a portion of the Land or the Project for $60,000.00 per condominium unit or more."

4     This provision in the JVA discussed third-party offers. It provided that if an offer was made, a dissenting partner may buy out the other partner for the amount that partner would have made if the sale went through and the joint venture was immediately liquidated. Otherwise, the third-party offer shall be accepted.

5     Rancho did not raise this alternative ground for affirmance as a cross-point in its response to the petition for review. It raised it for the first time in its brief on the merits. Aquaplex argues Rancho has waived this point. *See* TEX.R.APP. P. 53.3(c)(2) (providing that the issues presented section in the response to the petition for review must include any "independent grounds for affirmance of the court of appeals' judgment"). Rancho's "Issues Presented" section did not assert that the court of appeals could have found no evidence supporting the intent element. But Rule 53.4 of the Rules of Appellate Procedure provides: "[T]o request that the Supreme Court consider [points briefed in the court of appeals but not decided by that court], a party may raise those issues or points in the petition, the response, the reply, any brief, or a motion for rehearing." TEX.R.APP. P. 53.4. The court of appeals did not consider the intent element, but Rancho raised that issue before the court of appeals and its brief on the merits before this Court. Therefore, the point is not waived.

---

**End of Document**                                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

110 Tex. 90
Supreme Court of Texas.

DECKER

v.

KIRLICKS et al.

No. 3189. | Nov. 12, 1919.

Error to Court of Civil Appeals of First Supreme Judicial District.

Action by H. R. Decker against John A. Kirlicks and others. The trial court directed a verdict for plaintiff, and the Court of Civil Appeals reversed and remanded the cause (Kirlicks v. Texas Co., 201 S. W. 687), and plaintiff brings error. Affirmed with directions.

Hawkins, J., dissenting in part.

West Headnotes (5)

**[2]** **Mines and Minerals** Surrender, Abandonment, or Forfeiture

An oil lease, providing that if oil is found in paying quantities in the first well the lease will in 30 days begin boring a second well on some other acre of the tract and continue to bore as developments may justify, until at least five or six wells have been completed, or the acre on which lessee has failed to drill a well reverts to lessor, is ambiguous, and will not sustain a forfeiture because of failure to bore all of five wells upon different acres.

27 Cases that cite this headnote

**[3]** **Contracts** Discharge of Contract by Breach

An ambiguous and uncertain forfeiture provision in a contract will not be enforced.

7 Cases that cite this headnote

**[4]** **Appeal and Error** Cases in Intermediate Courts

Ruling of Court of Civil Appeals that issues both of an entire forfeiture and a partial forfeiture of oil lease should have been submitted to jury *held,* even if erroneous, not so clearly wrong as to bring it properly within the Supreme Court's jurisdiction under

Rev.St.1911, art. 1521, subd. 6, as amended by Acts 1917, c. 75, § 1, Vernon's Ann.Civ.St. arts. 1728, 1741.

14 Cases that cite this headnote

**[5]** **Appeal and Error** 🗝 Cases in Intermediate Courts

A ruling of the Court of Civil Appeals in a particular case that there was some evidence warranting the submission of a given issue to the jury, or that there was no evidence justifying its submission, is not within Rev.St.1911, art. 1521, subd. 6, as amended by Acts 1917, c. 75, § 1, Vernon's Ann.Civ.St. arts. 1728, 1741, as to appellate jurisdiction of the Supreme Court, unless it can be fairly regarded as so flagrantly wrong as to amount to a virtual denial and abrogation of established rules of law.

10 Cases that cite this headnote

**[5]** **Appeal and Error** 🗝 Direction of Verdict

Assignments of error as to the giving of peremptory instruction are entitled to consideration, though objection to the giving of it was not made.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*91** **\*\*385** Carothers & Brown, of Houston, for plaintiff in error.

**\*92** McMeans, Garrison & Pollard, of Houston, for defendants in error.

**Opinion**

**\*93** PHILLIPS, C. J.

The suit was by H. R. Decker against John A. Kirlicks to quiet the rights of Decker under an oil lease granted by Kirlicks and others, and to recover from the Texas Company the purchase price of certain oil from wells developed under the lease to which Kirlicks and others were asserting an adverse claim. The Texas Company declared its willingness to pay the amount due for the oil to the rightful owner, and impleaded other parties. Some of these joined with Kirlicks in a plea that Decker had forfeited his rights under the lease. Upon the trial a verdict for Decker was directed. The honorable Court of Civil Appeals reversed the judgment and remanded the cause.

[1] The ruling of the Court of Civil Appeals that under the Act of 1913 the peremptory direction of the verdict was subject to challenge on the appeal though not objected to in the trial court before read to the jury, presented a conflict with decisions of other Courts of Civil Appeals, and we granted a writ of error in order to settle the question. We decided it at the last term in Walker v. Haley which involved a similar conflict. 109 Tex. --, 214 S. W. 295. That decision sustains the holding of the Court of Civil Appeals in the present case.

 **[2]**   The oil lease contained this provision:

> 'It is further agreed that in the event oil is found in paying quantities in said first well, then the lessee agrees and covenants that within thirty days from the completion of such successful well he will begin the boring of a second well on some other acre of said tract herein leased, and continue to bore additional wells with due diligence in such order as to additional wells on the tract herein leased as developments may justify, until at least five or six wells have been completed, or the acre upon which said second party has failed to drill a well reverts to the first party by written notice to that effect being served upon said second party by said first party.'

The tract of land leased embraced about 20 acres and was laid off in acre blocks. Decker bored his first two wells upon different acres. He completed five wells with due diligence, but four of them  **\*94**  were upon the same acre.  **\*\*386**  Upon the question as to whether this provision in the lease would sustain a forfeiture because of a failure to bore all of the five wells upon different acres, the Court of Civil Appeals held that the provision was ambiguous and that its meaning should have been submitted to the jury for decision.

 **[3]**   If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear, whose unequivocal character may render its exercise fair and rightful.

It is not necessary that we determine whether this clause in the lease requires the boring of the five wells upon five different acres, or sanctions their location upon but two different acres. If it be conceded that it admits of the first construction, it is not certain that such is its true construction. It does not plainly say that each of the wells shall be upon a different acre. It is only by inference,

at best, that such meaning can be gained from the language. A provision so indefinite as to the obligation imposed, in incapable of supporting a forfeiture. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396.

Another clause in the lease was as follows:

'It is further mutually agreed that in case lessee abandons said property; or in case he fails to operate any particular well which is in actual operation on said tract, which is producing either oil or gas, for the period of thirty days, and fails to operate same for said period, unless such failure is unavoidable and is because of broken machinery that cannot by proper care and diligence be sooner replaced or put in order, or because of the wells clogging so as to reasonably require a longer time to clean and put them in order, then this lease and such producing well and the land hereinabove provided to operate it, shall revert to the lessors, and the lessors shall in such event have the right to take possession of said premises and such well, together with all of its equipments, and operate same, or have same operated for their own benefit without further proceedings, or any legal proceedings, of any kind or character but in such event the lessee shall have the right to remove his equipments and machinery from such well so forfeited, and from said land herein leased on which said well is directly located, and not to exceed one acre in area, but in no event to so operate as to interfere with other wells operated by lessee or with other drilling by him for other wells unless the lessors shall within thirty **\*95** days after such forfeiture elect to pay and do pay to the lessee fifty per cent. of the market price for the piping in such well or wells, and the market value of all equipments retained, and should lessors fail to make such payment within thirty days after such forfeiture on the part of lessee and the taking over of said well by lessors, the lessee shall have the right to remove said pipe and equipment from such well and from such land.'

A further ruling of the Court of Civil Appeals, complained of here by Decker, was that in the state of the proof an issue of fact was presented as to whether under this clause Decker had forfeited the lease in whole or in part.

The clause provides two different conditions as grounds for forfeiture, and different measures of forfeiture as the consequence: (1) an abandonment of the property, whereon the entire lease should terminate; and (2) a failure to operate a producing well for thirty days unless due to an excepted cause, whereon such well and the immediate land upon which it was located in extent sufficient for its operation but not to exceed one acre, should revert to the lessors. In the event of the latter happening, the lessee is given the right to remove his machinery and equipment from such forfeited well and land unless within 30 days after such forfeiture the lessors shall pay him therefor as stipulated.

 **[4]** As we understand its opinion the Court of Civil Appeals did not construe the clause as authorizing a forfeiture of the entire lease upon a failure to operate one of the producing wells. It held that there was evidence tending to establish an entire abandonment of the land by the lessee, and also evidence of his failure to operate producing wells for 30 days and longer. Its ruling simply was that such being the record the issues both of an entire forfeiture and a partial forfeiture should have been submitted to the jury.

If we have jurisdiction to review this holding of the Court of Civil Appeals, it is in virtue of subdivision 6 of article 1521 as amended by the Act of 1917 (chapter 75), by which the appellate jurisdiction of the Supreme Court is now governed. That is, it must appear that the ruling constitutes 'an error of law * * * of such importance to the jurisprudence of the State, as in the opinion of the Supreme Court requires correction.' The amendment of this subdivision by the Act of 1917 was plainly intended to further limit the jurisdiction of the Supreme Court as conferred by the Act of 1913. Whether the Court of Civil Appeals 'has erroneously declared the substantive law of the case' is no longer the test as applied to cases falling within the subdivision. The amendment declares, in effect, that it is not enough that the error of law be obvious, in the opinion of the Supreme Court; nor that it be of importance to the aggrieved party; nor **\*\*387** that its correction be necessary in the view of the Supreme Court to prevent an injustice in the immediate case; nor even that it be 'of importance' to the jurisprudence of the **\*96** State. For the Supreme Court to be invested with the power to revise the ruling, it is required that it amount to an error of law 'of such importance' to the jurisprudence of the State as in the opinion of the court requires correction. This clearly presupposes a ruling of such erroneous consequence as, if permitted to stand, would constitute a serious departure from the established law or introduce a doctrine violative of fundamental principles.

Whatever may be the difficulties of its administration, this is the theory and plain meaning of the amendment. It is the written law, and our duty is to give it effect.

 **[5]** We do not consider a ruling of the Court of Civil Appeals in a particular case either that there was some evidence warranting the submission of a given issue to the jury, or that there was no evidence justifying its submission, as within the purview of the amendment unless it can be fairly regarded as so flagrantly wrong as to amount to a virtual denial and abrogation of the established rules of law which, in the one instance, enjoin upon the trial court the exercise of its essential function, and in the other preserve the right of jury trial. Where these questions are presented, our practice is to examine the record; but unless it discloses that the ruling is of the character stated, we do not regard it as one within the court's power to revise.

We have examined the record here under the assignment challenging the ruling of the Court of Civil Appeals above noted. If erroneous at all, the ruling was not so clearly wrong as to bring it properly within the Supreme Court's jurisdiction.

Other questions are presented, but they are equally without our jurisdiction.

The judgment of the Court of Civil of Appeals reversing that of the District Court is affirmed, but with the direction that the further trial of the case be in accordance with this opinion.

HAWKINS, J.

In so much of the foregoing majority opinion by our Chief Justice as deals with issues of which this court has entertained jurisdiction I concur; but I do not concur entirely in the application made, in that opinion, of amended subdivision 6, R. S. art. 1521, Acts of 1917.

It is my opinion that whenever it is shown here, to the satisfaction of this court, that a Court of Civil Appeals has held erroneously that a given issue is or is not supported by some evidence, thereby determining whether such issue is or is not properly referable to the jury, such error should be treated by this court as being, in and of itself, of such importance to the jurisprudence of the state as to require correction.

I believe that the requirements of this jurisdictional statute are met in every such instance, and that intrinsically such error is of the stated importance, even though such error may have been **\*97** committed in treating an issue which is not of frequently recurring nature or of general interest, and even though such erroneous ruling may not have been intended as an assertion of a general principle or a general rule of practice.

I think that a holding by the Court of Civil Appeals, approving or directing the submission by the district court to the jury of a given issue when in the opinion of the Supreme Court there is no evidence to support it, or approving or directing refusal of a district court to submit to the jury a given issue when in the opinion of the Supreme Court there is evidence to support it, constitutes inevitably in every instance 'a serious departure from the established law,' and introduces into our jurisprudence 'a doctrine violative of fundamental principles.' Instances of the former character involve refusal of the trial court to perform an 'essential function'-to discharge a legal duty which ought not to be shifted to the jury; and instances of the latter character involve a practical denial of the right of trial by jury, in plain contravention of our state Constitution.

Such errors very naturally will occur occasionally, and that is bad enough, even though all such errors be subject to correction by our Supreme Court; but for any such error to be recognized by this court and yet not be subject to correction by it, for lack of jurisdiction in this court, is, I think, a very serious reproach to our jurisprudence. In view of the phraseology of said amended subdivision 6 I cannot concur in a construction of it which entails that deplorable result.

I think that the practice of this court, under said statute, should be to examine the record whenever such a question is duly presented here, and, if such error be found, to correct it in every instance, upon the theory that such error is of vital importance to our jurisprudence.

As to the construction properly attributable to said statute I refer to 'In re Subdivision 6 of Supreme Court, Jurisdiction Act of 1917,' 201 S. W. 390 et seq. In so doing it is not my purpose to reopen or deal with any question concerning the constitutionality of said statute further than such question may be involved in the construction placed upon it by the majority opinion of this court in this present case.

## Parallel Citations

216 S.W. 385

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

105 S.W.3d 66
Court of Appeals of Texas,
Eastland.

OUTDOOR SYSTEMS, INC., Appellant,

v.

BBE, L.L.C. a/k/a BBE/Arromid, L.L.C., Appellee.

No. 11−01−00052−CV. | March 20, 2003.

Lessor of two tracts of property upon which lessee maintained billboards brought action against lessee, alleging trespass and breach of leases. In a bench trial, the trial court, Dallas County, W. Bruce Woody, J., found that lessee breached the leases and, for having remained in possession of property after termination of leases, committed trespass, and awarded lessor damages of $80,034.71, title to two billboards, and attorney fees. Lessee appealed. On motions for rehearing, the Court of Appeals, Austin McCloud, Senior Justice (Retired), held that: (1) lessor's notice of default was legally insufficient to justify lessor's forfeiture of leases, (2) lessor made an excessive demand in its letter to lessee and, thus, could not recover any attorney fees from lessee, and (3) lessee's "excessive demand" defense to liability for attorney fees was tried by implied consent.

Reversed and rendered in part; modified in part; and, as modified, affirmed in part.

West Headnotes (13)

**[1]    Estates in Property**  ☞ Ground rents
Lessor's demand for rent, in lessor's written notice of default, was not specific, but was instead excessive, imprecise, and unreasonable, and thus notice of default was legally insufficient to permit forfeiture of two billboard ground leases, where first letter sent to lessee made no demand but merely was a reminder that the rent for the month had not been paid, and second letter, sent two weeks later, demanded total arrearages from the inception of the 12-year-old lease within 10 days, an amount which lessee could not calculate in 10 days.

1 Cases that cite this headnote

**[2]    Estates in Property**  ☞ Ground rents

Lessor could not base forfeiture of two billboard ground leases on lessee's failure to provide advertising contracts so that lessor could audit and calculate the percentage payments that were owed throughout the term of leases, where leases did not contain a requirement or obligation on part of lessee to provide lessor with advertising contracts relating to billboards.

Cases that cite this headnote

**[3]    Estates in Property** 🔑 Ground rents

Notice of default that lessor sent to lessee of billboard ground leases, and not lessee's response, determined the legal sufficiency of the notice.

Cases that cite this headnote

**[4]    Landlord and Tenant** 🔑 Breach of Covenant or Condition

A landlord cannot base a forfeiture on the breach of an obligation that does not exist in the lease.

Cases that cite this headnote

**[5]    Landlord and Tenant** 🔑 Costs and attorney fees

Lessor made an excessive demand in its letter purportedly notifying lessee of its default under billboard ground leases, and thus lessor could not recover any attorney fees in its suit against lessee to recover unpaid rent and other damages, where lessor did not demand a specific liquidated sum, but instead demanded that lessee, within 10 days, pay lessor an unspecified amount based upon "total arrearages from the inception of the [l]eases," lessee acquired the leasehold interest 10 years after the leases were executed, and lessor demanded that lessee provide advertising contracts from the inception of the leases, despite fact that leases contained no such requirement.

2 Cases that cite this headnote

**[6]    Costs** 🔑 Particular Actions or Proceedings

A creditor who makes an excessive demand upon a debtor is not entitled to attorney fees for subsequent litigation required to recover the debt.

1 Cases that cite this headnote

**[7]** **Pleading** 👉 Objections to evidence as not within issues

Lessee's defense to any liability for attorney fees, claiming that lessor had made an excessive demand, was tried by implied consent in lessor's suit for breach of billboard ground leases, and thus lessee could rely upon such defense even though it failed to expressly plead the defense, where lessor did not argue in the trial court that lessee had failed to sufficiently plead the issue of the excessive demand defense to attorney fees liability, and lessor instead raised the issue in its trial brief and argument.

Cases that cite this headnote

**[8]** **Appeal and Error** 👉 Issues not passed on below

After the Court of Appeals partially reversed the trial court's judgment in favor of lessor in its action against lessee for breach of billboard ground leases and for trespass, it was not necessary to remand lessee's counterclaims to the trial court for consideration, where trial court had conducted a nonjury trial on the merits and had entered judgment providing that "all relief not expressly granted herein is denied," thereby showing that trial court had considered the counterclaims and denied them.

Cases that cite this headnote

**[9]** **Appeal and Error** 👉 Defects in proceedings in lower court in general

**Appeal and Error** 👉 Persons entitled to restitution

After the Court of Appeals partially reversed the trial court's judgment in favor of lessor in its action against lessee for breach of billboard ground leases and for trespass, it was not necessary to remand matter to the trial court in order to permit lessee to seek recovery of the billboards pursuant to the Court of Appeals' holding; under preexisting procedure, lessee could instead seek restitution after the Court of Appeals' judgment became final by issuance of the mandate.

Cases that cite this headnote

**[10]** **Appeal and Error** 👉 Persons liable

A party obtaining any advantage or benefit through a trial court's judgment that is later reversed must return the benefit to the other party.

2 Cases that cite this headnote

**[11]    Appeal and Error** 🔑 Making or Compelling Restitution

When an erroneous judgment has not been suspended pending appeal, and the relief granted has already been obtained, the successful appellant may reclaim what he has been deprived of, and if his demands are wrongfully resisted, he is entitled to the assistance of the courts; the assistance which the successful appellant is entitled to seek from the courts is characterized as the right of restitution.

1 Cases that cite this headnote

**[12]    Appeal and Error** 🔑 Making or Compelling Restitution

A party may have restitution of a benefit transferred under a trial court's judgment, which is later reversed on appeal, upon its own motion after an evidentiary hearing establishing with certainty what he has lost.

2 Cases that cite this headnote

**[13]    Appeal and Error** 🔑 Making or Compelling Restitution

A successful appellant, who has lost a benefit as a result of trial court's erroneous judgment, is entitled to seek restitution in the same proceeding without resorting to a new suit.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*68** Ernest Figari, Parker D. Young, Figari Davenport & Graves, Dallas, for appellant.

Steven Harr, Greg Noschese, LaDawn Conway, Munsch Hardt Kopf & Harr, Dallas, for appellee.

Panel consists of: ARNOT, C.J., and McCALL, J., and McCLOUD, S.J. [*]

**Order**

AUSTIN McCLOUD, Senior Justice (Retired).

The motions for rehearing filed by Outdoor Systems, Inc. and BBE, L.L.C. a/k/a BBE/Arromid, L.L.C. are denied. Our former opinion and judgment dated November 14, 2002, are withdrawn, and our opinion and judgment dated March 20, 2003, are substituted therefor.

## Opinion

The controlling issue in this case is whether the landlord's written notice of default because of nonpayment of rent was legally sufficient to permit forfeiture of two billboard ground leases. We hold that the notice was insufficient, as a matter of law, because the notice was not specific; the notice was excessive, imprecise, and unreasonable; and the notice required the tenant to perform, in order to cure the default, certain acts not required in the leases.

The trial court, in a nonjury trial, found that the tenant, Outdoor Systems, Inc. (Outdoor Systems), breached the leases and awarded the landlord, BBE, L.L.C. a/k/a BBE/Arromid, L.L.C. (BBE), damages of $80,034.71, title to the two billboards located on the land, and attorney's fees. We reverse and render in part; modify in part; and, as modified, affirm in part.

The significant economic issue between the parties is who owns the two billboards located in Dallas. If the forfeiture was effective, the billboards are owned by the landlord, BBE. If the forfeiture was ineffective, the billboards are owned by the tenant, Outdoor Systems, who has the right under the leases to come upon the land and remove the billboards. In 1998, the city of Dallas enacted a moratorium prohibiting the construction of new billboards within the city limits. The effect of that moratorium significantly increased **\*69** the value of the two billboards. The trial court found that the value of the billboards as constructed on the land is substantial and that the value of the billboards removed from the land is minimal.

The two leases were dated July 20, 1987, and each provided for a primary term of 10 years. After the expiration of the 10–year term, each lease was automatically renewed for 1–year terms unless terminated in writing by either party 60 days prior to the anniversary date of the respective lease. The anniversary date for each lease was September 1.

In February of 1997, Outdoor Systems acquired the leasehold interest in two tracts of land which contained a billboard on each tract. At that time, the land was owned by Sun NLF Limited Partnership. BBE purchased the land from Sun on or about June 29, 1999. On or about June 28, 1999, Sun sent a letter to its tenant, Outdoor Systems, advising Outdoor Systems that it was selling the land to BBE and that future rent payments should be sent to BBE. Before receiving the letter, Outdoor Systems had mailed the July rent to Sun.

On July 2, 1999, BBE sent a letter (first default notice) to Outdoor Systems stating that future rent payments under the two leases should be mailed to BBE. Upon receipt of the July 2 letter, Tanya Lillie, an employee of Outdoor Systems, contacted Donald L. Woodsmall, BBE's manager, and told Woodsmall that the July rent had been sent to Sun. Because Sun had returned the July rent payment to Outdoor Systems and because Outdoor Systems only cut rent checks once a month, Lillie asked Woodsmall if Outdoor Systems could reissue the July payment when the rent check for August was sent out. Woodsmall told Lillie that he would get back to her regarding her proposal. Woodsmall did not get back in touch with Lillie.

On July 16, 1999, BBE sent a second letter (second default notice) to Outdoor Systems. This letter stated that Outdoor Systems had miscalculated the amount of rent owed under the leases and demanded that Outdoor Systems perform other acts within ten days or the leases would be in default and BBE would look "to all of our remedies both at law and under the Leases." The July rent, as calculated by Outdoor Systems, was tendered with the August payment. [1] BBE rejected both the July and August payments.

Each lease contained the following provisions:

4. *Rentals.*

(c) It shall be deemed a default by Lessee under the terms of this Agreement if Lessee fails to make any payment to Lessor pursuant to the terms of this Agreement and such failure continues for a period of ten (10) days following receipt by Lessee of written notice from Lessor *specifying such default.*

5. *Termination.*

(a) Lessor may terminate this Agreement at any time following the nonpayment by Lessee of any amounts due to Lessor hereunder, and the failure to pay **\*70** such amounts within the applicable cure period set forth in Paragraph 4 above.

(c) Upon termination of this Agreement by Lessee or Lessor, for any reason *other than default by Lessee,* Lessee shall have the right for a period of sixty (60) days following the date of such termination to remove the Board and any other associated facilities which had previously been installed by Lessee in connection with the operation of the Board. Lessor shall cooperate with Lessee in order to accomplish such removal. *In the event of default by Lessee Board shall become sole property of Lessor and Lessee has no further recourse or claim to the board or against Lessor.* (Emphasis added)

The July 2, 1999, letter from Donald Woodsmall to Outdoor Systems provides in part:

You recently received a letter from STERLING PACIFIC MANAGEMENT SERVICES, INC., the Asset Manager for Sun NLF Limited Partnership, notifying you that they have sold the Property to BBE, l.l.c., and that the July 1, 1999 payments under the Leases should be paid to BBE. Please note that the payments should be made payable and sent to:

**BBE, l.l.c.**

**P.O. Box 690348**

**San Antonio, Texas 78269**

**(301) 6957505 FAX (301) 6957510**

*We have not yet received the July 1, 1999 payments.* (Emphasis added)
The July 16, 1999, letter from Donald Woodsmall provides in part:

Dear Ms. Lillie:

In reviewing the payments made under the Leases in the last year, it is apparent that Outdoor Systems has been miscalculating how the payments are to work. The payments are not to fluctuate on a monthly basis, but a new minimum is to be set each year based on 25% of the previous year's gross billings. Outdoor Systems method miscalculates the Lease payments owing and results in an understatement of the true payments. *The arrearages for the last ten months alone equal $878.50. The amount of the arrearages prior to the last ten months is unknown to us as we do not have the information needed to calculate those payments. Inasmuch as BBE, l.l.c. has succeeded to all of the rights, title and interest of the previous Property owner in and to the Leases, these arrearages under the Leases belong to BBE. I would appreciate receiving within ten days from the date hereof both the $878.50 relating to the last ten months and the total arrearages from the inception of the Leases up to the last ten months; failing which, Outdoor Systems will be in default under the Leases and we will look to all of our remedies both at law and under the Leases.*

*We would also ask that you forward to us your advertising contracts from the inception of the Leases to the present so that we may audit and calculate the percentage payments that are owed throughout the term of the Leases.* We are preserving all of our rights with regard to the previous underpayments of rent until such audit has been performed. (Emphasis added)

Under the leases, in order for there to be a "default" for nonpayment of rent, BBE was required to give Outdoor Systems written notice "specifying such default."

Forfeiture is a harsh and punitive remedy, and it is not favored in law or equity. 41 TEX. JUR. 3D *Forfeitures and Penalties* § 5 (1998). Some of the appropriate **\*71** rules regarding forfeiture pursuant to a contract are discussed in 41 TEX. JUR. 3D *Forfeitures and Penalties* § 6 (1998):

> Forfeiture under a contract will not be declared unless the language of the contract can be construed in no other way. A forfeiture will be avoided when another reasonable reading of the contract exists.

> The right to a forfeiture may be found only in language that is plain, clear, and unequivocal. Thus, when forfeitures are intended to take place upon the happening of certain events, cause of forfeiture is to be plainly and clearly stated, and the time definitely fixed. Where grounds for a forfeiture are specified in a contract, a forfeiture cannot be had on other grounds.

The court in *Wendlandt v. Sommers Drug Stores Company,* 551 S.W.2d 488 (Tex.Civ.App.-Austin 1977, no writ), discussed the general rules regarding notice:

> Notice of default in payment of rent must convey a message that the notifier is initiating steps necessary to finally assert his legal rights that if default is not cured, he may take final action as provided in the contract. In this respect see: *Moore v. Richfield Oil Corp.,* 233 Or. 39, 377 P.2d 32 (1962); *Hocker v. Heins,* 231 N.Y.S.2d 481 (Sup.Ct. of Suffolk County, N.Y.1962)....The cases in this State hold that a landlord cannot forfeit the lease of his tenant for failure to comply with the provisions without first making demand upon the tenant for performance. *Gray v. Vogelsang,* 236 S.W. 122 (Tex.Civ.App.1921, no writ); *Shepherd v. Sorrells,* 182 S.W.2d 1009 (Tex.Civ.App.1944, no writ); *Conn v. Southern Pine Lumber Co.,* 11 S.W.2d 199 (Tex.Civ.App.1928, no writ).

See 41 TEX. JUR.3d *Forfeitures and Penalties* § 16 (1998).

Regarding the sufficiency of a demand, it is stated in 51C C.J.S. *Landlord & Tenant* § 114(2)(b) (1968):

> Where forfeiture of a lease is dependent on the making of a demand for performance, the demand must be a proper, specific, and reasonable one.

The demand for rent must not be excessive. It is stated in 49 AM. JUR.2d *Landlord and Tenant* § 303 (1995):

> As a general rule, the demand for rent, for the nonpayment of which the lessor may declare the lease forfeited, must be for the precise amount of rent due, and if an excessive amount is demanded the demand will be ineffectual.

 **[1]**   **[2]**   The notice by BBE of default and the demand upon Outdoor Systems to pay the rent pursuant to the leases was necessary in order to provide Outdoor Systems an opportunity to cure the default prior to the harsh consequences of forfeiture. *Cf. Ogden v. Gibraltar Savings Association,* 640 S.W.2d 232, 234 (Tex.1982).

The July 2 letter made no demand. It was merely a reminder that the July rent had not been paid. The July 16 letter demanded too much. The demand was not specific but was excessive, unreasonable, imprecise, and required Outdoor Systems to perform acts not required by the leases.

 **[3]**   The July 16 letter demanded that Outdoor Systems, within 10 days, pay to BBE an unspecified amount based upon "total arrearages from the inception of the Leases." The leases were signed by the original tenant and landlord in 1987. Lillie, an employee of Outdoor Systems, testified that she was responsible for calculating and paying the rent on the billboards. Lillie testified that, assuming there was an arrearage owed on the two leases, neither she nor anyone else at Outdoor Systems had the information or ability to calculate, within the 10–day period, any arrearage **\*72** that might have been owed back to 1987. The trial court, in its findings of fact, found that Outdoor Systems ignored the July 16 demand from BBE and that Outdoor Systems made no effort to calculate or pay any rental arrearages. We look at the notice of default that was sent to Outdoor Systems by BBE to determine if the notice was sufficient. The response of Outdoor Systems does not determine the legal sufficiency of the notice. The demand letter purported to address both of the leases; however, it failed to segregate the amount demanded to cure the alleged default under each agreement. Furthermore, BBE demanded that Outdoor Systems provide advertising contracts from the inception of the leases so that BBE could audit and calculate the percentage payments that were owed throughout the term of the leases.

 **[4]**   Outdoor Systems was not personally liable for any unpaid rent prior to the time it became the tenant under the leases in February 1997. See *Regency Advantage Limited Partnership v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275 (Tex.1996); 49 AM. JUR.2d *Landlord and Tenant* § 1145 (1995). There is no requirement or obligation in the leases on the part of the tenant to provide the landlord with advertising contracts relating to the billboards. A landlord cannot base a forfeiture on the breach of an obligation that does not exist in the lease. See *Deauville Corporation v. Garden Suburbs Golf and Country Club,* 164 F.2d 430 (5th Cir.1947), *cert. den'd,* 333 U.S. 881, 68 S.Ct. 912, 92 L.Ed. 1156 (1948).

Both parties discuss *Rohrt v. Kelley Manufacturing Company,* 162 Tex. 534, 349 S.W.2d 95 (1961). The issues involved in this appeal were not discussed in *Rohrt.* There, the court observed that the effect of the default notice was not "disputed."

Neither the July 2 letter nor the July 16 letter was a sufficient notice of default. On August 11, 1999, BBE sent a "Notice of Termination" to Outdoor Systems purporting to terminate both leases and to declare that title to the billboards had "automatically" vested in BBE. We hold that the notice of termination was ineffective because it was not preceded by a proper notice of default. See *Ogden v. Gibraltar Savings Association,* supra.

Outdoor Systems refused to vacate the land and continued to operate the billboards and tender monthly rental payments to BBE who rejected each of the tendered rent payments. On May 12, 2000, BBE sent a letter to Outdoor Systems stating that the leases had terminated because of numerous defaults by Outdoor Systems. However, to remove any misunderstanding, BBE notified Outdoor Systems that, pursuant to Paragraph 3(b) of the leases, the May 12 letter constituted Outdoor Systems's 60–day notice of termination. The letter stated, "The Leases shall not renew but shall cease and expire on the anniversary date thereof, which can in no event be later than September 1, 2000." Outdoor Systems agrees that this was a proper termination of the leases between the parties.

Outdoor Systems vacated the land prior to the September 1, 2000, anniversary date and advised BBE that it was prepared to remove the billboards. BBE objected to the removal of the billboards and refused to permit Outdoor Systems to remove the structures.

We reverse the trial court's judgment awarding title to the two billboards to BBE, and we render judgment that the two billboards located on the separate tracts of real property described in the judgment as Exhibits A and B are owned by Outdoor Systems and that Outdoor Systems **\*73** has the right to remove the two billboards.

In its conclusions of law, the trial court found that the leases terminated on August 11, 1999, and that Outdoor Systems violated TEX. CIV. PRAC. & REM. CODE ANN. § 80.002 et seq. (Vernon 1997 & Supp.2002) by remaining in possession after that date and by failing to remove advertising from the billboards after August 11. The court assessed trespass damages against Outdoor Systems in the amount of $75,604.58. We reverse this award and render judgment that Outdoor Systems is not liable to BBE for trespass damages because the leases did not terminate on August 11. The termination letter was ineffective because it was based upon an insufficient notice of default.

As part of its damages award, the trial court found that Outdoor Systems was liable to BBE for unpaid rent of $4,430.13. Outdoor Systems does not challenge this finding. We, therefore, will

modify the trial court's judgment to provide that BBE recover judgment against Outdoor Systems in the amount of $4,430.13.

 **[5]**    **[6]**    The trial court awarded BBE attorney's fees of $75,000.00 through trial and additional attorney's fees in the event of an appeal. Outdoor Systems contends that BBE is not entitled to attorney's fees because BBE's demand was excessive. A creditor who makes an excessive demand upon a debtor is not entitled to attorney's fees for subsequent litigation required to recover the debt. *Collingsworth v. King,* 155 Tex. 93, 283 S.W.2d 30 (1955); *Ingham v. Harrison,* 148 Tex. 380, 224 S.W.2d 1019 (1949). The court in *Findlay v. Cave,* 611 S.W.2d 57 (Tex.1981), observed that *Collingsworth* and *Ingham* involved liquidated sums. However, the court stated that a party could make an excessive demand for an unliquidated sum. The court said:

> Certainly one can conceive of circumstances in which a demand for an unliquidated sum would have to be characterized as excessive, and attorney's fees denied.

The *Findlay* court also held:

> [W]e do not find a sufficient level of unreasonableness or bad faith to warrant finding excessive demand as a matter of law.

We find in the present case, as a matter of law, that the demand made by BBE in the July 16 letter was an excessive demand for an unliquidated sum and, thus, discharged any liability for fees expended thereafter.

BBE's demand was not for a specific liquidated sum. As pointed out earlier in this opinion, the July 16 letter demanded that Outdoor Systems, within 10 days, pay BBE an unspecified amount based upon "total arrearages from the inception of the Leases." The original lessor and lessee executed the leases in 1987. Outdoor Systems acquired the leasehold interest in 1997. BBE demanded that Outdoor Systems provide advertising contracts from the inception of the leases. The leases were forfeited by the trial court, and title to the billboards was awarded to BBE. We have reversed that finding. The trial court found that Outdoor Systems was a trespasser because it failed to comply with the demand and awarded BBE $75,604.58. We have reversed that finding. Under our decision, BBE has a judgment against Outdoor Systems for $4,430.13. Unlike the court in *Findlay,* we do find a sufficient "level of unreasonableness ... to warrant finding excessive demand as a matter of law."

 **[7]**    BBE argues that Outdoor Systems cannot rely upon the defense of "excessive demand" because Outdoor Systems failed to expressly plead the defense. See *Tuthill* **\*74** *v. Southwestern Public Service Company,* 614 S.W.2d 205, 212 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.). The record in this case reveals that, after the evidence closed and before judgment was entered,

the parties filed trial briefs. In Paragraph IV of BBE's trial brief submitted to the trial court, BBE stated:

> ***Excessive Demand***—A creditor who makes an excessive demand upon a debtor is not entitled to attorneys' fees for subsequent litigation. An excessive demand is one which is manifestly unreasonable, or made in bad faith. *Findlay v. Cave,* 611 S.W.2d 57, 58 (Tex.1981). Where the demand in *Findlay* was for more than a jury awarded the close of the trial, the Court found that was some evidence of excessive demand, but not enough to support the "manifestly unreasonable" or "bad faith" standard. The court noted that the cases on excessive demand occurred where the amount in controversy was liquidated and the creditor made demand for more than it was entitled. Clearly the testimony in this case shows that BBE's demand for a specific sum of money was for less than the amount due and that its further demand was for an amount that could reasonably be thought to be within the knowledge and control of Outdoor Systems. There is no authority to support that an excessive demand is otherwise void or vitiated.

BBE did not argue in the trial court that Outdoor Systems had failed to sufficiently plead the defense. On the contrary, it is apparent that the issue was before the court, as evidenced by BBE's briefing and argument presented to the trial court. We hold that Outdoor Systems's "excessive demand" defense to any liability for attorney's fees was tried by implied consent. See *City of Los Fresnos v. Gonzalez,* 848 S.W.2d 910 (Tex.App.-Corpus Christi 1993, no writ). The award of attorney's fees, both trial and appellate, to BBE is reversed; and we render judgment that Outdoor Systems is not responsible for attorney's fees.

**[8]** In its brief, under issues presented, Outdoor Systems states:

> [T]his case should be remanded for *consideration* of Outdoor Systems' counterclaims, including its claim for conversion of the billboards. (Emphasis added)

Outdoor Systems argues that, because the trial court erroneously concluded that BBE's termination complied with the leases, the trial court improperly failed to consider Outdoor Systems's counterclaims. This was a conventional nonjury trial on the merits. The judgment provides that "all relief not expressly granted herein is denied." The trial court considered the counterclaims, and they were denied. We overrule Outdoor Systems's request that its counterclaims be remanded to the trial court for consideration.

**[9]** **[10]** **[11]** Finally, Outdoor Systems seeks a remand of this matter to the trial court in order to seek the recovery of the billboards pursuant to our holding.[2] It would appear that Outdoor Systems has an avenue for seeking the recovery of the billboards without the case being remanded to the trial court. Texas courts have long held that a party obtaining any advantage or benefit through a trial court's judgment that is later reversed must return the benefit to the other party. *Peticolas v.*

*Carpenter,* ***\*75*** 53 Tex. 23 (1880); *Currie v. Drake,* 550 S.W.2d 736, 739 (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.); *Salgo v. Hoffman,* 521 S.W.2d 922, 925 (Tex.Civ.App.-Dallas 1975, no writ). As noted in *Salgo v. Hoffman,* supra at 925:

> When an erroneous judgment has not been suspended pending appeal, and the relief granted has already been obtained, the successful appellant may reclaim what he has been deprived of, and if his demands are wrongfully resisted, he is entitled to the assistance of the courts.

**[12]** **[13]** The assistance which the successful appellant is entitled to seek from the courts is characterized as the right of restitution. *Currie v. Drake,* supra at 740 ("The right of restitution of what one has lost by the enforcement of a judgment subsequently reversed has long been recognized.") A party may have restitution upon its own motion after an evidentiary hearing establishing with certainty what he has lost. *Currie v. Drake,* supra at 740. Furthermore, the successful appellant is entitled to seek restitution in the same proceeding without resorting to a new suit. *Cleveland v. Tufts,* 69 Tex. 580, 7 S.W. 72, 74 (1888); *Peticolas v. Carpenter,* supra; *Baca v. Hoover, Bax & Shearer,* 823 S.W.2d 734, 739 (Tex.App.-Houston [14th Dist.] 1992, writ den'd); *Currie v. Drake,* supra at 740–41. We, therefore, decline Outdoor Systems's request for a remand of this case in light of the existing procedure for Outdoor Systems to seek restitution after our judgment becomes final by the issuance of our mandate. See TEX.R.APP.P. 18.1(a).

The judgment of the trial court is reversed and rendered in part; modified in part; and, as modified, affirmed in part.

## Footnotes

\* Austin McCloud, Retired Chief Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

1 The method used by Outdoor Systems to calculate the rent had been used for several years by a prior tenant. None of the prior landlords had complained. At trial, Outdoor Systems attempted to prove an alleged oral modification between a prior tenant and landlord. The trial court agreed with BBE that Outdoor Systems and prior tenants had not followed the contract in the method used to calculate the rent. The trial court found that the alleged modification was invalid. Outdoor Systems argues that the earlier conduct of BBE and its predecessors waived, as a matter of law, any claimed forfeiture arising from payment of reduced rents. Because we hold that the forfeiture was invalid, it is not necessary that we reach this argument urged by Outdoor Systems. TEX.R.APP.P. 47.1.

2 A supplemental clerk's record has been filed in this appeal which details events that transpired after the entry of the trial court's judgment on November 3, 2000. The supplemental clerk's record reflects that BBE conveyed title to the two billboards and the underlying real property to Sterling Samuel, Ltd. in December of 2000. Sterling then sold the billboards to Lamar Whiteco Outdoor Corporation for $675,000.00.

**529 S.W.2d 622**
Court of Civil Appeals of Texas,
Amarillo.

T—ANCHOR CORPORATION, Appellant,

v.

TRAVARILLO ASSOCIATES, a California Limited Partnership, Appellee.

No. 8563. | Oct. 31, 1975.

A vendor of motel property brought an action against the purchaser and its assignee for a permanent injunction against interference with its right of possession pursuant to a forfeiture provision contained in the installment sale contract. The District Court, Potter County, Don M. Dean, J., rendered judgment against the vendor, and it appealed. The Court of Civil Appeals, Ellis, C.J., held, inter alia, that the trial court had acted correctly in concluding that equity required relief from the forfeiture provisions of the sale contract.

Affirmed.

West Headnotes (14)

**[1]**  **Trial**  Ultimate or Evidentiary Facts

In action to court, court is not required to make findings of fact on evidentiary matters as distinguished from controlling matters.

2 Cases that cite this headnote

**[2]**  **Vendor and Purchaser**  Effect of Default or Delay

Where trial court, in action by vendor of motel properties seeking control of such properties after alleged forfeiture on default of payments called for by installment contract, found that purchaser's assignee was entitled to equitable relief from such forfeiture, finding of waiver or default by vendor was not necessary to support judgment.

1 Cases that cite this headnote

**[3]**  **Vendor and Purchaser**  Effect of Default or Delay

Where court found that assignee of installment purchaser of motel properties was entitled to equitable relief from forfeiture provisions of contract after purchaser had defaulted thereunder, and that contract was in full force and effect so that equity of redemption mentioned in contract was not required to be invoked, assignee was not required to pay balance of unpaid purchase price, but merely to make vendor whole under contract by bringing contract obligations up to date.

Cases that cite this headnote

[4]   **Vendor and Purchaser**   Effect of Default or Delay

Evidence supported holding of trial court that assignee of purchaser of motel properties under installment contract was entitled to equitable relief from forfeiture after default of purchaser.

1 Cases that cite this headnote

[5]   **Contracts**   Discharge of Contract by Breach

Although parties may contract to provide for forfeiture upon default, where equities are shown which justify continuation of contract rather than forfeiture of it, forfeiture will be prevented.

3 Cases that cite this headnote

[6]   **Vendor and Purchaser**   Rents and Profits

Where, after default by purchaser of motel properties under installment contract, forfeiture under contract was prevented by restraining order of bankruptcy court, and where relief from forfeiture was later granted by court on equitable grounds, purchaser's assignee, as owner of complete title to motel, was entitled to its net profits during period after default, despite fact that motel was in possession and under operation of vendor during such period.

2 Cases that cite this headnote

[7]   **Trial**   Construction and Operation

Where express findings of fact are made by trial court in court-tried action, independent issuable facts may not be supplied by extension of express findings.

Cases that cite this headnote

**[8]** **Trial** 🔑 Ultimate or Evidentiary Facts

Trial court in court-tried action need not make findings of fact on mere evidentiary matters with respect to ultimate issue.

2 Cases that cite this headnote

**[9]** **Trial** 🔑 Failure to Find on Particular Questions

Where findings of fact requested of court in court-tried action would not have compelled result different from that reached by court, it was not error to reject such proposed findings.

Cases that cite this headnote

**[10]** **Bankruptcy** 🔑 Arrangements

Purpose of chapter XI of Bankruptcy Act is to provide quick and economical means of facilitating simple compositions among general creditors who have been deemed by Congress to need only minimal disinterested protection provided by chapter. Bankr.Act, § 301 et seq., 11 U.S.C.A. § 701 et seq.

1 Cases that cite this headnote

**[11]** **Bankruptcy** 🔑 Arrangements

Congressional intent in establishing chapter XI of Bankruptcy Act is to provide for efficient and orderly method by which claims of unsecured or common creditors of debtor might be satisfied without resort to general bankruptcy.

1 Cases that cite this headnote

**[12]** **Trial** 🔑 Ultimate or Evidentiary Facts
**Trial** 🔑 Failure to Find on Particular Questions

In court-tried action brought by vendor of motel properties under installment contract to obtain permanent injunction against interference with right of possession after claimed forfeiture of motel by default under contract, trial court was not required to make finding as to why assignee of purchaser filed petition under chapter XI of Bankruptcy Act where such finding would have been merely evidentiary and would not necessarily have compelled different conclusion by trial court as to ultimate and vital issue of termination of contract. Bankr.Act, § 301 et seq., 11 U.S.C.A. § 701 et seq.

Cases that cite this headnote

**[13] Vendor and Purchaser** 🔑 Waiver of Default in Payment

Whether seller has effectively exercised option of forfeiture for default in payment depends not upon number of hours or days that have elapsed since default in question, but upon whether facts and circumstances are such that buyer has, by conduct of seller, been led reasonably to believe that strict application of right of forfeiture will not be insisted upon, for time being.

Cases that cite this headnote

**[14] Vendor and Purchaser** 🔑 Right to Rescind

Suspension of right of forfeiture under installment contract depends upon facts in each case.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*623** Stalcup, Johnson, Meyers & Miller, David J. White, Dallas, Miller, Sanders & Baker, Dee Miller, Amarillo, for appellant.

Stokes, Carnahan & Fields, O. P. Fields, Amarillo, for appellee.

**Opinion**

**\*624** ELLIS, Chief Justice.

This is a suit for permanent injunction against interference with the right of possession claimed by plaintiff-appellant, T—Anchor Corporation, a Texas corporation, pursuant to a forfeiture provision contained in an installment contract for the sale of real property designated as Travelodge West Motel, in Amarillo, Texas, entered into between T—Anchor as seller and Young Properties Corporation, a California corporation, as buyer. After trial without a jury, the trial court rendered judgment against T—Anchor that it take nothing by its suit, and for defendant-appellee, Travarillo Associates, a California limited partnership, the assignee of Young Properties, on its cross-action for possession of the motel property. T—Anchor brings this appeal from the judgment of the trial court. Affirmed.

The right to forfeiture which T—Anchor claims and upon which it bases its suit for injunction is contained in paragraph XIII of the contract of sale. After setting out that time shall be of the essence, the contract further provided that if the buyer fails to pay any of the installments or breaches any of the conditions of the contract, the seller shall have the right, after giving written notice to the buyer, to declare the contract forfeited and cancelled and of no further force and effect.

Appellant asserts its entitlement to exercise its contractual right of forfeiture by reason of default on the part of the buyer and its assignee in making the required installment payments. We note that, among other contentions, appellee insists that appellant's claim for possession and title based on termination or forfeiture of the contract was not raised at the trial level and cannot properly be advanced for the first time and considered in this appeal. However, after reviewing the entire record, including the pleadings and the evidence admitted, we have determined to consider appellant's asserted rights concerning the alleged forfeiture and the injunctive relief sought.

After trial on the merits, the trial court rendered its judgment which decreed that: (1) certain interlocutory orders be dissolved which had restrained and enjoined Travarillo Associates, the assignee of Young Properties, the original purchaser, from the taking possession of the Travelodge West Motel, the subject of the contract of sale entered into on April 4, 1973; (2) Travarillo is the owner and holder of all rights of 'purchaser' as formerly held by Young Properties under the contract of sale; (3) the contract of sale is in full force and effect, and Travarillo with its acquired rights as purchaser is entitled to possession of the Travelodge West Motel described therein; (4) certain monies tendered into the registry of the court by Travarillo be paid to T—Anchor, the seller, and that the balance in the registry be paid to Travarillo; (5) the only real parties in interest in this case are T—Anchor and Travarillo; and (6) all other parties named as defendants have no interest in this controversy and are dismissed from the suit. Subsequent to the judgment, the trial court ordered that the agreement of the parties with respect to the payment and receipt of the monies paid out from the registry of the court would not constitute any agreement to the judgment entered in this cause by T—Anchor nor in any manner affect T—Anchor's notice and right of appeal.

Upon request, findings of fact and conclusions of law were made by the trial court. Since this appeal is determinable from competing equitable considerations necessarily based upon a series of acts and conduct of the parties, we shall set out what we deem to be the court's significant factual findings and legal conclusions.

Among other facts found by the trial court were that: on April 4, 1973, T—Anchor, the seller, entered into a contract for the sale of the Travelodge West Motel in Amarillo, Texas, with Young, the buyer; as a part of the same transaction, Young and Travarillo entered into an agreement of purchase and sale of the motel whereby Travarillo acquired all of Young's interest **\*625** in the motel; T—Anchor consented to the assignment of the contract interest from Young to Travarillo upon the terms that Travarillo could acquire all of Young's interest in the motel if Young should

default in its contract payments to Travarillo; and on the same date, April 4, 1973, Young was placed in possession of the motel under a leaseback agreement with Travarillo.

Although there was evidence of prior late payments and acceptance thereof by T—Anchor, the trial court found that beginning with the payment due in November, 1973, Young defaulted in its monthly payments to T—Anchor in the amount of $10,812.17 each, and in each of its monthly lease payments to Travarillo in the amount of $6,471.00. The court further found that pursuant to a proceeding brought by Young, on October 31, 1973, a bankruptcy court in California entered its order restraining all creditors of Young from accelerating or attempting to accelerate any indebtedness of Young, from enforcing any rights or remedies provided in any agreements with Young, and from cancelling any such agreements or commencing any kind of forfeiture proceeding against Young; and that throughout the restraining period ordered by the bankruptcy court, Young remained in possession of the motel, but made no payments to T—Anchor or to Travarillo.

Additionally, the court found that: T—Anchor defaulted in the first and second lien payments which it was required to make to Home Savings and Loan Association of Waterloo, Iowa, and to Amarillo National Bank of Amarillo, Texas, under the sale contract with Young; both T—Anchor and Travarillo appeared in the bankruptcy proceeding seeking relief from the bankruptcy court's restraining order, T—Anchor seeking cancellation of the sales contract and Travarillo seeking cancellation of the lease agreement and possession of the motel; T—Anchor, in its pleadings in bankruptcy court, fully recognized that Travarillo was the assignee of Young and held all of the interest of Young in the motel and that Young was only a defaulting lessee at the time of the bankruptcy; on April 2, 1974, the bankruptcy court entered an order directing Young to vacate the motel ten days after the date of the order, and dissolving the restraining orders against T—Anchor and Travarillo on or about April 12, 1974; as of the date of the dissolution of the restraining orders, Travarillo was the owner of all of the interest of Young in the sales contract with T—Anchor; immediately after the bankruptcy court entered its order on April 2, 1974, the general partner of Travarillo tendered full payment of all delinquent land sales contract installments to T—Anchor and otherwise tendered performance of all delinquent obligations of Young to T—Anchor to make performance current under the contract; and T—Anchor wrongfully refused the tender by Travarillo and assumed possession of the motel as Young vacated.

The trial court further found that: the money contributed to the purchase of the motel was principally that of Travarillo in the amount of $300,000; T—Anchor received as cash consideration for the motel $137,500; and some $200,884.32 was required to bring the obligations of Young current under the land sales contract, including delinquent interest and penalty due from T—Anchor to the first lienholder plus attorneys' fees paid by T—Anchor in attempting to secure performance of the contract or possession, all of which, ought equitably to be reimbursed to T—Anchor.

Also, the court made findings that: since T—Anchor was in possession of the motel from April 20, 1974, to the time of trial on the merits, it had realized from motel operations a profit of $113,097.09 after expenses; after deducting the profits of T—Anchor from the amount required to bring the contract obligations current, the sum of $87,787.23 was found to be owing to T—Anchor by Travarillo; Travarillo paid into the registry of the trial court the sum of $100,000, a sum sufficient to make T—Anchor whole under the land sales contract; and **\*626** receipt of $87,787.23 thereof by T—Anchor would fully adjust the equities of the parties and all accounts between them up to September 5, 1974, the date of the trial on the merits.

Additionally, the trial court found that: it would be exceptionally harsh and unjust to forfeit the monies contributed by Travarillo to the motel project and an unjust enrichment to T—Anchor by allowing forfeiture of the purchaser's rights under the land sales contract in the face of unusual circumstances where a debtor in bankruptcy was continued in possession of the property while making payments to no one; it would be unreasonable to refuse Travarillo the right to pick up the obligations of Young once the bankruptcy restraining order was terminated; upon payment to T—Anchor of $87,787.23 from the registry of the trial court Travarillo would be entitled to possession of the motel as owner and holder of the land sales contract of April 4, 1973, and the contract is in full force and effect with all payments due thereunder made current through the month of September, 1974.

The conclusions of law by the trial court were that: (1) Travarillo is entitled to equitable relief from forfeiture of the purchaser's rights under the land sales contract; (2) the land sales contract is in full force and effect and that Travarillo is the owner of all the rights of purchaser thereunder; (3) T—Anchor is entitled to recover from the registry of the trial court $87,787.23; (4) Travarillo is entitled to possession of the motel; and (5) T—Anchor is not entitled to any injunctive relief.

T—Anchor predicated its appeal upon thirty-two points of error. For convenience we shall discuss T—Anchor's points of error in the same groupings as in its brief.

**[1]** **[2]** In its first two points T—Anchor contends that the judgment of the trial court denying forfeiture of the contract cannot be supported without findings of waiver and default on the part of T—Anchor. T—Anchor requested amended and additional findings of fact and conclusions of law which would have established and held that T—Anchor did not waive its right under the contract to forfeiture and that through the effective date of forfeiture, T—Anchor fulfilled its obligations under the contract. Both of these theories of waiver and default by T—Anchor as requested are inconsistent with and contrary to the findings of fact and conclusions of law made by the trial court. The trial court need not make findings of fact or conclusions of law which are in conflict with the original findings and conclusions made. Neither is the trial court required to make findings of fact on evidentiary matters as distinguished from controlling matters. Plaza Co. v. White, 160 S.W.2d 312 (Tex.Civ.App.—San Antonio 1942, writ ref'd); Wade v. Taylor, 228 S.W.2d 922 (Tex.Civ.App.—Amarillo 1949, no writ). The findings of fact and conclusions of law requested

by T—Anchor either are evidentiary if no forfeiture was found to exist prior to a possible waiver or default by T—Anchor, or, if they are controlling matters, then such requested findings and conclusions are in conflict with the findings of fact and conclusions of law originally made by the trial court that no forfeiture occurred. Further, in view of the holding of the trial court that Travarillo is entitled to equitable relief from forfeiture, a finding of waiver or default by T—Anchor is not necessary to support the judgment. Points of error numbers 1 and 2 are overruled.

 [3]   In points of error numbers 3 through 11, T—Anchor contends that the tender of performance by Travarillo was deficient and thus cannot operate to prevent forfeiture of the contract of sale. Points of error numbers 3, 5—7, and 9—11 all concern the amount of the tender of money made by Travarillo. T—Anchor contends that a tender of the amount necessary to bring the contract payments current is not tender of a sufficient amount to put Travarillo in possession of the motel as its owner. Such a contention by T—Anchor is  **\*627**  predicated upon its assertion that the contract was, indeed, forfeited; therefore, T—Anchor contends that the only amount that can be tendered by Travarillo to put Travarillo in possession of the motel is the balance of the unpaid purchase price under the contract of sale. However, the holding of the trial court was that the contract was in full force and effect so that the equity of redemption mentioned in paragraph XIII of the contract was not required to be invoked. Thus, Travarillo was not required to pay the balance of the unpaid purchase price since it had never forfeited the contract. By bringing the contract obligations up to date, Travarillo made T—Anchor whole under the contract of sale which was held to be in full force and effect.

Further, in points of error numbers 3—11, T—Anchor contends that the equities are in its favor to allow a forfeiture and not in favor of Travarillo to deny forfeiture. The trial court found that it would be exceptionally harsh and unjust to forfeit the monies contributed to the motel project and unjust enrichment to T—Anchor to allow forfeiture of Travarillo's rights under the contract in the face of unusual circumstances, namely, that the debtor in bankruptcy, Young, was continued in possession of the motel while paying no one. The trial court held that the order of the bankruptcy court prevented forfeiture of the contract until April 12, 1974. The trial court further held that since Travarillo was tendering performance in full prior to April 12, 1974, it would be unreasonable to refuse Travarillo the right to pick up the contract obligations of its assignor Young upon termination of the restraining order of the bankruptcy court. The trial court found that T—Anchor defaulted on its first and second lien payments because of the restaining orders which continued Young in possession without requiring Young to make contract payments to T—Anchor.

 [4]    [5]   It is our opinion that the evidence supports the holding of the trial court that Travarillo was entitled to equitable relief from forfeiture. It is an established rule of law that forfeitures are disfavored. Although parties may contract to provide for forfeiture upon default, where equities are shown which justify a continuation of the contract rather than forfeiture of it, the forfeiture will be prevented. Stevenson v. Lohman, 218 S.W.2d 311(Tex.Civ.App.—Beaumont 1949, writ ref'd); Baines v. Clinton Park Development Co., 224 S.W.2d 729 (Tex.Civ.App.—Galveston 1949, no

writ). In view of the disfavor with which the law looks upon forfeitures in a contract for the sale of land and in the light of the unusual chain of events which eventually left Travarillo as the buyer under the contract ready, willing and able to perform, we overrule points of error numbers 3—11.

 [6]    T—Anchor contends in point of error number 12 that the trial court erred in holding that the net profits of the motel earned during a period of possession and operation by T—Anchor were the property of Travarillo as owner of complete title to the motel. T—Anchor presupposes that a forfeiture has, in fact, occurred. The trial court held that a forfeiture was prevented by the restraining order of the bankruptcy court. Therefore, possession of the motel by T—Anchor was during a period when Travarillo was entitled to possession, and, under the holding of the trial court that the contract is in full force and effect, Travarillo is, and T—Anchor is not, entitled to the profits of the operation. It is our opinion that the holding of the trial court is sustained by the evidence and the equities of this particular situation. Point of error number 12 is overruled.

 [7]    In points of error numbers 13—15, T—Anchor contends that it was error to hold that default in the payment of monthly installments by Young commenced with the failure to make the November, 1973 payment. T—Anchor points to undisputed testimony that payments were late in more than one month prior to November, 1973, and that notices of default were sent to Young. The trial court made no express **\*628** finding of waiver by T—Anchor. We recognize that where express findings of fact are made by the trial court, independent issuable facts may not be supplied by extension of the express findings. Duncan v. Willis, 157 Tex. 316, 302 S.W.2d 627 (1957), McKenzie v. Carte, 385 S.W.2d 520 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.). However, the same evidence that would support a finding of waiver by T—Anchor supports the trial court's application of equitable principles which would efficiently prevent forfeiture of the contract sale. Testimony by Boyce Box, president of T—Anchor, revealed that T—Anchor ultimately received purchase money installments up to the payment due in November, 1973, and that an oral extension of time until October 11 was agreed to by T—Anchor after the September, 1973 payment was made late. This testimony tends to show that T—Anchor considered the contract as continuing after making its initial gesture with respect to forfeiture, and supports the granting of equitable relief to prevent forfeiture. Points of error numbers 13—15 are overruled.

In points of error numbers 16—22, T—Anchor next contends that the trial court erred in failing to find certain facts since such findings are, as stated in T—Anchor's brief, 'supported by the uncontroverted evidence.' The findings requested by T—Anchor relate to the defaults, notices of such defaults sent to Young and absence of tender of performance by Young, prior to November, 1973, as claimed by T—Anchor to establish forfeiture of the contract and termination of Young's and, therefore, Travarillo's interest under the contract.

 [8]    Even if the specific findings requested by T—Anchor had been made, the result reached by the trial court would not necessarily be changed. In fact, the record reveals that there is evidence of conduct by T—Anchor showing an intent not to terminate the contract but to continue in a

contractual relationship. Even after giving notice concerning forfeiture, T—Anchor accepted late payments of purchase price installments although Young failed to comply with its agreement to bring the delinquent payments to a current status or to vacate the motel. The findings requested by T—Anchor even if made would not, in the light of all the evidence, compel a conclusion of law by the trial court that the contract was forfeited and cancelled in October, 1973, as contended by T—Anchor. The trial court need not make findings of fact on mere evidentiary matters with respect to the ultimate issue. Plaza Co. v. White, supra; Wade v. Taylor, supra. Points of error numbers 16—22 are overruled.

 **[9]**   With respect to points of error numbers 23—28 we believe that the requested findings of fact on which they are grounded relate only to evidentiary matters not required to be included in the trial court's findings of fact. The facts they seek to establish would show that Travarillo failed to make various payments to T—Anchor prior to trial. Such facts, even if included in the trial court's findings of fact, would not compel a result different from that reached by the trial court since there was evidence that Travarillo made tender of performance to bring its contract obligations current early in April, 1973, just prior to dissolution of the Young bankruptcy restraining order. Points of error numbers 23—28 are overruled.

The testimony reveals that after this suit was filed and hearing had on temporary injunction, Travarillo attempted to put the motel under the jurisdiction of the bankruptcy court by filing for an arrangement under Chapter XI of the Bankruptcy Act. By its points numbered 29—32, T—Anchor contends it was error for the trial court to fail to find that by this action, Travarillo, in effect, failed to do equity and effectively withdrew its tender of any sums to T—Anchor, resulting in the defeat of any right to prevent forfeiture.

The trial court made no findings of fact with respect to the Chapter XI proceeding initiated by Travarillo. There is much controversy **\*629**  about the reasons for filing the petition for arrangement under Chapter XI. T—Anchor insists that Travarillo sought to repeat the actions of Young, and thus remain in possession of the motel without being required to make payments to T—Anchor. Travarillo insists, on the other hand, that by filing a bankruptcy petition it was only 'trying to litigate in every conceivable form' to protect its rights. Travarillo contends that it wanted to use the Chapter XI proceeding 'to get a court to make a determination that (it) had a right to cure because (it) had substantial equities' it was in danger of losing. Morgan Jones, a lawyer for Travarillo, testified that it was upon his advice that the Chapter XI proceeding was initiated, asserting that insolvency is not presumed in a Chapter XI proceeding. The only evidence before us on the issue of solvency is that Travarillo was solvent.

 **[10]**   **[11]**   The purpose of Chapter XI of the Bankruptcy Act is to provide a quick and economical means of facilitating simple compositions among general creditors who have been deemed by Congress to need only the minimal disinterested protection provided by the Chapter. In Re Texas Consumer Finance Corporation, 480 F.2d 1261 (5th Cir. 1973). Further, the Congressional intent

in establishing Chapter XI is to provide for an efficient and orderly method by which the claims of unsecured or common creditors of a debtor might be satisfied without resort to general bankruptcy. 9 Remington on Bankruptcy s 3565, p. 32 (Supp.1975).

[12] In any event, we do not think that the trial court was required to make a finding that Travarillo filed a petition under Chapter XI because such a finding would be evidentiary. Plaza Co. v. White, supra; Wade v. Taylor, supra. Moreover, the evidentiary finding would not necessarily compel a different conclusion by the trial court regarding such ultimate and vital issue of termination of the contract.

Further, it is our opinion that the case of Smith v. Owen, 43 Tex.Civ.App. 51, 107 S.W. 929 (1908, writ ref'd), cited in appellant's brief in support of its contention that tender had been withdrawn, is not applicable to the facts in the instant case. In that case the vendee pleaded defenses inconsistent with his tender of the purchase money; the court held that the plea of limitation title precluded the adjustment of any equities in the vendee's favor that might allow him to pay the unpaid balance of the purchase money and hold the land. Id. at 930. The court stated in Smith v. Owens, supra, there were no equities pleaded or proved that would entitle the vendee to defeat the remedy of rescission of the contract sought in that case.

In the instant case we have no pleading by Travarillo of any theory inconsistent with its tender of whatever amount the trial court determined to be owing. Further, in the instant case, we find evidence to support a judgment in favor of Travarillo upon equitable grounds. By way of cross-action Travarillo invoked the equity jurisdiction of the trial court to deny cancellation of the contract.

Here, Travarillo had paid into the registry of the trial court which, in turn, has paid to T—Anchor, an amount making Travarillo current in its obligations. The Chapter XI proceeding initiated by Travarillo was dismissed, with no change in possession resulting from the proceeding. T—Anchor's conduct with reference to the forfeiture that it claims occurred on October 11, 1973 was not consistent with such claim of forfeiture. By accepting late payments and by making a subsequent agreement for cure of defects T—Anchor indicated that it continued to consider the contract in force. This is a case where the seller recognized the contract as still in force even after default. Hoover v. General Crude Oil Co., 147 Tex. 89, 212 S.W.2d 140 (1948); Tom v. Wollhoefer, 61 Tex. 277 (1884). Although it may be contended that T—Anchor may have made moves toward some definite action to exercise its right of forfeiture, yet there is evidence of probative force to support a finding that T—Anchor had not unequivocally **\*630** declared the contract cancelled at the time Young went into bankruptcy on October 31, 1973.

[13] [14] Whether the seller has effectively exercised an option of forfeiture for default in payment depends not upon the number of hours or days that have elapsed since the default in question, but upon whether the circumstances are such that the buyer has, by the conduct of the

seller, been led reasonably to believe that strict application of the right of forfeiture will not be insisted upon, for the time being. A. L. Carter Lumber Co. v. Saide, 140 Tex. 523, 168 S.W.2d 629 (1943). Suspension of the right of forfeiture depends upon the facts in each case. 77 AmJur.2d, Vendor and Purchaser, s 589, p. 716; 91 C.J.S. Vendor & Purchaser, s 137, pp. 1076—1077, s 144.

T—Anchor cites Stevenson v. Lohman, supra, in support of its contention that equitable relief should be denied. It is noted that the buyer in Stevenson made no tender of all or part of the contract payments until after suit in trespass to try title was filed. The buyer advised the seller that he would make no further monthly payments, and the seller treated the contract as abandoned. Travarillo has tendered performance to bring the contract obligations up to date before this suit was filed in April, 1974. In the instant case there is evidence that subsequent to the time when T—Anchor contends it first declared a forfeiture, it treated the contract as continuing and not as abandoned. Also, in Stevenson, the court significantly pointed out that the vendor's right of possession upon default could be defeated by the vendees 'upon pleading and proving such facts as would make it inequitable to enforce it.' In view of the equities pleaded and proved here, points of error numbers 29—32 are overruled.

We recognize that this is a case that requires the weighing of competing equities and that the equities do not lie wholly in favor of either party. However, we hold that the trial court's judgment, based on a balancing of equities, is supported by the record, and that the findings requested by T—Anchor, even if established, would not compel the trial court to reach a different result.

The judgment of the trial court is affirmed.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

335 S.W.3d 344
Court of Appeals of Texas,
Fort Worth.

VINSON MINERALS, LTD., Johnny H. Vinson and Chisholm 2000, L.P., Appellants,
v.
XTO ENERGY, INC., Appellee.

No. 02–08–00453–CV.  |  Dec. 16, 2010.

**Synopsis**

**Background:** Mineral rights owners brought action against lessee for numerous claims relating to operation of oil and gas leases, including trespass, breach of contract, incorrect calculation and underpayment of royalties and other production costs, surface damages, and failure to develop, and sought unspecified amount of damages and attorney fees. After successor acquired lessee and the leases, owners amended petition by substituting successor as party and adding breach of contract claim and request for a declaratory judgment seeking termination of the leases. The 271st District Court, Wise County, John H. Fostel, J., granted successor's motion for summary judgment without specifying the grounds, and dismissed the owners' action with prejudice.

**Holdings:** The Court of Appeals, Gardner, J., held that:

[1] letter from owners was an inadmissible settlement offer, and

[2] owners were only entitled to damages, rather than forfeiture of oil and gas leases.

Affirmed.

Terrie Livingston, C.J., concurred and filed opinion.

West Headnotes (16)

**[1]     Evidence** ⬤ Offers of Compromise or Settlement

Letter from mineral rights owners to oil and gas lessee was an inadmissible "settlement demand," rather than a "demand letter" sufficient to trigger a forfeiture under the terms of

the leases, though letter included sentence demanding undisputed amounts, where letter otherwise was devoted to compromise and settlement; letter began with discussion of settlement, stated that it was in response to lessee's request for a settlement demand, concluded with a valuation of case greatly in excess of $30 million, offered to settle all claims for $9.5 million, and was written during the parties' ongoing negotiations for settlement of an existing lawsuit. Rules of Evid., Rule 408.

Cases that cite this headnote

**[2]** **Evidence** Offers of Compromise or Settlement

**Witnesses** Competency of Impeaching Evidence

In an "offer of settlement or compromise," which is inadmissible to prove liability for or invalidity of claim or its amount, a party concedes some right to which he believes he is entitled in order to bring about a mutual settlement; but settlement offers are admissible when offered for another relevant purpose such as to demonstrate bias or prejudice. Rules of Evid., Rule 408.

Cases that cite this headnote

**[3]** **Evidence** Preliminary Evidence

The burden is on the party objecting to evidence as offer of settlement to show that it was a part of settlement negotiations and not offered for another purpose. Rules of Evid., Rule 408.

Cases that cite this headnote

**[4]** **Appeal and Error** Rulings on admissibility of evidence in general

Only when the trial court abuses its discretion will its ruling whether to exclude evidence as offer of settlement be disturbed on appeal. Rules of Evid., Rule 408.

Cases that cite this headnote

**[5]** **Evidence** Offers of Compromise or Settlement

Purpose of rule excluding evidence of offer to compromise a claim is to encourage settlement. Rules of Evid., Rule 408.

Cases that cite this headnote

**[6]    Mines and Minerals** 🔑 Forfeiture and re-entry for nonpayment

Mineral rights owners did not make adequate written demand for performance under terms of oil and gas leases, as required to be entitled to forfeiture of leases for lessee's nonpayment of royalties, although owners sent letter to lessee that included demand for all royalties due, where letter was primarily offer to settle and did not indicate owners would be seeking forfeiture, and owners did not inform lessee of specific amount due or time within which to cure.

Cases that cite this headnote

**[7]    Mines and Minerals** 🔑 Forfeiture and re-entry for nonpayment

Promise in oil and gas lease to pay royalties is generally a covenant, which will give rise only to a remedy of damages in absence of a specific clause allowing the option of termination of the lease upon the lessee's failure to pay.

1 Cases that cite this headnote

**[8]    Mines and Minerals** 🔑 Forfeiture for breach in general
**Mines and Minerals** 🔑 Forfeiture and re-entry for nonpayment

Upon breach of a condition subsequent in oil and gas lease, the lessor must elect between seeking damages or forfeiture; the lease is not automatically terminated upon breach.

2 Cases that cite this headnote

**[9]    Mines and Minerals** 🔑 Forfeiture for breach in general

To obtain forfeiture of oil and gas leases upon breach of condition subsequent, the lessor must take affirmative steps by re-entering or seeking a judicial declaration of forfeiture.

Cases that cite this headnote

**[10]   Mines and Minerals** 🔑 Forfeiture for breach in general
**Mines and Minerals** 🔑 Forfeiture and re-entry for nonpayment

Rule of strict construction disfavoring forfeiture of oil and gas lease applies when a forfeiture is claimed for breach of a condition subsequent.

Cases that cite this headnote

**[11]** **Mines and Minerals** Surrender, abandonment, or forfeiture

**Mines and Minerals** Forfeiture for breach in general

**Mines and Minerals** Forfeiture and re-entry for nonpayment

If the oil and gas lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture.

Cases that cite this headnote

**[12]** **Mines and Minerals** Surrender, abandonment, or forfeiture

**Mines and Minerals** Forfeiture for breach in general

**Mines and Minerals** Forfeiture and re-entry for nonpayment

If oil and gas lease contains a provision giving the lessee a right of notice of any breach or default before declaring any forfeiture, it must be literally complied with; under such a provision, the lessor cannot claim a forfeiture without giving the lessee the benefit of notice of any default and an opportunity to remedy it.

1 Cases that cite this headnote

**[13]** **Mines and Minerals** Forfeiture and re-entry for nonpayment

For payment to be "undisputed," under provision of oil and gas leases permitting termination by owners if lessee wrongfully or unreasonably withheld payment after proper written demand, the amount had to be undisputed by both parties, not just the lessee.

Cases that cite this headnote

**[14]** **Landlord and Tenant** Breach of Covenant or Condition

Where forfeiture of a lease is dependent on the making of a demand for performance, the demand must be proper, specific, and reasonable.

Cases that cite this headnote

**[15]** **Landlord and Tenant** Sufficiency

Written notice seeking to invoke the harsh remedy of termination or forfeiture of lease must be clear and unambiguous.

1 Cases that cite this headnote

**[16]  Mines and Minerals**  🔑  Demand and notice before forfeiture

By precluding initiation of litigation until notice of default had been provided, oil and gas lease agreements effectively prevented the use of a pleading to make a proper demand for payments due under leases, as condition of seeking forfeiture.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*346**  Moses, Palmer & Howell, LLP and Shayne D. Moses and David A. Palmer, Fort Worth, TX, and Winstead PC and Craig T. Enoch, Austin, TX, for Appellants.

Friedman, Suder & Cooke and Jonathan T. Suder, Michael T. Cooke and David Skeels, Fort Worth, TX, and Locke Lord Bissell & Liddell LLP and Charles R. "Skip" Watson, Jr., Austin, TX, for Appellee.

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

## OPINION

ANNE GARDNER, Justice.

## I. INTRODUCTION

Appellants Vinson Minerals, Ltd., Johnny H. Vinson, and Chisholm 2000, L.P. (the Vinsons) and Appellee XTO Energy, Inc. (XTO) filed cross-motions for summary judgment on the Vinsons' claims relating to ten oil and gas leases covering the Vinsons' ranch in Wise County, Texas. The trial court granted XTO's motion and denied the Vinsons' motion. The Vinsons, as one or more of the lessors in each of the leases, contend that they are entitled to terminate the leases with XTO, as successor lessee, because XTO failed to make "undisputed payments" after demand. Because we hold that the Vinsons presented no evidence that they provided XTO with a proper written notice or demand for payment as required by the leases, we affirm.

## II. BACKGROUND

The oil and gas leases at issue originated in 2001 between Johnny Vinson, Vinson Minerals, Ltd., and others as lessors and Threshold Development Company as lessee. Threshold is a Vinson family company **\*347** in that the owners, officers, and directors are members of the Vinson family. In 2003, Antero Resources Corporation bought Threshold's interests as lessee in the leases for $25 million.

In early 2005, the Vinsons began disputing Antero's calculations of royalty payments to the Vinsons from 2003 to 2005 and commenced an audit of Antero's accounting records of royalties. By letter of January 25, 2005, the Vinsons informed Antero that they were "waiting on requested information to complete [the] audit of production and royalty payments" and that the Vinsons' "potential claim" for royalty underpayment was $2 million. In March 2005, the Vinsons provided Antero with audit exceptions listing, among other complaints, improper deductions from royalty payments for compression, fuel, treating, and transportation charges by an "affiliated" pipeline owned by Antero "to be determined" but "estimated ... to be in the range of $600,000." [1]

The relationship between the parties deteriorated as the Vinsons raised other issues, including claims for reassignment of undeveloped acreage, drill site issues, and road and surface damage issues. On July 11, 2005, the Vinsons filed suit against Antero for numerous claims—including trespass, breach of contract, incorrect calculation and underpayment of royalties and other production costs, surface damages, and failure to develop—seeking an unspecified amount of damages and attorney fees.

In the meantime, two months before the Vinsons filed suit, XTO acquired Antero and the leases. XTO was made aware of the outstanding issues claimed by the Vinsons at the time it acquired the leases. In March 2005, the Vinsons faxed XTO a copy of its January 25 letter to Antero regarding the status of their claims. By letter dated August 5, 2005, XTO's outside litigation counsel initiated settlement dialogue with the Vinsons' counsel, requesting that the Vinsons (1) amend their pleadings to substitute XTO as the sole defendant, (2) agree to suspend their ongoing audit during litigation, and (3) consider opening discussions with XTO "to see if some or all of these issues can be resolved, and good working relations restored, before pursuing litigation aggressively." [2]

In a January 18, 2006 letter to the Vinsons' counsel, confirming delivery of documents in response to discovery, XTO's counsel reaffirmed its "intention to resolve the royalty payment issues both prospectively and [as] to past months, by an agreed method of changed payment and a lump sum settlement for past months once the new payment method is agreed upon." A few days later, XTO's and the Vinsons' accountants and legal counsel met to discuss settlement of all issues in the suit, including the issue of the new methodology to be agreed upon in order to recalculate the disputed royalties. Under the methodology proposed by XTO, its "estimated" preliminary calculation of royalty payments owed to the Vinsons for the period from November 2003 through

April 2005 (the Antero period) totaled $643,548.19. XTO described this number as an estimate, subject to adjustment as XTO continued reviewing Antero's boxes of accounting **\*348** records. [3] The Vinsons and XTO agreed at this meeting to continue working, without the presence of legal counsel, on the changed methodology to recalculate the disputed royalty payments owed to the Vinsons during both the Antero period and the period after May 2005, when XTO acquired Antero (the XTO period). In this regard, the parties obtained a Rule 408 Agreed Protective Order from the trial court that included a provision for informal meetings of representatives of the parties to discuss royalty accounting issues. [4]

On March 16, 2006, XTO's counsel wrote the Vinsons' counsel, summarizing the current status of the ongoing settlement discussions on all issues and proposing that XTO recalculate all prior royalties under a revised methodology and format and "in due course, make a retroactive payment to bring all prior periods up to the new payment methodology." The letter requested that the Vinsons present a settlement demand "to resolve all issues in the case" as follows:

> Please discuss these issues with your client and present XTO a settlement demand to resolve all issues in the case. If we have misunderstood your pleading in any respect, or if you would need to discuss any of these issues prior to submitting a demand, please call me at your convenience.

On May 12, 2006, the Vinsons' counsel responded with a three-page letter faxed to XTO's counsel (the May 12 letter). The letter began with the following paragraph:

> In response to your March 16, 2006, letter regarding possible settlement of this matter, [the Vinsons have] been thoroughly engaged in reviewing all of the information available related to this dispute. Now that this review is complete [the Vinsons are] prepared to respond in full to your suggestion as to "what XTO might offer to attempt to resolve the rest of the claims in the lawsuit."

In the May 12 letter, the Vinsons' counsel characterized their claims as falling into two major categories, summarized as "surface/lessor issues" and "working interest/reassignment issues," with four main causes of action. He discussed those issues in detail, including the following:

> ***Royalty/Accounting Issues.*** If XTO makes a retroactive payment as represented, including interest and attorney fees, and revises the format for making future payments then this issue should be resolved. Until agreement on each of these matters is reached, in accordance with the terms of [the Vinson] leases ... demand is hereby made for all undisputed payments due under the Wise County leases. As a part of any **\*349** settlement of this issue XTO will also have to confirm that it will provide [the Vinsons] with daily production information....

The letter concluded with the following paragraph:

> Considering each of these factors, [the Vinsons] conservatively believe [ ]this case has a value greatly in excess of $30,000,000. Recognizing the risks of litigation and the costs associated therewith, I have been authorized to settle all claims in exchange for a payment in the amount of $9,500,000 and XTO bringing itself into compliance with the Barnett Shale Project Agreement by signing JOA's correctly identifying Threshold's before and after payout working interests after XTO acquired Sinclair Oil Corporation's interest in said agreement, in the same manner as all previously executed JOA's.

On May 25, 2006, XTO paid the Vinsons the amount of $103,047.68, representing underpayments for royalties owed for the XTO period, and using the new methodology that had been discussed.[5] The Vinsons accepted that payment. XTO then began using the new methodology to adjust the royalty calculations previously made by Antero from the 348 boxes of accounting documents, which were incompatible with XTO's computer system, in order to calculate amounts to be paid for the Antero period.[6]

Sixty days after sending the May 12 letter, the Vinsons filed an amended petition substituting XTO as the defendant. In addition to the claims for damages previously asserted, the Vinsons alleged that XTO was in breach of contract by failing to make "undisputed royalty payments" demanded by the Vinsons in the May 12 letter. By the new pleading, the Vinsons added a request for a declaratory judgment seeking termination of the leases under the following portion of Section 3 (entitled "Royalty Payment") of the leases:[7]

> 3. **Royalty Payment.** Royalties on oil, gas, and other substances produced and saved hereunder shall be paid by [XTO] to [the Vinsons] as follows: ...

> e. ... If [XTO] wrongfully or unreasonably withholds any undisputed payment or payments due to [the Vinsons] for a period of sixty (60) days after written demand for payment is made by [the Vinsons] on [XTO at the above address (or such other address as may be specified in writing hereafter by XTO) ], at the election of [the Vinsons] this lease may be terminated. The foregoing sentence **\*350** shall not apply to payments withheld by [XTO] because [XTO] contests such payments in good faith so long as [XTO] has timely paid to lessor all undisputed payments due to [the Vinsons].[8]

On October 16, 2006, the Vinsons filed a partial motion for summary judgment asking the trial court to declare the leases terminated under Section 3(e) of the leases because of XTO's failure to comply with the Vinsons' alleged May 12 demand that "all undisputed amounts" be paid within sixty days.[9]

On November 1, 2006, XTO paid the Vinsons $725,942—the "estimated" amount of $643,548.19 in royalty underpayments during the Antero period for improper transportation charges on the Antero affiliated pipeline, plus $61,006 in interest and $21,387 in surface damages. XTO made subsequent payments of $16,972.79 and $2,380.82 to the Vinsons later in November 2006 as further adjustments for the underpaid amounts by Antero, as well as $150,000 in attorney's fees. After a hearing, the trial court denied the Vinsons' motion for partial summary judgment. Eventually, the parties settled all other claims and issues, with the Vinsons reserving their right to pursue the lease forfeiture claim.

XTO then filed a motion to exclude the May 12 letter under Texas Rule of Evidence 408, together with a motion for no-evidence summary judgment. XTO's no-evidence summary judgment motion asserted that the Vinsons had no evidence

  (1) that it fully and sufficiently described in writing the alleged breach or default and properly notified XTO of the forfeiture to result from said breach;

  (2) that undisputed royalty payments were due and owing under the Leases;

  (3) that undisputed payments were withheld in bad faith; and

  (4) that undisputed payments were wrongfully or unreasonably withheld.

The Vinsons responded to XTO's motion and also requested that the court reconsider their motion for partial summary judgment. The trial court granted XTO's motions to exclude and for summary judgment without specifying the grounds relied on, denied the Vinsons' motion for reconsideration, and dismissed the Vinsons' case with prejudice. This appeal followed.

### III. ISSUES

On appeal, the Vinsons raise three issues. First, they contend that the trial court erred by denying their motion for summary judgment and granting XTO's motion for summary judgment because the Vinsons made written demand for payment of undisputed sums in the May 12 letter, XTO failed to pay those sums within sixty days, and the leases expressly provide that they may be terminated if "undisputed" sums are not paid within sixty days of written demand. Second, the Vinsons assert that the trial court abused its discretion by excluding from evidence the May 12 letter, which they contend was their "written demand" pursuant to the terms of the leases. Third, the Vinsons argue that the trial court erred by excusing XTO from complying with the leases and by **\*351** applying the doctrine of disproportionate forfeiture.

XTO responds that the trial court correctly excluded the May 12 letter from evidence and that the trial court correctly granted its summary judgment motion because the Vinsons produced no evidence of a proper demand, no evidence that unpaid royalties were "undisputed," no evidence that amounts claimed were "wrongfully or unreasonably" withheld, and no evidence that the Vinsons gave proper notice "fully describing" any breach or default by XTO as required by the leases for forfeiture. XTO further asserts that the Vinsons were made whole by the payments they accepted, which foreclosed any election to sue for forfeiture of the leases.

## IV. ANALYSIS

At the core of the Vinsons' appeal is their complaint that the trial court abused its discretion by excluding from evidence and refusing to consider the May 12 letter, which the Vinsons characterize as their "Demand Letter." The Vinsons contend that the May 12 letter was admissible and was a proper written demand that met the requirements of Section 3(e) of the leases. We will first consider whether the trial court abused its discretion by excluding the May 12 letter from evidence.

### A. The May 12 Letter Was Not a "Demand Letter."

[1] The Vinsons argue that the trial court abused its discretion by excluding the May 12 letter from evidence under Texas Rule of Evidence 408 as a compromise offer because the letter was not a compromise settlement demand but was clearly a "Demand Letter" notifying XTO of its obligation to pay an amount that XTO knew it owed but was withholding until all issues could be resolved. The Vinsons point out that the letter contained wording from Section 3(e) of the leases making "demand ... for all undisputed payments due" and that it expressly referred to the Wise County leases, which was, according to the Vinsons, sufficient language to put XTO on notice that the leases gave it sixty days to respond in order to defeat forfeiture of the leases. Thus, the Vinsons argue that the letter was admissible as evidence of a demand. XTO replies that the language of the letter is couched as a global settlement demand offering to compromise all issues in the case for a total specific amount (the only amount demanded in the letter); that the amount owed for royalties was disputed; that if the Vinsons intended a demand for payment in the letter, it was not recognized as such by XTO's forty-year veteran oil and gas litigation attorney; and that the alleged demand was misleading and surreptitious with no specified amount to cure a default and did not specify a time within which to pay but, instead, indicated it would remain open until settlement. Thus, XTO argues the May 12 letter was properly excluded by the trial court.

[2] Offers of settlement are not admissible to prove liability or invalidity of a claim or its amount. Tex.R. Evid. 408; *Ford Motor Co. v. Leggat,* 904 S.W.2d 643, 649 (Tex.1995) (orig. proceeding); *Tatum v. Progressive Polymers, Inc.,* 881 S.W.2d 835, 837 (Tex.App.-Tyler 1994, no writ). In

an offer of settlement or compromise, a party concedes some right to which he believes he is entitled in order to bring about a mutual settlement. *Mercedes–Benz of N. Am. v. Dickenson,* 720 S.W.2d 844, 857 (Tex.App.-Fort Worth 1986, no writ). But rule 408 does not bar the admission of settlement offers when offered for another relevant purpose. Tex.R. Evid. 408; *Barrett v. U.S. Brass Corp.,* 864 S.W.2d 606, 633 (Tex.App.-Houston [1st Dist.] 1993), *rev'd on other grounds sub* **\*352** *nom, Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644 (1996). Thus, an offer or demand for settlement may be admissible for another purpose, such as to demonstrate bias or prejudice. Tex.R. Evid. 408; *Gen. Motors Corp. v. Saenz,* 829 S.W.2d 230, 243 (Tex.App.-Corpus Christi 1991), *rev'd on other grounds,* 873 S.W.2d 353 (Tex.1993); *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259, 269 (Tex.App.-Houston [1st Dist.] 1991), *rev'd on other grounds,* 903 S.W.2d 315 (Tex.1994); *Ochs v. Martinez,* 789 S.W.2d 949, 959–60 (Tex.App.-San Antonio 1990, writ denied) (op. on reh'g).

**[3]** **[4]** The burden is on the party objecting to evidence under rule 408 to show that it was a part of settlement negotiations and not offered for another purpose. *TCA Bldg. Co. v. Nw. Res. Co.,* 922 S.W.2d 629, 636 (Tex.App.-Waco 1996, writ denied); *Haney v. Purcell Co., Inc.,* 796 S.W.2d 782, 790 (Tex.App.-Houston [1st Dist.] 1990, writ denied). Whether the evidence is being impermissibly offered as evidence of liability or for some other valid reason is a matter within the trial court's discretion. *Tatum,* 881 S.W.2d at 837. Only when the trial court abuses its discretion will its ruling be disturbed on appeal.[10] *See id.*

XTO contends that, when the "demand" language is properly viewed in the context of the remainder of the May 12 letter and the parties' ongoing negotiations, the letter was clearly a part of settlement negotiations, not a demand for payment of undisputed amounts triggering forfeiture of the leases if not paid.[11] XTO points out that the May 12 letter's first paragraph begins: "*In response to your March 16, 2006, letter regarding possible settlement of this matter, ....*" [Emphasis added.] Moreover, the very paragraph of the letter the Vinsons rely upon as setting forth the demand begins by expressly acknowledging, immediately before the words they claim to be a demand for payment, that a settlement had *not* been reached, stating: "*Until agreement on each of these matters is reached. ...*" [Emphasis added.] Immediately following the demand language, that same paragraph references payment of such undisputed amounts as a part of a proposed settlement, stating that "*[A]s a part of any settlement of this issue,* XTO will also have to confirm" that it will provide various production information in a timely manner. [Emphasis added.]

Then, as XTO notes, the letter closes with a straightforward compromise settlement demand for the entire case, stating that the Vinsons value the case at more than $30 million, but "[r]ecognizing the risks of litigation and the costs associated therewith, *I have been authorized to settle all claims* in exchange for a payment in the amount of $9,500,000." [Emphasis added.] The Vinsons deny that the last paragraph of the letter was intended to constitute a settlement demand for all claims —including their claim for unpaid royalties—and insist that the letter made clear that the Vinsons'

counsel was only authorized to settle all *other* matters for a specified amount. We disagree with the Vinsons' post hoc interpretation. "All claims" necessarily includes the Vinsons' **\*353** claim for unpaid royalties, which were sought in the pending litigation.

The May 12 letter speaks for itself. It begins with a discussion of settlement, states that it is in response to XTO's request for a settlement demand, clearly and unambiguously concludes with a settlement demand for "all claims," and was written during the parties' ongoing negotiations for settlement of an existing lawsuit that included the Vinsons' claim for underpayment of royalties. The May 12 letter also concludes by conceding a right to which the Vinsons believe they are entitled. *See Mercedes–Benz,* 720 S.W.2d at 857 (holding that an offer of compromise exists when a party concedes some right to which he believes he is entitled to bring about a mutual settlement). Specifically, the letter concludes with a valuation of "this case" greatly in excess of $30 million and an offer to settle "all claims" for $9.5 million. The language and context of the letter negate any reasonable interpretation of the language buried in the middle of a sentence, buried in the middle of a paragraph, and buried in the middle of the three-page letter as a stand-alone "demand" for payment under Section 3(e) of the leases that can be considered separate and apart from the rest of the letter.

 **[5]**    The purpose of rule 408 is to encourage settlement. *See MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.,* 179 S.W.3d 51, 61 (Tex.App.-San Antonio 2005, pet. denied); *State Farm Mut. Auto. Ins. Co. v. Wilborn,* 835 S.W.2d 260, 261 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding) (noting settlement offers are excluded to allow a party to "buy his peace and encourage settlement of claims outside the courthouse"). Permitting a party to recharacterize, after the fact, what was clearly a settlement demand as a "Demand Letter," to use the Vinsons' label, based upon part of a sentence inserted in the middle of a letter otherwise ostensibly devoted from beginning to end to compromise and settlement, in order to invoke the harsh consequences of forfeiture, would reward obfuscation and "gotcha" tactics and would chill rather than encourage parties to negotiate in good faith toward a compromise and settlement of their claims.

By granting XTO's motion to exclude, the trial court could have found, within its discretion, that the May 12 letter was not a "demand letter" sufficient to trigger a forfeiture under the terms of the leases but was part of a settlement demand inadmissible under rule 408 offered solely to prove XTO's liability for forfeiture of its leases. *Cf. Mercedes–Benz,* 720 S.W.2d at 857 (holding trial court was within its discretion to determine a letter "was more in the nature of an ultimatum than an offer to compromise" and, therefore, admissible into evidence). We will not disturb the exercise of the trial court's discretion in excluding the May 12 letter from the summary judgment evidence. *See id.; Allen v. Avery,* 537 S.W.2d 789, 791 (Tex.Civ.App.-Texarkana 1976, no writ) (upholding trial court's exclusion of compromise settlement from evidence). We overrule the Vinsons' second issue.

**B. Insufficient Evidence Existed to Raise an Issue of Fact as to Notice and Demand to Entitle the Vinsons to Forfeiture of the Leases.**

**[6]** The Vinsons contend in their first issue that the trial court erred by denying their motion for summary judgment and granting XTO's motion for summary judgment because the May 12 letter constituted written demand for payment, XTO failed to pay those sums within sixty days, and the leases expressly provide that they may be terminated if "undisputed" sums are not paid within sixty days of written **\*354** demand. But even if the trial court erred by excluding the May 12 letter from evidence as a demand, the Vinsons were only entitled to damages, not forfeiture of the leases. Thus, the Vinsons have failed to show how the exclusion of the May 12 letter led to rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a).

**[7]** The promise to pay royalties is generally a covenant, [12] which will give rise only to a remedy of damages in absence of a specific clause allowing the option of termination of the lease upon the lessee's failure to pay. *Blackmon,* 276 S.W.3d at 606 (citing Linton E. Barbee, *The Lessor's Remedies for Nonpayment of Royalty,* 45 Tex. L.Rev. 132, 159 (1966)). As XTO acknowledges, the Vinson leases are among the "few" that contain a specific clause making non-payment of royalties a condition subsequent, expressly permitting the Vinsons, as lessors, to elect to seek forfeiture of the lease. *See* Barbee, 45 Tex. L.Rev. at 159–60.

**[8]** **[9]** Upon breach of a condition subsequent, the lessor must elect between seeking damages or forfeiture; the lease is not automatically terminated upon breach. *Blackmon,* 276 S.W.3d at 605; *see Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 223–24, 19 S.W. 472, 474 (1892). The lessor must take affirmative steps by re-entering or seeking a judicial declaration of forfeiture as the Vinsons did in this case. *See* Barbee, 45 Tex. L.Rev. at 159.

**[10]** **[11]** The rule of strict construction disfavoring forfeiture applies when a forfeiture is claimed for breach of a condition subsequent. *Coastal Oil & Gas Corp. v. Roberts,* 28 S.W.3d 759, 763 (Tex.App.-Corpus Christi 2000, pet. granted, judgm't vacated w.r.m.); *Tickner v. Luse,* 220 S.W. 578, 580 (Tex.Civ.App.-El Paso 1920, writ ref'd); *see* Patrick H. Martin & Bruce M. Kramer, 3 Williams & Meyers, Oil and Gas Law § 656.2 (2008) (stating that strict construction "governs forfeiture provisions based on failure to make proper and timely payment of royalty"). It is settled law that the rule of construction against the right of forfeiture applies to oil and gas leases. *Wisdom v. Minchen,* 154 S.W.2d 330, 334 (Tex.Civ.App.-Galveston 1941, writ ref'd w.o.m.) (citing *Ryan v. Kent,* 36 S.W.2d 1007, 1011 (Tex. Comm'n App.1931, judgm't adopted)). Thus, if the lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture. *Ryan,* 36 S.W.2d at 1011; *Wisdom,* 154 S.W.2d at 334.

**[12]** Additionally, if the lease contains a provision giving the lessee a right of notice of any breach or default before declaring any forfeiture, it must be "literally complied with." *Coastal,* 28 S.W.3d

at 763 (citing *Deace v. Stribling,* 142 S.W.2d 564, 566 (Tex.Civ.App.-Austin 1940, no writ)). Under such a provision, the lessor cannot claim a forfeiture without giving the lessee the benefit of notice of any default and an opportunity to remedy it. *Wisdom,* 154 S.W.2d at 334.

The Vinsons contend that this case is controlled by *Coastal Oil & Gas Corp. v. Roberts,* in which a global demand referencing no stated amount of royalties due, and not mentioning termination, was nevertheless held sufficient to entitle the lessor to forfeiture of a lease under a provision that, according to the Vinsons, is almost identical to Section 3(e) of their **\*355** leases. *See* 28 S.W.3d at 764–65. We agree that *Coastal* is similar to this case but find it distinguishable in material respects.

Paragraph 3 of the *Coastal* leases, specifically regarding royalties and other payments for production, and similar to section 3(e) of the Vinsons' leases, provided:

> Royalties and other payments for production shall be due and owing to Lessor within 120 days from the date of first production.... If Lessee wrongfully or unreasonably withholds any such payment or payments due to Lessor for a period of thirty (30) days after written demand for payment is made by Lessor on Lessee at the above address (or other such address as made by [sic] specified in writing hereafter by Lessee), at the election of Lessor this lease may be terminated.

*Id.* at 761–62.

Litigation had been pending by the lessor against Coastal for several years for underpaid royalties on several other leases, but not for the "E" or "F" lease. *See id.* at 761. Coastal, as lessee, failed to pay any royalties due on the F–6 well on its "F" lease by the 120th day after first production of gas from the well it drilled on that property. *See id.* at 762. Coastal suspended payment of any royalties due on the F–6 well while it awaited return of a signed division order from the lessor. *See id.* Without returning the division order, the lessor sent a written demand letter that read, in toto, as follows:

> Plaintiffs hereby make demand for all royalties due and owing pursuant to each paragraph 3 of the (a.) Coates "E" lease and (b.) Coates "F" lease. Plaintiffs demand payment in full from each separate defendant, their proportionate share of all amounts due. You have thirty (30) days, after receipt of this letter, to pay said amounts. We appreciate your immediate attention to this matter.

*Id.* The lessor subsequently amended its pleadings in the existing suit and sought to terminate the lease based upon Coastal's "wrongful or unreasonable" failure to pay royalties after written demand for payment. *See id.* Coastal contended that the lessor failed to give proper notice because the generic written demand letter did not explain the amounts owed, how Coastal had improperly

calculated royalties, or how the lessor wished royalties to be calculated, and was thus "insufficient, deliberately vague and written in such a way as to keep [Coastal] from being able to adequately respond." *Id.* The Corpus Christi Court of Appeals affirmed a summary judgment for the lessor, holding that the written demand sufficed to invoke the right of the lessor to terminate, despite the rule that oil and gas leases must be construed against forfeiture, [13] and despite the additional rule that the prerequisites of notice of forfeiture must be "literally complied with" [14] because the Coastal lease did not require the lessor to explain the particulars of the breach or to specify how the lessee had defaulted and, thus, the lessor's global demand did "literally compl[y]" with the requirement of written demand for **\*356** payment. *Id.* at 763–65. *Coastal* differs significantly from this case. First, the demand in *Coastal* was clearly a "written demand" as required by the lease, unlike the alleged demand here, which was contained within a letter offering to settle the pending litigation. *See id.* at 762. Coastal clearly recognized the demand as such because it responded and complained that the demand letter was inadequate. *See id.* Most significantly, the Corpus Christi court's holding in *Coastal* that the lessor "literally complied" with the forfeiture clause rests upon the absence of any language in that lease requiring the lessor to describe the breach or specify the particulars of the default. *See id.* at 764. Holding that "literal compliance" with the prerequisite of notice to forfeit did not require the lessor to identify the specifics of the breach, the court of appeals noted in a footnote:

> An example of a clause in a lease requiring the lessor to indicate the specifics of the breach is found in 4 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW § 682.1, at 340 (1984) (citing *Ridl v. E.P. Operating Limited Partnership,* 553 N.W.2d 784 (N.D.1996)). The clause provides, in relevant part, "In the event the Lessor considers that Lessee has failed to comply with an obligation hereunder, express or implied, Lessor shall *notify Lessee in writing specifying in what respect Lessor claims Lessee has breached this lease....*"
> *Id.* at 764 n. 3.

The leases in this case, unlike the one in *Coastal,* do contain such a clause as the example cited in the footnote, requiring the Vinsons, as lessors, to provide written notice "fully describing the breach or default" to entitle them to forfeiture of the leases. Section 11 of the leases, applicable to all breaches or defaults, states:

> No litigation shall be initiated by [the Vinsons] for damages, forfeiture, or cancellation with respect to any breach or default by [XTO] hereunder, for a period of at least sixty (60) days after [the Vinsons] ha[ve] given [XTO] written notice *fully describing the breach or default,* and then only if [XTO] fails to remedy the breach or default within such period. [Emphasis added.]

The lease in *Coastal* contained no such provision, and the court refused to write into the contract a requirement that it did not provide. *Id.* at 764–65. *Compare Ridl,* 553 N.W.2d at 784 (lessor's demands not "specifying in what respects" lessee breached lease, as required by notice clause, not

appropriate demand entitling lessor to forfeiture), *and Savoy v. Tidewater Oil Co.,* 218 F.Supp. 607, 610 (W.D.La.1963) (notice required lessor to "point out the particulars in which they were deemed deficient" to allow forfeiture), *aff'd,* 326 F.2d 757 (5th Cir.1964), *and Mont. E. Pipe Line Co. v. Shell Oil Co.,* 216 F.Supp. 214, 221 (D.Mont.1963) (notice should "express clearly the dereliction of which complaint is made"), *with Sowell v. Natural Gas Pipeline Co. of Am.,* 789 F.2d 1151, 1156 (5th Cir.1986) (applying Texas law) (notice and demand clause contained no condition requiring specific facts of breach but demand letter identified proper royalty as based upon six-county average gas price specified in division order).

 **[13]**    **[14]**    The Vinsons did not comply with Section 11's notice provision requiring them to "fully describe" the breach or default. They offered no answer to the prerequisites of notice and cure under Section 11 of the leases in their opening brief except to assert that Sections 11 and 3(e) involve "different circumstances." For the first time in their reply brief, they argue that they repeatedly made their complaints **\*357** known in writing in their audit exceptions provided to XTO as early as March 2005, and more than 60 days expired before they brought suit. But none of those communications specified any amount due or gave XTO a time within which to cure the alleged default. For example, the Vinsons' audit exception with respect to the improper transportation charges stated only that "the Dollar amount ... to be determined but is estimated ... to be in the range of $600,000." And none of their communications claimed any amount to be "undisputed." [15] Thus, even if the language in the May 12 letter was intended to constitute notice, it was for an unspecified amount to be paid by an unspecified time for unspecified claims or charges, as to all of which XTO was left to guess. Where forfeiture of a lease is dependent on the making of a demand for performance, the demand must be proper, specific, and reasonable. *Outdoor Sys., Inc. v. BBE, L.L.C.,* 105 S.W.3d 66, 71 (Tex.App.-Eastland 2003, pet. denied) (holding that a lessor's demand letter was excessive, unreasonable, and imprecise when it demanded payment within ten days of an unspecified amount based upon "total arrearages from the inception of the Leases").

The Vinsons' May 12 letter states neither a time limit within which XTO is to make the payments nor notice of any amount other than the $9.5 million proposed for settlement of all claims. *See id.* Moreover, the Vinsons have never identified any amount that was "undisputed" either in the trial court or in this court. The Vinsons acknowledge as much in their reply brief in this court, conceding that they "could not know what was undisputed by XTO; thus, [they] could not demand a specific amount." If the Vinsons could not know the amount they were demanding to be paid by XTO, it is difficult to see how they can argue that XTO had notice of what amount was "undisputed."

The Vinsons' solution to this conundrum is to argue that "[e]ven if XTO was uncertain as to exactly how much money it owed, it clearly knew (from the parties' prior dealings and discussions) that it owed [the Vinsons] in excess of $600,000; accordingly, it had a duty to tender the portion that was undisputed." The Vinsons also quote from the September 25, 2006 deposition of XTO's accounting representative, in which she stated that upon recalculating the monies due to the Vinsons, she

came up with an amount "in the neighborhood of $650,000 to $700,000," that she estimated the amount owed for the Antero period for transportation charges was $643,548.19, and that she agreed with the Vinsons' counsel's estimate that XTO recognized since at least January of 2006 that it owed "something north of $600,000" for past due royalty. The Vinsons cite no authority defining "undisputed" to include an "estimated" amount, nor do we agree that "in the neighborhood of" or "something north of" a particular amount equates to an "undisputed amount."

The May 12 letter is insufficiently specific to constitute "written notice fully describing the breach or default" as required **\*358** by Section 11 of the leases, particularly in the context of the remainder of the letter and the ongoing negotiations for settlement. *See id.; see also Cedar Rapids Television Co. v. MCC Iowa LLC,* 560 F.3d 734, 739–40 (8th Cir.2009) (holding notice of termination of a contract must be "clear and unequivocal" and state a definite intent to cancel or terminate the contract); *Laverty v. Hawkeye Sec. Ins. Co.,* 258 Iowa 717, 140 N.W.2d 83, 87 (1966); *Morris Silverman Mgmt. Co. v. W. Union Fin. Serv., Inc.,* 284 F.Supp.2d 964, 974 (N.D.Ill.2003) (citing *LA–Nev. Transit Co. v. Marathon Oil Co.,* 985 F.2d 797, 800 (5th Cir.1993) ("The focus is on whether the notice is sufficiently clear to apprise the other party of the action being taken.")); *see also Accu–Weather, Inc. v. Prospect Comm. Inc.,* 435 Pa.Super. 93, 644 A.2d 1251, 1254 (1994) (holding conditions precedent to termination must be strictly complied with, and clear and unequivocal language is necessary to terminate); *Morris Silverman,* 284 F.Supp.2d at 974 ("[T]o be effective, notice of termination must be 'clear and unequivocal.' "); *Todd v. Corp. Life Ins. Co.,* No. 89–C–7711, 1990 WL 16430, at \*4 (N.D.Ill. Feb. 15, 1990), *aff'd in part, rev'd on other grounds,* 945 F.2d 204, 208 (7th Cir.1991) ("[N]otice to terminate a contract under an express provision must be clear and unequivocal.").

**[15]** The May 12 letter also fails to give XTO notice that the Vinsons intended to seek the drastic remedy of forfeiture of the leases if payment was not made within any certain time. Specifically, written notice seeking to invoke the harsh remedy of termination or forfeiture must be clear and unambiguous. *See Ogden v. Gibraltar Sav. Ass'n,* 640 S.W.2d 232, 233–34 (Tex.1982) (holding that equity demands clear and unequivocal notice be given of a party's intent to exercise such harsh consequences as acceleration or foreclosure); *see also Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 891–92 (Tex.1991) (holding harshness of option of accelerating maturity of extended indebtedness requires both strict reading of terms of option and notice to debtor, and notice of intent and notice of acceleration must be clear and unambiguous); *Outdoor Sys., Inc.,* 105 S.W.3d at 71 ("The cases in this State hold that a landlord cannot forfeit the lease of his tenant for failure to comply with the provisions without first making demand upon the tenant for performance."); Barbee, 45 Tex. L.Rev. at 161 (stating terms of a claim for forfeiture of an oil and gas lease must be clear and unambiguous and lessor is held to strict proof of compliance with notice and demand requirements).

The Vinsons argue that the reference in the letter to the Wise County leases and the words "undisputed payments" and "demand" were sufficient to alert XTO that the Vinsons were seeking to invoke Section 3(e) of the leases, which allowed an election for forfeiture. Even if the letter was sufficient to invoke Section 3(e) as a demand for payment, it was not sufficient for them to invoke termination under Section 11. The May 12 letter was written in the context of settlement negotiations for numerous claims for alleged breaches of covenants and conditions. At best, an analogy may be made to cases under the Uniform Commercial Code, where attempted notices of termination of a contract—"mixed" with words of negotiation and compromise—have been held ineffective as a matter of law. *See, e.g., Stovall v. Pub. Paper Co.,* 284 Or. 53, 584 P.2d 1375, 1380 (1978) (holding notice of termination insufficient where it mixed words of termination with words of compromise, negotiation, and present obligation); *Morris Silverman,* 284 F.Supp.2d at 974 (holding notice of termination ineffective where **\*359** party made repeated oral and written statements that it intended to continue contract); *Gatt Trading Inc. v. Sears, Roebuck, & Co.,* No. 02–CV–1573–B, 2004 WL 2511894, at \*10 (N.D.Tex. Nov. 8, 2004) (holding letter attempting to terminate insufficient where it invited further negotiation); *Accu–Weather,* 644 A.2d at 1254 (holding notice of termination that made reference to continuing contract to later date held "ineffectively ambiguous"); *cf. Dresser Indus., Inc. v. Pyrrhus AG,* 936 F.2d 921, 930 (7th Cir.1991) (holding notice clearly invoking termination clause that also indicated willingness to negotiate sufficient where notice also stated further discussions would not limit effect of termination notice).

Because we have determined that the trial court did not abuse its discretion by excluding the May 12 letter from evidence, and because we conclude that the May 12 letter was also insufficient as a matter of law to constitute a proper written notice fully describing the breach or default in order for the Vinsons to seek forfeiture, we hold that the May 12 letter is no evidence that the Vinsons provided XTO with a proper "written demand" for payment or notice of default as required by the leases, entitling them to a declaratory judgment forfeiting the leases.

 **[16]**    Alternatively, the Vinsons argue that they made a sufficient demand by filing their amended petition and attaching the May 12 letter with all three pages of text redacted except the few words in the middle of the letter that they contend is a demand. However, by precluding initiation of litigation until notice has been provided, the lease agreements effectively prevent the use of a pleading to make a demand. Moreover, the Vinsons did not make a "demand" by their amended pleading. Rather, they used XTO's alleged failure to pay within sixty days after May 12, 2006, as the reason to assert their election to terminate.

As previously discussed, Section 11 of the leases precluded the Vinsons from "initiat[ing] litigation" unless XTO had received "written notice fully describing the breach or default" and had "fail[ed] to remedy the breach or default within" sixty days of receiving the notice. Because suit could not be filed until XTO had at least sixty days after notice in which to remedy the breach

or default, the letter's attachment to the Vinsons' amended petition could not serve as the required notice of default. *See Deace,* 142 S.W.2d at 566 (holding prerequisite of thirty days' written notice to cancel or terminate lease prior to filing of suit not literally complied with and, therefore, ineffective where suit was brought twenty-five days after notice); *see also Westwind Exploration Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985) (holding that contracting parties intend every clause to have some effect); *Lacquement v. Handy,* 876 S.W.2d 932, 937 (Tex.App.-Fort Worth 1994, no writ) (stating that language in contracts is given its plain, ordinary meaning).

Moreover, we do not agree that attaching the redacted letter to XTO's amended petition was sufficient to meet the leases' pre-suit notification requirement. *See Huff v. Fid. Union Life Ins. Co.,* 158 Tex. 433, 443, 312 S.W.2d 493, 500 (1958) (holding that neither the filing of a lawsuit "arising out of a contract nor the allegation of a demand in the pleadings constitutes presentment of a demand" to entitle a party to attorney fees as required by Chapter 38 of the Texas Civil Practice and Remedies Code); *see also Richardson v. Foster & Sear, L.L.P.,* 257 S.W.3d 782, 785 (Tex.App.-Fort Worth 2008, no pet.) (stating that the filing of a lawsuit does not constitute the sixty-day pre-suit notice of a Deceptive Trade Practices Act claim as **\*360** required by section 17.505(a) of the business and commerce code).

Absent proper notice under Section 11 of the leases, the Vinsons are not entitled to forfeiture of the leases, even if the May 12 letter constituted a proper "written demand" for payment. Finding no evidence that the Vinsons provided XTO legally sufficient written notice or demand for payment of undisputed sums as required by the terms of the leases, we hold that the trial court correctly granted XTO's no-evidence motion for summary judgment. For the same reasons, we hold that the Vinsons failed to establish entitlement to a traditional summary judgment declaring the leases forfeited for XTO's failure to pay undisputed amounts within sixty days of a written demand. We overrule the Vinsons' first issue. [16]

## V. CONCLUSION

Having overruled the Vinsons' first and second issues and having found it unnecessary to address the Vinsons' third issue, we affirm the trial court's judgment.

LIVINGSTON, C.J. filed a concurring opinion.

TERRIE LIVINGSTON, Chief Justice, concurring.

I respectfully concur with the majority opinion and write separately only to make some distinctions regarding the rule 408 admissibility question raised by the Vinsons' May 12, 2006 "demand" letter and the sufficiency of their "election of forfeiture." *See* Tex.R. Evid. 408.

Texas Rule of Evidence 408 mandates exclusion of evidence of settlement offers unless offered for some reason other than to establish liability. *Id.* Additionally, the burden is on the *objecting* party to show that the evidence was not offered for some other reason or purpose allowed by rule 408. *See In re Univar USA, Inc.,* 311 S.W.3d 175, 182 (Tex.App.-Beaumont 2010, orig. proceeding). And courts have recognized the admission of some portions of settlement agreements if relevant for proof of some other element than liability. *Id.*

Because the letter was written in response to XTO's request to provide such a "settlement demand," the Vinson demand letter must be read in context with that preceding request. Basically, XTO asks, "What will it take to settle all the various other/remaining claims [other than the accounting/ royalty issues] asserted in the Vinsons' latest pleading?" In other words, XTO's letter implies that it believes they have basically resolved the accounting/royalty issues. And apparently, the May 12, 2006 Vinson letter acknowledges this: "[T]his issue should be resolved." However, that belief is clearly contingent upon XTO's performance in accordance with the representations it had made to the Vinsons regarding the accounting/royalty issues. Furthermore, the Vinsons follow this statement with a clear demand for "all undisputed payments due under the Wise County leases." As the Vinsons point out, XTO admits that it has calculated and is ready to pay undisputed amounts, amounts that necessarily can only be fully determined by XTO. Thus, I believe that this **\*361** portion of the May 12, 2006 letter is a demand for payment of undisputed amounts, not evidence of a settlement offer, and that the trial court abused its discretion in excluding this portion of the Vinsons' response under rule 408. This portion of the letter was admissible because it was offered for "another purpose than validity of the claim." Tex.R. Evid. 408.

As to the forfeiture issue, we are to construe oil and gas leases disfavoring forfeiture. *See Coastal Oil & Gas Corp. v. Roberts,* 28 S.W.3d 759, 763 (Tex.App.-Corpus Christi 2000, pet. dism'd by agr.). If a lease states how to give notice of demand or forfeiture, such notice must comport with the lease. *Id.* at 764.

Here, the remaining question is whether this portion of the letter is a sufficient demand and whether it made clear that failure to perform within a certain time would result in the Vinsons exercising their forfeiture rights. I would agree with the majority as to the insufficiency of the forfeiture. The accounting/royalty demand portion gave no notice of a time limit within which to perform, which the lease states can be no less than sixty days with prior written notice. Furthermore, and more importantly, the last paragraph of the letter, which would have also had to have been admitted, includes the value of the entire "case" and is an offer to settle "all claims." Again, there is no notice or mention of the possibility of forfeiture. And as XTO points out, the last paragraph refutes

the claim of forfeiture because the Vinsons offered to settle *all* aspects of the case for a sum certain. Thus, I believe, and would conclude, that the letter, although admissible in part, provided insufficient notice of what performance was required and when and insufficient notice that the failure to timely perform would result in the exercise of the election to forfeit the leases.

Because my analysis would result in the same affirmance of the trial court's granting of XTO's motion for summary judgment, I join in the judgment of the court and concur only to set forth these distinctions.

## Footnotes

1    In his affidavit, Threshold's CFO stated, "Although I was unable to calculate a precise figure at that time because I had not received all documentation I had requested, I was able to arrive at the estimate within a matter of hours, and I noted it in the audit exceptions."

2    In the letter, XTO observed that "relations between Antero and [the Vinsons] had deteriorated to a point that discussions for a reasonable resolution of some or all of the issues of the lawsuit became impossible."

3    Following XTO's acquisition of Antero, XTO received 348 boxes of Antero records. To establish the $643,548.19 estimate, XTO "pieced together" information contained in 59 boxes from Antero labeled "accounting records." However, at the time of this estimate, XTO was finding numerous accounting records in the other 289 boxes. The document XTO provided to the Vinsons that contained its estimate was titled "Preliminary Accounting Review" and included the following notation: "These are preliminary findings only. All calculations are subject to further examination and revision by XTO Energy, Inc. Accounting personnel."

4    The last paragraph of the order, in part, states:
> [The Vinsons] and [XTO] further agree that at certain times in this Lawsuit, it may be necessary for representatives of both [the Vinsons] and [XTO] to meet in person or via telephone, without counsel for either [the Vinsons] or [XTO] present, to discuss certain accounting issues raised in this Lawsuit. Such informal meetings ... shall be governed by Texas Rule of Evidence 408.

5    Joni Van Meter, XTO's accounting representative, explained in her September 2007 deposition that she was able to calculate applicable charges for gathering and transporting already in XTO's own computer system, to give them separate deduct codes, and to flag royalties for each individual owner as being exempt from those deductions.

6    The Vinsons dispute that the "methodology" issue had anything to do with the amounts they claim for underpaid royalties but had to do with Antero's improper use of weighted averages and composite rates in calculating the royalties. According to the Vinsons, royalties were not being calculated on the higher of the proceeds from sale of the gas or the market value but simply on the amount realized, contrary to the leases, and XTO's proposal was to use an index price to simplify calculations. The Vinsons provide no record references to support this proposition but contend that the changed methodology would have no effect on the "undisputed amounts" at issue.

7    The Vinsons' amended pleading attached a copy of the May 12 letter with all parts redacted except the single paragraph relied upon by the Vinsons as their demand for payment. Only when this amended pleading was filed did XTO's counsel learn of the Vinsons' interpretation of the May 12 letter as a "demand" that allegedly entitled them to termination of the leases.

8    The Vinsons omitted the last sentence of Section 3(e) of the leases in their amended petition and in their opening brief in this Court. Because we resolve this appeal on other grounds, we do not reach XTO's cross-point that the summary judgment may be upheld on the ground, raised in its motion for summary judgment and not addressed by the Vinsons on appeal, that the Vinsons produced no evidence that the payments were not contested by XTO in good faith.

9    The Vinsons sought partial summary judgment because other claims were pending at the time the motion was filed.

10    The abuse of discretion standard of review is limited to the trial court's determination to exclude the May 12 letter from evidence. We review the trial court's summary judgment ruling de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009).

11    As late as October 2007, the Vinsons represented to the trial court in a "Memorandum of Settlement," filed in response to an order of the trial court prior to a scheduling conference, that the "bulk of the parties' settlement discussions to date have focused on [the Vinsons'] royalty claims."

12    There are three primary qualifications generally imposed on the various ownership interests created by an oil and gas lease: (1) general and special limitations, (2) conditions subsequent, and (3) covenants. A.W. Walker, Jr., *The Nature of the Property Interests*

*Created by an Oil and Gas Lease in Texas,* 8 Tex. L. Rev. 483, 483–84 (1930); *see Blackmon v. XTO Energy, Inc.,* 276 S.W.3d 600, 605 (Tex.App.-Waco 2008, no pet.).

13    *See id.* at 763 (citing *Cambridge Oil Co. v. Huggins,* 765 S.W.2d 540, 542–43 (Tex.App.-Corpus Christi 1989, writ denied); *see also Reilly v. Rangers Mgmt. Inc.,* 727 S.W.2d 527, 530 (Tex.1987); *TSB Exco, Inc. v. E.N. Smith, III Energy Corp.,* 818 S.W.2d 417, 422 (Tex.App.-Texarkana 1991, no writ)).

14    *Coastal,* 28 S.W.3d at 763; *see Deace,* 142 S.W.2d at 566 (holding that suit brought twenty-five days after notice to lessee could not be maintained where lease required thirty days notice because authorities hold "prerequisite of notice to forfeit contained in a lease must be literally complied with").

15    During oral argument, the parties vehemently disputed the meaning of the term "undisputed" contained in Section 3(e) of the leases. XTO contended that both parties must have agreed on an amount for it to be "undisputed," whereas the Vinsons argued that only XTO could know whether it disputed the amount owed. To the extent that both interpretations may be reasonable, we must adopt the construction that avoids forfeiture. *Coastal,* 28 S.W.3d at 763; *Wisdom,* 154 S.W.2d at 334. We conclude that the term "undisputed" as used in Section 3(e) of the leases requires a specific amount to be undisputed by both parties, which was never the case here.

16    Because the summary judgment in favor of XTO may be upheld based upon no evidence of a sufficient demand, we need not consider the Vinsons' third issue as to whether the trial court erred by excusing XTO's compliance and by applying the doctrine of disproportionate forfeiture, nor need we consider XTO's alternative grounds raised in the trial court to sustain its summary judgment based on no evidence that it "wrongfully or unreasonably" withheld undisputed payments or did not act in "good faith" in contesting such payments under Section 3(e). *See* Tex.R.App. P. 47.1.

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 4. Actions and Remedies
      Chapter 22. Trespass to Try Title (Refs & Annos)
        Subchapter B. Judgment and Damages (Refs & Annos)

V.T.C.A., Property Code § 22.021

§ 22.021. Claim for Improvements

Currentness

(a) A defendant in a trespass to try title action who is not the rightful owner of the property, but who has possessed the property in good faith and made permanent and valuable improvements to it, is either:

(1) entitled to recover the amount by which the estimated value of the defendant's improvements exceeds the estimated value of the defendant's use and occupation of and waste or other injury to the property; or

(2) liable for the amount by which the value of the use and occupation of and waste and other injury to the property exceeds the value of the improvements and for costs.

(b) In estimating values of improvements or of use and occupation:

(1) improvements are valued at the time of trial, but only to the extent that the improvements increased the value of the property; and

(2) use and occupation is valued for the time before the date the action was filed that the defendant was in possession of the property, but excluding the value resulting from the improvements made by the defendant or those under whom the defendant claims.

(c) The defendant who makes a claim for improvements must plead:

(1) that the defendant and those under whom the defendant claims have had good faith adverse possession of the property in controversy for at least one year before the date the action began;

(2) that they or the defendant made permanent and valuable improvements to the property while in possession;

(3) the grounds for the claim;

(4) the identity of the improvements; and

(5) the value of each improvement.

(d) The defendant is not liable for damages under this section for injuries or for the value of the use and occupation more than two years before the date the action was filed, and the defendant is not liable for damages or for the value of the use and occupation in excess of the value of the improvements.

**Credits**
Acts 1983, 68th Leg., p. 3509, ch. 576, § 1, eff. Jan. 1, 1984.

Notes of Decisions (239)

V. T. C. A., Property Code § 22.021, TX PROPERTY § 22.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.